**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ANAHEIM GARDENS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 93-655C |
| v. | ) | (Judge Robert H. Hodges, Jr.) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| ALGONQUIN HEIGHTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 97-582C |
| v. | ) | (Judge Robert H. Hodges, Jr.) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM CONCERNING RIPENESS**

The United States respectfully submits this memorandum concerning the issue of ripeness to facilitate discussions and clarify the United States' position in advance of the July 20, 2007, status conference in Anaheim Gardens v. United States, No. 93-655 (Fed. Cl.), and Algonquin Heights v. United States, No. 97-582 (Fed. Cl.). This memorandum is divided into two sections The first section gives a general overview of the two statutes (collectively, the "Preservation Statutes") that are at issue in these actions. The second section describes the steps necessary for the owner of a section 221(d)(3) or 236 project to establish a ripe as-applied taking claim. A chart providing a summary of the administrative process and potential outcomes is attached as Exhibit A.

## I. General Background

In the late 1980s, Congress became concerned that many owners of section 221(d)(3) and 236 properties would prepay their mortgages, triggering a substantial drop in the nation's supply of low-income housing. See, e.g., H.R. Conf. Rep. No. 100-426, at 192 (1987) (estimating that almost 950,000 low-income housing units could be lost through mortgage prepayments). Consequently, in 1988 and 1990, Congress enacted and funded the Preservation Statutes to preserve low-income housing while safeguarding the interests of property owners.

### A. ELIHPA

In 1988, as a temporary measure, Congress enacted the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877-86 (1988) ("ELIHPA" or "Title II"). The statute instituted a complex permitting process under which owners interested in prepaying their mortgage were required to apply to HUD for approval. ELIHPA §§ 221-23. This enabled HUD, using the agency's knowledge and expertise, to assess whether a project warranted preservation as low-income housing. ELIHPA § 225(a).

As an alternative to prepayment, Congress authorized HUD to alter the project's regulatory structure "to provide a fair return [to] the owner." Id. §§ 224-25. Under ELIHPA, owners could obtain a Government-insured equity take out loan funded by increased rents, increased annual cash distributions, Section 8 housing assistance contracts, and financing for capital improvements. Id. §§ 224(b), 231. These benefits would be incorporated into a use agreement that amended the project's original regulatory agreement and provided a new regulatory regimen for operating the project. Id. § 225(b). Congress also authorized HUD to provide assistance to facilitate a project's sale to a qualified nonprofit organization, tenant

cooperative or public agency. Id. § 224(b). Under ELIHPA, owners "seeking to initiate prepayment or other changes in [their] regulatory agreement" were required to submit a "notice of intent," obtain an appraisal, and provide HUD a "plan of action" requesting either prepayment, sale, or incentives. Id. §§ 221-23.

Finally, to prevent prejudice to owners that chose to proceed under ELIHPA, Congress provided that owners could to switch to benefits authorized by any successor statute. ELIHPA § 230 (allowing owners to opt for a different course even after incentives under ELIHPA had been accepted).

**B. LIHPRHA**

In 1990, Congress replaced ELIHPA with the Low-Income Housing Preservation and Resident Homeownership Act, Pub. L. No. 101-625, 104 Stat. 4249 (1990) (codified at 12 U.S.C. § 4101 et seq.) ("LIHPRHA" or "Title VI"). Like its predecessor, LIHPRHA asserted HUD's regulatory jurisdiction over prepayment, required owners to seek approval to prepay their HUD-insured mortgage, and provided opportunities to exit the program or alter the project's regulatory regimen in the event of a denial. 12 U.S.C. §§ 4101(a), 4108-10, 4114. An owner interested in pursuing the options provided by LIHPRHA was first required to file a notice of intent. See, e.g., Initial Notice of Intent for Anaheim Gardens (July 20, 1992) (requesting incentives) (attached as Exhibit B); Initial Notice of Intent for Cedar Gardens (Oct. 20, 1992) (requesting to sell) (attached as Exhibit C). The owner would then conduct an appraisal of the project, the project's market value would be determined, and the owner would submit a plan of action to HUD. 12 U.S.C. § 4102(a); see also Letter from HUD to Anaheim Gardens (Aug. 27, 1993) (attached as Exhibit D). Owners who were proceeding under ELIHPA were allowed to

continue under that statute or switch to LIHPRHA. 12 U.S.C. § 4101 note; see also ELIHPA § 230.

Under LIHPRHA, prepayment could occur under two distinct avenues. 12 U.S.C. § 4101(a). First, HUD could approve an owner's request to prepay if prepayment would not cause a material hardship for current tenants or materially affect the availability of low-income housing in the area. 12 U.S.C. § 4108. As with ELIHPA, this provided HUD discretion to determine whether the project's preservation as low income housing was warranted. Id. (directing HUD to assess whether prepayment would "materially increase economic hardship for current tenants" or "materially affect . . . the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families"). Second, HUD allowed prepayment if, within a fixed period, use agreement incentives were not available, or a sale was not consummated. 12 U.S.C. § 4114; see also Letter from HUD to Anaheim Gardens at 1 (June 29, 1995) (explaining that funding for incentives was unavailable and prepayment could occur on July 31, 1995) (attached as Exhibit E); Letter from HUD to Cedar Gardens at 1 (explaining that funding to facilitate sale was unavailable and prepayment could occur on November 12, 1995) (attached as Exhibit F).

LIHPRHA also allowed owners to sell their property to a "qualified purchaser" at the "fair market value of the housing based on the highest and best use of the property," i.e., the project's market value without HUD restrictions. 12 U.S.C. §§ 4103(b), 4110(b). To facilitate sales, which enabled the owner to realize equity and exit the program, HUD funded virtually all transaction costs, provided mortgage insurance, and paid consultants to assist the parties. 12 U.S.C. § 4110(d). HUD provided loans and grants that enabled non-profit organizations to

acquire the projects. Id. Further, as noted above, if an owner seeking to sell did not receive a bona fide offer within a specified time frame, did not receive financial assistance from HUD to facilitate the sale, or was unable to consummate the transaction for another reason, the owner would be allowed to prepay and exit the program. 12 U.S.C. § 4114(1)(B); Ex. F.

As under ELIHPA, LIHPRHA also permitted the owner to request changes to the regulatory structure in exchange for remaining in the program. 12 U.S.C. § 4109. HUD could authorize rent increases, an increased rate of return based upon the property's market value as conventional rental housing, access to project equity through a Government-insured loan, and financing for capital improvements. Id. The agreed changes would be formalized in a use agreement that amended the project's original regulatory agreement. Id. Further, if incentives were not provided within a fixed period, the owner was allowed to prepay the original mortgage and leave the program. 12 U.S.C. § 4114; Ex. E.

Finally, LIHPRHA sought to ensure that owners were not disadvantaged by delays in processing applications and providing funds. Thus, LIHPRHA permitted owners to submit a notice of intent two years before their original prepayment date to minimize any administrative delays after prepayment eligibility. 12 U.S.C. §§ 4102, 4119(1)(B). Additionally, Congress ordered HUD to review applications within 180 days and, if the review extended beyond that, to provide retroactive incentives and assistance to owners. 12 U.S.C. § 4115(c). Federal district courts were empowered to enforce these provisions. Id.

### C. **Additional Legislation**

The Preservation Statutes were subject to frequent criticism due to their generous provisions and excessive cost to the Government. In the mid-1990s, Congress commenced hearings to consider alternatives. HUD's Inspector General recommended, among other measures, that Congress "[d]iscontinue paying owners windfall profits for projects that threaten to prepay their mortgages and remove the low income character of the units." Hearing before the Subcommittee on VA, HUD, and Independent Agencies of the House Committee on Appropriations, 104th Cong., 1st Sess. (January 24, 1995). These concerns resulted in passage of the Housing Opportunity Program Extension Act of 1996 ("HOPE Act"), Pub. L. No. 104-120, 110 Stat. 834 (March 28, 1996). Although the HOPE Act did not expressly repeal LIHPRHA, it "restored the prepayment rights to owners" of moderate- and low-income housing. Chancellor Manor v. United States, 331 F.3d 891, 896 (Fed. Cir. 2003).

## II. **Plaintiffs' As-Applied, Regulatory Taking Claims Are Not Ripe Unless HUD Reached A "Final Decision" With Respect To The Plaintiffs' Properties**

The aim of Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124 (1978), is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 539 (2005). To establish a taking under Penn Central, a property owner must establish that the regulation at issue "has in substance 'taken' their property by going 'too far.'" Greenbrier v. United States, 193 F.3d 1348, 1357 (Fed. Cir. 1999).

### A. As-Applied Taking Claims Do Not Ripen Until The Responsible Government Entity Makes A Final Decision Applying The Regulation At Issue To The Property

An "as-applied," regulatory taking claim under Penn Central does not ripen "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001); Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985). This is because "a court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 350 (1986). Plaintiffs bear the burden of establishing that their as-applied, regulatory taking claims are ripe. E.g., Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006).

Ripeness is a well-established prerequisite to judicial relief. E.g., Williamson, 473 U.S. at 186 (dismissing plaintiff's unripe regulatory takings claim); Greenbrier, 193 F.3d at 1356-60 (same). For as-applied, regulatory taking claims, the "final decision" requirement ensures that a live controversy exists, provides certainty about how the property is affected by the challenged governmental regulation, fixes the start of the alleged taking, and establishes when the statute of limitations begins to run. See MacDonald, 477 U.S. at 350; Boise Cascade v. United States, 296 F.3d 1339, 1347-48 (Fed. Cir. 2002); Bayou des Familles Dev. Corp. v. United States, 130 F.3d 1034, 1038 (Fed. Cir. 1997). Significantly, where a challenged regulatory restriction can be modified or eliminated by more than one avenue, an "as applied" taking claim does not ripen until every available avenue has been exhausted. Stearns Co. v. United States, 396 F.3d 1354, 1358 (Fed. Cir. 2005); see also Williamson, 473 U.S. at 186 (requiring the property owner to

apply for a variance in order to ripen its claim); Whitney Benefits v. United States, 752 F.2d 1554, 1559 (Fed. Cir. 1985) (aggrieved property owners "must show that they have done everything they reasonably could to take advantage of any hardship exceptions or other escape hatches that the regulations under attack allow").

The Preservation Statutes established a complex administrative process by which a project owner could (1) prepay and exit the HUD program, (2) sell at fair market value and exit the HUD program, or (3) alter the project's existing regulatory regimen. See Ex. A (showing the regulatory process under LIHPRHA); Chancellor Manor v. United States, 331 F.3d 891, 905 (Fed. Cir. 2003); 12 U.S.C. §§ 4108-10, 4114. The process had two basic components. First, HUD evaluated whether the project's preservation as low-income housing was necessary. See ELIHPA § 225(a); 12 U.S.C. § 4108. If HUD concluded that prepayment would not have a material effect upon current tenants and the supply of low income housing, the agency allowed owners to prepay and exit the program. Id. Second, if a project's use as low-income housing was to be preserved, the owner chose between (1) selling at the project's fair market value without HUD-restrictions, and (2) remaining in the program in exchange for relaxed regulations and valuable monetary incentives provided in a new regulatory agreement (a "use agreement"). ELIHPA §§ 225(b), 230; 12 U.S.C. §§ 4109-10, 4114; see also Ex. A. If the owner's chosen option did not come to fruition within a fixed period, the owner was allowed to prepay. 12 U.S.C. § 4114; Greenbrier, 193 F.3d at 1358 (noting that an owner could prepay under either section 4108 or section 4114); Chancellor Manor, 331 F.3d at 905 (directing the trial court to consider plaintiffs' use agreements in evaluating their as applied regulatory taking claims); see also Exs. A, E & F.

It is undisputed that no plaintiff in these actions applied to prepay. The plaintiffs maintain that it would have been futile to seek HUD's permission to prepay under the Preservation Statutes. We respectfully disagree. Indeed, the doctrine of futility serves only to "protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved." Howard W. Heck & Associates v. United States, 134 F.3d 1468, 1472 (Fed. Cir. 1998) (emphasis in original). Because the plaintiffs never submitted a single request to prepay to HUD, the doctrine of futility is unavailable.

The plaintiffs apparently also maintain that pursuing the sale option, the use agreement option, and the possibility of prepayment under section 4114, are irrelevant to the question of ripeness. The plaintiffs are mistaken. It is well-established that aggrieved property owners "must show that they have done everything they reasonably could to take advantage of any hardship exceptions or other escape hatches that the regulations under attack allow." Whitney Benefits v. United States, 752 F.2d 1554, 1559 (Fed. Cir. 1985) (emphasis added); see also Stearns, 396 F.3d at 1358. The use agreement and sale options are such "escape hatches." Through these avenues, the owner could exit the HUD program by prepayment, exit the program with a cash payment of the project's fair market value, or alter the regulatory restrictions on their project. 12 U.S.C. §§ 4109, 4110, 4114.

Plaintiffs who failed to obtain a "final decision" from HUD concerning the sale or incentive options do not have a ripe claim. Only a "final decision" from HUD can establish (1) that prepayment would not occur under either of the available avenues, see 12 U.S.C. §§ 4108, 4114, and (2) even assuming prepayment was not available, "the extent of the

governmental restriction" on the property's use. See Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 746 (1997) (Scalia, J., concurring) ("The focus of the 'final decision' inquiry is on ascertaining the extent of the governmental restriction on land use."). Consequently, even if submitting a plan of action to prepay under section 4108 would have been futile, an owner that failed to obtain a "final decision" from HUD with respect to either the use agreement option or the sale option would not have a ripe as-applied taking claim.[1] See Stearns, 396 F.3d at 1358.

In sum, an as-applied taking claim concerning the Preservation Statutes does not ripen until (1) HUD denies prepayment (or the owner's failure to seek prepayment is excused by the doctrine of futility), and (2) the administrative sale or use agreement process reaches a final conclusion (i.e., HUD approves and funds the project's sale to a purchaser, HUD offers the owner a funded use agreement, or prepayment is allowed under 12 U.S.C. § 4114). See Stearns, 396 F.3d at 1358.

### B. The United States Seeks Discovery To Ascertain Whether The As-Applied, Regulatory Taking Claims Asserted By Plaintiffs Are Ripe

The United States seeks discovery in this action to determine which plaintiffs, if any, have ripe as-applied taking claims. The United States has served discovery seeking to ascertain

[1] The Federal Circuit has recognized that, in rare circumstances, an "extraordinary administrative delay" can effect a regulatory taking. See, e.g., Seiber v. United States, 364 F.3d 1356 (Fed. Cir. 2004). This Court previously rejected plaintiffs' claims of administrative delay, Anaheim Gardens v. United States, 33 Fed. Cl. 24, 36-38 (1995), plaintiffs did not appeal the Court's decision in this regard, plaintiffs do not assert administrative delay in the their respective complaints, see Fourth Amended Complaint in Anaheim at 32-34 (showing plaintiffs' "extraordinary delay" claim as dismissed by court order); First Amended Complaint in Algonquin (containing no administrative delay count), and plaintiffs' counsel recently sent a letter confirming that no claims regarding administrative delay are asserted in these actions, see Letter from Harry Kelly to David Harrington (June 22, 2007) (attached as Exhibit G). Thus, plaintiffs assert no claim that the period of administrative processing needed to obtain a final decision from HUD constituted a compensable taking.

the basis for the owners' contention that their failure to apply to HUD to prepay is excused by the doctrine of futility. See Def.'s Motion to Compel at 6-8 (filed Feb. 26, 2007) (discussing interrogatory 7). The plaintiffs have refused to provide the bases for their contentions in response to the United States' discovery requests.

The United States has also served discovery seeking to ascertain whether the sale or use agreement process reached a final conclusion before passage of the HOPE Act in March 1996. In this regard, the United States has inquired when the plaintiffs contend that HUD rendered a "final decision" applying the Preservation Statutes to their respective properties. See Def.'s Motion to Compel at 4-6 (filed Feb. 26, 2007) (discussing interrogatories 5 and 6). Again, the plaintiffs have not provided this information.

Because of the plaintiffs' resistance to the United States' written discovery requests, the United States has sought to take depositions with respect to approximately 50 of the 71 projects at issue. Despite the fact that these actions concern 71 different HUD projects, the plaintiffs have refused to consent to taking more than 10 depositions in the respective actions.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin

BRIAN M. SIMKIN
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0277
Fax: (202) 307-0972

July 17, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 17th day of July 2007, a copy of "DEFENDANT'S MEMORANDUM CONCERNING RIPENESS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington