- - - - - - - - - - - - - - - x

30(b)6 DEPOSITION OF ALGONQUIN HEIGHTS

BY AND THROUGH ITS DESIGNEE

DEAN DONNELSON

Washington, D.C.

Wednesday, August 1, 2007

9:45 a.m.

Job No.: 4024

Pages 1 -

Reported by: TRISTAN-JOSEPH, RPR



Deposition of ALGONQUIN HEIGHTS, by and through its designee, DEAN DONNELSON, held at the offices of:

DOJ Civil Division - Civil Division

1100 L Street, N.W.

Eleventh Floor, Room 11010

Washington, D.C. 20005

(202)616-0465

MS. ZIARNO: Objection.

THE WITNESS: I think they were the same. Although, we did -- we evaluated Title VI. We spent most of our projects, we remained in Title II, so I'm not as familiar with Title VI as I am with Title II but I think they were similar.

BY MR. HARRINGTON:

10:08:49 Q. When you say they were similar was there an option to see under Title VI?

A. I believe there was, yes.



10:08:55 Q. Was there an opportunity to obtain incentives from HUD under Title VI?

A. There was, yes.

Q. Was there an option to request permission to prepay under Title VI?

A. That's a -- I don't know about that, that we -- I don't recall any discussions internally where we evaluated that as being as an option.

10:09:17 Q. So to the best of your knowledge there were no evaluations or considerations of the possibility of applying to HUD to prepay the mortgage on Cambridge Square North?

A. Not, not during my time there.

10:09:31 Q. And you're not aware of anything that took place before your time at Cambridge Square

North?

A. I'm not aware of any discussions. And I said, when I was there, we discussed the option of

10:09:40 switching from Title II to Title VI, that was our main focus.

Q. Was there an appraisal process under



10:09:51 Title VI?

A. Yes, there was.

Q. And can you describe the Title VI appraisal process.

10:09:57 A. It was very similar. I mean, there were subtle differences, slight terminology differences but, quite frankly, the process was basically the same, trying to figure out what your costs of conversion were, coming up with rents that were

10:10:12 unrestricted based on market comparables and trying to find the highest and best use.

Q. Was the purpose of the appraisal process under Title VI to establish a fair market value at the property's highest and best use?

10:10:31 A. That's correct.

Q. Let's turn to the HOPE Act.

Are you familiar with the HOPE Act?

A. A little bit, yes.

Q. When was the HOPE Act passed?

Cambridge North's records after the Algonquin Heights action was filed?

A. Nothing additional at that point that we had partnership files that we maintained and just continued to do so in the same way.

10:16:19

Q. Would communications with Cambridge Square North's Limited Partners have been included in those files?

A. Well, through about '98, all of that communication was done by Boston Financial as their role as investing servicing agent. So they would have had the files as far as that is concerned.

10:16:46

Q. Were any files obtained from Boston Financial to be produced?

10:17:01

A. There were not.

Q. Do you know if Boston Financial has maintained any files --



10:17:05

A. No --

Q. -- in connection with Cambridge Square North?

A. -- I do not.

10:17:08

Boston Financial is no longer in existence. So I have no idea what they have done with those files.

Q. Did the Partnership Agreement for Cambridge Square North require approval from

10:17:33 limited partners for certain actions?
A. It did.
Q. What sort of actions required consultation and approval by limited partners?
A. Any sale or refinancing requires
10:17:47 notification and approval by 51 percent in interest.
Q. Would that include prepaying the mortgage on Cambridge Square North?
A. Probably not prepaying the mortgage but
10:18:00 applying for any type of refinancing would.
Q. So then, if the partner was going to prepay and then refinance its mortgage on Cambridge



10:18:18 Square North, that would have required consultation with the limited partners?
A. That's correct.
Q. Do you know if Cambridge Square North
10:18:43 could have prepaid its mortgage under Title II?
A. I do not.
MS. ZIARNO: Objection.
BY MR. HARRINGTON:
Q. Do you know if Cambridge Square North
10:18:51 could have prepaid its mortgage under Title VI?
A. I do not.
MS. ZIARNO: Objection.

BY MR. HARRINGTON:

10:19:06 Q. And I believe we talked about an analysis that was done with respect to prepaying the mortgage under Title II, and said you weren't aware of anything under Title II.

Were you aware of it of any analysis of prepaying the mortgage under either of the

10:19:20 Preservation Statutes?

A. I was not.

MS. ZIARNO: Objection.



10:19:25 BY MR. HARRINGTON:

Q. So to the best of your knowledge there was no analysis done of prepaying the Cambridge Square North's mortgage under either of the

10:19:46 Preservation Statutes?

A. That's correct.

(Deposition Exhibit No. 2 was marked for Identification.)

BY MR. HARRINGTON:

10:20:37 Q. I've marked, as Exhibit 2, a document entitled Intent To Prepay Mortgage. It's dated November 28, 1990, numbered GOV-AH_40075 through 76.

Are you familiar with this document?

10:20:57 A. I am.

Q. What is this document?

10:46:26 approved Plans of Action; and, again, I don't -- it's hard to recall, 12 or 13 years ago, when they were -- would have occurred. But I believe it



10:46:35 probably would have been in the '93 to '94 or '5 range, I think that it would have had to have been.

Q. About how many face-to-face meetings did you have?

10:46:47 A. I would guess three or four.

Q. And who at HUD did you meet with?

A. Well, Franca Hetue would have always been there. And I'm trying to remember. I think a fellow named Sisson may have been the internal

10:47:03 appraiser at that point.

Q. The first HUD official you mentioned, could you spell his name?

A. Franca.

Q. Yes.

10:47:09 A. That's a female. It's F-R-A-N --

Q. A female, sorry.

A. -- C-A H-E-T-U-E.

Q. Thank you.

A. You're welcome.

10:47:27 Q. How many phone calls would Cambridge Square North have had with HUD about the preservation process?

10:47:36 A. I really have no guesses to that.
Q. Do you know how many phone calls you were personally involved with?
A. I do not.
10:47:43 Q. Would those calls have dealt with the status of where the processing was?
A. I'm sure a lot of the calls would have, and a lot of those calls probably would have been made by Beverly Jackson, at my direction.
10:47:56 Q. Now talking about the meetings that we we've already discussed.
Did any of the meetings discuss or concern the possibility of prepaying the HUD insured mortgage?
10:48:06 A. None did.
Q. Did any of the phone calls with HUD concern --
A. None of my calls did.
Q. Are you aware of any phone calls that
10:48:12 involved discussions about prepaying the HUD insurance mortgage?
A. I am not.

know, where the legislation was going to end up and -- but the likelihood of any additional funding would be.

11:19:09 Q. What specific publications do you recall reviewing in the ordinary course?

MS. ZIARNO: Objection.

87

□

11:19:17 THE WITNESS: I know the Housing Development Reporter would be the one thing that I routinely read.

BY MR. HARRINGTON:

11:19:32 Q. Were there other publications that you would have read?

MS. ZIARNO: Objection.

THE WITNESS: Again, I read Affordable Housing now, but I'm not sure when that came into

11:19:42 existence. It deals with all affordable housing issues.

BY MR. HARRINGTON:

Q. Were there any other publications and newsletterss that you would have read?

11:19:57 A. Not that I'm aware of.

Q. Did Cambridge Square North conclude that it would be futile to apply to prepay its HUD-insured mortgage?

A. I have no recollection of any discussion

11:21:04 on that topic.

Q. Did Cambridge Square North consider pursuing incentives available under Title VI?



11:21:24 MS. ZIARNO: Objection.

THE WITNESS: I know it was talked about.

BY MR. HARRINGTON:

11:21:29 Q. What discussions were there about the possibility of pursuing incentives under Title VI?

A. Well, we were already pursuing incentives under Title II, and the discussion was, which program would be more beneficial. They each

11:21:42 had strengths and weaknesses. I don't recall all of what they were now. But I know a number of the people in the industry switched to Title VI. We chose to stay with Title II, I think, mainly because of the shorter term of restrictions that

11:21:56 you had to sign up for as part of that program.

Q. Were there any other reasons that you chose to pursue incentives under Title VI -- oh, excuse me, under Title II?

A. No. I think was the basic reason we

11:22:08 felt we had an obligation to the partners to pursue anything that economically benefitted their interests and that's, you know, fiduciary