IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

**Algonquin Heights Associates, L.P.**
55 Summer Street
Boston, Massachusetts 02110

**Brandy Hill Company**
c/o State Street Development
Management Corp.
488 Commonwealth Avenue
Boston, Massachusetts 02215

**Briar Crest, A Michigan General Partnership**
207 Hawthorne Avenue
St. Joseph, Missouri 49085

**Briar Crest Apartments II, A Michigan Limited Partnership**
207 Hawthorne Avenue
St. Joseph, Missouri 49085

**Briar Hills, A Michigan Limited Partnership**
207 Hawthorne Avenue
St Joseph, Missouri 49085

**Brookside Manor Associates Limited Partnership**
c/o Mid-City Financial Corp.,
General Partner
4340 East-West Highway, Suite 300
Bethesda, Maryland 20814

**Buckman Gardens Limited Partnership, and it individual general and limited partners, Clarence W. Gosnell, Jr., John G. Gosnell, Murray Haber, Richard S. Bright, Philip Berman, Alfred S. Bright, Samuel Eisenstat, Melvin S. Heller, Milton S. Lider, Martin Myers, Malcomb Meister, Harold D. Price, Herbert W. Savit, Walter Weitzner, Estate of Jack N. Blinkoff and Harold D. Frazee, Jr.,**

**CASE NO.: 97-582C**
**(Judge Hodges)**

**SECOND AMENDED COMPLAINT**

**Trustee, U/A DTD 4/2/89 for E.D. Frazee**
c/o John G. Gosnell
8130 Boone Blvd.
Vienna, Virginia 22180

**Cambridge Square North Associates,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Cambridge Square of Fort Wayne**
**Associates I,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Cambridge Square of Grand Rapids**
**Associates I,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Cambridge Square of Grand Rapids**
**Associates II,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House North Associates,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House of Elkhart Associates,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House of Mishawaka**
**Associates I,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House of Mishawaka**
**Associates II,**
**A Limited Partnership**

P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House of Muskegon Associates,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House South Associates,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House West I Associates,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House West II Associates,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House West III Associates,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Carriage House West IV Associates,**
**A Limited Partnership**
P.O. Box 40177
Indianapolis, Indiana 46240

**Chauncy House Company**
c/o State Street Development
Management Corp.
488 Commonwealth Avenue
Boston, Massachusetts 02215

**Cromwell Court Company**
c/o State Street Development
Management Corp.
488 Commonwealth Avenue
Boston, Massachusetts 02215

**Country Towne Apartments**

**Partnership**
c/o Littman & Pakenham
Box 6013
North Brunswick, New Jersey 08902

**Dolly Ann Apartments Limited Partnership, and its individual general and limited partners, Mid-City Financial Corporation, Eugene F. Ford, John & Irene Walsh, Hilda Zeldon, John J. McAvoy, Saul Ritzenberg, Joseph Marilley, Julius Sankin, Clark Enterprises, Inc., Estate of Jane Deblois Hannan, Isadore Rodis Credit Shelter Trust, Jane Papish Revocable Trust and Delia Lang**
c/o Mid-City Financial Corporation
4340 East-West Highway, Suite 300
Bethesda, Maryland 20814

**Emory Grove Limited Partnership**
c/o NHP
Fairfax Square
8065 Leesburg Pike, Suite 400
Vienna, Virginia 22182-2780
Attn: Roberta Ujakovich

**First Landmark Associates Limited Partnership**
c/o Mid-City Financial Corp.,
General Partner
4340 East-West Highway
Bethesda, Maryland 20814

**Forest Glen Limited Dividend Housing Association**
c/o Joel L. Altman - General Partner
Altman Development Corporation
2201 Corporate Boulevard, N.W., Suite 200
Boca Raton, Florida 33433

**Fort Heath Associates**
c/o Sanford Kaplan
77 Oak Street
Newton, Massachusetts 02164-1460

**Garrison Forest Associates**

c/o Mount Royal Management Company
1233 West Mount Royal Avenue
Baltimore, Maryland 21217

**Glenarden Limited Partnership, and its individual general and limited partners, Daniel M. Lyons, Lester M. Lewis, Charlotte K. Lewis, Samuel J. Gorlitz, Grace K. Gorlitz and Betty C. Lyons Living Trust**
c/o Daniel M. Lyons
13685 Rivioli Drive
Palm Beach Garden, Florida 33410

**Jodani Associates, L.P.**
c/o Alpert & Alpert Development Ltd.
One Parker Plaza
Fort Lee, N.J. 07024

**Kimberly Associates Limited Partnership**
c/o NHP
Fairfax Square
8065 Leesburg Pike, Suite 400
Vienna, Virginia 22182-2783
Attn: Robert Ujakovich

**King's Grant Company**
c/o State Street Development
Management Corp.
488 Commonwealth Avenue
Boston, Massachusetts 02215

**Leader House Associates and Leader Housing Co., Inc.**
c/o Starrett Corporation
909 Third Avenue
New York, New York 10022

**New Amsterdam Associates and New Amsterdam Houses, Inc.**
c/o Starrett Corporation
909 Third Avenue
New York, New York 10022

**Pine Crest Company**

c/o State Street Development
Management Corp.
488 Commonwealth Avenue
Boston, Massachusetts 02215

**Riverside Village Company**
c/o State Street Development
Management Corp.
488 Commonwealth Avenue
Boston, Massachusetts 02215

**Suburbia Associates Limited Partnership, and its individual and general partners, Stephen G. Dakes, Harvey E. Johnson, Jr., W. Dewey Rasnake, Martin E. Brown, Warren W. Taylor, Jr., Waren W. Taylor, Jr., Trustee, Ludlow King, and James L. Brehony**
c/o Steven G. Dakes
Brown, Dakes, Wannall
3025 Hamaker Court, Suite 401
Fairfax, Virginia 22031-2226

**Suehar Associates, L.P.**
c/o Alpert & Alpert Development Ltd.
One Parker Plaza
Fort Lee, N.J. 07024

**Tower West Associates, L.P. and Tower West, Inc.**
Grenadier Realty Corp., As Agent
1230 Pennsylvania Avenue
Brooklyn, New York 11239

**Town & Country Apartments and Townhouses, a Virginia partnership**
c/o Mount Royal Management Company
1233 West Mount Royal Avenue
Baltimore, Maryland 21217

**The United Company Limited Partnership, a Massachusetts Limited Partnership**
c/o Boyd/Smith Inc.
221 Massachusetts Avenue
Boston, Massachusetts 02115

Plaintiffs,

v.

**THE UNITED STATES OF AMERICA,**

**SECOND AMENDED COMPLAINT**

**(FOR COMPENSATORY DAMAGES,
JUST COMPENSATION AND OTHER RELIEF)**

## I. PRELIMINARY STATEMENT

1. Plaintiffs (hereinafter also referred to as "Owners") bring this action to recover damages against the United States of America (hereinafter referred to as "United States") for breach of contract and takings without just compensation in violation of the Fifth Amendment of the U.S. Constitution and failure to provide compensation pursuant to a money mandating statute. The Plaintiffs (referred to herein as the "Plaintiffs " or the "Owners") are owners of various multifamily apartment projects located throughout the United States.

2. These projects provide below-market rate affordable housing in exchange for receiving mortgage guarantees and interest subsidies from the United States. This arrangement provided Owners with certain limited returns, and required the Owners to rent their apartments to lower-income persons and to satisfy certain other restrictions. Under the terms of their agreements with the United States, the Owners were entitled to prepay their mortgages after 20 years and terminate the Government's restrictions on the Owners' use of their properties.

3. As the 20-year "prepayment window" neared, Congress perceived that large-scale prepayments would begin to occur in the late 1980s which could lead to significant reductions in the stock of affordable housing. Congress therefore enacted the Emergency Low Income Housing Preservation Act of 1987, Pub. L. 101-242, 101 Stat. 1815, 1877 (February 5, 1988) (hereinafter "ELIPHA"), which was intended to halt prepayments temporarily (See ¶¶ 41-42, infra). Congress later enacted the Low Income Housing Preservation and Resident Homeownership Act of 1990 (hereinafter "LIHPRHA") 12 U.S.C.A. §§ 4101 et seq. (West Supp. 1993). LIHPRHA was intended by Congress to prevent prepayment in virtually all cases and was consciously known by Congress to constitute a taking of the Owners' original prepayment rights. LIHPRHA therefore also incorporated other provisions which, in Congress' estimation, provided just compensation for the taking of the prepayment rights. (See ¶¶ 43-45, infra.) To obtain that compensation, however, Owners were required to apply to the Department of Housing and Urban Development (hereinafter as "HUD"), which was directed to process the requests for compensation, generally known as incentives, to be provided to the Owners pursuant to strict statutory definition. (See ¶¶ 45-46, infra).

4. In the early years of these programs, HUD, delayed the processing of the Owners' applications for their benefits under these statutes. Later, as Congress became aware of the costs of providing owners with just compensation for the loss of their prepayment rights, Congress decided to repeal the prepayment prohibitions initially adopted in ELIHPA and LIPRHA[1]. In Section 2 of the Housing Opportunity Program

[1] Several of the Owners received some incentives pursuant to ELIHPA or LIPRHA. However, these incentives at most constitute a mitigation of some of the Owners' damages incurred as a result of their inability to utilize their properties in the most economically beneficial manner.

Extension Act of 1996, P.L.104-120, 110 Stat. 834 (March 28, 1996), Congress thus restored in part the Owners' prepayment rights and terminated most of the incentives that ELIHPA and LIPRHA originally offered.

5. As a result of these actions, the Owners have suffered a double blow: First, they suffered the loss of their unconditional right to prepay for a period of at least nine years. During this time, the Owners were damaged by lost benefits that they would have received, if they had been able to prepay their mortgages and utilize their properties in the most economically advantageous manner. Later, when Congress partially restored their prepayment rights, its actions were incomplete and did not attempt to compensate the Owners for the annual revenue and overall lost value in the prepayment prohibition era. In essence, Congress deprived the Owners of their contractual rights for an extended period of time and failed to compensate the Owners for the resulting losses they sustained.

6. The Owners seek damages on four theories. Count One seeks damages for the taking by ELIHPA and LIHPRHA of the Owners' property rights without just compensation. See ¶¶ 76-78, infra. Count Two seeks damages for breach of contract resulting from HUD's abrogation of the Owners' right to prepay. See ¶¶ 79-81, infra. Count Three seeks damages for breach of the implied covenant of good faith and fair dealing contained in the Owners' contracts with HUD, as a result of which the Owners were denied the benefit of their contracts. See ¶¶ 82-86, infra. Count Four seeks damages for the Defendant's failure to make funds available to the Plaintiffs pursuant to a money-mandatory statute passed by the Congress. See ¶¶ 87-92, infra.

## II. JURISDICTION AND VENUE

7. This is a civil action against the United States of America, acting through HUD, arising under contracts entered into between HUD and each of the Plaintiffs, arising under LIHPRHA, and arising under the Fifth Amendment to the U.S. Constitution. Therefore, this Court has jurisdiction pursuant to 28 U.S.C.A. § 1491 (West 1989 and Supp). Accordingly, venue is appropriate in this Court.

## III. PARTIES

8. The Plaintiffs are 81 individuals, partnerships, and other legal entities. The following is a list of each Owner's name and the project it owns:

| Owner | Project |
|---|---|
| **Algonquin Heights Associates, L.P.**<br>55 Summer Street<br>Boston, Massachusetts 02110 | Algonquin Heights |
| **Brandy Hill Company**<br>c/o State Street Development Management Corp.<br>488 Commonwealth Avenue<br>Boston, Massachusetts 02215 | Brandy Hill Apartments |
| **Briar Crest, A Michigan General Partnership**<br>207 Hawthorne Avenue<br>St. Joseph, Missouri 49085 | Briar Crest I |
| **Briar Crest Apartments II, A Michigan Limited Partnership**<br>207 Hawthorne Avenue<br>St. Joseph, Missouri 49085 | Briar Crest II |

| Owner | Project |
| --- | --- |
| **Briar Hills, A Michigan Limited Partnership**<br>207 Hawthorne Avenue<br>St Joseph, Missouri 49085 | Briar Hills Townhouses |
| **Brookside Manor Associates Limited Partnership**<br>c/o Mid-City Financial Corp., General Partner<br>4340 East-West Highway<br>Bethesda, Maryland | Brookside Manor Apartments |
| **Buckman Gardens Limited Partnership, and its individual general and limited partners, Clarence W. Gosnell, Jr., John G. Gosnell, Murray Haber, Richard S. Bright, Philip Berman, Alfred S. Bright, Samuel Eisenstat, Melvin S. Heller, Milton S. Lider, Martin Myers, Malcomb Meister, Harold D. Price, Herbert W. Savit, Walter Weitzner, Estate of Jack N. Blinkoff and Harold D. Frazee, Jr., Trustee, U/A DTD 4/2/89 for E.D. Frazee**<br>c/o John G. Gosnell<br>8130 Boone Blvd.<br>Vienna, Virginia 22180 | Buckman Road Garden Apartments |
| **Cambridge Square North Associates, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Cambridge Square North I |
| **Cambridge Square of Fort Wayne Associates I, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Cambridge Square of Fort Wayne I |

| Owner | Project |
|---|---|
| **Cambridge Square of Grand Rapids Associates I, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Cambridge Square of Grand Rapids |
| **Cambridge Square of Grand Rapids Associates II, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Cambridge Square of Grand Rapids II |
| **Carriage House North Associates, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House North |
| **Carriage House of Elkhart Associates, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House of Elkhart |
| **Carriage House of Mishawaka Associates I, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House of Mishawaka |
| **Carriage House of Mishawaka Associates II, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House of Mishawaka II |

| Owner | Project |
|---|---|
| **Carriage House of Muskegon Associates, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House of Muskegon |
| **Carriage House South Associates, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House South |
| **Carriage House West I Associates, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House West I |
| **Carriage House West II Associates, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House West II |
| **Carriage House West III Associates, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House West III |
| **Carriage House West IV Associates, A Limited Partnership**<br>P.O. Box 40177<br>Indianapolis, Indiana 46240 | Carriage House West IV |
| **Chauncy House Company**<br>c/o State Street Development Management Corp.<br>488 Commonwealth Avenue<br>Boston, Massachusetts 02215 | Chauncy House |

| Owner | Project |
|---|---|
| **Cromwell Court Company**<br>c/o State Street Development<br>Management Corp.<br>488 Commonwealth Avenue<br>Boston, Massachusetts 02215 | Cromwell Court Apartments |
| **Country Towne Apartments Partnership**<br>c/o Littman & Pakenham<br>Box 6013<br>North Brunswick, New Jersey 08902 | Country Towne Apartments |
| **Dolly Ann Apartments Limited Partnership, and its individual general and limited partners, Mid-City Financial Corporation, Eugene F. Ford, John & Irene Walsh, Hilda Zeldon, John J. McAvoy, Saul Ritzenberg, Joseph Marilley, Julius Sankin, Clark Enterprises, Inc., Estate of Jane Deblois Hannan, Isadore Rodis Credit Shelter Trust, Jane Papish Revocable Trust and Delia Lang**<br>c/o Mid-City Financial Corporation<br>4340 East-West Highway, Suite 300<br>Bethesda, Maryland 20814 | Dolly Ann Apartments |
| **Emory Grove Limited Partnership**<br>c/o NHP<br>Fairfax Square<br>8065 Leesburg Pike, Suite 400<br>Vienna, Virginia 22182-2780<br>Attn: Roberta Ujakovich | Willow Creek Apartments |
| **First Landmark Associates Limited Partnership**<br>c/o Mid-City Financial Corp., General Partner<br>4340 East-West Highway<br>Bethesda, Maryland 20814 | Landmark Apartments |

| Owner | Project |
|---|---|
| **Forest Glen Limited Dividend Housing Association**<br>c/o Joel L. Altman - General Partner<br>Altman Development Corporation<br>2201 Corporate Boulevard, N.W., Suite 200<br>Boca Raton, Florida 33433 | Forest Glen Apartments;<br>Phases I-III |
| **Fort Heath Associates**<br>c/o Sanford Kaplan<br>77 Oak Street<br>Newton, Massachusetts 02164-1460 | Fort Heath Apartments |
| **Garrison Forest Associates**<br>c/o Mount Royal Management<br>1233 West Mount Royal Avenue<br>Baltimore, Maryland 21217 | Garrison Forest<br>Apartments, Sections I & II |
| **Glenarden Limited Partnership, and its individual general and limited partners, Daniel M. Lyons, Lester M. Lewis, Charlotte K. Lewis, Samuel J. Gorlitz, Grace K. Gorlitz and Betty C. Lyons Living Trust**<br>c/o Daniel M. Lyons<br>13685 Rivoli Drive<br>Palm Beach Gardens, Florida 33410 | 1. Glenarden Woods Apartments<br>2. Glenreed Apartments |
| **Jodani Associates, L.P.**<br>c/o Alpert & Alpert Development Ltd.<br>One Parker Plaza<br>Fort Lee, N.J. 07024 | Jodani Associates |
| **Kimberly Associates Limited Partnership**<br>c/o NHP<br>Fairfax Square<br>8065 Leesburg Pike, Suite 400<br>Vienna, Virginia 22182-2783<br>Attn: Roberta Ujakovich | Cherry Branch Townhomes |

| Owner | Project |
|---|---|
| **King's Grant Company**<br>c/o State Street Development<br>Management Corp.<br>488 Commonwealth Avenue<br>Boston, Massachusetts 02215 | King's Grant Apartments |
| **Leader House Associates and Leader Housing Co., Inc.**<br>c/o Starrett Corporation<br>909 Third Avenue<br>New York, N.Y. 10022 | Leader House Apartments |
| **New Amsterdam Associates and New Amsterdam Houses, Inc.**<br>c/o Starrett Corporation<br>909 Third Avenue<br>New York, N.Y. 10022 | New Amsterdam Apartments |
| **Pine Crest Company**<br>c/o State Street Development<br>Management Corp.<br>488 Commonwealth Avenue<br>Boston, Massachusetts 02215 | Pine Crest Apartments |
| **Riverside Village Company**<br>c/o State Street Development<br>Management Corp.<br>488 Commonwealth Avenue<br>Boston, Massachusetts 02215 | Riverside Village Apartments |

| Owner | Project |
|---|---|
| **Suburbia Associates Limited Partnership, and its individual general and limited partners, Stephen G. Dakes, Harvey E. Johnson, Jr., W. Dewey Rasnake, Martin E. Brown, Warren W. Taylor, Jr., Waren W. Taylor, Jr., Trustee, Ludlow King, and James L. Brehony**<br>c/o Steven G. Dakes<br>Brown, Dakes, Wannall<br>3025 Hamaker Court, Suite 401<br>Fairfax, Virginia 22031-2226 | Suburbia Fairfax Apartments |
| **Suehar Associates, L.P.**<br>c/o Alpert & Alpert Development Ltd.<br>One Parker Plaza<br>Fort Lee, N.J. 07024 | Suehar Associates |
| **Tower West Associates, L.P. and Tower West, Inc.**<br>Grenadier Realty Corp., As Agent<br>1230 Pennsylvania Avenue<br>Brooklyn, N.Y. 11239 | Tower West Apartments |
| **Town & Country Apartments & Townhouses, a Virginia partnership**<br>c/o Mount Royal Management Company<br>1233 West Mount Royal Avenue<br>Baltimore, Maryland 21217 | Town & Country Apartments and Townhouses, Sections I & II |
| **The United Company Limited Partnership, a Massachusetts Limited Partnership**<br>c/o Boyd/Smith Inc.<br>221 Massachusetts Avenue<br>Boston, Massachusetts 02115 | Church Park Apartments |
| | |

9. HUD is an agency of the Defendant United States, and at all times relevant to the allegations in this Complaint, was acting as an agent of the Defendant, and acts of HUD are imputed to the Defendant. HUD acts through its Secretary and other authorized officials. HUD is authorized by Acts of Congress, including the National Housing Act of 1934 (as amended, 12 U.S.C.A. §§ 1701 et seq.) (West 1989 and Supp.) to enter into contracts with private property owners, including the Owners.

IV. STATEMENT OF FACTS

10. Plaintiffs are Owners of multifamily housing projects which participated in programs established by, among other things, Section 221(d)(3) (the "221(d)(3) program") or Section 236 ("Section 236") of the National Housing Act, as amended, to encourage private development of housing for lower income persons. Each of the Owners enjoyed a contractual right to prepare its mortgage, and thereby terminate certain tenant and use restrictions that accompanied its participation in these programs. As set out in detail below, ELIHPA and LIHPRHA abrogated these prepayment rights and thereby imposed an uncompensated taking on the Owners and breached the Owners' contracts with the Government. In addition, the Owners have failed to receive compensation to which they were entitled pursuant to ELIHPA and LIHPRHA.

A. Plaintiffs' Program Participation.

1. Section 221(d)(3) Program.

11. Under the Section 221(d)(3) program, the government offered Owners contracts for 40-year loans at a below market three percent interest rate, but required that the Owners pass the benefit of such reduced interest to the tenants in the form of lower rents. 12 U.S.C.A. § 1715l(d)(3) (West 1989 and Supp.). Participating Owners undertook

the risk of building and operating such housing and agreed to a limitation on distribution of any earnings to a maximum of 6% of their initial equity investment.

12. To participate in the Section 221(d)(3) program, the Owners were required to execute a contract called a Regulatory Agreement ("221 Regulatory Agreement"), that restricts the Owners' use and operation of their projects with respect to rents, charges, and methods of operation. Both the 221 Regulatory Agreement and applicable regulations place restrictions on the Owner's use of their property including: (1) restrictions limiting occupancy for new tenants to low and moderate income families; (2) restrictions on the rent actually charged tenants; (3) restrictions on the capital structure and the rate of return from the project; (4) restrictions on the procedures for increasing rents; and (5) restrictions on the procedures for evicting tenants.

13. The 221 Regulatory Agreement also provides that its restrictions continue as long as the contract for mortgage insurance continues in effect.

14. Project owners also entered into a long-term mortgage or deed of trust with a private lender and executed a standard promissory note (hereinafter as "Note") which, notwithstanding the original 40 year term of the loan, permits project owners to prepay the note twenty years after the date of the mortgage without having to obtain Government approval. HUD endorsed the Note, stating that the Note was insured under Section 221(d)(3) and the federal regulations thereunder in effect on the date of execution. Contemporaneous with the execution of the 221 Regulatory Agreement and the Note, HUD and the lender entered into a contract of mortgage insurance.

15. Prepayment of the Note terminates both the mortgage and the HUD mortgage insurance. Thus, if the mortgage is prepaid, the mortgage insurance ceases and

the project owner is no longer bound by the terms of the Regulatory Agreement to maintain the project's use restrictions.

16. Specifically, the Note widely used in the Section 221(d)(3) program and endorsed by HUD, FHA Form No. 4104-3, provided in part as follows: "The debt evidenced by this Deed of Trust Note may not be prepaid, either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner, except a maker which is a limited distribution mortgagor may prepay without such approval after twenty (20) years from the date of final endorsement of this note by the Federal Housing Commissioner."

2. Section 236 Program.

17. The Section 236 program was enacted in 1968 (12 U.S.C.A. § 1715z-1 (West 1989 and Supp.)). The Section 236 program was essentially intended to replace the Section 221(d)(3) program. The Section 236 program offered project Owners contracts for 40-year loans at market rate but with an interest subsidy so that the Owner effectively paid interest at only a 1% rate. The Owner was required to pass the benefits of the federally-assisted loans to the tenants in the form of lower rents. Participating owners still undertook the risk of building and operating such housing and agreed to a limitation on distribution of any earnings to 6%.

18. To participate in the Section 236 program, Owners (except the Massachusetts - financed and New York - financed plaintiffs (see ¶¶ 22-31, below)) were required to enter into a series of agreements, including a contract, also called the Regulatory Agreement ("236 Regulatory Agreement") that restricts Owners' use and operation of their projects with respect to rents, charges, and methods of operation. Like



WAS:56068_1.DOC.25649.3

the 221 Regulatory Agreement, the 236 Regulatory Agreement and applicable regulations place restrictions on the Owners' use of their property including: (1) restrictions limiting occupancy for new tenants to low and moderate income families; (2) restrictions on the rent actually charged tenants; (3) restrictions on the capital structure and the rate of return from the project; (4) restrictions on the procedures for increasing rents; and (5) restrictions on the procedures for evicting tenants.

19. The 236 Regulatory Agreement also provides that its restrictions continue as long as the contract for mortgage insurance continues in effect.

20. Project owners also entered into a long-term mortgage or deed of trust with a private lender and executed a standard Note which permits project owners to prepay the Note twenty years after the date of the mortgage, without having to obtain Government approval. HUD endorsed the Note, stating that the Note was insured under Section 236 and the federal regulations thereunder in effect on the date of execution. Contemporaneous with the execution of the Regulatory Agreement and the Note, HUD and the lender entered into a contract of mortgage insurance.

21. Under the Section 236 program, prepayment of the Note terminates both the mortgage and the HUD mortgage insurance. Thus, if the mortgage is prepaid, the mortgage insurance ceases and the project owner is no longer bound by the terms of the Regulatory Agreement to maintain the project's use restrictions.

22. Specifically, the Note widely used in the Section 236 program and endorsed by HUD, FHA Form No. 4104-3, provided in part as follows: "The debt evidenced by this Deed of Trust Note may not be prepaid, either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing

Commissioner, except where: (1) the prepayment is in connection with the release of an individual unit for sale to a lower income, elderly, or handicapped person; or (2) the Maker is a limited distribution mortgagor which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of twenty (20) years from the date of final endorsement of this Deed of Trust Note by the Commissioner. . . ."

3. <u>Massachusetts-Financial Plaintiffs.</u>

23. In the case of several Owners (jointly, the "Massachusetts-financed Plaintiffs"), the lender is the Massachusetts Housing Finance Agency, an instrumentality of the Commonwealth of Massachusetts ("state agency lender").

24. In the case of a state agency lender, HUD did not insure payment of the mortgage, but did subsidize the mortgage payments under Section 236(b), making interest reduction payments identical to those made for projects insured by HUD. In such cases, HUD, in lieu of entering into the Regulatory Agreement described in ¶¶ 12 and 18, above, enters into a tri-party Interest Reduction Contract ("IRC") with borrowers such as the aforementioned Owners and the state agency lender.

25. In the case of the Massachusetts-financed Plaintiffs, their IRCs set forth the same low income occupancy restrictions contained in the Regulatory Agreement described in ¶¶ 12 and 18 for projects insured by HUD. Their IRCs also provided that these contracts terminate upon the prepayment of the mortgage, thereby terminating the aforesaid occupancy restrictions. Pursuant to their mortgages with the MHFA, each of the

Massachusetts-financed Plaintiffs received the right to prepay those mortgages after 20 years.

26. ELIHPA and LIHPRHA are specifically made applicable to plaintiffs in Section 233 (l)(A)(iii) and Section 229(1)(A)(iii) respectively. ELIHPA and LIHPRHA thus made the above cited prepayment right impossible to exercise, thereby denying the Massachusetts-financed Plaintiffs the right to receive a valuable benefit of the contract. The Massachusetts-financed Plaintiffs are situated similarly to the other Owners and have suffered from the same injuries resulting from loss of their 20 year prepayment rights.

27. As a result of the enactment of ELIHPA and LIHPRHA, HUD thus breached their contracts with the Massachusetts-financed Plaintiffs, including the implied covenant in every government contract, such as the IRCs, that neither party shall do anything which shall have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

4. <u>New York-Financed Plaintiffs</u>

28. Several of the Plaintiffs, Leader House Associates, L.P. and Leader Housing Co., Inc., New Amsterdam Associates, L.P. and New Amsterdam Houses, Inc., and Tower West Associates, L.P., and Tower West, Inc. (collectively, the "New York-financed Plaintiffs") are the legal and beneficial owners of certain projects originally financed by loans funded through tax exempt bonds provided by the City of New York ("City") through its Housing and Development Administration ("HDA") in the early 1970s under Article 2 of the State of New York's Private Housing Finance Law ("PHFL") (also known as the "Mitchell-Lama Act"). In addition to the HDA tax exempt bond financing, those projects received federal assistance in the form of interest reduction payments pursuant to an

interest reduction contract ("IRC") under Section 236(b) of the National Housing Act as amended and like their Massachusetts counterparts were classified as "noninsured Section 236 projects."

29. In the mid-1970s, the City was experiencing a fiscal crisis, and at the City's request, some of the noninsured Section 236 projects including the projects owned by the New York Plaintiffs were refinanced under Section 207 pursuant to Section 223(f) of the National Housing Act, pursuant to which among other things the projects' existing mortgages were bifurcated into an FHA insured hard first mortgage ("FHA Insured Mortgage") and a subordinated soft second uninsured cash flow mortgage, provided by the City ("City Subordinate Mortgage"). The FHA insured mortgages were underwritten to cover only a portion of the projects' outstanding mortgage balances and the City Subordinate Mortgages covered the remainder of the restructured mortgages balances. As part of the refinancings and to conform the IRC to the transaction, HUD bifurcated each project's Section 236(b) IRC contract into two IRC contracts, one applicable to each project's FHA Insured Mortgage and the other to each project's City Subordinate Mortgage. The owners of these projects were required to adhere to both the New York State Mitchell-Lama regulations and relevant HUD requirements pursuant to a HUD Regulatory Agreement and other applicable provisions of law. HUD was and is the primary supervisory agency approving and authorizing all rent increases, occupancy eligibility criteria, directing physical inspections, and exercising other regulatory controls over the projects.

30. Under Section 35(2) of the PHFL and the contractual requirements of the projects' Land Disposition Agreements ("LDA") the New York-financed Plaintiffs were

permitted to cease operating the projects as affordable housing 20 years after occupancy, and could then prepay the FHA Insured Mortgage, terminate the HUD Regulatory Agreement, and prepay the City Subordinate Mortgage, resulting in the termination of the IRC contracts and the New York Plaintiffs could then have pursued a market rate alternative.

31. The HUD Office of General Counsel in an August 5, 1993 letter to the counsel for the New York Plaintiffs, concluded that these projects constituted "eligible low income housing". Thus, as owners of eligible low income housing, the New York Plaintiffs' prepayment rights were denied and suspended pursuant to Section 211(a) of LIHPRHA, and they could not pursue a market rate alternative as allowed by the LDA and applicable state and local requirements as contractually incorporated by reference in the LDA by prepaying the FHA Insured Mortgage and the City Subordinate Mortgage, thus terminating the HUD Regulatory Agreement and the IRC, unless and until the LIHPRHA prepayment process requirements were satisfied.

5. Formerly-Insured Plaintiff.

32. One Owner, Country Towne Apartments Partnership, acquired its project, Country Towne Apartments, from HUD, which holds a purchase money mortgage for that project dated June 30, 1978. The project's Mortgage Note expressly states that the Owner may prepay the mortgage in whole or in part at any time, upon at least 30 days' prior written notice to HUD, as mortgagee. Notwithstanding this absolute right to prepayment, HUD has determined that, because the project was insured under § 221(d)(3) prior to its acquisition by the current Owner, the project constitutes "eligible low income housing" for purposes of LIHPRHA and is subject to LIHPRHA's prepayment restrictions. Thus, like

the other plaintiffs here, Country Towne Apartments Partnership's right to prepay has been abrogated as a result of the enactment of ELIHPA and/or LIHPRHA.

33. Each of the Plaintiffs:

a. Would have prepaid its mortgage at the end of the twenty year contractual and statutory restriction but for the enactment of ELIHPA and LIHPRHA;

b. From the end of the 20 year affordable use restriction period until the restoration of the prepayment right was not subject to any other contractual or statutory restriction on its right to prepay its mortgage; and

c. Has suffered damages as a result of the breach of contract and uncompensated taking of its right to prepay resulting from the enactment of ELIHPA and LIHPRHA.

B. <u>Status of Owners' Prepayment Rights</u>

34. Consistent with the language of the Notes endorsed by HUD, HUD regulations codified at 24 C.F.R. § 221.524(a)(ii) (1986) (and predecessors thereto), implementing Sections 221 and 236 of the National Housing Act, permitted limited distribution mortgagors to prepay their mortgages twenty years after endorsement and to terminate their Regulatory Agreements with HUD.

35. All of the plaintiffs qualified as limited distribution mortgagors, and none of the plaintiffs that entered into Regulatory Agreements pursuant to Section 236 of the National Housing Act, 12 U.S.C..A. § 1715z-1, is receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965. Accordingly, plaintiffs were entitled under their

Agreements with HUD (or, in the case of the Massachusetts-financed Plaintiffs and the New York-financed Plaintiffs, their respective IRCs), HUD regulations and their respective Mortgage or Deed of Trust Notes to prepay their mortgages twenty (20) years from the date of HUD's endorsement of the Notes securing the mortgages and thereafter to use or dispose of their properties as they saw fit.

36. The twenty-year prepayment date for all of the plaintiffs' projects has passed. Notwithstanding this fact, plaintiffs have been barred from prepaying their mortgages and terminating their Regulatory Agreements or other HUD-imposed restrictions based on the Congressional action hereinafter described.

37. Plaintiffs' right to prepay their mortgages was a material term of their contracts and, in the absence of the contractual right to prepay, plaintiffs would not have entered into the transactions. But for the action of Congress, plaintiffs would have prepaid their mortgages in accordance with their contracts on the prepayment dates of their mortgages or on such other dates thereafter as would have maximized their return on their investment in their properties.

38. Plaintiffs have complied fully and in good faith in all material respects with the terms and conditions of their contracts and have otherwise fully performed their undertakings in connection therewith. To the extent that the Owners have received any benefits under ELIHPA or LIHPRHA, they did so merely to mitigate their damages.

C. Prepayment Prohibitions and Preservation Legislation.

39. Plaintiffs decided to participate in these programs for several reasons apart from and of greater importance to them than the return they expected to earn from current operations. First, Plaintiffs anticipated tax benefits in the form of accelerated

depreciation. Such tax benefits lasted from fifteen (15) to seventeen (17) years from the inception of the project. Second, Plaintiffs anticipated that, after twenty (20) years, they would exercise their right to prepay their mortgage and thus realize accrued appreciation, either through sale to purchasers at market value, or through rents from market-rate tenants. The right to prepay was of vital importance to Plaintiffs, because the tax benefits would terminate shortly before the time at which they could exercise their right to prepay the mortgages. Third, Plaintiffs anticipated that upon prepayment, accrued and unused reserves would become the unrestricted property of the owner.

40. While prepayment was and is a vital right of the Owners, the prospect that many owners would prepay and thereby remove their units from the lower income market concerned Congress. In or around 1987, Congress believed that a national housing crisis existed because more than 330,000 units of such housing for low-income persons were subject to mortgages which permitted Owners to, at the Owner's option, prepay after the 20th anniversary date. Congress feared that such prepayment would cause a significant decline in the Nation's affordable housing stock, jeopardizing the ability of low-income Americans to find decent, affordable housing.

41. In order to avoid this crisis, on February 5, 1988, Congress enacted ELIHPA, as part of the Housing and Community Development Act of 1987. To avoid the feared mass defection of units from the 221 and 236 Programs, ELIPHA required Owners to submit to a HUD review prior to prepayment and set forth very stringent requirements for prepayment. ELIHPA was never intended to be more than a temporary measure until a permanent resolution could be put in place, however.

42. That permanent solution was LIHPRHA, which was enacted as Title VI of the Cranston-Gonzalez National Affordable Housing Act of 1990, Pub. L. 101-625, 104 Stat. 4079, 4249 (November 28, 1990). LIHPRHA provides a process for review under which an Owner of eligible housing, which includes owners of Section 221(d)(3) and Section 236 projects, may obtain incentive payments in exchange for maintaining their projects as affordable housing.

43. The LIHPRHA process was completely unanticipated by the parties, and is not even hinted at in the original Regulatory Agreements, Notes or IRCs. As shown in ¶¶ 56-66, infra, Congress was amply aware that LIHPRHA constituted a taking of the Owners' prepayment rights and determined that some form of compensation was necessary.

44. LIHPRHA therefore provided Owners with a choice for the disposition of their projects. Owners could choose to: (1) seek financial incentives to extend use restrictions for the remaining useful life of the project; (2) seek a sale of the project to certain categories of non-profit and for-profit entities who will maintain the use restrictions with the aid of government financial assistance, since purchasers could not maintain below-market rents if they have to pay market price for projects; or (3) prepay and terminate the use restrictions, which is only permitted in those very rare situations that such prepayment will have no significant adverse effects on tenants and the housing stock in the community).

45. As discussed in ¶¶50-51, infra, the Owners could not satisfy LIHPRHA's test for prepayment. Therefore, to mitigate their damages caused by the abrogation of their prepayment right, they had to choose to either maintain their projects with use restrictions

in exchange for compensation, or sell their projects at or near fair market value with Government subsidy to a buyer who will maintain such restrictions.

46. While the process to obtain compensation under LIHPRHA was complicated, it contained four basic steps -- Notice of Intent (hereinafter as "NOI"), appraisals, notification of preservation information, and Plan of Action. LIHPRHA required the owner to file a NOI to seek benefits under the program (see, ¶ 47, infra). HUD and the Owner then conducted appraisals of the project at its highest and best use (see, ¶ 47-48, infra). Based on this appraisal, HUD was supposed to provide the Owner with essential information needed by the Owner to submit its Plan of Action (see, ¶ 48, infra), which outlined the Owner's proposed package of incentives.

47. More specifically, an initial NOI initiated the Owner's intent to obtain compensation. 12 U.S.C.A. § 4102 (West Supp. 1993). Within 30 days after the NOI was submitted, HUD was supposed to notify the Owner of the need to obtain an appraisal of the project. Both HUD and the Owner were required to complete appraisals and to do so within four (4) months. If the appraisals yielded different values, and the Owner and HUD could not agree on the project's value, they jointly obtain a third appraisal. 12 U.S.C.A. § 4103 (West Supp. 1993). The purpose of the appraisal was to determine the highest and best value of the project.

48. HUD failed and/or refused to provide its appraisal within the four (4) month period required under LIHPRHA, and prevented Owners from complying with this provision. HUD also failed to notify the Owner of the "preservation value" of the property, the "preservation rents" and the "federal cost limits" -- all critical components of the LIHPRHA scheme. 12 U.S.C.A. § 4106 (West Supp. 1993). HUD further failed and/or

refused to provide compensation for these delays. HUD's actions, or lack thereof, evidenced a blatant disregard of the Congressional intent to execute the LIHPRHA process and compensate Owners in a punctual manner.

49. In order to assure compliance by HUD and prompt compensation to the Owners, Congress included in LIHPRHA a series of deadlines for administrative action by HUD. Thus, LIHPRHA set specific deadlines for HUD to issue regulations implementing its provisions. See Section 604(d) of LIHPRHA (12 U.S.C.A. § 4101 note (West Supp. 1993)). Even here, HUD failed to meet its legal obligations: interim or final rules, originally due in April 1991, were not issued until May 1992 -- more than one year late.

50. LIHPRHA only permitted prepayment as an alternative if: (1) the government failed to provide funding for promised incentives, as noted above; (2) an Owner seeking to sell the project did not receive an offer to purchase the property at fair market value within 15 months of the filing of an NOI to sell; or (3) the project met certain prepayment criteria. These criteria were: (1) such prepayment did not involuntarily displace current tenants where comparable and affordable housing is not readily available; (2) prepayment did not materially affect the availability of decent, safe and affordable, sanitary housing and the ability of lower income persons to find such housing near employment opportunities; and (3) did not affect housing opportunities of minorities in the community. 12 U.S.C.A. § 4108 (West Supp. 1993).

51. Because of these highly restrictive criteria, it was virtually impossible for any project to qualify as eligible to prepay. Therefore, generally, HUD could not permit payment. Indeed, none of the Plaintiffs were allowed to prepay because such prepayment would violate one or more of the above-noted provisions.

D. Congress Intended LIHPRHA As The Method For Adequately Compensating Owners For A Taking Of The Prepayment Rights.

52. There is irrefutable evidence that Congress intended the Owners to be the intended recipients of payments under LIHPRHA. The payments were also known as "incentives." Congress intended to provide these incentives as timely compensation for LIHPRHA's abrogation of their prepayment rights.

53. LIHPRHA adopted the intent behind ELIHPA, which is to strike a balance between the need for maintaining the use restrictions on these properties, and for compensating owners:

> The fundamental principle of [ELIHPA] was that housing should be preserved for its intended beneficiaries and that owners should be guaranteed a fair and reasonable return on their investment through new incentives. While the principle of [ELIHPA] is retained, this legislation [LIHPRHA] transforms the goal of a fair and reasonable return into a set of concrete economic alternatives for the owner that can be pursued through a more objective and streamlined process.

H.Rep. No. 943, 101st Cong., 2d Sess. 458 (1990) (emphasis added).

54. In hearings on the ELIPHA legislation in 1987 several Subcommittee witnesses before the Senate Subcommittee on Housing and Urban Affairs raised the contract abrogation issue, and informed Congress that there were constitutional defects in federal acts to abrogate federal contracts:

(a) Thomas R. Runquist, President, Council for Rural Housing and Development, stressed the "fidelity owed by the United States government to its contractual commitments." Id. at 174.

(b) Robert I. Dodge, III, Rental Housing Association, pointed out that if the Federal Government terminated contract "[o]ptions to pay off mortgages and end

assistance contracts", it "would probably be unconstitutional (as either a 'taking' without compensation or a violation of the 'contract provision' of the Constitution)." Id. at 235-236.

(c) Emily P. Achtenberg, a housing policy consultant, id. at 272, stated that preservation "will need to be accomplished in a way that is consistent with and does not breach the Government's contractual obligations to existing owners", which means "that owners must be able to exercise their prepayment privileges and to receive a fair and equitable return. . . ."

The Decline in Subsidized Units Expected During the Late 1980's and 1990's Assuming Owners Opt Out of the Section 8 or Section 236 Programs When Their Contractual Obligations Expire, Hearings Before the Subcommittee on Housing and Urban Affairs of the Committee on Banking, Housing and Urban Affairs, United States Senate, 100th Cong., 1st Sess. (1987).

55. Congress was well aware as early as 1987 that Owners believed that they had contractual rights with the United States deserving of constitutional protection. Indeed, H.R. 4, 100th Cong., 1st Sess. (1987), the predecessor bill to ELIHPA, as reported out of House Committee, provided at Section 161, that the "Secretary [of HUD] shall. . . respect the rights of owners, including (but not limited to) existing contract rights to prepay mortgages and. . . to receive a fair and equitable return on their investment. . . ." Therefore, Congress focused on the owners' contract rights and the potential abrogation of same.

56. This awareness led to congressional concern for Owners' rights. Senator J. Robert Kerrey (D-Neb.), in a floor debate on S.566 (leading to the Cranston-Gonzelez National Affordable Housing Act of 1990), said:

> I personally believe the Government has made a contract with [the developers], and you cannot expect people in the business world to put their capital up for the purposes that the Government entices only to find that later on the Government is always willing to change the rules. . . .

Cong. Rec. S8247 (daily ed. June 19, 1990) (Statement of Sen. Kerrey).

57. In the Hearings Before the Subcommittee on Housing and Community Development of the Committee on Banking, Finance and Urban Affairs, House of Representatives, 101st Cong., 2nd Sess. (1990), Congressman Steve Bartlett (R-Tex.), who played a leading role in the LIHPRHA legislation, noted that ELIHPA "placed a unilateral moratorium on the expiration" of the mortgages at issue, which he believed "will prove to be unconstitutional and was wrong." Id. at 3.

58. In 1990, Congress extended the ELIHPA's effective date on several occasions (which initially expired on February 6 of that year) pending LIHPRHA's passage. The Senate floor debates on such extensions provide significant evidence that Congress was aware that ELIHPA, and potentially LIHPRHA, abrogated Owner's contract rights. During a debate over extension in late September 1990, several Senators stressed the taking issue. Senator William L. Armstrong (R-Colo.) said:

> If there is a taking of private property here --which is one of the issues that I hope to develop while we discuss this -- I think that is unfair. I also happen to think that is unconstitutional. Even under a lot of different theories, the Supreme Court has been quite touching [sic] about taking away people's property. I think the right to use and dispose of that property is part of the right. When you curtail that, particularly when it is a contract right with a sovereign, it might well be that some court, a circuit court or the Supreme Court might find that to be unconstitutional.

Cong. Rec. S14090 (daily ed. Sept. 27, 1990) (Statement of Sen. Armstrong). Senator Howell Heflin (D-Ala.) stated the proposition more directly:

> Mr. President, I rise today to address an issue which I feel is of the utmost importance: that is the obligation of the U.S. Government to fulfill contractual agreements into which it enters or, at a minimum, to justly compensate those parties whose contractual rights it abrogates.
>
> * * *
>
> Mr. President, the very notion of unilaterally abrogating a contract, which has been adhered to by one party for 20 years, flies in the face of the law. I am opposed to it, except in the most extreme circumstances. And when such circumstances arise, that party whose rights are denied must be fully compensated.
>
> I am aware that in a recent court case, Orrego versus HUD, it was held that Congress may be able to abrogate commercial contracts through subsequent legislation in certain situations.[2] While I do not dispute the underlying logic behind that decision, I do not believe that situations involving the 221(d)(3) program are extreme enough to warrant such action. I do not think Congress intended to abrogate these contracts, and I am afraid of the precedent which is being set.
>
> Having said this, let me state that if my opinion regarding the total abrogation of 221(d)(3) contracts is incorrect, then at least the aggrieved party should be compensated.
>
> The housing bill which is currently in conference will soon address this issue of compensation. The House-passed version contains a fair, equitable compensation clause which received broad bipartisan support. If, and only if, it is deemed necessary to abrogate these contracts--and reiterate my opposition to so doing--I urge adoption of the House-passed prepayment provisions.

Cong. Rec. S14091 (daily ed. Sept. 27, 1990) (Statement of Sen. Heflin).

---

[2]This case, Orrego v. HUD, 701 F.Supp 1384 (N.D.Ill. 1988) was reversed by the Seventh Circuit on other grounds at 943 F.2d 730 (7th Cir. 1991).

59. Echoing such concerns, Senator Alfonse M. D'Amato (R-N.Y.), who was a Senate Conferee, and who helped shape LIHPRHA into its final form, stated:

> As we enter the conference, I am going to keep in mind the concerns that Senator Armstrong has raised, because ultimately his concerns are aimed at keeping this problem out of the courts. Again, no one, no one, whether it be tenant or owner, is going to benefit if this matter is in the courts.

Cong. Rec. S14093 (daily ed. Sept. 27, 1990) (Statement of Sen. D'Amato).

60. As Senator Heflin noted, the House version of the bill provided for fair market value compensation to the owner. The House bill contained this provision as a result of the adoption by the House Committee on Banking, Finance and Urban Affairs of the Bartlett-Barnard Substitute Amendment in its "mark-up session" of H.R. 1180 (which eventually led to the Cranston-Gonzalez National Affordable Housing Act of 1990) on June 13, 1990. Representatives Bartlett and Douglas Barnard, Jr. (D-Ga.) introduced the substitute for an amendment offered by the Committee leadership, namely Chairman Henry Gonzalez (D-Tex.), Congressmen Barney Frank (D-Mass.), Joseph P. Kennedy II (D-Mass.) and Congresswoman Nancy Pelosi (D-Cal.). In contrast to the leadership amendment, the Bartlett-Barnard Amendment provided Owners full fair market compensation in exchange for Owners voluntarily agreeing to maintain the property as low income after the expiration of the 20-year use restriction. On the other hand, the Committee Leadership Amendment would not provide full compensation to the Owners in all instances and mandated that the Owners participate in the program beyond the 20-year period.

61. During the debate on the Bartlett-Barnard Substitute Amendment, the proponents stressed throughout that the owners' contracts must be honored. In the debate,

Congressman Bartlett stressed that another major difference between the Bartlett-Barnard Substitute and the leadership amendment was that HUD was constrained by a definitive period -- 6 months -- to certify the amount of incentives and to announce them to the world so that everyone would know the money that HUD would bring to the table.

62. Although the Bartlett-Barnard Amendment was strongly opposed by the majority leadership of the Committee, it passed by a 29-19 vote. Hous. & Dev. Rep. [Current Developments] (WGL), June 25, 1990, at 86. Although modified on the House floor, the basic principal of the Bartlett-Barnard Amendment, that the owner receive fair market compensation pursuant to a precise schedule, became a principal tenant of the House Bill.

63. Indeed, further attempts to amend the Bartlett-Barnard Amendment were made when the legislation was considered by the full House. Another attempted amendment by Congressman Frank failed; but a modification proposed by Congressmen Thomas Carper (D-De.) and David E. Price (D-N.C.) and others, and supported by Rep. Bartlett, was adopted during debates on July 31, 1990, and August 1, 1990. During those debates, Owner rights were again discussed. Congressman Carper noted:

> Twenty Years ago, Mr. Chairman, a commitment was made by our Government to a private builder that, if they would build these properties, if they would then rent them to low-income families, that 20 years into the mortgage . . . the Owner could elect to prepay. . . .

Cong. Rec. H6180 (July 31, 1990) (Statement of Congr. Carper). Congressman Price went on to succinctly state the dilemma before Congress:

> This issue confronts us with two worthy goals: one is preservation of low-income housing stock; the other is honoring the Federal Government's contract with owners who were given the right to prepay their mortgages after 20 years. Our amendment is an attempt to balance these two goals.



WAS:56068_1.DOC.25649.3

Cong. Rec. H6182 (July 31, 1990) (Statement of Cong. Price).

64. Congressman Peter Hoagland (D-Neb.) pointed out in the debate on August 1, 1993 that Congress intended to accomplish the balancing that Congressman Price refers to, and to accommodate Owners' interests:

> The consensus of the committee was to honor the contractual rights of owners while making provisions to protect the tenants who may be displaced.

Cong. Rec. H6211 (August 1, 1993) (Statement of Cong. Hoagland).

65. The Senate bill and the House bill leading to LIHPRHA both contained appraisal mechanisms, but the Senate bill provided a discounting of the fair market value due to Owners, to reflect the alleged residual value of the prior federal assistance. Sen. Rep. No. 101-316, 101st Cong. 228 (accompanying S.566). The House version, containing no such discount, was adopted. Senator John B. Breaux (D-La.) argued for this result:

> Mr. President, I rise today to join my colleagues in expressing concern for contract rights. I do not wish to kill the housing bill. Nor do I wish to see low-income tenants displaced. But I do believe that it is important that providers of low-income housing retain their confidence in the Government with which they do business. Unilateral abrogation of 20-year-old contracts is not the way to build confidence. Nor is unequitable reimbursement the answer. Quite simply we must find a way to come as close as possible to meeting the terms of these contracts without violating the tenants' rights or aggravating the Nation's affordable housing crisis. While this may seem to be a difficult task, it is not. Our colleagues in the House have developed a fair and simple solution to this problem. Their version of the Housing bill contains provisions which, I believe, should be incorporated into the final version.

Cong. Rec. S14091 (daily ed. Sept. 27, 1990) (Statement of Sen. Breaux). The Congress rejected the Senate approach as denying Owners just compensation through use of the discount. Congress, in adopting the House approach, manifested a clear intent that

Owners be compensated fairly. Congress thus intended to vest the Owners with rights to compensation for the taking of their rights to prepay.

66. Of course, these rights were not created by Congress in LIHPRHA nor does LIHPRHA's calculation of "incentives" necessarily determine the actual compensation to which the Owner are entitled. Rather, they exist pursuant to the Fifth Amendment's taking clause, which conferred a right to just compensation upon the Plaintiffs as soon as Congress abrogated their contractual prepayment rights. The significance of LIHPRHA's legislative history is that it demonstrates that Congress recognized the right asserted by the Plaintiffs here and the need to assure prompt payment to them of just compensation for the taking effected by LIHPRHA. It is this right, and the right to receive damages for the breach of the Plaintiffs' contracts with the Government, and the right to payment pursuant to LIHPRHA itself, that the Plaintiffs seek to vindicate here.

E. Congress Prescribed Timetables In LIHPRHA In Order To Assure Timely Compensation, Which <u>HUD Has Failed To Properly Implement</u>

67. Although Congress wanted specifically to provide the incentives under LIHPRHA in a timely manner, HUD has failed to fulfill Congress' intent to achieve the goal of providing Owners a fair and reasonable return by failing to timely process requests for LIHPRHA payments. HUD delayed issuing regulations to implement LIHPRHA for over a year past the statutory mandated date, in violation of LIHPRHA itself.

68. Further, in most cases HUD did not follow statutory deadlines for processing appraisals, or providing certain information concerning project value, which is at the heart of the process for determining compensation.

69. Perhaps most importantly, HUD refused to provide adequate compensation retroactively for the delay it caused by violating LIHPRHA's implementation provisions.

70. Congress provided two requirements to assure that LIHPRHA took effect in a timely manner. The first, in states that:

> Not later than the expiration of the 90-day period beginning on the date of the enactment of this Act, the Secretary of Housing and Urban Development shall, subject to the provisions of section 553 of title 5, United States Code, publish proposed rules to implement this subtitle and the amendments made by this subtitle. Not later than 45 days after the expiration of the period under the preceding sentence the Secretary shall issue interim or final rules to implement such provisions.

(emphases added). Section 604(d) provides that 90 days after November 28, 1990, LIHPRHA's effective date, a proposed rule would be enacted, and 135 days after November 28, 1990, the interim or final rules would become effective. Interim or final rules were due on April 12, 1991, but were not issued for effect until May 8, 1992, which was over one year later than Section 604(d) required. By delaying the issuance of effective regulations for over a year, HUD effectively delayed the compensation of many owners, specifically the Plaintiffs herein, for more than one year.

71. An additional indication of congressional concern with timely effectiveness is contained in Section 605 of LIHPRHA, which states that "[t]his subtitle (subsuming LIHPRHA) shall take effect on the date of the enactment of this Act." (emphasis added). Pub. L. 101-625, 104 Stat. 4879, 4278. Congress specifically commanded that LIHPRHA is effective upon enactment, on November 28, 1990. It is no accident that Congress uses the word "shall." The word "shall" is a command, both to issue regulations by the specified dates and to honor LIHPRHA when it is effective.

72. Additionally, LIHPRHA is replete with mandatory deadlines, evidencing Congress' intent that the prepayment process move in a timely manner. For example:

(a) LIHPRHA Section 224(a) (12 U.S.C.A. § 4114 (West Supp. 1993)) provides that an owner may prepay where: (1) HUD approves an owner's plan to extend affordability restrictions but fails to provide approved incentives for 15 months; or (2) HUD approves a sale plan but fails to provide agreed incentives to subsidize the sale within the lesser of the two-month period following the next fiscal year or six months after the Plan of Action is approved (and where the sale plan is approved before the original prepayment date, the lesser of the two-month period following the next fiscal year or nine months after the Plan of Action is approved).

(b) LIHPRHA Section 225 (12 U.S.C.A. § 4115 (West Supp. 1993)) provides that HUD must approve a Plan of Action within 180 days of filing (unless the owner requests longer); HUD's failure to meet that deadline triggers incentives retroactive to that date.

(c) Similarly, LIHPRHA Section 213 (12 U.S.C.A. § 4113 (West Supp. 1993)) provides that within four months after an owner files a notice of intent, the owner and HUD must file an appraisal of the property. In fact, HUD has violated this four month requirement in many instances with respect to the Plaintiffs herein.

(d) Section 216 (12 U.S.C.A. § 4116 (West Supp. 1993)) also requires HUD to submit certain information to owners. If an owner files a notice of intent to prepay, such information must be sent within six months after receipt of the

notice. That time increases to nine months where the notice of intent seeks incentives to extend affordability restrictions.

There would be no purpose to such congressional directives if HUD were permitted to implement the program, process thereunder and then pay at its leisure, thereby thwarting congressional commands to timely process payment applications. HUD's delay rendered this statutory language meaningless in most cases.

73. The members of Congress who debated and passed LIHPRHA knew of the importance of providing adequate compensation where LIHPRHA took private property. Congressman Wylie at the mark up session stressed that absent the passage of the Bartlett-Barnard Amendment, Congress would be appropriating property without just compensation and that HUD would be sued.

74. Congress appropriated $618,462,000 million under the Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1992, Pub.L. 102-139, 105 Stat. 736, 745 (1991), and appropriated $600,000,000 under the Departments of Veteran Affairs and Housing and Urban Development and Independent Agencies Appropriations Act, 1993, Pub.L. 102-389, 106 Stat. 157, 158 (1992) to provide the incentives as set out in LIHPRHA to pay the owners the statutorily required fair market value. Congress did everything it could possibly do to indicate that it required prompt payment of compensation -- it set a rigid timetable, it provided for payments, and it provided money to make those payments. HUD, by delaying payment, and failing to pay incentives for the period of delay, denied the Owners the sums that Congress intended them to have.

F. The Repeal of LIHPRHA Did Not
Repair The Injuries Suffered By the Plaintiffs.

75. Aware of HUD's inability to implement LIHPRHA at an administrative or project level and concerned about the fiscal burden that would be required in order to assure just compensation to the Owners for the taking of the loss of their prepayment rights, Congress ultimately determined that LIHPRHA was fundamentally misguided. In 1996, Congress enacted legislation that effectively repealed ELIHPA and LIHPRHA. Pub. L. No. 104-204, 110 Stat. 2877 (1996). At least in principle, Owners are now allowed to prepay. Nevertheless, even after the repeal of these statutes, they remain subject to a broad series of restrictions on their ability to dispose of their properties in the most economically beneficial manner. As a result, the uninhibited right to prepay their mortgages and dispose of their properties freely that was contained in the Owners' agreements with HUD have never been returned to the Owners. In repealing ELIHPA and LIHPRHA, therefore, Congress did not cure its earlier breach restore the payments owed to the Plaintiffs pursuant to LIHPRHA nor eliminate the taking effected by ELIHPA and LIHPRHA.

COUNT ONE

THE OWNERS HAVE NOT RECEIVED JUST COMPENSATION
FOR THE TAKING OF THEIR PREPAYMENT RIGHTS

76. Paragraphs 1 through 75 are incorporated as if repeated herein.

77. The Plaintiffs entered into contracts with the Defendant, which provided Plaintiffs with the right to prepay their mortgages, and terminate project use restrictions, after 20 years. Plaintiffs had reasonable investment-backed expectations that they could exercise such right, and realize the appreciation of their property values. Plaintiffs'

prepayment rights are property rights, protected by the Fifth Amendment to the U.S. Constitution.

78. ELIHPA and LIHPRHA prohibited the Plaintiffs' exercise of their contract right to prepay. Accordingly, ELIHPA and LIHPRHA take the Plaintiffs' contract rights and investment expectations. The taking occurred as to each Owner when such Owner became eligible to prepay their mortgage at will, but was unable to prepay because of these prohibitions. Accordingly, the Fifth Amendment requires that just compensation, including interest, should be paid from the date of the taking.

COUNT TWO

BREACH OF CONTRACT

(Right to Prepay)

79. Paragraphs 1 through 78 are incorporated as of repeated herein.

80. HUD has breached its contractual obligations to Owners by abrogating Owner's right to prepay their mortgages and terminate their participation in HUD's low-income housing programs.

81. Owners have been damaged by the Defendant's breach in an amount to be shown at trial. Owners are continuing to suffer injury and resulting damages each day they are denied their unfettered contractual right to prepay their mortgages.

COUNT THREE

BREACH OF CONTRACT

(Covenant of Good Faith and Fair Dealing)

82. Paragraphs 1 through 81 are incorporated as if repeated herein.

83. In every contract to which the Government is a party, including each and every agreement between the Government and the Plaintiffs here, there is an implied covenant of good faith and fair dealing.

84. Pursuant to that covenant, the Government committed that it would do nothing that would have the effect of destroying or injuring the right of the other party to those contracts to receive the fruits of the contract.

85. In abrogating the Plaintiffs' unfettered right to prepay their mortgages after twenty years, ELIHPA and LIHPRHA destroyed or injured the right of the Owners to receive the fruit of their contracts with the Government, thereby breaching the implied covenant of good faith and fair dealing in the subject contracts.

86. Owners have been damaged by the Defendant's breach in an amount to be shown at trial. Owners are continuing to suffer injury and resulting damages each day they are denied their unfettered contractual right to prepay their mortgages.

## COUNT IV

## COMPENSATION PURSUANT TO MONEY-MANDATING STATUTE
(with respect to Plaintiffs that sought LIHPRHA benefits)

87. Paragraphs 1 through 86 are incorporated as if repeated herein.

88. Some of the Plaintiffs (the "LIHPRHA Owners") have applied to receive incentives pursuant to LIHPRHA.

89. LIHPRHA is a money-mandating statute. Congress intended LIHPRHA to provide adequate compensation to Plaintiffs in a timely manner for Congress' taking of Plaintiffs' contract rights. To that end, Congress provided specific timetables and deadlines which it required HUD to follow.

90. HUD failed and/or refused to follow the congressionally required statutory provisions for timely compensation. HUD also failed and/or refused to provide such payments retroactively in order to compensate the LIHPRHA Owners' for HUD's violations of such statutory provisions.

91. Accordingly, the LIPRHA Owners are entitled to receive compensation as required under LIHPRHA for the time period resulting from HUD's violation of LIHPRHA. These time periods include, but are not limited to:

a. The period between April 12, 1991 (when HUD should have issued regulations implementing LIHPRHA) and May 8, 1992, (when HUD did issue such regulations);

b. Any time in excess of LIHPRHA's requirement that HUD has four (4) months to provide its appraisal to owners; and/or

c. Any time in excess of LIHPRHA's requirement that HUD has nine (9) months within which to provide Owners with certain financial information.

d. Any other delay in payment or processing in violation of the provisions of LIHPRHA, and any amendment thereto.

92. Plaintiffs are entitled to damages equivalent to the statutory 8% return from the date that they would have begun to receive that return, had LIHPRHA regulations been issued in timely fashion and applications processed pursuant to the LIHPRHA statute.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand money damages, interest, and other relief for the damages from the date when the takings and breaches alleged herein occurred and when

HUD failed to make LIHPRHA payments when due. Owners specifically demand that they be awarded monetary relief for the damages suffered to date and for the damages Owners continue to suffer as a result of the breach of Owners' contracts are HUD's failure to make timely LIHPRHA payments, and for just compensation arising from the taking of their contractual right to prepay, in an amount to be determined at trial. Plaintiffs further demand interest from the date of the taking breach and failure to pay, or such additional amounts as this Court determines, including attorneys fees pursuant to the Equal Access to Justice Act or other applicable Law.

Dated: May 8, 1998

Respectfully submitted,

By: Charles L. Edson by Harry J Kelly
Charles L. Edson, Esq.
PEABODY & BROWN
1255 23rd Street, N.W.
Washington, D.C. 20037
(202) 973-7700

Of Counsel:

Harry J. Kelly, Esq.
Stephen J. Wallace, Esq.
Richard M. Price, Esq.
PEABODY & BROWN
1255 23rd Street, N.W.
Washington, D.C. 20037
(202) 973-7700

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this 8th day of May, 1998, a copy of the Second Amended Complaint was served via hand delivery to Brian M. Simkin, Esq., Commercial Litigation Branch, Civil Division, Department of Justice, Attn: Classification Unit, 1100 L Street, N.W., Washington, D.C. 20005.

Harry J. Kelly