EXHIBIT E



LEXSEE 57 FR 12064

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Office of the Assistant Secretary for Policy Development and Research

Office of the Assistant Secretary for Housing -- Federal Housing Commissioner

AGENCY: Office of the Assistant Secretary for Policy Development and Research, and Office of the Assistant Secretary for Housing -- Federal Housing Commissioner, HUD.

[Docket No. N-92-3382; FR-3177-N-01]

*57 FR 12064*

April 8, 1992

Preservation of Multifamily Assisted Rental Housing: Interim Guidelines for the Section 222(e) Windfall Profits Test
ACTION: Notice of interim guidelines and request for public comment.

SUMMARY: On May 2, 1991 the Department published a proposed rule entitled "Prepayment of a HUD-Insured Mortgage by an Owner of Low Income Housing" designed to implement the Low-Income Housing and Resident Homeownership Act of 1990 (The 1990 Act). In conjunction with this proposed rule, HUD has developed written guidelines to carry out the windfall profits test required under section 222(e) of the 1990 Act. The purpose of this notice is to announce the standards that will be used for making "windfall profit" determinations in accordance with the statute, and to afford opportunity for public comment which HUD will take into consideration in developing and implementing final windfall profits guidelines.

DATES: Effective date: These interim guidelines shall become effective May 8, 1992. The effective date of this notice may be postponed if the Department is unable, on or before that date, to publish a companion document, the final Guidelines for Determining Appraisals of Preservation Value under the Low Income Housing Preservation and Resident Homeownership Act of 1990. (The proposed Appraisal Guidelines were published for notice and comment on December 12, 1991 at *56 FR 64932.)*

Comment due date: All written comments must be received on or before June 8, 1992.Display Classification Information Display Classification Information Display Classification Information Display Classification Information Display Classification Information Display Classification Information

ADDRESSES: Interested persons are invited to submit comments regarding these guidelines to the Rules Docket Clerk, Office of General Counsel, room 10276, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410-0500. Communications should refer to the above docket number and title. A copy of each communication submitted will be available for public inspection and copying between 7:30 a.m. and 5:30 p.m. weekdays at the above address.

**EXHIBIT E**



FOR FURTHER INFORMATION CONTACT: Bruce D. Atkinson, Office of Economic Affairs, room 8222, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410, voice: (202) 708-0590; TDD (202) 708-0770. (These are not toll-free numbers.)

**TEXT:** SUPPLEMENTARY INFORMATION: Title VI of the Cranston-Gonzalez National Affordable Housing Act, Public Law 101-625, enacted November 28, 1990, contains the Low Income Housing Preservation and Resident Homeownership Act of 1990 (the "1990 Act").

The 1990 Act provides the Secretary of HUD with permanent authority to deal with HUD-assisted multifamily projects where owners have the option of prepaying their mortgage loans. Its basic objectives are to assure that most of the "prepayment" inventory of HUD-assisted housing remains affordable to low-income households and to provide opportunities for tenants to become homeowners, while at the same time fairly compensating owners for the value of their properties. A proposed rule for implementing the 1990 Act was published in the Federal Register on May 2, 1991 under the title "Prepayment of a HUD-Insured Mortgage by an Owner of Low-Income Housing" *(56 FR 20262)*. The Department provided for a 60-day period after the publication of the proposed rule for the submission of public comments (until July 1, 1991).

Section 222(e) of the 1990 Act reads as follows:

(e) WINDFALL PROFITS. -- The Secretary shall submit a report to the Congress not later than 90 days after the enactment of the Cranston-Gonzalez National Affordable Housing Act, evaluating the availability, quality, and reliability of data to measure the accessibility of decent, affordable housing in all areas where properties are eligible to submit a notice of intent to prepay under section 212. To prevent payment of windfall profits, the Secretary may make available incentive payments under section 219 or 220 *only* to owners in those rental markets where there is an inadequate supply of decent, affordable housing, if the Secretary determines that adequate data can be obtained to permit objective and fair implementation or where necessary to accomplish the other public policy objectives under this subtitle. The Secretary shall implement this subsection in a manner consistent with the process established by this subtitle.

The purpose of this notice is to publish HUD's interim windfall profit guidelines for effect, and to provide opportunity for public comment upon the guidelines preparatory to their republication in final form.

Section 222(e) specifies that "to prevent payment of windfall profits", the Secretary may make available incentive payments under section 219 or 220 only to owners in those rental markets where there is an inadequate supply of decent, affordable housing, if the Secretary determines that adequate data can be obtained to permit objective and fair implementation or where necessary to accomplish the other public policy objectives (under title VI subtitle A). The statute reflects the concern that "the preservation solution should not be used to provide incentives to owners who would not have prepaid, given local market conditions." House Conference Report to the Cranston-Gonzalez National Affordable Housing Act, Conf. Rep. No. 101-943, 101st Cong., 2nd Sess. p. 469.

Section 222(e) also required the Department of Housing and Urban Development to submit an evaluation of the "availability, quality and reliability of data to measure the accessibility of decent affordable housing in all areas where properties are eligible to submit a notice of intent to prepay." This evaluation was delivered to the Congress on April 4, 1991 and is available for examination and copying by the public at the office of the Rules Docket Clerk, room 10276, Department of Housing and Urban Development. The Department found that adequate data can be obtained to permit the objective and fair implementation of the type of test required by section 222(e).

The Department believes that these guidelines are appropriate for publication for immediate effect, in advance of public comment, because the nature and scope of the guidelines already have been the subject of congressional examination at the time the above-noted report to the Congress was made, and because the report (which was available to the public) has itself been the subject of numerous comments, which were consulted during the development of this

EXHIBIT E



document.

It is critical that the windfall profit guidelines be made effective at the outset of the effectiveness of the new Prepayment regulation, because the mechanisms described in this document are integrally related to the prepayment process described in that related regulation. Nevertheless, the Department expects promptly to republish these guidelines in their final form following additional public comment, so that the great majority of prepayment applicants will be subject to the application of guidelines developed following full public comment.

Procedural Matters

*Executive Order 12606, The Family*

The General Counsel, as the Designated Official under Executive Order 12606, The Family, has determined that this issuance would not have potential for significant impact on family formation, maintenance, and general well-being, and, thus, is not subject to review under the Order. The guidelines would be used as an adjunct to regulations implementing the Low Income Housing and Resident Homeownership Act of 1990 -- legislation designed to preserve and enhance housing opportunities for lower income families.

*Executive Order 12612, Federalism*

The General Counsel, as the Designated Official under section 6(a) of Executive Order 12612, Federalism, has determined that the policies contained in these guidelines will not have federalism implications when implemented and, thus, are not subject to review under the Order. These guidelines do not change in any way existing relationships between HUD, the States, or local governments.

Dated: March 6, 1992.

John C. Weicher,

Assistant Secretary for Policy Development and Research.

Arthur J. Hill,

Assistant Secretary for Housing -- Federal Housing Commissioner.

Preservation of Multifamily Assisted Rental Housing: Guidelines for the Section 222(e) Windfall Profits Test

*Summary*

This document sets forth HUD's procedures and standards for implementing the windfall profits test in section 222(e) of subtitle A of title VI of the Cranston-Gonzalez National Affordable Housing Act of 1990 (Pub. L. 101-625 approved November 28, 1990), entitled the "Low Income Housing Preservation and Resident Homeownership Act" ("title VI"). Title VI replaces the Emergency Low Income Housing Preservation Act of 1987 ("title II") with a comprehensive program governing the prepayment of mortgages insured or assisted under the National Housing Act. Regulations for title VI are contained in 24 CFR part 248. One part of the program enacted by Congress to deal with prepayments is a windfall profits test as set forth in section 222(e). This document explains how HUD will implement this requirement.

*Background*

Title VI creates a permanent and comprehensive program to preserve privately-owned low income housing projects while not unduly restricting the owner's mortgage prepayment rights. Section 218 allows owners of projects subject to low-income affordability restrictions to terminate these restrictions by prepaying their HUD-insured mortgage subject to certain statutory constraints: Prepayment may occur only if it does not result in a material increase in economic hardship for current tenants and only in localities where prepayment will not materially affect the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families. Sections 219 and 220 provide incentives to owners to maintain the low income affordability restrictions for the remaining useful life of their projects or to transfer the property to other entities which agree to continue the low income affordability restrictions.

Section 222(e) specifies that "to prevent payment of windfall profits, the Secretary may make available incentive payments under section 219 or 220 only to owners in those rental markets where there is an inadequate supply of decent, affordable housing, if the Secretary determines that adequate data can be obtained to permit objective and fair implementation or where necessary to accomplish the other public policy objectives" (under title VI, subtitle A). The statute reflects the concern that "the preservation solution should not be used to provide incentives to owners who would not have prepaid, given local market conditions." House Conference Report to the Cranston-Gonzalez National Affordable Housing Act, Conf. Rep. No. 101-943, 101st Cong., 2nd Sess. p. 469.

Section 222(e) also required the Department of Housing and Urban Development to submit an evaluation of the "availability, quality and reliability of data to measure the accessibility of decent affordable housing in all areas where properties are eligible to submit a notice of intent to prepay." This evaluation was delivered to the Congress on April 4, 1991. The Department found that adequate data can be obtained to permit the objective and fair implementation of the type of test required by section 222(e).

*Windfall Profits Test*

This section describes HUD's proposed windfall profits test and explains why HUD has constructed the test in this manner. The section that follows discusses the procedure HUD will use to carry out the windfall profits test as part of the overall process related to title VI.

In carrying out the requirement of section 222(e), the Department observed that Congress identified three distinct concerns. First, the language in the conference report, quoted above, speaks about the concern that benefits might be made available in cases where an abundant supply of market rate rental housing would not make prepayment profitable. This language describes situations in which supply exceeds demand in rental markets so that returns to new or newly converted market rate rental units are below average. In underwriting mortgages for FHA insurance, these situations are referred to as "soft markets". In general, incentives would not be needed in these markets to prevent prepayment. Second, the statute speaks about the "accessibility of decent, affordable housing" and an "inadequacy of the supply of decent, affordable housing." The Department interprets these two phrases to encompass the same concept, that is, markets where housing is inexpensive relative to income. In these markets, incentives are not needed as long as the tenants directly affected will be protected. The reduction in the number of units of assisted housing should have little impact on unassisted low-income tenants because of the accessibility of affordable housing. Third, the statute speaks about making incentives available to owners, regardless of the adequacy or accessibility of the supply of housing, where necessary to accomplish the other public policy objectives under title VI.

The Department recognizes that these conditions may be distinct. A market may have an abundant supply of market-rate housing of the type the project would compete with (i.e., be a soft market), but have a limited supply of housing affordable to low-income families. A market may also have a supply of housing that is both abundant and accessible, but because of the special circumstances of a particular project, incentives are justified in order to preserve

the housing, e.g., the project is the only source of low-income rental housing in the immediate area or there is a shortage of the particular type of rental housing provided by the project such as units suitable for the elderly, disabled, or for large families.

Because three distinct concepts are involved, two dealing with market area wide factors of affordability and availability, and one about the uniqueness of a special project, the Department has determined that a three-part test would best carry out the intent of the legislation. A project would be denied eligibility to apply for incentives only if the requisite conditions under both parts of the market area test are satisfied and the Department has further determined that incentives to the particular project are not necessary to accomplish other public policy objectives under title VI.

The first part of the test focuses on the accessibility of affordable rental housing. HUD will identify those market areas where rental housing is relatively more affordable, and therefore relatively more accessible, in relation to other areas in the country. This determination uses the ratio of the most recent Section 8 Existing Fair Market Rent ("FMR") for a two-bedroom unit for the area (pursuant to section 8(c) of the United States Housing Act of 1937) to the rent affordable by a four person family with an annual income equal to fifty percent (.50) of the area median family income, assuming the family uses thirty percent (.30) of income for gross rent. The median family incomes are based on estimates developed by the Department (pursuant to section 3 of the United States Housing Act of 1937). Fifty percent of median is, in general, the federal definition of very low income for families seeking admission to assisted housing.

Mathematically, the ratio is expressed as the following fraction:

```
             Local Fair Market Rent
(.5) * (Local median annual income/12) * (.3)
```

This ratio examines affordability directly by comparing the two factors which determine affordability, rent levels and income levels. Families of four are eligible for most assisted housing programs if their incomes are below 50% of median income. In some cases, program rules allow higher income families to qualify. Only rarely are income limits set below 50% of median income. The denominator of the fraction measures what rent a family of four, on the borderline of eligibility for assisted housing, would be able to afford spending 30% of its monthly income for rent and utilities (affordable rent). (In almost all assisted housing programs, the Federal government requires most families to contribute 30% of their income, after adjustments, for rent.) The numerator is HUD's estimate of the cost (rent plus utilities) of the two-bedroom rental unit at the 45th percentile of the rent distribution (Fair Market Rent). This means that 45% of the standard-quality, two-bedroom units cost less for rent and utilities than the local Fair Market Rent.

If this ratio is equal to 1 in a locality, then a family of four on the borderline of eligibility for assisted housing would be able to afford a unit renting at the Fair Market Rent from its own resources. (Because, as explained later, HUD makes adjustments to the fifty percent of median figure when setting its very low income eligibility standards, such a family would be well within the limits for admission to assisted housing in many localities.) This family would be able to afford 45% of all two-bedroom units without spending more than 30% of its income for rent. In a majority of cases, this family would spend less than 30% of its income. If the ratio is less than 1 in a locality, then the borderline four-person family would be able to afford more than 45% of the standard-quality two-bedroom units. The opposite is true for localities where the ratio is greater than one. In these places, the borderline four-person family would be able to afford less than 45% of the standard-quality two-bedroom units. Thus, if all localities were ranked by this ratio, localities with lower ratios would be places where housing is more affordable.

In carrying out the first part of the Windfall Profits Test, HUD will calculate the ratio of market rent (the most

recent section 8 Existing FMR) to affordable rent (the rent affordable by a four person family with an annual income equal to fifty percent (.50) of the area median family income) for all metropolitan areas and all nonmetropolitan counties. The ratios for the metropolitan and nonmetropolitan areas will then be arrayed separately in rank order from lowest to highest.

This process will produce a relative ranking of localities with respect to the affordability of housing. Localities with low ratios have rental housing which is relatively more affordable than localities with high ratios. However, some dividing line has to be established such that localities whose ratios fall below that line will be considered to have affordable housing in the sense of this statutory requirement. This is difficult, because there is no agreed-upon definition of what constitutes "affordable housing" for a market perspective.

In order to see if the data provide information on where to establish the dividing line, HUD graphed the ratios from lowest to highest. The results evidenced no obvious break point. Except for the very lowest and very highest ratios, the ratios for both metropolitan and non-metropolitan areas follow approximately a straight line from lowest to highest.

There may be no single definition of "affordable housing" from a market perspective; however, a generally accepted definition does exist from an individual perspective. A 30% rent-to-income ratio has become accepted as constituting a reasonable expenditure on housing for an individual family. As stated previously, in almost all assisted housing programs, the Federal government requires families to contribute 30% of their income, after adjustments, for rent.

A ratio of 1 provides a reasonable safety check for affordability. As noted earlier, when the ratio is 1, a family earning 50% of median income can afford to rent up to 45% of all standard quality, two-bedroom units by spending no more than 30% of its income on rental costs. To provide a further check of affordability, areas with ratios at or less than one (1.0) that have unusually high Fair Market Rents would be eliminated. Therefore, HUD proposes that the list of affordable areas will be comprised of those areas whose ratios do not exceed one (1.0) and whose two-bedroom Fair Market Rents do not exceed 120% of the national average Fair Market Rent for a two-bedroom unit. The result of the first measure is the list, in appendix 1, of Metropolitan Statistical Areas (MSAs) and nonmetropolitan countries where rental housing was determined to be relatively affordable. This list will be updated by the Department annually.

Being on the list means only that rental housing in that particular area is relatively more affordable and therefore potentially more accessible, in relation to other areas in the country. The fact that an area is not on the list does not mean that rental housing is not affordable. In particular, it does not mean that tenant-based assistance (Section 8 certificates and vouchers) will not work in those areas. Moreover, it does not mean that there is any problem with the ability of the market to supply housing in the unlisted areas. The Department believes that freely operating housing markets will respond effectively to demand.

The purpose of the list is to identify those areas where the change from project-based rental assistance to tenant-based assistance should not result in an upward pressure on rents overall. In such areas, tenants affected by prepayment would, with the use of certificates and vouchers, be able to find affordable housing units without adversely raising the overall rents of units available to low income renters. However, even in communities where housing is relatively affordable, a large change relative to the inventory of housing available may adversely affect the supply of units currently available to and occupied by the unassisted low income renters. Therefore, the Department must also look at the adequacy of the overall supply of rental housing. This analysis of the adequacy of the supply will be covered in the second part of the windfall profits test.

HUD considered other alternatives for designating areas where housing is affordable. These alternatives included (1) the procedures used in designating difficult development areas for purposes of the low-income housing tax credit; (2) Census data on median income and median rents; and (3) information from Comprehensive Housing Affordability Strategies.

**EXHIBIT E**



LIHTC Difficult Development Areas

The first part of the test is conceptually similar to the procedure used by the Department in designating difficult development areas for the purposes of the low income housing tax credit (LIHTC) under *section 42 of the Internal Revenue Code of 1986*. The difficult development area approach compares fair market rents to 120% of HUD very low-income limits rather than 50% of actual median income. There are two important differences between HUD very low income limits and 50% of median income. HUD very low income limits are set in each locality so that they are the higher of 50% of local median income or of the state nonmetropolitan median income. HUD very low income limits are also increased in areas with high housing costs. The ratio used for difficult development areas would overestimate affordability in localities where these upward adjustments are made. Therefore, HUD decided not to use the same approach as it uses to designate difficult development areas.

Using the adjusted ratio is appropriate for designating difficult development areas. Congress created the difficult development area distinction to identify places where there might be an inconsistency between the rules governing income eligibility and allowable rent in the low income housing tax credit program. Therefore, the correct comparison in this case is between housing costs and program income limits, rather than actual median income.

Census Data

HUD also compared median rents to median income for the 1980 Census. The results were highly correlated with the approach which HUD proposes to use. HUD believes that the first part of its test should reflect current market conditions and therefore decided against using data which are available only on a decennial basis.

Comprehensive Housing Affordability Strategies

HUD chose not to use information from the Comprehensive Housing Affordability Strategies (CHAS) submitted by localities and states for several reasons. First, a CHAS submitted by a locality reflects that community's assessment of the needs and conditions only in the locality, and not necessarily in the overall housing market area. Second, a substantial part of the data on housing needs and market conditions that will be the basis of the CHAS will be obtained for the 1990 Decennial Census and will be provided by the Department later this year and in 1993. This information is not immediately available and, once available will become dated as the decade progresses. Third, not all communities where projects would be eligible to prepay may be covered by a CHAS. Under the rules for the CHAS, a state has the option to decide at what geographic level it presents its analysis of housing needs and conditions. Fourth, the CHAS does not specifically require an assessment of the affordability of rental housing. Therefore, the Department could not rely on the CHAS for an objective and fair implementation of the windfall profits test.

The second part of the windfall profits test involves determining whether there is an excess of supply over demand for rental housing in the housing market area. The purpose of this part of the test is to identify those market areas on the above list of places with affordable housing where, given local market conditions, owners would probably not prepay if allowed.

An accurate, timely and objective analysis of the balance between supply and demand of rental housing in a market area requires analysis of the current conditions of the individual market. The analysis must be based on a comprehensive review of the current and anticipated supply and demand factors influencing the rental housing market. Such an analysis requires data on, and consideration of, factors such as the current rental inventory by rent range, recent trends in the occupancy and absorption of rental units, current and anticipated rental construction activity, rental vacancy rates in the area and the current and forecasted number of renter households. The analysis also has to take into consideration such factors as current and anticipated future employment growth and changes in population and households.

The most comprehensive source of local market data on rental inventories, rents and vacancy rates would be the 1990 Census. But detailed census data for local areas will not be completely available for all areas until 1993 and by

this time the market conditions in a particular area may have changed significantly. Some characteristics of the rental housing market, rental inventory and rents for example, can be estimated by updating the census benchmark data; however, many variables, such as rental vacancy rates, require considerable knowledge of current local market conditions in order to be accurately estimated and interpreted. Therefore, the Department will conduct the second part of the windfall profits test using a combination of census and other federally produced data and local data. Determinations will be made on a case-by-case basis by field staff familiar with local market conditions.

Conducting a case-by-case analysis of each individual market area, as the second part of the test, is also consistent with the manner in which HUD will administer other aspects of this legislation, specifically the review of plans of action to prepay in section 218.

The HUD Field Office with jurisdiction over the market area in which a project is located will be responsible for conducting the second part of the windfall profits test. The second part of the test involves the same process and the accepted statistical and analytical methods of housing market analysis that the Department uses in its underwriting of multifamily mortgage insurance and its analyses of project proposals for federal rental assistance. HUD field office staffs routinely monitor rental housing market conditions of the market areas in their jurisdictions, maintaining data bases of current information on housing market conditions, including information on housing supply and demand trends.

As noted earlier, projects are eligible for incentives unless both market-area-wide conditions of the windfall profits test are satisfied. Eligibility to receive incentives will be denied only if (1) a project is located in a market that HUD determined has an adequate supply of affordable housing; and (2) HUD has determined that the market area has an excess supply of rental housing. Even if both conditions are satisfied, a project can still be eligible to receive incentives if the Department determines, in the third part of the test, that provision of incentives is necessary to achieve other public policy objectives under title VI.

The HUD field office with jurisdiction over the market area in which a project is located will be responsible for conducting the third part of the test. Because this test involves the specific circumstances and composition of each individual project, it will be necessary to conduct a case-by-case analysis. The third part of the test would only be conducted where both market area-wide conditions of the windfall profits test are satisfied. This document defines the public policy objectives to be the local market conditions which would prevent a project from prepaying under section 218(a)(2). Therefore, no project denied the right to prepay under section 218 will also be denied eligibility to apply for incentives.

The three parts of the windfall profits test function together to satisfy both the letter and the spirit of section 222(e) and are consistent with the intent of, and procedures set forth in title VI.

*Description of the Procedure*

In order objectively and fairly to implement the windfall profit provisions of section 222(e) of subtitle A of title VI, the Department has made two distinct determinations on an area-wide basis: One on the affordability of rental housing and the second on the balance between supply and demand in the rental housing market. If, as a result of these determinations, the Department decides that incentives should not be made available in an area, the Department will examine each project separately to determine whether incentives are justified on the basis of public policy objectives.

The method of carrying out the windfall profits test is as follows:

1. Test of Relatively Affordable Rental Housing

The determination of the relative affordability of rental housing in all areas where properties are eligible to submit a notice of intent to prepay is based on the ratio of the most recent Section 8 Existing Fair Market Rent for a two-bedroom

**EXHIBIT E**



unit for the area (pursuant to section 8(c) of the United States Housing Act of 1937) to the rent affordable (assuming a 30 percent rent-to-income ratio) by a four-person family with an annual income equal to fifty percent (.50) of the area median family income. The median family incomes are based on estimates developed by the Department (pursuant to section 3 of the United States Housing Act of 1937).

a. A ratio of market rent to affordable rent is calculated for all metropolitan areas and all nonmetropolitan counties. The ratios for the two categories are then arrayed separately in rank order from lowest to highest.

b. Based on the ratios, the Department has developed a list of affordable areas. The list of affordable areas is comprised of those areas (metropolitan areas and nonmetropolitan counties) whose ratios do not exceed one (1.0) and whose two-bedroom Fair Market Rents do not exceed 120% of the national average Fair Market Rent for a two-bedroom unit.

c. The list will be updated by the Department annually.

2. Notification of the Owner of the Windfall Profit Test

Within 10 days of the field office's receipt of the notice of intent to request incentives either to extend low-income use or for transfer to a qualified purchaser, the owner will be notified by the field office whether or not the project is located in a market area on the affordable housing list.

a. If the market area is not on the list, the field office will proceed with sending the owner information under *24 CFR 248.131* (Information from the Commissioner).

b. If the applicable market area is on the list, the field office will also inform the owner that the project may be denied eligibility to receive incentives, depending on the outcome of an assessment of the supply of rental housing (rental market conditions test), unless the field office determines that incentives are justified to meet other public policy objectives.

c. The field office will notify the owner, within 30 working days after the receipt of the notice of intent, of the field office's determinations regarding the rental market condition test and the other public policy objectives. The notification will inform the owner of the Department's decision whether or not the project is eligible to apply for incentives, and will state the reasons for the field office's decision if the project is denied eligibility to receive incentives. If the owner is eligible to apply for incentives, the field office should proceed to send the owner information under *24 CFR 248.131* (Information from the Commissioner).

3. Field Office Conduct of the Rental Market Conditions Test (Soft Market Review)

a. Upon receipt of the owner's notice of intent, the field office will, if the project is located in an area on the affordable housing list, conduct an analysis of the rental market in the housing market area. The analysis will be conducted in accordance with the general guidelines and content and format outlined in appendix 1 of this document.

b. The determination to deny a project eligibility to receive incentives will be made by the HUD field office, based on its analysis of the conditions in the housing market area and a determination whether other public policy objectives apply.

4. Field Office Determination of Public Policy Objectives

If a project is located in an area on the affordable housing list and the Field Office has determined that the market area has a surplus of rental housing, i.e., the supply of vacant available rental housing significantly exceeds the demand (surplus market), the Field Office will conduct a review to determine whether the project may still be eligible to apply for incentives in order to achieve one or more of the public policy objectives under section 218(a)(2).

The Field Office will have to make a finding that a denial of eligibility to apply for incentives will not materially affect:

a. The availability of decent, safe and sanitary housing affordable to low-income families or persons in the area the housing could reasonably be expected to serve;

b. The ability of low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

c. The housing opportunities of minorities in the community within which the housing is located.

Since a project is on the list of areas with relatively affordable housing for low-income families, the finding under paragraph "a." above is more project-specific, i.e., the project represents the only source of low-income rental housing in the immediate area; or there is a shortage of a particular type of rental housing provided by the project such as units suitable for the elderly, disabled, or large families.

5. Duration of Market Review Findings

a. The HUD field office is not required to conduct a market review for each project submitting a notice of intent to request incentives in a particular housing market area. The findings of the market review conducted by the HUD field office upon submission of the first project in a market area are to be considered valid for a period of at least 12 months. Thus, any subsequent project requesting incentives which is located in a market area identified as a soft market within the last 12 months will be denied eligibility to receive incentives unless the field office determines that incentives are necessary to meet the other public policy objectives stated above.

b. An owner of a project submitting a notice of intent subsequent to the field office's initial soft market review of a particular market area may request that the field office conduct another market review if the owner believes that market conditions have changed. The owner's request must provide sufficient reliable data and market information (see appendix 2 of this document) which evidence that market conditions have changed significantly since the time of the previous review.

BILLING CODE 4210-32-M

[See Material in original]

BILLING CODE 4210-32-C

Appendix 2

Section 222(e) Windfall Profits Test

*Guidelines for Conducting the Rental Market Analysis*

1. Definition of the Market Area

For the purpose of the analysis, the housing market area (where housing units of similar characteristics are in relative competition with each other) is defined, in the case of a nonmetropolitan area, as the county in which the project is located. For projects located in metropolitan areas, the market area is generally defined as the entire Primary Metropolitan Statistical Area (PMSA/MSA). (In unusual circumstances, such as the case of very large metropolitan areas, the defined market area may be only a part of the larger area.)

57 FR 12064

2. Evidence Indicating a Soft Market Condition (Surplus of Rental Housing)

Experience has shown that certain market conditions are indicative of a soft rental market. The existence of one or more of these conditions does not automatically establish the market area as a soft market, but indicates the need for further analysis.

a. Upward trends in the number of defaults and foreclosures in rental projects and the existence of a large inventory of HUD acquired properties.

b. Unusually low rents being asked for new units or widespread use of concessions for both new and existing units. Widespread use of short-term leases.

c. Increases in overall rental vacancy rates and increases in vacancies in existing rental projects which had previously had a history of high occupancy.

d. Excessive number of vacant rentals (particularly apartments) of particular size, age, project or unit type, or other common characteristic.

e. Rental vacancy rates of greater than 10 percent overall and 12 percent or more in multifamily rental projects for a sustained period (24 months).

f. Flat or stable rents in existing projects or rent increases smaller than what could be expected from normal increases in property taxes, utilities, maintenance costs or inflation.

g. Newly built rental units are being absorbed at a slower rate than in previous periods, vacancies in existing projects are on the market for a longer period, or new units are being absorbed at the expense of existing units.

h. Significant declines in waiting lists and increases in the size and frequency of advertising.

i. Construction or proposed construction of a substantial number of rental units.

j. Downturns in the local economy, as indicated by declining employment growth, reductions by major employers or increased unemployment or evidence that future growth will not be sufficient to increase demand to levels needed to absorb the supply.

A rental vacancy rate of 10 percent or more should generally be considered excessive for almost all markets, unless the area is experiencing a sustained and rapid rate of growth. In market areas with moderate to low levels of household growth, rental vacancy rates of less than 10 percent may also be considered excessive, especially if the impending increase in supply is significant. A vacancy rate cannot be the sole basis for the soft market determination. The current vacancy situation must be considered in the context of other factors.

3. Extent and Length of Time for Soft Market Conditions

Because a housing market is dynamic, the extent of the surplus condition and the estimated length of time the condition is expected to last are important factors in the identification of a surplus rental market. For the purposes of the windfall profits test an area is considered a soft market if:

a. There is currently a surplus of rental housing such that the current excess supply of vacant available housing, plus units currently under construction that will enter the market within the next 24 months, is expected to exceed demand for at least the next 24 months; or

b. The market is anticipated to become a soft market within the next 12 months if, based on the housing production (units currently under construction or with firm planning commitments), in combination with the current supply of

available vacant units, supply is expected to exceed demand for at least 24 months.

4. Content of the Analysis

The determination is based on analysis of the current and anticipated conditions in the overall rental market. The analysis takes into account data from the 1990 Decennial Census and the most recent available, locally obtainable data on such factors as: Changes in population, households and employment, the housing inventory, residential construction activity, and recent trends in the absorption of rental housing. A determination of market conditions must be a comprehensive view of market forces and trends and comprise the following:

a. Forecasts of employment, incomes, population and household growth and other relevant economic factors.

b. Estimates of supply and demand taking into consideration marketability factors, such as, the time period necessary to successfully absorb the projects comprising the existing and planned supply.

c. Analysis of the potential number of units eligible to prepay during the forecast period relative to any excess supply of vacant available housing plus units currently under construction.

d. Estimates of current and future rental vacancies and vacancy rates.

e. Evaluation of local market absorption rates in terms of reduction of supply and evaluation of rental absorption experience in the area, so as to determine whether new projects coming on the market are adversely affecting existing inventories, that is, successful occupancy is being achieved at the cost of creating sustained vacancies in existing units.

5. Content and Format of the Soft Market Report

The specific content and length of the soft market report, which will vary depending on the nature of the local market circumstances, are at the discretion of the Field Office staff conducting the review. The staff is not required to submit a lengthy detailed report for a housing market area which it has not identified as having a surplus of rental housing.

The report should be as comprehensive and explicit as needed to assure an understanding of the rationale of the analysis and its conclusions, findings and recommendations. The market analysis review is expected to contain a specific determination of whether the market area is a soft rental market. The report should contain:

a. A description of the geographic boundaries of the market area for which the determination is being made, including an explanation for the definition based on any relevant characteristics.

b. An analysis of current market conditions and a forecast of future conditions over the next 24 months, including consideration of the following:

(1) The recent trend in household growth and an estimate of growth over the forecast period, comparing the growth to the annual changes in housing production and the current inventory.

(2) The current overall rental vacancy rate and a discussion of any specific vacancy problems in the market.

(3) A discussion of recent market experience, including absorption experience of new housing projects, occupancy levels and recent trends in existing projects and a discussion of current rents, recent trends, and anticipated trend, given anticipated market conditions as of the forecast period.

(4) The number of units under construction and the characteristics of these units. The number of units in advanced planning stages, e.g., with building permits or firm financial commitments.

(5) An analysis that reconciles the estimates of annual demand with the forecast of household growth and the anticipated supply (current vacancy situation and supply of units in production).

(6) A discussion of the length of time the identified market conditions are anticipated to last.
[FR Doc. 92-7513 Filed 4-7-92; 8:45 am]

BILLING CODE 4210-32-M