11, 1990 to convert to subpart B by filing a notice of intent prior to February 5, 1992 or within thirty days of approval of the plan of action, whichever is later. Two commenters stated that the February 5, 1992 and thirty-day deadlines should be extended. One commenter was concerned that owners may have to make the decision to convert without adequate information, the other felt that this would not give nonprofit organizations sufficient opportunity to explore the possibility of purchasing tha project. Given the fact that this rule was not made effective by February 5, 1992, the Department has decided to amend this paragraph to extend the time period for conversion to thirty days after the effective date of the rule.

The conversion deadline will have no impact on any nonprofit organizations or other potential purchasers of the project. At the time that an owner exercises its right to convert, it shall notify the Department of its intention by filing a notice of intent pursuant to § 248.105 and proceeding under subpart B in exactly the same manner as any other owner of eligible low income housing. Prospective purchasers will learn of the availability of the project for sale at the same time and by the same method as all other potential purchasers who are interested in buying housing subject to the provisions of subpart B.

Paragraph (d) of this section prohibits an owner who filed a subpart C plan of action after October 11, 1990 from changing its mind and filing a plan under subpart B. On fairness grounds, one commenter objected to this prohibition and argued that if a plan of action is rejected by HUD under subpart C, the owner should be permitted to file a notice of intent under subpart B. The Department has rejected this recommendation. Under both subparts B and C, if a plan of action submitted by an owner is unacceptable to the Department, the owner has the opportunity to revise it. If, after revision, it is still rejected by the Department either because the Department has not made the required findings under § 248.221 or because the project is not eligible for incentives under § 248.231, then the plan of action would also be unapprovable under the relevant provisions of subpart B since the same standards would be applied by the Department under both subparts.

*Section 248.7 (Waivers).*

Three commenters stated that, when the Department permits a waiver of any provision of this part, the tenants, State and local government, and the public should receive notice of the waiver. One of these commenters also suggested the opportunity for a thirty-day comment period for tenants and the State and local government. The Department recognizes that a waiver under this program could have an impact on the tenants of the eligible low income housing and on the State and local government. In order to accommodate their interests, HUD has amended §§ 248.135(d) and (e) to require owners to submit with their plans of action a list of all waivers which they have requested. This information will be available to the tenants and State and local government as part of the plan of action package submitted to them under § 248.135(h) of subpart B and §§ 248.213 and 248.218 of subpart C and they will have the same opportunity to comment on the request for waivers as they do on the plan of action itself. Also, pursuant to the requirements of section 106 of the Housing and Urban Development Reform Act of 1989, any waivers granted by HUD will be published in the Federal Register on a quarterly basis.

*Section 248.183 (Preemption of State and Local Laws)*

In accordance with one commenter's suggestion, this section of the rule has been renumbered as § 248.183 and made part of subpart B in order to demonstrate its applicability to State and local laws which conflict with subpart B, and not those that conflict with subpart C. Twelve commenters, consisting of State and local governments, national foundations, nonprofit organizations, and attorneys requested further clarification and guidance as to what types of State and local laws would be preempted by this section of the proposed rule.

In examining the legislative history concerning this provision, the Department has noted an inconsistency between the language of section 232(a) of LIHPRHA and the House Conference Report to the Cranston-Gonzalez National

Affordable Housing Act, Conf. Rep. No. 101-943, 101st Cong., 2d Sess. (the "Conference Report"). The statute grants the Department authority to preempt State and local laws which restrict or inhibit the prepayment of eligible low income housing, restrict or inhibit an owner of such housing from receiving the authorized annual return, are inconsistent with LIHPRHA or are limited in their applicability to eligible low income housing for which the mortgage has been prepaid or the insurance contract terminated. The Conference Report, however, at page 460, indicates an intention to preempt only those State and local laws which target "prepayment projects for special treatment." A circumstance may arise where a law of general applicability is inconsistent with LIHPRHA. If the Conference Report language is adopted in the rule, then that law could not be preempted. However, if the statutory language is followed, LIHPRHA would supersede the inconsistent State or local law. Since the statutory language is clear on its face, the Department has no basis to resort to the contrary discussion contained in the Conference Report.

The language of subparagraph (a)(3) authorizes the Department to preempt State and local laws which are "inconsistent with any provision of this subtitle, including any law, regulation, or other restriction that limits or impairs the ability of any owner of eligible low income housing to receive incentives, * * * ." Even though subparagraph (a)(3) explicitly permits preemption of only those laws which interfere with the receipt of incentives, HUD has construed the reference to this category of laws to be illustrative, and not complete. Congress' use of the word "includes" in subparagraph (a)(3) implies that laws interfering with incentives are only one type of legislation which comes within the bounds of that subparagraph. The Department, therefore, interprets subparagraph (a)(3) as authorizing it to preempt any State or local law which is inconsistent with subpart B and LIHPRHA.

In order to clarify how preemption will work in practice, one commenter suggested that a statement be included in the regulation to the effect that State and local laws of general applicability which are more onerous to eligible low income housing are discriminatory, and hence are preempted under this section. The Department agrees that if a statute establishes different standards, requirements or restrictions with respect to eligible low income housing than it does for other categories of housing, section 232(a)(4) of LIHPRHA would preempt the statute as to the disparity in treatment. Another commenter suggested that State and local governments be given clear guidance that laws which assist the implementation of this subpart are not subject to preemption under this section. The statute does not distinguish between State and local laws that assist in implementing LIHPRHA and those which impede the statute. However, as a general matter, any State or local law which does not materially affect the timetable for approval of a plan of action under subpart B and which does not impose substantive restrictions on prepayment would not be deemed by HUD to be "inconsistent" with LIHPRHA.

A commenter questioned whether, given HUD's interpretation of the statute, State and local governments can enact legislation to fill gaps in LIHPRHA and this subpart. State and local governments may enact legislation concerning the preservation of low income housing as long as the legislation does not violate any of the four conditions set forth in section 232(a). For example, one commenter suggested that the proposed rule be amended to allow a State or local law which limits owners, rate of return and applies generally to both federally-assisted and unsubsidized projects. HUD would preempt such a law, finding it to be in violation of subparagraph (a)(2) of this section. While the law is of general applicability, it restricts and inhibits owners from receiving the annual rate of return to which they are entitled under § 248.121 of this subpart. However, it should be noted that the law would be taken into consideration in appraising the project under § 248.111.

Certain commenters expressed concern that, in implementing this provision HUD may not recognize the historical deference given to State and local governments in the regulation of real property, land use and landlord- tenant relations. For instance, many communities have laws restricting conversion of rental housing to cooperatives and condominiums. These laws will be preempted only if they fall into one of the four categories listed in paragraph (a) of this section. Additionally, HUD acknowledges that this provision applies only to State and local laws affecting eligible low income housing, as that term is defined in § 248.101, and not to FmHA projects, projects with expiring HAP contracts, or section 8 nonrenewals.

Section 232(b) of the statute lists those State and local laws which are not preempted by the Department to the

extent that such laws are of general applicability and are not inconsistent with this subpart. The list consists of laws concerning building standards, zoning limitations, health, safety and habitability standards, rent control and condominium and cooperative conversion. One commenter stated that the regulation should indicate that this list is merely illustrative, and not exhaustive. The Department disagrees with this interpretation and takes the position that this list is inclusive. The statutory language, which was tracked in the proposed regulation, does not indicate in any way that it is meant only to be exemplary. In the absence of any direction to the contrary, the Department presumes that Congress only meant to exclude the preemption of those types of legislation specifically enumerated in section 232(b). Furthermore, this position is supported by the fact that the types of laws listed in paragraph (b) of the statute are those concerning the health and safety powers, which are generally retained by the States without Federal government interference.

The Department has chosen not to amend the proposed regulatory language to address specific legislation commenters have brought to the Department's attention. In the course of implementing this subpart, HUD will determine on a case-by-case basis, based on the language of this section, whether specific State or local laws should be preempted. The Department believes that it is impractical to make any preemption determination at this time, prior to the existence of a conflict. This section was amended, however, at one commenter's suggestion, to include the phrase, "under this subtitle including authorization" in paragraph (a)(3), in order to conform to the statutory language.

In response to a recommendation from another commenter, paragraph (c), which states that contracts entered into by an owner prior to November 28, 1990 and which restrict the owner's right to prepay the mortgage or terminate the mortgage insurance contract are not preempted, has been amended to include any contracts which are voluntarily entered into by the owner, on or after the enactment of LIHPRHA. The Department has decided to make this revision because owners of eligible low income housing have constructive notice of LIHPRHA and its impact on prepayment and termination of insurance contracts. If an owner wants to restrict its rights under LIHPRHA by entering into a contract, it is free to do so.

Subpart B -- Prepayments and Plans of Action Under the 1990 Act

*Section 248.101 (Definitions)*

Aggregate Preservation Rent

A recommendation was made by three commenters that the definition of "aggregate preservation rent" be amended to include asset management fees, standard debt service coverage, vacancy underwriting allowances, and debt service for third party acquisition or rehabilitation financing. The definitions of extension and transfer preservation rents in the proposed rule already include debt service on any rehabilitation financing, which includes loans made by third parties. Debt service on any acquisition loans is included in the proposed definition of transfer preservation rent, and again, includes third party financing. Sections 214(b) (1) and (2) of the statute, which define extension and transfer preservation rents, do not include asset management fees as one of the costs to be supported by the preservation rents, and the Department has concluded that asset management fees are not an appropriate component of preservation rents.

Two commenters suggested that the debt service on federally-assisted mortgages be included in the calculation of extension preservation rent. The proposed rule already includes debt service on the federally-assisted mortgage as a component of both extension and transfer preservation rents.

The Department has decided to include vacancy underwriting allowances in the calculation of preservation rents. The need for a vacancy allowance is implied by the building block preservation rent approach, the statute's use of the term "gross potential income," in section 214 and the comparison of preservation rents to the income the property would produce if each unit charged 120% of the FMR, i.e., assuming full occupancy. In short, the aggregate preservation rent

could not support the costs that the statute requires it to support unless some allowance is made for vacancy loss. Consistent with underwriting practices for assisted properties, the Department will assume a three percent vacancy cost. For similar reasons, the Department will include standard debt service coverage allowances in the calculation of aggregate preservation rents. Consistent with its underwriting practices, the Department will assume a 1.11 debt service coverage ratio in figuring the preservation rents needed to support debt service on the existing mortgage, the rehabilitation loan, and the acquisition loan in the case of a transfer. Debt service coverage will only add to extension preservation rents if the required 8 percent return on preservation equity is inadequate to provide the required income cushion.

Bona fide Offer

The Department received 19 comments regarding its proposed definition of bona fide offer. The commenters requested further clarification of this definition. The Department has retained its original definition, but included a cross-reference to § 248.157(g), which sets forth the contents of a bona fide offer. The Department will consider an offer bona fide if the purchaser submitting the offer submits it within the applicable marketing period, under § 248.157(c), for that particular purchaser and if the offer contains a contract of sale acceptable to the Department and the appropriate earnest money deposit. Also, for an offer submitted under § 248.161 to be bona fide, the contract of sale must include a purchase price equal to the transfer preservation value of the project. The Department will include in its administrative guidelines language which will be required in the contract of sale.

Community-Based Nonprofit Organization

The Department has amended its proposed definition of community-based nonprofit organization in response to changes made in the regulatory definition of "community-based nonprofit organization" under the HOME program, title II of the Cranston-Gonzalez National Affordable Housing Act. However, the definition of community-based nonprofit organization does not require that the organization have a demonstrated capacity to carry out housing activities or a history of local community service, as is required in the HOME definition, and as one commenter requested. The reason for this difference is that HUD expects many community-based nonprofit organizations to be established as a result of the preservation program, and such newly-created organizations will not have any demonstrated capacity, as organizations, in these areas.

Default

The way the term "default" is defined in this section differs from the definition applicable to multifamily mortgage insurance claims. For claims purposes, a mortgage is considered in default as soon as a mortgagor fails to make a payment under the mortgage. However, for purposes of filing a notice of intent, a 30-day grace period is provided for making any payments under the mortgage. A default does not occur, for purposes of this subpart, unless an owner fails to make a payment within 30 days after it becomes due. The rationale for this distinction, as noted in the preamble to the proposed rule, is to recognize that an owner's failure to make a mortgage payment on the first day of the month does not necessarily mean that a project is in financial jeopardy.

Six commenters suggested that the definition of the term "default" be amended to include covenant, as well as monetary, defaults. When a covenant default occurs, a mortgagee may accelerate the mortgage debt. The mortgagor's failure to pay the accelerated debt would convert the covenant default into a monetary default. (The Department would view an attempt by the owner to pay the accelerated debt as tantamount to a prepayment, which would thus be barred by LIHPRHA.) Thus, there is no reason to amend the definition since a covenant default may lead to a monetary default, which falls within the proposed definition of "default." Under this subpart, a default is relevant in determining an owner's eligibility to file a notice of intent and in approving a plan of action. In either of these instances, it is irrelevant whether the default was precipitated by a covenant default or a failure to make a monthly payment under the mortgage.

One commenter stated that an owner should not be barred from filing a notice of intent if a default was caused by

HUD's abuse of discretion, such as by improperly denying a rent increase, thereby making the owner unable to make its mortgage payments. Under the terms of the mortgage contract, a mortgagor is required, to make its payments in a timely manner (unless the actions of the mortgagee have excused performance, for example, by waiving timely payment). This contractual obligation exists without regard to the actions of the Department. Therefore, the Department has not amended this definition as the commenter has suggested.

Eligible Low Income Housing

The Department received thirty comments concerning its definition of "eligible low income housing." The proposed rule excludes from this definition those projects which are subject to a use restriction imposed by the Department to maintain the low and moderate income use of the project for the remaining term of the mortgage. This exclusion primarily affects those projects which have received flexible subsidy assistance, as authorized by section 201 of the Housing and Community Development Amendments of 1978, as amended, and 24 CFR part 219. Fourteen owners, developers, national nonprofit organizations, management entities, lenders, and an accounting firm, contested the Department's exclusion of projects receiving flexible subsidy assistance. Eight tenant organizations, legal aid services, nonprofit organizations, and State and local governments agreed with the Department's interpretation.

The Department notes that section 201 of the Housing and Community Development Amendments of 1978, as amended by section 211(c) of the Housing and Community Development Amendments of 1979, provides that HUD may provide flexible subsidy assistance only if the owner agrees to maintain the low and moderate income character of the project for the remaining term of the mortgage; HUD has implemented this requirement by obtaining the owner's agreement to prohibit prepayment of the mortgage or by execution of a use agreement. Only those projects which first received flexible subsidy assistance after the enactment of section 211(c) on December 21, 1979 are excluded from the definition of eligible low income housing. Projects which received flexible subsidy prior to that date are eligible low income housing and may proceed under this subpart.

The preamble to the proposed rule provides that the Department's rationale for excluding from ELIHPA flexible subsidy projects subject to use restrictions is principally because projects subject to a use agreement have no "higher and better use," as required by § 248.233, for the purpose of receiving incentives under that subpart. The same rationale supports excluding from this subpart those flexible subsidy projects subject to use restrictions.

Three commenters disputed this explanation, claiming that, while a use restriction could significantly decrease a project's appraised value, it may not preclude a higher or better use for the project. These commenters suggested that this determination is one which should be made by an appraiser and not by HUD before the project is appraised.

The Department does not agree with this point of view, believing instead that Congress never intended to include projects with use restrictions in the eligible low income housing inventory. The purpose of LIHPRHA, as noted at page 457 of the Conference Report, is to preserve low income housing which could be lost if an owner exercises its right to prepay the mortgage or terminate the mortgage insurance contract, resulting in the termination of the Federal use restrictions. Since those projects receiving flexible subsidy assistance are subject to use restrictions for the remaining term of their mortgages, it is irrelevant whether the mortgage is prepaid or the insurance contract is terminated. Hence, providing Federal incentives to these projects would not further the purpose of the statute. Congress has also tacitly acknowledged that projects receiving flexible subsidy assistance are excluded from this definition, for purposes of LIHPRHA, by adopting HUD's numerical estimate of eligible low income housing, which has never included projects receiving flexible subsidy assistance.

Although, as pointed out by two commenters, the inclusion of projects with flexible subsidy assistance would increase the period of time during which use restrictions will be maintained on the projects, from the end of the term of the original mortgage until the end of the projects' remaining useful life, the Department's position is that this consideration does not have any bearing on the issue of eligibility under the statute. The preservation of these projects as low and moderate income housing will be addressed at the expiration of the mortgage term.

Eleven commenters, mostly State and local governments and nonprofit organizations, stated that if the Department takes the position that projects receiving flexible subsidy assistance are not eligible low income housing, and hence the owners of such projects may prepay their mortgages or terminate the mortgage insurance contracts without complying with the provisions of this subpart, the use restrictions on the projects must still remain in place until the date the mortgage would have been paid, in the absence of prepayment. The Department reiterates here the language contained in the preamble to the proposed rule. Projects encumbered with use restrictions under the flexible subsidy program are not deemed eligible low income housing and are therefore not precluded by this subpart from prepaying their mortgages. However, even if the mortgage on such a project were prepaid, the owner would still be required to comply with the use restrictions for the duration of the term of the mortgage. Additionally, if the project was sold to another owner during the term of the mortgage, the purchaser would take the property subject to the use restrictions on the project.

Two commenters stated that where HUD has failed, in connection with the provision of flexible subsidy assistance, to require the execution of a use agreement to maintain the affordability restrictions for the remaining term of the project's mortgage, those projects should not be excluded from the definition of eligible low income housing. As previously noted, the requirement of use restrictions in conjunction with flexible subsidy was incorporated into the statute on December 21, 1979, so that projects which received flexible subsidy before that date were not required to have an executed use agreement to maintain affordability restrictions on the project for the term of the mortgage, and hence would be considered eligible low income housing. Projects receiving flexible subsidy after that date are required to have a use agreement in effect or otherwise ensure that the low and moderate income requirement be fulfilled (such as by agreeing to prepay the mortgage debt only with HUD's consent for the full term of the mortgage). While the Department is unaware of any cases, since December 21, 1979, where a use agreement or prepayment prohibition has not been executed as a condition of receiving flexible subsidy assistance, if such a case surfaces, the failure to execute a use agreement or to agree to a prepayment prohibition will not qualify the project as eligible low income housing. The requirement that an owner may receive flexible subsidy assistance only upon its agreement to maintain the affordability restrictions on the project for the mortgage's remaining term is statutory. The Department cannot waive this requirement, and if this statutory requirement has not been implemented due to an administrative error, the Department's position is that the owner nevertheless accepted the flexible subsidy assistance with constructive knowledge of the condition that the use restrictions be maintained on the project, and therefore, that the owner is bound by these restrictions.

One commenter asked for clarification as to what restrictions and obligations are imposed for projects receiving flexible subsidy assistance. This issue is one which need not be addressed in this rulemaking. The commenter may refer to 24 CFR part 219 or the use agreement on a specific project to obtain this information.

Another commenter questioned whether projects which originally received rent supplement assistance which was later converted to section 8 assistance would be excluded from the definition of eligible low income housing. Sections 221.524 and 236.30 of HUD's regulations prohibit the prepayment of mortgages on projects receiving rent supplement assistance without the Department's consent. Section 229(1)(B) of LIHPRHA provides that only projects which are eligible to prepay without the Department's prior approval are deemed eligible low income housing. Thus, projects receiving rent supplement assistance are clearly not eligible to proceed under this subpart. However, a project whose rent supplement assistance was converted to section 8 assistance is no longer subject to the regulations concerning rent supplement assistance. These projects would be governed by the section 8 regulations once the conversion took place. Since projects receiving section 8 assistance are not subject to a prepayment prohibition based on the receipt of such assistance, these projects can qualify as eligible low income housing.

Fair Market Rent

One commenter recommended that this definition state that the fair market rent is adjusted for utilities. As noted in this section of the proposed rule, the fair market rent is the section 8 published existing fair market rent which is adjusted for utilities, where appropriate. The utility adjustment is equal to the personal benefit expense for each unit in a

project, as of the most recent HUD-approved rent increase. While no amendment is needed on this point, the definition has been amended to clarify that the fair market rent is not adjusted for utilities for the purpose of determining whether preservation rents exceed the Federal cost limit under § 248.123.

Low Vacancy Area

In response to one comment, the Department has amended the definition of "low vacancy area" to ensure that in measuring the number of vacant units only units in standard condition, which are "decent, safe and sanitary," will be included in the survey. The Department has decided not to accept two comments suggesting that HUD determine that the vacant units are actually available to tenants who are likely to be displaced. The proposed definition already requires the units to be "vacant available rental units." It would be too cumbersome to require the Department to ascertain for each market area that the units will be vacant at some future time for tenants who will potentially be displaced due to prepayment. Additionally, HUD has rejected the comment recommending that a specific vacancy rate, such as 2-3%, be adopted to determine whether a particular market area qualifies as a low vacancy area. Because market conditions will vary in different areas, this type of threshold has a high potential for inaccuracy. For example, in an expanding market area, 7% vacancy may be considered low, while in a stagnant market, 6% vacancy may be very high. The Department believes that a more reliable estimate could be made by examining the market conditions in each area, rather than by adopting a vacancy rate which would be applicable across the nation.

Nonprofit Organization

A suggestion was made by thirteen commenters that limited partnerships be included in the definition of "nonprofit organization" on the condition that no profits inure to the benefit of the partnership or any member, founder, contributor, partner or individual associated with the partnership. The commenters suggesting this amendment consisted of State agencies, national and regional nonprofits, and a legal services organization. The rationale for including limited partnerships would be to permit these entities to utilize tax credits when purchasing eligible low income housing. The Department's position is that a limited partnership does not satisfy the definition of a nonprofit organization. Any limited partner, regardless of the legal composition of the managing general partners, is still by definition profit-motivated and, therefore, cannot be considered a priority purchaser for purposes of this subpart. It is irrelevant whether the general partner of the partnership is a nonprofit entity or whether there is only one limited dividend or for-profit partner in the partnership. This interpretation does not exclude limited partnerships from eligibility to purchase projects under this subpart. However, they will not have the priority status granted to nonprofit organizations.

Preservation Equity

Several commenters questioned the elements included in the definition of extension preservation equity. One suggested that the amount of funds in the residual receipts account as of the effective date of the plan of action should be included as part of the owner's equity. Residual receipts belong to the owner of a project, but are not considered part of the project itself for purposes of determining equity. This conclusion is supported by the fact that residual receipts are not normally included in the calculation of the project's value under standard appraisal practices. Extension preservation equity is the value on which an owner's annual rate of return is based, and the Department believes that an owner is not entitled to a return under LIHPRHA on the funds deposited in this account.

Another commenter contested the fact that outstanding balances on non-federally-assisted mortgages are deducted from extension preservation equity, resulting in a possible reduction in the annual return to an owner who retains the project and receives incentives. Section 229(8)(A) of the statute requires that all debt secured by the property be deducted from extension preservation equity. The Department recognizes that this differs from the statute's definition of transfer preservation equity, which only requires the outstanding balance of the federally-assisted mortgage to be subtracted. However, since the statute unambiguously makes this distinction between extension and transfer preservation equity, the Department believes that it is left with no authority to alter it and, hence, has not amended either definition.

Preservation Value

The Department does not agree with the comment that extension and transfer preservation value should both be based on the highest and best use of the eligible low income housing. The statutory language, at section 213(b), expressly provides that the extension preservation value is to be based on the highest and best use of the project as residential rental housing, while the transfer preservation value is based on its highest and best use. HUD has no justification for ignoring this statutory distinction.

Priority Purchaser

According to one commenter, the definition of priority purchaser should be modified to give priority to the purchaser who is most qualified to preserve the property, even if this purchaser is a for-profit entity. The definition of "priority purchaser" in the proposed rule tracks the statutory language, which gives priority to resident councils organized to acquire a project under a HUD-approved homeownership program, and nonprofit organizations and State and local government agencies agreeing to maintain the low income affordability restrictions for the remaining useful life of the project. For-profit entities are not included in the statutory definition of priority purchasers, but are explicitly classified as qualified purchasers in section 231 of the statute. In the Conference Report, at page 464, Congress explained that the reason for this distinction between priority and qualified purchasers is to "establish a genuine advantage for priority purchasers." Therefore, a for-profit organization will not be deemed a priority purchaser.

Additionally, HUD will not give preference to the priority purchaser which is most qualified. Attempting to ascertain which of the priority purchasers is most qualified would entail subjective judgments. The Department will not compare each potential purchaser's qualifications, but rather, will determine whether the potential purchaser has met the minimum standards of a priority purchaser and has submitted an offer which is bona fide. A priority purchaser will be chosen by the owner in accordance with the procedures set forth in § 248.157 of this subpart. If an owner receives more than one bona fide offer from priority purchasers, the owner may accept the highest bid which does not exceed the transfer preservation value. In a mandatory sale, the owner must accept the first bona fide offer at a sale price that is not less than the transfer preservation value.

Related Party

One hundred comments were received by the Department concerning its implementation of the related party rule. The overwhelming response was that the Department's interpretation of "related party" is too broad. The major issues addressed by the comments concerned seller financing, owners, membership on the board of directors of nonprofit purchasers, and nonprofits buying out the interest of their for-profit partners.

Fifty-seven commenters spoke out in favor of seller financing, with none opposed. The main argument they advanced was that the limitation on acquisition loans in § 241.1067(b), stating that the maximum amount of the loan may not exceed 95% of the project's transfer preservation equity, plus, in the case of priority purchasers, any expenses associated with the acquisition, loan closing, and implementation of the plan of action, would make it difficult for priority purchasers to raise the remaining 5% if sellers were not allowed to lend them the money to complete the transaction. The Department acknowledges that this is an important concern and one which may impede sales to priority purchasers. Therefore, the Department has decided to amend this definition to permit seller financing as long as (1) only take-back financing, and not a grant, is provided by the seller; (2) the maximum amount of the financing is limited to 5% of the project's transfer preservation equity; (3) the financing is not a condition of accepting a bona fide offer or entering into a sales contract; and (4) the financing is provided through an arms-length transaction where the seller has no input in the continued operation of the project. Under this interpretation, a management company that is affiliated with the seller may also provide financing to a purchaser; however, the terms of the loan must meet the four conditions required for seller financing, and in addition, the financing must not be conditioned on the retention of the management company to manage the project.

The Department notes that even though the acquisition loan is limited to 95% of transfer preservation equity, plus, for priority purchasers, any expenses associated with the acquisition, loan closing, and implementation of the plan of action, the Department may provide a grant to a priority purchaser, pursuant to § 248.157(o), to cover the remaining 5% of the sales price. If the Department provides a grant equal to, or more than, 5% of transfer preservation equity, then no seller financing will be needed and, therefore, will not be permitted.

According to thirteen commenters (eight national or regional nonprofit foundations or organizations, three State or local government agencies, one tenant, and one attorney), owners or former owners should be permitted membership on the boards of nonprofit purchasers. In addition, members of Congress cited the Conference Report as evidence of their intent that owners be permitted to sit on nonprofit boards. The Conference Report, at page 469, states that if "an individual is involved in the ownership of an assisted project and also participates, on the board of directors of a nonprofit organization that seeks to acquire a project from the owner, this participation alone should not trigger the application of the related party rule." This view was also expressed by members of Congress in the Congressional Record, on October 26, 1990, at page S.17137. In the face of this expression of legislative intent, despite the fact that this intent is not demonstrated in the statute itself, and because of the strong public support evidenced in the comments, the Department has amended the definition of related party to permit owners, and former owners, to be members of the board of directors of nonprofit purchasers, as long as the owners and former owners are nonvoting members, sit in their personal capacity and do not receive any compensation for their board membership.

Eighteen comments were received by the Department suggesting that nonprofit organizations should be permitted to buy out the interest of their limited dividend and for-profit partners. These comments were made by seven nonprofit organizations, four of which are organized on the national level, five State and local qovernment agencies, three tenants, an attorney, and members of Congress (See colloquy between Senators Kerry and Cranston at Congressional Record, October 26, 1990, p. S17137). As long as the transaction is at arm's length, the Department has decided to permit nonprofit organizations to buy out their partners, interest in eligible low income housing pursuant to the provisions of this subpart. The definition of related party has been revised accordingly.

Remaining Useful Life

One commenter suggested that a remaining useful life of 50 years may be unrealistic for some projects. LIHPRHA requires that in order to receive incentives the owner or purchaser of eligible low income housing must agree to retain the low income affordability restrictions on the project for its remaining useful life. The determination of when the remaining useful life of a particular project terminates is left to the Department's discretion. However, the owner is entitled to petition the Department for a determination that the project's useful life has expired. Since, pursuant to section 222(c) of the statute, owners are not permitted to exercise their right to petition for 50 years from the date of approval of a plan of action, the Department has assumed that Congress expects the remaining useful life of eligible low income housing to be at least 50 years from the date of plan of action approval.

Another commenter questioned what happens to rent levels if a project's remaining useful life exceeds the mortgage period. The Department has concluded that once the mortgage on a project has been paid in full, whether through prepayment, or at the end of the original amortization period, rents will be lowered commensurate with the decrease in debt service on the property. The decrease in rent will not affect an owner's rate of return, but may decrease the amount of Federal subsidy provided to the project, and at the same time protect the affordability of the units for low and moderate income families.

One commenter questioned what the Department's policy would be if a project covered under a plan of action is destroyed or demolished during the project's remaining useful life and the insurance proceeds are insufficient to rebuild the project. There are three options which could be considered. The owner could be required to rehabilitate the project to its original condition through the use of the insurance proceeds and subsidies provided by HUD and other sources; the owner could be required to pay-off the remaining balance of the mortgage with the insurance proceeds without rebuilding the project; or if there is no mortgage on the project at the time of the destruction, the owner could be

permitted to retain the insurance proceeds without rebuilding the project. Many factors could influence this decision, such as the number of years that would have been left of a project's remaining useful life if the destruction had not occurred, the extent of the destruction, the cost of rebuilding the project, the need for low income housing in that particular locality at the time of the destruction, etc. At this time, the Department declines to make a fixed policy concerning the impact of destruction or demolition on a project whose useful life has not ended, and intends to examine this issue on a case-by-case basis as the need arises.

Resident Council

A commenter recommended that the definition of "resident council" should be amended to state that it is an organization open to all residents and only to residents. In response to this recommendation, the Department has amended the definition accordingly. The Department has declined, however, to require that a resident council represent a minimum proportion of the tenants, as suggested by the same commenter. The Department feels that there is no need to require a certain level of representation for the formation of a resident council. If tenants wish to organize a resident council, they may do so even if only a minority of the tenants participate. If the resident council intends to purchase the project under a resident homeownership program, then a minimum indication of support is required under § 248.173(c), in connection with submitting a bona fide offer. Additionally, if the resident council submits a bona fide offer under § 248.157 or § 248.161, then it must provide an earnest money deposit, which will also demonstrate tenant support of the council's actions.

Special Needs Tenants

In order to provide additional protection to tenants who may be unable to find vacant affordable housing in the event of prepayment, the Department has expanded the definition of "special needs tenants" in response to the suggestion made by two commenters. The interim rule provides that, in addition to those who are elderly (at least 62 years of age) and/or disabled, special needs tenants include families of five or more persons which require units containing three or more bedrooms. The Department has added large families to this definition due to the shortage of large multifamily rental units in many market areas, making it difficult for these families to find suitable replacement housing. However, contrary to one commenter's suggestion, the Department has declined to expand this definition to include minority households and single parent families. Title VI of the Civil Rights Act of 1964, the Fair Housing Act, Executive Order 11063, section 504 of the Rehabilitation Act of 1973, as well as 24 CFR parts 1, 100, 107, 110 and subparts I and M of part 200, should provide sufficient protection to minority families and single parent families seeking replacement housing. Additionally, inclusion of these household types in the definition of special needs tenants would make this classification almost meaningless, given the large number of these household types which reside in eligible low income housing.

Tenant Representative

Twelve comments were received concerning the definition of "tenant representative." Several commenters sought clarification as to the difference between a resident council and a tenant representative. For purposes of this subpart, a tenant representative is an individual or organization who represents some or all of the tenants, for purposes of receiving information under § 248.181. A tenant representative could be a tenant, a housing advocate, legal aid, or a nonprofit organization. A "tenant representative" is not necessarily designated to represent tenants in negotiations between the owner and/or HUD or in purchasing the project. The tenant representative represents the tenants for purposes of receiving notifications and information under this subpart.

In comparison, a resident council is an organization composed solely of tenants, whose function is to serve as the governing body of a tenant association; it represents the tenants in negotiations on purchasing the project on behalf of the tenants.

The proposed rule requires that tenant representatives represent at least 50% of the occupied units of a project. The

Department received seven comments claiming that this number is too high and one comment supporting this percentage. Those against the 50% limit were State and local government agencies, nonprofit organizations and an attorney, while the commenter in favor was a State agency. No response was received from any tenants. Upon reconsidering the issue, the Department has decided to omit the requirement that a tenant representative must represent a certain minimum percentage of the tenants. Since, as previously noted, a tenant representative's function under the regulation is purely informational, the Department feels that there is no need to require a minimum showing of support by the tenants. While this may mean that more than one tenant representative will exist for each project, this should not put a substantial burden on the Department or owners who are required to provide copies of documents to those tenant representatives. In order to identify these representatives, tenants are instructed, in the notice of intent, submitted pursuant to § 248.105, to provide the owner and HUD with the name(s), address(es), and telephone number(s) of their representative(s).

The Department notes that a tenant representative, whose function is to supply tenants with the information it receives pursuant to this subpart, must make available this information to all tenants who request it.

*Section 248.103 (General Prepayment Limitation)*

A comment was received suggesting that a list be compiled of all insured projects falling within the scope of paragraph (c) of this section, which restricts mortgagees from foreclosing the mortgage on, or acquiring by deed in lieu of foreclosure, eligible low income housing. The Department has compiled a list of eligible low income housing as a result of a survey of local field offices conducted earlier this year. Mortgagees may contact the field offices to request a copy of this list.

Another comment was received suggesting that a mortgagee letter should be issued by the Department, and that such a mortgagee letter should instruct the mortgagee on how to correctly proceed under this subpart and should constitute a defense against any charge of improper action directed at a mortgagee. The Department issued Mortgagee Letter 91-25 on May 28, 1991 which indicates the mortgagee actions which would constitute a violation under this subpart. This letter will not constitute a defense to any wrongdoing on the part of the mortgagee. Furthermore, administrative action may be taken by the Department, pursuant to paragraph (e) of this section in the event of any violation.

*Section 248.105 (Notice of Intent)*

Management organizations and national nonprofit foundations submitted seven comments regarding the prohibition of certain projects with mortgages which are, or have been, in default, from filing a notice of intent under this section. One commenter suggested that the Department accept notices of intent filed by owners whose mortgages are in default at the time of filing, as long as the default can be cured by the receipt of incentives. Section 212(c) of LIHPRHA precludes owners from submitting a notice of intent if the mortgage fell into default after the enactment date of the statute or if the mortgage fell into default prior to the enactment date and the owner does not agree to recompense the appropriate Insurance Fund in the amount of any loss. For those mortgages which are insured and that have fallen into default on or after the enactment date, the Department has determined they are not in default for purposes of filing a notice of intent unless the mortgages have been assigned to the Commissioner as a result of the default. Hence, certain owners with insured mortgages may be able to file a notice of intent under this section while in default. However, pursuant to § 248.145(a)(11), the owner must cure the default as a condition of the Department's approval of a plan of action. Since the default must be cured prior to plan of action approval and incentives will not be provided until after the plan of action is approved, incentives may not be used to cure the default.

The proposed rule provided that an owner of a project whose mortgage was in default prior to November 28, 1990 and continued in default past that date would be ineligible to file a notice of intent if the mortgage has been assigned to

the Commissioner as a result of the default or if the default occurred while the mortgage was held by the Commissioner. One commenter questioned HUD's statutory authority for treating projects whose mortgages continued in default past the date of enactment in the same manner as projects whose mortgages first fell into default after the date of enactment. HUD believes that statutory authority for its position lies in section 212(c)(2) of the statute, which provides in part that an owner shall not be eligible to file a notice of intent if the mortgage covering the housing --

(A) fell into default before, but is current as of, [November 28, 1990]; and (B) the owner does not agree to recompense the appropriate Insurance Fund, in the amount the Secretary determines appropriate * * *.

HUD construes this provision as establishing that owners of projects whose mortgages fell into default prior to November 28, 1990 are ineligible to file a notice of intent, except in cases where the owner brings the loan current by November 30, 1990 and agrees to recompense the Secretary for losses to the Insurance Fund. Under an alternative reading of the statute, the quoted language would be applicable only to loans which fell into default prior to November 30, 1990 but were current as of such date. If this interpretation were correct, there would be no provision in section 212(c) addressing projects whose mortgages coo that the workout agreement itself is not current, the impact on HUD is the same as a default under the mortgage. Therefore, if an owner is ineligible to file a notice of intent under subparagraph (a)(3) of this section, because it has failed to keep the workout agreement current as of the enactment date, then the owner is also ineligible under section 212(c)(2) of the statute because the mortgage has not been current as of that date.

Under subparagraph (a)(4) of this section, an owner whose mortgage fell into default prior to the enactment date and which has been current as of that date may submit a notice of intent if the owner agrees to recompense the insurance fund for any losses. One commenter suggested that the owner reimburse the fund for lost interest due to the default. There should not be any lost interest due to a default. While a loan is in default, interest is still charged against the unpaid principal balance of the mortgage. The owner will be required to pay this accrued interest under the terms of a workout agreement. The commenter also suggested that the owner reimburse HUD for any costs involved in recasting the delinquent principal and interest, as well as requiring the owner to replenish reserves or escrows for which deposits were waived as a result of the default. Any cost involved in recasting principal and interest is an administrative cost to the Department, not a cost to the insurance fund, and HUD does not have the statutory authority to require the owner to reimburse the Department for any costs which are not losses to the insurance fund. The waiver of any deposits to reserves and escrows because of a default likewise does not constitute a loss to the insurance fund. Again, the Department does not have the authority to require an owner to make these deposits as a condition to filing a notice of intent.

Another commenter suggested that the Department and the owner jointly determine the amount which needs to be reimbursed to the insurance fund. Section 212(c)(2)(B) of the statute states that to be eligible to file a notice of intent, the owner shall agree to recompense the insurance fund "in the amount the Secretary determines appropriate." Thus Congress gave HUD the discretion to determine this amount. The Department has, however, decided to permit the owner more latitude in the timing of the reimbursement. The preamble to the proposed rule requires that the reimbursement occur prior to filing a notice of intent. The Department has extended this to permit the owner to reimburse the insurance fund at any time prior to the date a plan of action is approved. If reimbursement does not occur prior to this time, the plan of action will not be approved. No changes to the proposed rule are needed in order to implement this procedure.

A commenter inquired whether an owner must file a notice of intent upon reaching the project's eligibility date under LIHPRHA, or else lose its eligibility to proceed under this subpart. Pursuant to this section, a notice of intent may be submitted by the owner within 24 months of the 20th anniversary date of the final endorsement of the mortgage. The owner has no obligation to file at this time and may file at any time during the remaining term of the mortgage.

Paragraph (b) of this section of the proposed rule states that a notice of intent must include the name, number and location of the project, a bri latitude in the timing of the reimbursement. The preamble to the proposed rule requires that

the reimbursement occur prior to filing a notice of intent. The Department has extended this to permit the owner to reimburse the insurance fund at any time prior to the date a plan of action is approved. If reimbursement does not occur prior to this time, the plan of action will not be approved. No changes to the proposed rule are needed in order to implement this procedure.

A commenter inquired whether an owner must file a notice of intent upon reaching the project's eligibility date under LIHPRHA, or else lose its eligibility to proceed under this subpart. Pursuant to this section, a notice of intent may be submitted by the owner within 24 months of the 20th anniversary date of the final endorsement of the mortgage. The owner has no obligation to file at this time and may file at any time during the remaining term of the mortgage.

Paragraph (b) of this section of the proposed rule states that a notice of intent must include the name, number and location of the project, a brief description of the owner's plans for the project, the reason the owner intends to prepay the mortgage, terminate the insurance contract, or extend the affordability restrictions, and a request to tenants that they notify the Department and the owner of the existence of any tenant representatives. The Department received four comments requesting that this language be modified. Two commenters requested that State or local governments also be notified by the tenants of the existence of any tenant representatives. The Department has amended this paragraph of the proposed regulation to request tenants to provide the State or local government official to whom the owner sent a copy of the notice of intent with the names of any tenant representatives.

One commenter suggested that the Department eliminate the requirement that an owner must state its intentions for the project under the preservation program. While the notice of intent is not meant to bind an owner to a particular course of action, the Department believes that a statement of an owner's intentions with regard to the preservation of the project is relevant to the prepayment process. It will provide HUD with some indication of the time and financial resources which will be required to process the plan of action. Tenants, State and local agencies and other interested parties will also be able to become aware of an owner's preliminary intentions if this information is included in the notice of intent. Therefore, the Department has retained this requirement.

One commenter recommended that an occupancy profile be included in the notice of intent. The proposed rule requires submission of the profile as part of the plan of action under § 248.135 and the Department sees no reason for requiring the submission of an occupancy profile at the time a notice of intent is filed. An occupancy profile is required only if the owner extends the use restrictions on the project, either by retaining the project or transferring it to a qualified purchaser. At the time a notice of intent is submitted the owner may be uncertain as to whether it will extend the restrictions, and if a profile is required at that time, it may be prepared needlessly. Additionally, because an occupancy profile must reflect the project occupancy as of the date a plan of action is approved, the profile will tend to be more accurate if it is submitted closer to that date. If it is submitted with the notice of intent, it is more likely that another profile will need to be compiled later in the process.

Other commenters suggested that the notice of intent be written comprehensibly, in plain English, so it is understandable by relatively uneducated tenants and recommended that the Department consult with tenants or nonprofit organizations for assistance in preparing the notice. The Department acknowledges the importance of submitting notices to the tenants which are understandable and will not cause alarm. The Department has drafted the language for the notice, which will be included in the Department's administrative guidelines, and has taken this concern into account by listing all of the possible outcomes for the project, but also reassuring tenants that the Department wants to work with the owner in preserving the project. If tenants or nonprofit organizations are still concerned about this matter, they are welcome to provide the Department with their specific comments on how the notice can be clarified and made easier to understand.

Paragraph (c) of this section of the proposed rule requires that the notice of intent be simultaneously submitted to the State or local government, the mortgagee, the tenants, and any tenant representatives known to the owner. Fifty-six comments were received by the Department concerning this provision. The majority of these comments addressed the issue of translating the notice of intent for non-English-speaking tenants. The proposed rule states that the notice of

intent shall be translated if a substantial number of the tenants in the project do not speak English. Commenters questioned the meaning of "a substantial number" and suggested amounts, such as five or ten percent of the total number of tenants. Others stated that translation should be required upon the request of any tenant or group of tenants. Also, commenters suggested that translations be posted in the affected buildings and that HUD should do the translating rather than require owners to take on this responsibility. The Department has decided to resolve this issue by adopting the suggestion of one commenter. The Department will provide owners with a cover sheet to be attached to the notices of intent delivered to the tenants. The cover sheet shall instruct tenants, in the necessary languages, that if they require a translated copy of the notice of intent, they may contact the owner of the project who will request an appropriate translation from the local field office. The owner's address and telephone number will be indicated on this sheet. The owner will tabulate the number of translated copies needed and request them from the local field office, which will prepare the translations. The owner will be responsible for making the translated copies provided available to the tenants. This resolution will ensure that all tenants have the opportunity to receive an accurately translated copy of the notice of intent and will keep the burden of preparing the translation from falling on the owners.

A large number of the commenters on this section were concerned with the method of delivery of the notice of intent to the tenants. Three commenters suggested that the proposed rule's requirement that notices of intent be sent to each tenant and any tenant representative imposes an additional burden not required by the statute. Fourteen other commenters, however, suggested strengthening the proposed rule's standard by requiring that the notices of intent be sent by certified mail or by the local HUD field office to ensure their receipt by each tenant. Another commenter stated that sending the notices of intent to tenants will only confuse them, and they should not be sent at all.

Section 230 of LIHPRHA requires that all notices to the tenants be posted in the affected buildings and sent to any tenant representatives. As noted in the preamble to the proposed rule, the Department interprets this as a minimal standard of notice. For purposes of notifying tenants of the submission of a notice of intent, an additional requirement was adopted in the proposed rule requiring submission of the notice to each tenant in order to identify tenant representatives who may not be known to the owner. The purpose of this requirement is to ensure that all tenants are made aware of the owner's submission and to request tenants to provide the names and addresses of all tenant representatives to HUD and the owner. At this stage in the preservation process, it is very likely that the Department and the owner are unaware of the existence of any tenant representatives and without requesting this information from the tenants, HUD and the owner may unintentionally fail to fulfill the statutory requirement by not sending notices to these representatives. Requesting this information in the first notice will resolve this problem.

In response to the comments, the Department has decided to clarify the language in the proposed rule by requiring that the notice be sent to each "occupied unit," rather than each tenant. The Department does not wish to adopt a specific standard for delivery, however. The statute puts the responsibility of notifying the tenants on the owners, and the owner must certify that it has complied with the notice requirements when submitting the notice of intent. The manner in which the requirements are fulfilled, whether by sending the notice certified mail, regular mail, or hand delivery to each unit, or unit's mailbox, is left to the owner's discretion. The owner should be aware, however, that if it fails to comply with the notice requirements, the notice will be deemed invalid, and the owner will have to resubmit a new notice in order to proceed under this subpart. The Department believes that this is a sufficient enforcement mechanism, making it unnecessary for HUD to impose a stricter delivery standard.

Four commenters were concerned about delivery of the notice of intent to State and local governments. Section 212 of LIHPRHA requires the owner to simultaneously submit the notice of intent to "the appropriate State or local government for the jurisdiction in which the housing is located * * *." Three comments were received suggesting that in the proposed rule, the term "State or local" should be replaced with "State and local." The statute provides the owner with the option of sending the notice to either the State or the local government. It does not require notification of both, and the Department has decided not to restrict this option. Another commenter suggested that the language of the proposed rule be amended to state that not only the chief executive officer, but also any officer designated by executive order or State or local law, should be sent a copy of the notice. This would ensure that the proper individual is made aware of the notice. The Department has added this requirement to the rule.

Other commenters suggested that the notice should also be sent to tenant advocacy groups, legal services organizations, holders of seller financing, and limited partners of the owner. Tenant advocacy and legal services groups would be sent copies of the notice of intent only if they are designated tenant representatives, as that term is defined under § 248.101, otherwise an owner is not required to send them copies of the notice of intent. Additionally, with regard to limited partners, the Department presumes that an owner is acting within its authority by submitting a notice of intent and has notified any interested parties of its submission. The Department cannot enforce a requirement that partners be notified of the notice of intent since HUD may not have knowledge of the existence of these parties. This section of the proposed rule does require notification of mortgagees. Therefore, the proposed rule has not been amended in response to these comments.

Notices of intent will not be considered properly filed for purposes of this subpart unless the notification requirements specified in paragraph (c) of the rule are fulfilled. However, the failure of an owner to comply with any non-federal notification requirements will not invalidate a notice of intent. In the case of owners who filed notices of intent pursuant to section 604 of the statute and § 248.5 of subpart A, in order to preserve the option of proceeding under either this subpart or subpart C, the notification requirements in the transition notice issued by the Department on December 11, 1990, as *Notice 90-88,* "Transition Rule for Filing Notices of Intent Pursuant to Section 604(a) of the Cranston-Gonzalez Nation Affordable Housing Act of 1990," must have been complied with. If an owner failed to comply with the notice requirements set forth in the transition notice, the owner will have failed to preserve its option of proceeding under ELIHPA. An owner who properly filed a notice of intent under the transition provisions must comply with the notice requirements of this section or § 248.211 upon making its election to proceed under this subpart or subpart C in order to maintain the validity of the notice of intent.

If an owner files a notice of intent under this section and the Department determines that the owner is not eligible to proceed under this subpart, then HUD will notify those persons and entities listed in paragraph (c) of this section of the interim rule that the notice is invalid. The purpose of this requirement is to ensure that tenants and State or local governments do not needlessly expend time and resources in anticipation of purchasing the project or providing financial assistance to the project.

*Section 248.111 (Appraisal and Preservation Value of Eligible Low Income Housing)*

This section of the proposed rule establishes the appraisal process for valuing eligible low income housing under this subpart. Two commenters took issue with the need for the preservation process to include appraisals at all. However, since the performance of appraisals is mandated in section 213 of the statute, the Department has no authority to omit this requirement.

One commenter stated that the appraisal process is expensive for both the owner and HUD and is very time-consuming and imprecise. This commenter requested that section 8 fair market rents (the "FMRs") should be used instead of appraisals. The Department sees no reason to supplant the appraisal with FMRs. While FMRs are a good measure of rents in a metropolitan area, they are not generally an acceptable measure of value. The most accurate manner to determine a project's value is through independent and professional appraisals.

The second commenter asked that owners be permitted to sell their projects for what a willing buyer will pay a willing seller, and not be limited to the transfer preservation value. By statute, the appraisal process determines fair market value and appropriate compensation for an owner. Under a voluntary sale an owner may sell its project for no more than the transfer preservation value. The appraisal is central to the LIHPRHA preservation strategy because it fairly establishes the preservation value upon which the Department will base incentives and compensation.

Two commenters said that tenants should be allowed to perform their own appraisal. The Department will not consider such tenant appraisals in determining preservation value since it does not have the authority to do so under LIHPRHA. HUD is confident that the process of reconciling HUD's and the owner's appraisals, possibly with a third

appraisal, will objectively establish preservation value. As is discussed in response to related comments, the separately published Appraisal Guidelines do provide tenants with opportunities for appropriate input into the appraisal process.

One commenter recommended that HUD permit qualified appraisers to determine the fair market value of the property without further guidance from the Department. The Department notes that the statute requires it to publish appraisal guidelines to implement assumptions and procedures mandated by statute and the preservation program process.

The Department received 19 comments asking that these Appraisal Guidelines be published for notice and comment. These guidelines were published for notice and comment on December 12, 1991 at *56 FR 64932*. One commenter said that the lack of defined appraisal standards made it appear less likely that owners will realize their equity. Appraisal standards have been defined in the published Appraisal Guidelines.

We received approximately two dozen additional comments that dealt with issues specific to the Appraisal Guidelines. These comments were forwarded to HUD staff preparing the Appraisal Guidelines. They have been taken into consideration and are not discussed here. Comments that apply both to this regulation and the Appraisal Guidelines are considered here.

One commenter suggested that among the qualifications for an appraiser should be that it not be affiliated with the original mortgage lender or the lender that will be used for the section 241(f) loan. The Department agrees that the appraiser should not be involved in a situation that may constitute a conflict of interest. At the time of the appraisals, however, no mortgagee for the rehabilitation, equity take-out, or acquisition loans will have been identified. Thus, the Department has amended § 248.111(c)(1) of the regulations to require that appraisers not be affiliated with the current mortgage holder.

A commenter said that it may be an undue burden to have the requirement that the appraiser be certified or licensed in states where certification is not required. The Department declines to change this requirement since under title 11 of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989, Public Law 101-73, *12 U.S.C. 3310 et seq.*, appraisals performed in connection with federally-related transactions must be conducted by individuals certified or licensed by the State in accordance with the Act's requirements. States are required to have licensing procedures and standards in place by December 31, 1992.

Two commenters said that the assessment of rehabilitation costs, or capital needs assessment, should be done by a competent estimator with experience in multi-unit construction. Similarly, five commenters said that HUD should require an independent engineering survey and a capital needs assessment. Another suggested that the analysis of replacement reserves be done by professional architects or engineers. These arguments, among others, persuaded the Department to have its own Architectural and Engineering staff or contractor undertake the capital needs assessment and reserves analysis instead of leaving these to each appraiser. The joint inspection format, discussed in the separately published Appraisal Guidelines, ensures that all concerned and knowledgeable parties have input to the capital needs assessment. At the same time, having a single, experienced estimator ensures that appraisers have in common a realistic, professional rehabilitation cost estimate and that eventual rehabilitation costs do not differ radically from those used at this stage to determine preservation value. It should be noted that, after initial reserve funding requirements are set by a formula described in the Appraisal Guidelines, future annual contributions will be determined periodically by HUD upon request of the owner.

Three commenters said that the Department should consider in its guidelines those applicable regulations and covenants that affect value, and that these should be furnished by owners' lawyers and appraisers. One commenter asked that the analysis of laws and contracts that affect value be done by lawyers. The Department agrees that such analyses should be done by competent professionals, but believes that it is the appraisers' responsibility as part of the appraisal assignment to collect such input from the appropriate sources and, using the Appraisal Guidelines provided by the Department, determine the effect of any covenants or use restrictions on value.

Two comments suggested that the appraisal guidelines contain specific instructions for estimating "conversion costs" and conducting capital needs assessments. The Department has published specific instructions regarding conversion costs and capital needs in the Appraisal Guidelines. The Department will conduct a capital needs assessment as part of the appraisal that will determine the costs of bringing the property back to original physical standards. This assessment will be provided to the appraisers.

A commenter recommended that the determination of operating expenses, reserve requirements, and rehabilitation needs in conjunction with HUD's review and approval of a plan of action be separate from the determinations made at the appraisal stage. Operating expense estimates and rehabilitation needs identified in the plan of action will receive a separate review and are expected to be more detailed than those conducted as part of the appraisal.

Three commenters suggested that HUD needs to distinguish between rehabilitation costs that an owner would incur to convert the project to a higher and better use for purposes of preservation value as opposed to rehabilitation costs necessary to preserve the project as low income housing for its remaining useful life. Another commenter questioned why, since the appraised value can be used to determine the amount of market rents, section 241 loans, etc., the proposed regulations say that the amenities and upgrades necessary to bring the project to its highest and best use will not be financed as part of the plan of action. Although fair market value is estimated as if the amenities and upgrades required to attract a market rate tenancy are added, they are not actually added since the project is not converted to market rate rental. These upgrades influence actual rents and equity or acquisition loan amounts only because the owner must be fairly compensated for preserving the housing for a low income tenancy. The rehabilitation necessary for the preservation of the affordable housing as decent, safe, and sanitary housing is independent of the upgrades necessary to attract a market-rate tenancy, and will be determined by the Department after a joint inspection conducted by HUD and the purchaser or owner during the preparation and review of the plan of action.

Two commenters recommended that the appraisal process include input from or participation of resident councils. Another commenter asked that tenants be permitted to submit information to HUD on the physical condition of the project. In response, the Department has provided in the Appraisal Guidelines opportunities for appropriate input before and during the project's inspection for capital needs. Two additional commenters suggested that HUD add a provision to the regulations to require that HUD consider any information submitted by a resident council. The Department will consider comments from resident councils prior to the inspection, but due to the statutory time frames established in section 213, it cannot lengthen the appraisal process in order to provide a formal comment period.

A similar comment asked that the appraisal process include input from the State housing finance agency. The Appraisal Guidelines provide that appraisers may place reliance upon the assessment of conversion costs (over and above the capital needs assessment) determined by an appropriate State agency, if such an agency has been approved by the Secretary.

Three commenters suggested that the Appraisal Guidelines should require the consideration of local ordinances or restrictions. Reflecting the statute, the Appraisal Guidelines will require the consideration of local ordinances and use restrictions. The same three commenters said that the guidelines should allow some opportunity for local government or tenant input into the appraisal instructions. Since the Appraisal Guidelines are being published for comment, local and tenant groups have an opportunity to comment on them. If the commenters intended that these groups have the opportunity to comment on the appraisal instructions sent out to the appraisers of each project, the Department feels that this would be unnecessary and would lengthen the process without justification. As discussed earlier, the Department has provided for appropriate participation of State and local government entities and tenant groups prior to and during the inspection of the property.

A commenter stated that the estimator who will calculate the rehabilitation costs should obtain and consider any inspection reports issued by the State or local government or by HUD. The Appraisal Guidelines clarify that HUD Architectural and Engineering staff or contractors will determine rehabilitation costs. The Department would expect State and local government to provide any such input at or prior to the time of the joint inspection.

The Department received three comments recommending that the appraisal take into account as conversion costs restrictions imposed by LIHPRHA itself on projects that prepay their mortgage or voluntarily terminate their mortgage insurance. Examples would include relocation costs for tenants, continued occupancy, etc. The Department has not accepted the recommendation, since the essential purpose of the LIHPRHA appraisal process is to determine the value of the project in the absence of the constraints imposed by LIHPRHA itself. However, State or local restrictions on conversion will be taken into account in the appraisal.

A commenter stated that the regulations do not take into account the fact that historical operating expenses may include extraordinary nonrecurring expenses and that an owner's accountants may characterize some capital expenditures as operating expenses in order to avoid phantom income. The Appraisal Guidelines will instruct appraisers to eliminate extraordinary or nonrecurring expenses from the operating expense analysis. In cases where capital expenditures have been allowed by auditors as operating expenses, the Department will assume the allowance is valid.

The Department received two comments stating that the three year rule on operating expenses should be a guide only and that HUD should instruct appraisers to look at the real operating expenses expected after conversion. Since the three year rule on operating expenses is a statutory provision, the Department lacks the authority under LIHPRHA to change this rule. Again, in the interests of determining "real operating expenses," the Department instructs appraisers in the Appraisal Guidelines to identify extraordinary or nonrecurring expenses. Section 248.111(e) has also been revised to clarify when and for what purposes appraisers may use the most recent year's operating expenses instead of the three year historical average.

A commenter also pointed out that in cases where the project's highest and best use is something other than residential rental use or cooperative ownership, it makes little sense to require a comparison to the three year average operating expenses of the property as a rental. The Department has accordingly revised the regulation to allow for the use of projected operating expenses alone in such cases.

The Department received three comments stating that if the cost of rehabilitation is to be deducted from value, then the replacement reserve funds available to be applied towards that cost must be offset against the deduction. The commenters suggest that the amount of the replacement reserves be included in the calculation of preservation value. The Department has decided not to include replacement reserves in the calculation of preservation value. As in other sales, upon the transfer of a property under LIHPRHA, reserve for replacement and other escrows are either purchased or retained by the owner and thus not included as part of the value of the property.

One commenter suggested that special rehabilitation needs be considered when computing the preservation value. The need to pay for seismic reinforcement or removal of toxic materials, such as asbestos, are among the most critical examples. Lead-based paint and asbestos abatement are included in the capital needs assessment performed by the Department. Other toxic material removal and seismic reinforcements will be included in the capital needs assessment if specified by State or local laws or codes.

One commenter stated that if the appraisal demonstrates that there is no preservation equity in the project, HUD's regulations do not specify the result. The Department has determined that if a project has no preservation equity, it cannot prepay, except pursuant to approval of a plan of action filed under § 248.141, nor is it eligible for any incentives under LIHPRHA. LIHPRHA is designed to provide owners with a fair market return on their investment through the receipt of incentives provided by HUD in exchange for maintaining low income affordability restrictions for the project's remaining useful life. If a project has no preservation equity, there is no basis on which to increase an owner's return. In these cases, if calculated, the new annual authorized return would be less than the current allowable distributions. Since owners have no preservation equity, permissible incentives under section 220(b) are, therefore, not necessary to provide owners with a fair market return on their investment. Owners, of course, could apply for such "incentives" as additional section 8 assistance or capital improvement loans under other program authorities designed to maintain the stock of HUD-assisted or insured loans.

Two commenters were concerned that priority purchasers were precluded from any involvement in setting the preservation value of a project. There is no provision in the statute for priority purchasers to be involved in setting the preservation value. The preservation value is established objectively in the appraisal process. Any purchaser in a voluntary or mandatory sale may submit an offer at less than the preservation value. Further, since HUD, with the possible exception of the five percent equity requirement, will provide insured financing and support the debt service on acquisitions, purchasers have less interest in the purchase price than they would in an ordinary transaction. Thus, the Department has decided not to accept the commenters' recommendation.

One commenter said that using the highest and best use appraisal for transfer preservation value, but the highest and best use as market rate rental for extension preservation value, will make selling the property more attractive to owners. Fair market values for transfer and extension are explicitly defined by LIHPRHA, and the Department has no authority to change them. In most situations, the highest and best use of a property will be market rate rental housing, so that the extension and transfer value will in fact be identical. It should be noted that other differences between the transfer and extension options will also influence owner decisions, e.g., tax consequences, processing times, and section 241(f) loan amounts.

Two commenters suggested that the owner should receive a copy of HUD's appraisal. The Department agrees, and has amended the regulation accordingly.

Fifteen comments requested that tenants should have the right to comment on the appraisals before they become final. The Department disagrees since this would make the appraisal process too burdensome and time-consuming. Furthermore, the determination of appraised value is best handled neither by HUD, nor the owner, nor the tenants, but by independent, professional appraisers. Tenants will be invited to HUD's inspection of the property for the capital needs assessment and may provide useful information about the physical condition and rehabilitation needs of the property, which will help the appraisers make accurate value determinations.

Section 213(a)(3) of the statute provides that the Secretary may approve an "extension" or "transfer" plan of action to receive incentives only based upon an appraisal that is not more than 30 months old. Five commenters were concerned that the appraisals could not be updated or adjusted during their thirty-month lifespan. Property values may change in this time period and owners could receive incentives based on an outdated property value. The Department recognizes the commenters' concerns but has been unable to formulate a workable and statutorily permissible mechanism to alleviate them. Preservation values drive the preservation process from the start. The resulting aggregate preservation rents are compared to the Federal cost limit to provide project-specific information to owners on their options. The property may be offered for sale for up to 15 months, and potential purchasers are informed of available assistance based on the preservation value and Federal cost limit. Reestimating value late in the process would change the ground rules for all parties concerned and unnecessarily lengthen the process. Adjusting preservation value would mean adjusting aggregate preservation rents and recomparing them to the Federal cost limit, which would also have changed since the original analysis. Moreover, property values are not subject to simple inflation factors that could be applied to all properties. An attempt to reach agreement on reevaluation might require multiple appraisals. Finally, the Department believes that the language of section 213(a)(3) implies an assumption on the part of Congress that no readjustment of preservation values is warranted as long as the plan of action is approved within 30 months from the date of the appraisal.

*Section 248.121 (Annual Authorized Return and Aggregate Preservation Rents)*

Fifteen commenters, composed of six national and regional nonprofit organizations, two State agencies, three law firms representing owners, two owners, one consultant, and members of Congress contested the Department's position concerning the annual authorized return which an owner may receive on its equity in the project. Paragraph (a) of this section of the proposed rule sets an annual authorized return of 8% for owners who retain the project and receive incentives in exchange for extending the project's affordability restrictions. This provision repeats, almost verbatim, the

language of section 214 of the statute. In addition, § 248.153(a)(1), which is based on section 219 of the statute, provides that the Commissioner shall "enter into such agreements as are necessary to enable the owner to receive the annual authorized return." The commenters have taken issue with the Department's interpretation of these provisions.

As noted in the preamble to the proposed rule, the Department's interpretation of the statute is that an owner is authorized to receive an 8% return, but is not guaranteed that return on an annual basis. The Department intends to set an annual authorized return of 8%, as mandated in section 214 of the statute, but cannot ensure that an owner will receive that level of return annually. The Department has not changed its position in the interim rule. The language of the statute, and the Conference Report at page 464, support the Department's interpretation by stating in section 219 that after HUD approves a plan of action, it should enter into such agreements so as to "enable" an owner to receive the annual authorized return. The common meaning of the term "enable" is to provide with a means, give an opportunity, make possible, or provide the capacity; it does not mean guarantee.

The Department, as set forth in paragraph (a) of this section, will set the annual authorized return equal to 8% and will provide incentives sufficient to enable an owner to receive that return. Because the statute requires, in section 222, that rent increases be phased-in when the increase is substantial, over a minimum three-year period, it is expected that some owners, especially those with a large proportion of non-section 8 units or vacant units, or those which own projects requiring substantial rehabilitation, will not receive the full 8% return in the first three years after approval of the plan of action. The Department intends to mitigate this effect as much as possible by permitting owners who fall short of the 8% to withdraw funds from the project's residual receipts account and, for those projects with a mortgage insured or assisted under section 236 of the National Housing Act, by permitting a temporary deferral in remitting excess income until such time as the phased-in rents allow the owner to receive an 8% return.

Another commenter questioned whether an owner who has deferred its distributions prior to approval of the plan of action may realize those distributions under this subpart. The commenter proposed a system for permitting an owner to receive accrued distributions by excluding them from the rent stream established under the plan of action. HUD's response is that an owner may receive its accrued, unpaid distributions by withdrawing funds from the residual receipts account or from surplus cash with HUD approval.

One commenter expressed concern that the preamble to the proposed rule indicated that the annual authorized return would be funded from the residual receipts account. The commenter claimed that at the conclusion of the preservation process, there would not be any residual receipts. The Department expects that the residual receipts account will continue to be funded after preservation. The annual authorized return will primarily come out of the rent stream for the project. It is anticipated that residual receipts funds will be utilized to enable an owner to receive its return only when the rent stream is insufficient to provide an adequate return, such as during the phase-in period required for rent increases under § 248.145.

A commenter questioned which rent levels would be used in the underwriting of section 241 acquisition and equity loans. The Department would like to clarify that the two rent levels established under this section, extension preservation rents and transfer preservation rents, are hypothetical estimates created by statute for the sole purpose, as noted in section 214(b) of LIHPRHA, of comparison to the Federal cost limit. Extension and transfer preservation rents are not determinative of the actual rents established under § 248.145. Rents will include debt service on the section 241 acquisition or equity loan. However, the total gross rents for the project cannot exceed 120% of the existing FMR. Extension and transfer preservation rents bear no relationship to the underwriting of any loans. Underwriting will be based on the actual rents for the project which will be established in accordance with § 248.145.

With regard to subparagraphs (c)(2) and (d)(2), a commenter requested more specificity on how HUD will determine the amount of the rehabilitation loan. The amount of the loans will depend on the rehabilitation which is needed, based on a physical inspection of the project at the time the plan of action is approved. If a project proceeding under this subpart requires rehabilitation, an owner or purchaser may receive financing under the rehabilitation loan program in part 241 of this title, or through the capital improvements loan program set forth in part 219 of this title.

Section 219.305 of title 24 of the CFR lists the rehabilitation expenses and energy improvements which may be covered by the capital improvements loan program.

The same commenter also suggested that the rehabilitation loan should include a one-time deposit to the project's replacement reserve fund as a sinking fund to protect against future rehabilitation costs. The Department expects that the monthly deposits made to the reserve for replacements fund will be sufficient to cover future project maintenance and the rehabilitation items, making the sinking fund unnecessary.

One commenter requested that the definition of adequate reserves in paragraph (e) be clarified in order to prevent arbitrary determinations. Adequate reserves will be determined in the same manner as in subpart C. The level of reserves is based on the amount of funds needed on a monthly basis to maintain the project in accordance with the housing quality standards of § 248.147.

*Section 248.123 (Determination of Federal Cost Limit)*

Section 215(a)(1) of LIHPRHA mandates that the Department separate high cost projects from the remainder of the eligible low income housing inventory by using a Federal cost limit. Twenty comments were received by the Department concerning the determination of relevant local markets, prevailing rents, and the Federal cost limit.

The term "relevant local market" is defined in both § 248.101 of this subpart and in the Appraisal Guidelines. The determination of what constitutes the relevant local market in which a specific eligible low income housing project is located is left up to the professional judgment of the appraiser retained by the Department under § 248.111. Section 248.101 of the proposed regulation defines a relevant local market as "identifiable as a distinct market area in which similar projects and units would effectively compete with the subject project, for potential tenants." It is expected that this market area will be smaller than that established by the Department to determine the section 8 existing fair market rents. This definition is expanded upon in the Appraisal Guidelines, which state that the relevant local market is a geographic area in which similar properties effectively compete with the subject project in the minds of probable, potential purchasers and users. In nonmetropolitan areas, if the appraiser ascertains that there is a lack of comparable rental housing, the appraiser may use comparables from noncontiguous localities as long as they are in the same county or parish and have similar demographics and market characteristics. If there are no comparables in the local market or noncontiguous areas, the appraiser will document that fact in his/her report.

One commenter suggested that paragraph (b) of this section be amended to delete the sentence permitting section 8 existing fair market rents to be the sole measure of the Federal cost limit if the appraiser determines that there are no comparables. HUD included this statement in the proposed rule in anticipation of situations where no comparables exist and where it is impossible to define a relevant local market and its prevailing rents. The Department sees no reason for amending this provision.

Two commenters questioned whether rent-controlled properties would be considered comparables for purposes of determining the prevailing rents for a relevant local market. The Department has decided that rent-controlled properties will be included as comparables to determine prevailing rents. Rent-controlled properties and eligible low income housing located in the same relevant local market area are very likely to compete with each other for tenants, supporting the position that they are similar properties, and hence, comparable. Also, it is expected that the inclusion of rent-controlled properties will not have a substantial impact on prevailing rents in most metropolitan areas.

However, rent-controlled properties will only be included as comparables in the determination of a project's fair market value if the appraised project would be subject to rent control in the event of prepayment. It is the responsibility of the appraisers retained by HUD and the owner to determine whether a project would fall within the scope of a locality's rent control laws.

To assist in determining prevailing rents for a particular relevant local market, the Department will instruct

appraisers to consult with the State and local governments in order to take advantage of any information they are able to provide. However, the Department has declined to make consultation with State and local governments over the appraisals mandatory, as six commenters suggested. HUD has also decided not to accept the suggestion that if a local government ascertains that there are no comparables for calculating prevailing rents, then only the section 8 existing fair market rents would be used to determine the Federal cost limit. The statutory language of section 215 leaves the determination of relevant local markets and prevailing rents up to HUD's discretion and, as the language of this section indicates, the Department will use information acquired by its appraiser and any other appropriate information in order to make the necessary calculations. HUD recognizes that State and local governments, as well as comments from community organizations and residents, may be a valuable source of information. HUD will take into consideration any information provided by the State and local government indicating the absence of comparables in a particular relevant local market; however, the State and local governments' determination will not be binding for purposes of determining the Federal cost limit.

In response to one comment, HUD believes that it is not necessary for the owner's appraiser to do a second relevant local market study to assist HUD in its determination of prevailing rents. A second study would be duplicative and would cause the owner to pay for additional work not required for determining the appraised value of the project. However, HUD will utilize, as appropriate, any information in the owner's appraisal or data submitted by interested parties in addition to the relevant local market study done by the HUD-retained appraiser.

A concern was raised by two commenters that the section 8 existing fair market rents which are used to determine the Federal cost limit would erroneously be adjusted for utilities. Utilities will not be deducted from the published fair market rents which are used for purposes of calculating the Federal cost limit. It should be noted, however, that for other purposes in this subpart, including the calculation of the actual rents to be paid by the tenants, the fair market rents will be adjusted by a utility allowance. To avoid confusion, the definition of fair market rent in § 248.101 has been amended to clarify that for Federal cost limit purposes utilities will not be deducted. For consistency, the Appraisal Guidelines will also instruct the HUD appraiser to use gross rents, i.e., contract rent plus all tenant-paid utilities, in determining the relevant local market rents. Section 248.121(e)(2) has also been modified to clarify that, for purposes of comparison to the gross rents used in determining the Federal cost limit, project operating expenses in aggregate preservation rents must include the cost of utilities paid by the residents.

The Department acknowledges one commenter's concern that underestimated rehabilitation costs may artificially inflate a project's preservation value, but disagrees with the conclusion that this will cause the Federal cost limit to be exceeded and lead to conversion to market rate housing and displacement of low income tenants. In determining whether or not the Federal cost limit is exceeded, HUD will compare a project's preservation rents to 120% of the section 8 existing fair market rents and 120% of the prevailing rents. One component of preservation rents is debt service on a rehabilitation loan. If rehabilitation is underestimated, the loan amount will be lower, leading to a corresponding decrease in the preservation rents. This decrease should offset any increase in the preservation rent resulting from a potentially overestimated preservation value. Moreover, regardless of how preservation rents are calculated, conversion to market rate housing would result only pursuant to § 248.169, either because of a lack of appropriated funds or because a bona fide offer is not made, or under § 248.141.

*Section 248.127 (Limitations on Action Pursuant to Federal Cost Limit)*

The discussion in the preamble of the proposed rule, regarding limitations on action pursuant to the Federal cost limit, states that where an owner intends to retain a project whose extension preservation rent exceeds the Federal cost limit, that owner may receive incentives only up to an amount that can be supported by a projected income stream equal to the Federal cost limit. Three commenters disagree with this position, asserting that the Conference Report, at page 464, states that section 8 assistance could be set at more than 120%. The Department's position is that section 8 rents can exceed 120% of the fair market rent; however, the income stream under the plan of action may not exceed the Federal cost limit.

*Section 248.131 (Information From the Commissioner)*

The Department received sixteen comments concerning this provision of the proposed rule which sets forth the information the Department is required to send to an owner and the tenants of a project for which a notice of intent has been submitted under this subpart. Section 216 of LIHPRHA requires that the Department supply the owner with any information necessary for preparation of a plan of action, including preservation values, preservation rents and a statement as to whether the aggregate preservation rents exceed the Federal cost limit. Two commenters noted that this information should be more extensive and should include audited financial statements, a current approved rent schedule and operating budget, a statement as to mortgage status, rent roll, physical inspection reports, and management reviews. The additional data mentioned by the commenters is already in the possession of the owner and will be made available to potential purchasers at the time they submit an expression of interest. The Department feels that it is not necessary to make this information available at an earlier stage in the process. For this reason, the Department declines to supply information which is not statutorily required.

Four commenters criticized the proposed rule's ambiguity in stating that this information shall be made "available to the tenants." In response to these comments, the Department has amended the proposed rule to state that information to be provided under this section will be sent to any tenant representatives who are known to the Department and if none exist, the information will be available from the local HUD field office. Notices will also be posted in each affected building apprising tenants of the information and explaining from whom, and where, that information can be obtained. The Department has also decided, in response to four additional comments, to provide this information to that officer in the State or local government to whom the owner sent a notice of intent, in order to fulfill the requirement of § 248.179 that HUD consult with other interested parties prior to approving a plan of action under this subpart.

*Section 248.133 (Second Notice of Intent)*

The Department received twenty-four comments regarding the submission by owners of a second notice of intent to the Secretary. Four of these comments concerned notification of the tenants, with three of the four commenters suggesting that the Department adopt the stricter notice requirements set forth in § 248.105, governing the original notice of intent, and requiring that all tenants and each tenant representative receive a copy of the second notice of intent. The fourth commenter suggested that the second notice of intent be posted in the affected buildings and be delivered to any tenant representatives. The Department has determined that it would be appropriate to require that the second notice of intent be delivered to each tenant representative, and if no tenant representative is known to the owner, then to each occupied unit. HUD has determined that it is unnecessary to send the second notice of intent to each of the tenants if a tenant representative exists since the tenants have already received the original notice of intent and it is presumed that the representative will act on the tenants' behalf and disseminate this information for them. The rule has been amended accordingly.

One commenter recommended that the Department require an owner submitting a second notice of intent to provide evidence of the consent of its general and/or limited partners to the submission. The Department has decided not to accept this proposition. It is presumed that an owner taking action under this rule has the authority to do so and has the consent and agreement of its partners.

Seventeen commenters suggested that the second notice of intent to transfer the project be binding on an owner. Commenters also noted that if an owner does change its mind after submitting a second notice of intent, it should have to face financial penalties, pay the costs incurred by potential purchasers, or be prohibited from prepaying the mortgage or terminating the mortgage insurance contract for a reasonable period of time. The concern raised by most of the commenters was that resident groups and nonprofit organizations would expend valuable time and funds attempting to put together a bona fide offer, and if an owner then decided not to sell the project, then these groups would needlessly lose that money.

The Department, acknowledges the validity of this concern; however, there is no statutory basis for requiring that a second notice of intent be binding and the Department has no authority to impose financial penalties on owners who change their minds after submitting a second notice of intent. Since the statute does not require an owner who receives a bona fide offer under § 248.157 to accept that offer, HUD cannot add the additional requirement that the second notice of intent be binding in that circumstance. Under the mandatory sale provisions of § 248.161, however, once an owner who has submitted a second notice of intent receives a bona fide offer for sale at a price equal at least to the transfer preservation value, the owner is bound to accept that offer, but prior to receipt of an offer under § 248.161, an owner is free to change its mind.

It should be noted that if an owner proceeding under § 248.157 or § 248.161 changes its mind after filing the second notice of intent, and in the case of § 248.161, before receiving a bona fide offer, and decides to retain the project and seek incentives, then the owner must comply with the statutory requirement that a plan of action be submitted within six months of receiving the information provided by the Secretary pursuant to § 248.131. If the owner fails to submit a plan of action for incentives within that six-month period, then it must begin the process over again by submitting a new notice of intent under § 248.105. Owners should also be aware that § 248.135(g), which bars an owner from resubmitting a notice of intent for six months from the date the process is aborted, is also applicable to owners who decide to pursue incentives after filing a second notice of intent and then fail to submit a plan of action for incentives within the applicable time frame.

This section of the proposed rule has been amended to delete subparagraph (a)(2), which requires the submission of a second notice of intent if an owner plans to prepay the mortgage or terminate the mortgage insurance contract under § 248.141. As a commenter pointed out, this is not required under section 216(d) of the statute. HUD has determined that this submission is not necessary since the tenants will be notified of this development when the plan of action is submitted.

*Section 248.135 (Plans of Action)*

This section discusses the submission of the plan of action. With respect to paragraph (b), which governs a joint submission by an owner and purchaser, the Department received six comments. Four commenters pointed out that if an owner terminates the use restrictions or retains the project with use restrictions in exchange for incentives, it has six months from receipt of the information provided by the Department under § 248.131 to submit a plan of action, but if the owner transfers the project under § 248.157 or § 248.161, it only has 90 days after accepting a bona fide offer in which to jointly submit a plan of action with the purchaser. The commenters claimed that the proposed timeframe for the joint submission is unreasonable and suggested extending it to six months. In order to treat owners equitably, regardless of whether they retain or sell the project, and in recognition of the fact that a joint submission may be difficult to prepare, the Department has amended paragraph (b) to provide the same six month period for submission of a plan of action to owners who retain the project and to those who sell.

Owner and purchasers should note that if a plan of action is not submitted within the applicable six month period, the notice of intent filed under § 248.105 becomes ineffective and the owner must wait six months before being eligible to resubmit the notice. Although one commenter claims that this result is inequitable if the failure to submit the plan of action was due to the fault of the purchaser or circumstances beyond the owner's control, this penalty is one that is statutorily imposed under section 217(a)(3) of LIHPRHA and the Department does not have the discretion to waive it. Owners and purchasers are also cautioned that if a bona fide offer to purchase the project is accepted late in the 15 month marketing period, it would be in the best interests of both parties to submit a plan of action as soon as possible during the six month submission period, given the fact that LIHPRHA authorizes the Department to accept only plans of action based on appraisals which are not more than thirty months old.

One commenter suggested that if an owner and purchaser cannot jointly agree on a plan of action, the owner should have the right to submit the plan alone and control the plan of action process. If an owner is selling a project, the

owner's primary interest in the transaction will be its return on the sale, which is established through the appraisal process; the owner's interest in the aspects of the plan of action which affect the operation of the project after the sale is minimal. Therefore, Department has decided to retain the requirement that the plan of action be jointly submitted. If the owner and purchaser are unable to submit a plan of action within the applicable time period, then the transaction will not be completed and the owner will be forced to file a new notice of intent after waiting the six months specified in paragraph (g) of this section.

One commenter recommended that procedures be established that ensure the purchaser's role in selecting professionals to prepare the plan of action. Another suggested that primary responsibility for demonstrating the feasibility of the sales transaction should rest with the purchaser, but the owner would ultimately control the contents of the submission. Still another commenter recommended that the plan of action be submitted by a qualified housing counseling agency that serves a low income clientele, rather than by the owner's staff or a housing consultant. The statute, under section 217, places the responsibility of submitting a plan of action with the owner, or in the case of a transfer, with the owner and the purchaser. The Department sees no need to further regulate the manner in which the plan of action is prepared. If an owner and purchaser are unable to submit a plan of action, the owner, as previously noted, will be forced to begin the process again by submitting a new notice of intent. The purchaser will be unable to purchase the project for at least another year and a half, until the six month waiting period, under paragraph (g), for submitting a new notice of intent expires, new appraisals are conducted, and the project is again offered for sale. This, in itself, should be a sufficient inducement to ensure cooperation by both parties.

Paragraph (c) of the proposed rule requires that the plan of action be submitted to the chief executive officer of the appropriate State or local government. This paragraph has been amended to conform to the changes made in §§ 248.131 and 248.133, which require that the information from the Commissioner and the second notice of intent be submitted to that officer of the appropriate State or local government entity to whom the notice of intent was submitted under § 248.105. A commenter also proposed that an owner should provide certified documentation that the plan of action has been reviewed by a unit of local government. Section 217(a)(2) requires the appropriate State or local government entity to review any plans of action which are submitted by an owner and this requirement has been included in this paragraph. The Department has declined to require a certification, however, since it does not have the authority under LIHPRHA to enforce this requirement and because the Department believes that an owner should not be penalized for another party's failure to comply with the statute. As long as the owner properly submits the plan of action to the specified parties, the owner has fulfilled its obligations under this paragraph.

Three commenters requested that State or local governments be notified if a plan of action submitted to HUD will not maintain the use restrictions on the project for its remaining useful life or if the plan contemplates the resale of the project by tenants for a profit. With the exception of projects purchased by tenants pursuant to a resident homeownership program under § 248.173, all plans of action to extend affordability restrictions must provide that the restrictions will remain in place for the project's remaining useful life. Additionally, under § 248.173(h)(3)(ii) a resident may not receive a profit from the resale of its unit for at least six years from the time it purchases the unit. In light of the foregoing, and since the State or local government will receive a copy of the plan of action upon its submission to HUD and the appropriate State or local government agency must review the plan of action, the Department sees no need to impose an additional notification burden under this section.

Paragraph (c) reiterates the statutory language of section 217(a)(2), requiring the "appropriate" State or local government agency to review any plans of action submitted to the Department. One commenter requested guidance in determining the appropriate agency. The notification requirements under LIHPRHA require submissions to be made to the State or local government in whose jurisdiction the project is located. The Department recognizes that delivering the plan of action to the State or local government in the jurisdiction in which the project is located may not ensure that the "appropriate" agency is provided with the plan of action for review. In order to ensure that the statutory purpose is carried out, the Department itself will forward copies of the plans of action to the appropriate State or local government agency if that agency did not receive a copy from the owner.

The Department received eleven comments contending that tenants and the State or local governments should have the right to comment on any plans of action submitted to the Department. In response to these comments, the Department has amended the proposed rule to provide a sixty-day comment period for tenants and State and local governments. This period will begin on the date of HUD's receipt of the plan of action, which should be sent simultaneously to the tenants and the State or local government. This comment period will not extend the processing time under this subpart because the sixty-day comment period will begin on the same date as the six-month period, provided under § 248.149(b), for Departmental approval of the plan of action. If the plan of action is revised, the tenants and the State or local government will be provided with a copy of the changes, pursuant to paragraph (c), and will be given a reasonable opportunity to comment on the revision. The Department will not approve a plan of action before the end of the sixty-day comment period, and in making its determination, the Department will take into account any comments received during that period. Findings made by the State or local government will be considered in accordance with section 228 of the statute, but they will not be binding on HUD; decisions made by State agencies may be binding, under the statute, only when the Department has delegated authority to that State pursuant to section 227 of LIHPRHA. Similarly, tenant approval of the plan of action is not required under the statute and it is impractical for the Department to respond to each tenant comment, but these comments will be given serious consideration in the Department's examination of the plan of action.

Tenant representatives may take part in negotiations between the owner and HUD on the plan of action, if the plan of action is jointly submitted by the owner and the tenants in connection with a sale of the project to the tenants. If the tenants are not purchasing the project, the Department sees no justification for participation by tenant representatives, especially since tenants, as well as tenant representatives, have the opportunity to comment on the plan of action.

Seventeen commenters advocated that HUD provide tenants with access to the plan of action. Comments ranged from requesting that each tenant be given a copy of the full plan of action to recommending that the plan be available on site and copying permitted free of charge. The proposed rule provides that the owner shall post a summary of the plan of action in each occupied building, provide the full plan to any tenant representatives, and make a copy available in a convenient location, as well as provide a copy to the chief executive officer of the State or local government. The Department has amended this provision to require that the posted summary indicate the name, address and telephone number of any tenant representatives and personnel in the local HUD field office who possess a copy of the plan of action, and a statement that tenants may contact these persons to obtain or review a copy of the plan. In addition to sending the plan to any tenant representatives and the State or local government, the owner must make a copy of the plan, with revisions, available to tenants for copying in the on-site office, or if an office is not available, in the location where rents are collected, during normal business hours. Owners shall permit tenants to photocopy the plan of action, or shall provide copies at a reasonable cost. Any revisions made to the plan of action, including any deficiency letters issued by the Department under § 248.149(a), shall be submitted to the tenants and State or local government in the same manner as the original plan of action. The Department will not require copies of the plan of action to be given to every tenant, or require posting of the entire plan of action, since plans of action are generally quite lengthy and the interim rule provides sufficient opportunity for tenant access to the plan of action.

According to four commenters, tenants should have the right to inspect and copy all supporting documentation to the plan of action. The plan of action is intended to be a complete, self-contained document, containing all of the information necessary for the Department to make its determinations under this subpart. All supporting documentation is included in the plan of action itself and is available to the tenants in the manner provided under paragraph (c).

One commenter suggested that if an owner submits a plan of action to terminate the affordability restrictions, given the fact that the purpose of the statute is to restrict terminations, the contents of the plan should include more detailed documentation than that required under paragraph (d) of this section. The commenter did not specify what type of documentation should be required, but the Department believes that the information requested in this paragraph of the proposed rule is sufficient to enable HUD to determine whether or not the owner is eligible to prepay the mortgage or terminate the mortgage insurance contract pursuant to § 248.141. The same commenter also recommended that someone other than the owner, its staff, or consultant, such as a State or local government, submit the assessment, under

subparagraph (d)(4), of the effect the prepayment or termination will have on existing tenants. Section 228 of LIHPRHA requires the Department to confer with, and give consideration to, the views of any State or local government agency when making determinations under the statute. The Department recognizes that State and local governments are valuable sources of information concerning housing located in their jurisdictions and the Department encourages the submission of relevant data, as well as comments, regarding any plans of action submitted under this subpart. The Department fully intends to consult with these agencies prior to approving any plans of action to prepay the mortgage or terminate the mortgage insurance contract.

Subparagraph (e)(2) of this section requires an owner to submit in its plan of action package a description of the Federal incentives requested to address any physical deficiencies of the project. Three commenters expressed concern that the rehabilitation costs for the project should not be based on the costs determined in the appraisal process under § 248.111, but should be based on information contained in the plan of action and on current cost considerations. In response, the Department notes that the rehabilitation costs determined in the capital needs assessment utilized in the appraisals, while intended to be a fair assessment of rehabilitation costs, are for the purpose of calculating preservation rents and preservation equity, and not for the purpose of actually funding rehabilitation as part of a plan of action. The scope of the capital needs assessment may not always be sufficient to reveal the actual costs necessary to rehabilitate the project to conform with housing quality standards or to estimate the actual operating costs of the project after rehabilitation. The Department recognizes that these costs may be underestimated in the assessment or the estimates may be outdated by the time of plan of action approval. For these reasons, the initial determination made in the appraisals will be an initial basis for estimating rehabilitation needs and costs, but will not be binding for purposes of funding rehabilitation and supporting operating expenses under a plan of action.

Nine commenters questioned the requirement in subparagraph (e)(5) of this section, that an owner submit as part of the plan of action an income profile of the tenants as of January 1, 1987 and as of the date of filing of the plan of action. The reason for this submission is to fulfill the statutory directive of section 222(a)(2)(F)(i) which authorizes the Department to approve plans of action extending affordability restrictions only if the project maintains the same proportions of very low, low and moderate income families or persons as resided in the project as of January 1, 1987 or as of the date of plan of action approval, whichever date results in the highest proportion of very low income families. As these commenters pointed out, however, the Department only requires that income profiles be retained by owners for a period of three years, so it is very likely that many owners have disposed of the January 1, 1987 profile, making it impossible for them to submit this information as part of the plan of action. It is impossible for the Department to reconstruct the missing income profiles since HUD does not keep data on all tenants.

One commenter suggested that to remedy this problem, for those projects where an income profile for January 1, 1987 is unavailable, HUD should set the proportion of very low income tenants, as of that date, at fifty percent. Another commenter suggested assuming a one hundred percent very low income tenancy. The Department believes, however, that the implementation of these suggestions would be contrary to the intent of the statute. Instead, where an owner certifies that the January 1, 1987 tenant income profile is unavailable, the Department will require that the owner submit an income profile for January 1, 1988, and if that is unavailable, for January 1, 1989. The affordability restrictions will then be maintained on the project in the same proportions of very low, low and moderate income tenants as resided in the project as of the date the plan of action is approved or the date of the earlier profile, whichever has the greatest number of very low income tenants. In order to minimize the need for this policy, the Department will include a directive in its administrative guidance requiring owners who still possess the January 1, 1987, the January 1, 1988 or the January 1, 1989 profiles to retain them for purposes of submitting a plan of action.

The Department received one comment encouraging HUD to examine whether or not project management caused distortion of the tenant income profiles by engaging in illegal tenant selection practices. The Department's position is that this type of review is not germane to the preservation process and HUD presumes that its customary management reviews will reveal any irregularities on the part of project management. In response to another comment, the Department is unable to internally examine the authenticity of an owner's submissions under this section since HUD does not have the necessary data for comparison. However, pursuant to the statute's directive in section 228, the

Department will consider any data submitted by State or local governments which supports or conflicts with the owner's submissions.

For purposes of maximizing the number of eligible low income housing units which are preserved for the use of very low income families and persons, four commenters suggested that any units which were vacant on January 1, 1987 and on the date of submission of the plan of action should be deemed very low income units. The Department has decided to adhere to its practice in implementing ELIHPA of allocating vacant units in proportion to the share of very low, low and moderate income tenants residing in the occupied units as of the date of the profile. In filling these vacancies, owners must rent the units in a manner that will maintain the tenant income profile for the remaining useful life of the project. This method of filling vacancies represents a deviation from the Department's usual policy governing tenant selection for units receiving section 8 assistance, because under this subpart a vacated section 8 unit may not be filled with a section 8 recipient if it is necessary to place a tenant who is ineligible for section 8 assistance in the unit in order to maintain the project's proportionality.

One commenter noted that section 222(a)(2)(F)(i) tracks the language in ELIHPA, requiring that the profile used with the plan of action be the one which has the highest proportion of very low income tenants. The commenter argues that the apparent purpose for this requirement under ELIHPA is to maximize the amount of section 8 assistance provided to the owner under a plan of action. However, under LIHPRHA, the Department is authorized to provide section 8 assistance to low income tenants as well as very low income residents. In some circumstances, this may result in less section 8 assistance being provided to a particular project than would be the case if the profile with a higher number of low income tenants is used. The commenter claims that Congress overlooked this result in drafting the statute. However, this outcome may indicate that the purpose of choosing the profile with the most very low income tenants is not to maximize section 8 assistance, but to preserve the greatest number of units for the tenants with the lowest incomes, i.e., those who are most in need. Regardless of congressional intent, the statute is clear that the profile to be used in the plan of action is the one with the highest proportion of very low income tenants and the Department perceives no justification for deviating from this standard.

As part of the plan of action submission under paragraph (e), one commenter suggested that a nonprofit or resident council purchaser should certify that it has retained an experienced management agent who has successfully managed low and moderate income housing, is familiar with HUD procedures and has the capacity to manage the rehabilitation, marketing and relocation contemplated under this subpart. The Department has determined that it is not necessary to include this requirement in the regulation since the regulatory agreement which a nonprofit or resident council purchaser will be required to execute as part of the transfer already states that any management agent must be acceptable to the Department.

Paragraph (h) of this section has been amended in response to two comments recommending that the State or local government be notified of the approval of a plan of action. The Department will notify the appropriate agency at the same time, and in the same manner, that it notifies the tenants of such approval.

*Section 248.141 (Criteria for Approval of a Plan of Action Involving Prepayment or Voluntary Termination)*

This section requires the Department to decide whether prepayment of the mortgage or termination of the mortgage insurance contract would create hardship for current tenants, whether other affordable housing is readily available, and whether the general supply of low income housing will be materially affected by such prepayment or termination. One commenter requested guidance as to how the Department would make these determinations. The written findings which this section mandates are identical to the findings the Department must make in § 248.221, pursuant to subpart C, and the Department will use the same methods and procedures in both subparts. HUD's administrative guidelines will elaborate upon the regulatory criterion.

Pursuant to this section, the Department may have to determine whether there is comparable, affordable housing for

tenants who may be displaced if a plan of action is approved. If an owner agrees to comply with the requirements of section 218(a)(1)(A), including the maintenance of rent restrictions and continued occupancy for current tenants, then the Department does not have to make this finding. One commenter stated that when determining whether housing is "comparable," the Department should take into consideration the special needs of the tenants, such as elderly residents, and include as comparable housing only those projects which can meet the tenants' needs and are suitable to the tenants' particular situation. The Department acknowledges that, for purposes of this section, "comparable" means more than just affordable. When determining whether there is adequate, comparable housing, under paragraph (a) of this section, the Department will take into consideration the requirements of special needs tenants, as that term is defined in § 248.101, who reside in the affected project. Housing will be deemed comparable only if the Department determines it to be suitable for those tenants who would be displaced if a plan of action involving prepayment or termination is approved.

The Department's position in the proposed rule, that tenants of projects for which the mortgage is prepaid or the insurance terminated under this section are not entitled to the tenant protections set forth in § 248.165, was contested by three commenters. As the Department explained in the preamble to the proposed rule, once the Department makes the findings required under this section, an owner is permitted to terminate the affordability restrictions on the project and further compliance with this subpart by the owner is not required. The Department's approval of a plan of action under this section signifies that the owner has demonstrated that its prepayment or termination will not create a significant hardship on current tenants; that there is a sufficient supply of readily available comparable housing; that low income families will be able to find affordable, decent, safe and sanitary housing near employment opportunities; and that housing opportunities for minorities in the community will not be adversely affected by the prepayment or termination. Approval of the plan implies that the protections provided for displaced tenants under § 248.165 are not necessary for the tenants residing in the affected project.

It should be noted that income eligible tenants residing in a project which is the subject of a prepayment or termination may receive section 8 certificates or vouchers to enable them to continue residing in the project or to relocate to other suitable housing. If these tenants are displaced, they have priority for receiving section 8 assistance pursuant to § 886.132 of this title.

If necessary to protect current tenants, the Department will require the execution by the owner of a use agreement, containing restrictions enabling current tenants to continue living at the project at rents set forth in section 218(a)(1)(A). This use agreement is enforceable by the tenants, as well as by the Department. While local governments and fair housing groups would not have standing to enforce the use agreement, they may bring violations of the agreement to the attention of the Department. A suggestion was received from one commenter that HUD should perform audits regularly and provide tenants, local fair housing groups and the local government with the right to notice and comment on the audit process in order to enforce such use restrictions. No scheduled audits will be performed to enforce the use restrictions on projects for which the mortgage is prepaid or the insurance terminated.

A commenter suggested that HUD work closely with, and obtain data from, local governments, where HUD is considering permitting an owner to terminate the affordability restrictions on the project. Another commenter stated that data received from an owner should be verified as to its accuracy and it should be determined whether the owner's submission is consistent with the community's perception of its needs. As noted in the previous section, the owner will provide the State or local government with a copy of the plan of action and the Department will provide the appropriate reviewing agency with a copy. These entities will then have sixty days in which to submit comments and any additional data to the Department for consideration. Also, the Department will confer with State and local government agencies, in accordance with section 228 of LIHPRHA, prior to making any determinations under this section.

A commenter claimed that the Department has no statutory basis for conditioning approval of a plan of action, under this section or § 248.145, on the absence of open findings of noncompliance with title VI of the Civil Rights Act of 1964, the Fair Housing Act, Executive Order 11063, the Age Discrimination Act of 1975, section 504 of the Rehabilitation Act of 1973 and all regulations promulgated under these statutes. While there is no explicit authority in

LIHPRHA permitting the Department to deny approval of a plan of action if an owner is found to be in noncompliance with any of the foregoing statutes, this requirement is consistent with the Department's obligations under the authorities cited above to affirmatively further fair housing. Furthermore, the Department cannot approve a plan of action permitting prepayment of the mortgage or termination of the mortgage insurance contract unless it finds that such prepayment or termination will not adversely affect the housing opportunities of minorities. An owner's failure to comply with the civil riqhts legislation listed above may support an inference that the prepayment or termination will produce a negative impact on minorities.

It should be noted owners of eligible low income housing must continue to comply with the Fair Housing Act and implementing regulations regardless of whether or not they prepay the mortgage or terminate the mortgage insurance contract on the project.

*Section 248.145 (Criteria for Approval of a Plan of Action Involving Incentives)*

Section 222(e) of LIHPRHA directs the Department, if feasible, to provide incentives only to owners of projects in those rental markets where there is an inadequate supply of decent, affordable housing, in order to prevent owners from receiving "windfall profits." The Department submitted a report to Congress on April 4, 1991 containing its findings and concluding that a windfall profits test is feasible. The Department intends to implement the windfall profits test in a separate issuance which will be published for notice and comment. In response to the proposed rule, the Department received forty-three comments concerning windfall profits and these comments have been given full consideration in developing the windfall profits test.

A commenter suggested that the Department abandon the "fair market rent" standard set forth in subparagraph (a)(5) and instead require that tenants pay the lesser of 30% of adjusted income or the preservation rent. The statute at section 222(a)(2)(D) explicitly requires that current tenants not pay more than 30% of their adjusted income or the published existing fair market rent. Additionally, the statute provides in section 214(b) that preservation rents are aggregate rents, not unit rents, and are used solely for the purpose of comparison with the Federal cost limit, implying that Congress did not intend the preservation rents to be the actual rents paid by the tenants. At the time of plan of action approval, the Department will determine the actual rents needed to support operating expenses, adequate reserves and rehabilitation needs.

The Department received eighteen comments concerning the phasing-in of rents for current tenants under subparagraph (a)(6) of this section. The most frequent responses were that the phase-in period should be extended, and that rent increases in any given year should be capped.

The proposed rule tracks the statutory language of section 222(a)(2)(E), which provides that rent increases of 10 to 30% will be phased in at not more than 10% per year and rent increases of more than 30% will be phased in equally over not less than three years. The statute clearly defines the parameters for the rent phase-in, providing the Department with no discretion to limit annual increases to 5% or 8%, or 10% in the case of very low income tenants, or 15% for increases greater than 30%, as commenters suggested. The statute places a cap of 10% on yearly increases if the total rent increase does not exceed 30%, but implicitly contemplates that if the total rent increase is greater than 30%, tenants may be faced with an annual increase of more than 10%. In order to decrease the burden on the tenants, an owner or purchaser may agree to phase in a rent increase over a period of more than three years, at its option. The Department also notes, in response to another comment, that all current tenants, including those of moderate income, will be subject to the phase-in provisions of this section.

Seven comments were received regarding subparagraph (a)(7) of this section, which authorizes the Department to provide section 8 assistance, if available, to current very low and low income tenants not already receiving section 8 assistance, who otherwise may experience adverse effects due to the implementation of a plan of action. To carry out this section, the Department will execute a section 8 housing assistance payments contract providing subsidy sufficient

to cover the number of very low and low income tenants residing in the project at the time of plan of action approval or at the time of the tenant income profile submitted under § 248.135(e)(5), whichever is higher. If the number of very low income tenants was higher at the time of the earlier profile, then the owner will be required to replace low and moderate income tenants who move out with very low income tenants. There is no need to reserve additional section 8 certificates, as one commenter suggested, since the assistance provided under this section is project-based.

Two commenters stated that there is no justification for restricting section 8 assistance to the amount established at the time of plan of action approval and that owners who wish to rent to additional very low and low income tenants should be entitled to a proportionate increase in section 8 assistance. Section 222(a)(2)(E)(ii) directs that section 8 assistance be provided to current tenants. At the time the plan of action is approved, if section 8 assistance is needed and is available, the Department will execute a housing assistance payments contract for the provision of this assistance. If a section 8 contract already exists, but is inadequate to meet the project's needs, the Department will also amend this contract in order to implement the plan of action. The statute does not obligate the Department to provide additional section 8 assistance to future very low and low income tenants. Future very low or low income tenants not covered by the new or amended section 8 housing assistance payments contract may apply for section 8 certificates or vouchers to subsidize its rent payments.

A commenter suggested that section 8 assistance should be provided to subsidize all of the units in a project in order to ensure sufficient rental income to support all acquisition costs. The statute only authorizes the Department to provide section 8 assistance to very low and low income tenants; therefore units occupied by moderate income and market-rate tenants will not be eligible for this assistance. However, the Department can provide section 8 assistance in excess of the section 8 existing fair market rent, as long as the total rent stream for the project does not exceed the Federal cost limit. If the rental income is still inadequate to pay for acquisition costs, the Department may provide grants to priority purchasers under § 248.157 and to qualified purchasers under § 248.161. The Department expects that the section 8 assistance provided to very low and low income tenants, along with the rents paid by moderate income and market rate tenants, will be sufficient to support the costs of the entire project since, for eligible low income housing, on average, an estimated 93% of the tenants currently residing in eligible low income housing are eligible for project-based section 8 assistance pursuant to this section.

Paragraph (a)(8) of the proposed rule permits the Department to approve rent levels for future tenants, including moderate income tenants. One commenter objected to providing future tenants with the same protections given to current tenants, claiming that this would make the project financially infeasible. Section 612 of the National Affordable Housing Act restricts the rents which can be charged to moderate income and market-rate tenants, capping rents at 30% of the adjusted income or the section 8 fair market rent, whichever is lower. This restriction applies to projects insured or assisted under section 236 and section 221(d)(3) of the National Housing Act, and, while independent of the preservation program, also applies to moderate income and market-rate tenants of eligible low income housing, which is financed by section 221 or section 236. Thus, the rent caps established by HUD for future tenants are consistent with section 612.

Section 222(a)(2)(G) of LIHPRHA requires that future rent adjustments for projects receiving incentives under a plan of action be made by applying an annual factor, to be determined by the Secretary, to the portion of rent attributable to operating expenses for the project. The Department received seventeen comments concerning the implementation of the annual adjustment factor under paragraph (a)(9) of this section. Four commenters merely requested further guidance, while others suggested specific methodology for determining the factor. The annual adjustment factor and the methodology for determining the factor will be issued by the Department as a separate administrative guidance.

The Department has decided to rely on the Consumer Price Index-Urban ("CPI-U") data collected by the Bureau of Labor Statistics, United States Department of Labor, to implement the annual adjustment factor method of adjusting the operating cost component of rents. These data are available on a reasonably current basis for the four census regions and for 74 metropolitan areas and the State of Hawaii, covering about two-thirds of the nation's population. Both national

data for the four census regions and metropolitan data are usually available within three months of the most recent survey period. The national sample for the four census regions is done on a monthly basis, and the metropolitan samples are done every three or four months. Regional factors will be used only if a project is not covered by one of the 74 CPI local data areas.

This approach provides for operating cost increases using factors that reflect changes in the underlying components of operating costs. The two major components of operating costs are utility and non-utility costs. These components are available on both regional and metropolitan levels. Non-utility costs include administrative expenses, operating and maintenance expenses, and taxes and insurance. The non-utility operating cost increase will be set equal to the overall change in the cost of all goods and services during the past year, as measured by the CPI-U "All Items" factor for the region or metropolitan area, less the weight for the utility change component for the area. The utility change component will be based on changes in the residential energy cost CPI-U factor for the region or metropolitan area (i.e., the CPI-U "Housing, Fuel and Other Utilities" factor). Both the utility and non-utility factors will be separately applied to the project's utility and non-utility operating cost components. Consumer Price Index data may be found in the "CPI Detailed Report(s)" published by the Bureau of Labor Statistics, U.S. Department of Labor.

In order to take extraordinary operating expenses into account, the Department has provided for an appeals mechanism. Appeals may be made by owners for the utility or non-utility change factors provided. Owners wishing to appeal must submit their entire project budgets to the Department for review. Documentation showing that a single component of operating expenses, such as insurance or taxes, increased faster than the CPI non-utility factor would not, of itself, be considered a basis for approving a higher annual adjustment factor. The Department will grant an owner a higher factor only if the total amount of all actual costs and expenses of the project exceed the aggregate change provided by the CPI-Urban factors.

A commenter stated that until HUD develops an annual adjustment system, it should use a property-specific budget-based rent increase. The Department will have in place an annual adjustment factor system by the time that it is needed for the first plans of action approved under LIHPRHA, so there is no need for any interim budget-based system for rent increases.

Three commenters were concerned that the regulation did not contain a mechanism for determining rent increases for purchasers. The annual adjustment factor will apply to purchasers as well as to owners extending the use of eligible low income housing.

Two commenters asked that HUD develop a project-based cost approach for making operating cost annual adjustment factors to section 8 rents. The Department declines to use such an approach, except on an appeals basis, since it has no authority to do so under LIHPRHA.

The Department received three comments stating that HUD should publish the methodology utilized in determining the rent adjustment factor so that underwriters can adjust their underwriting procedures. The commenters recommended that this method should be flexible and responsive to changing circumstances. The determination of the rent adjustment factor is flexible since it provides an owner with an appeals process based on a project budget review if it believes it has incurred extraordinary expenses. Three other commenters indicated their preference for budget-based operating expense increases. The Department can only respond, however, that the combination of the statutorily required annual adjustment factor and the opportunity for budget-based appeals will fairly address all their concerns.

A commenter suggested that the annual adjustment factor for rents should be based on the current section 8 annual adjustment factor. The Department rejects this suggestion because section 8 annual adjustment factors reflect changes in the rental market supply and demand conditions, and have no necessary relationship to changes in operating costs. For instance, in a depressed market, operating costs often continue to increase even though rents are stable or decreasing.

The Department received one comment asking whether, if an annual adjustment factor is used, the rent increase

will be processed in the same manner as the existing section 8 special adjustments, i.e., only for taxes, utilities, and insurance. As discussed, the annual adjustment factor is applied to operating expenses as a whole.

Three commenters suggested that any annual adjustment factor also be applied to replacement reserve contributions. Replacement reserve contributions are not included as operating expenses and thus are not subject to the annual adjustment factor. Changes to replacement reserve contributions may be requested of the local HUD field office which will review the adequacy of the existing level of contribution.

Three commenters asked that the annual adjustment factor be determined for geographic regions. As described above, the Department has decided to use data for the adjustment factor that is available on a fairly current basis for the four census regions and for 72 metropolitan areas that cover about two-thirds of the nation's population. Another commenter suggested that in developing an annual adjustment factor, HUD should allow each area office to modify the factor to reflect unusual operating costs in a particular geographic region. The Department has decided to handle geographic variations with the consistently available CPI data described earlier. Again, an owner who has experienced unusual operating costs may use the appeals process that the Department has created for this purpose.

Five commenters requested clarification of paragraph (a)(10) of this section, which permits any savings from reductions in operating expenses due to management efficiencies to be deposited in the project's reserve for replacements account, and then distributed to the owner with HUD approval. The commenters wondered how savings from reductions in operating expenses would be calculated. The Department believes that this provision, set forth in section 222(a)(2)(H) of LIHPRHA, is a remnant from an earlier version of the statute, which provided for budget-based rent increases. With the budget method, it would be simple to determine reductions in operating expenses and decide how much of the reduction was due to management efficiencies. However, the use of an annual adjustment factor to increase operating expenses, makes it difficult to determine what portion of any savings are due to management efficiencies. For this reason, the Department will not make the determination required under this section and will seek a technical amendment of this section of the statute. Such savings instead will go into the residual receipts account.

One commenter objected to, and one commenter approved of, the requirement that in order for the Department to approve a plan of action for a project, there must be no open findings of noncompliance with the fair housing and civil rights legislation and regulations listed in paragraph (a)(12). The Department has retained this requirement, for the reasons noted in the previous section, discussing § 248.141. The Department reiterates that owners of eligible low income housing must continue to comply with the civil rights legislation and regulations listed in this paragraph of the interim rule after approval of a plan of action.

One commenter stated that the proposed rule did not make it clear under what circumstances a prepayment or termination could occur in connection with a plan of action for incentives and recommended that paragraph (c), which refers to prepayments and terminations, be deleted. Pursuant to section 211(a) of LIHPRHA, an owner of eligible low income housing may prepay its mortgage or terminate the mortgage insurance contract only in accordance with a plan of action which has been approved by the Department. When the Department approves a plan of action for incentives, it does not prohibit mortgage prepayment or insurance termination, but in exchange for providing incentives, places restrictions on the use of the property in the event of prepayment or termination. This is the purpose of the agreements referred to in paragraph (c) of this section, which are executed at the time of approval of the plan of action. If an owner prepays or terminates after a plan of action for incentives has been approved, the regulatory agreement on the project will no longer be effective, but a use agreement, containing the affordability restrictions approved in the plan of action as well as other tenant protections, will continue to bind the project for its remaining useful life. Although prepayment occurs, the project will still be preserved for low income use, in accordance with the purpose of LIHPRHA.

A commenter requested that paragraph (d) permit State or local governments, as well as owners, to appeal a determination of remaining useful life. Section 222(c)(3) of LIHPRHA specifically provides for an owner's appeal of the Department's determination of the project's remaining useful life. However, the owner may not exercise this appeal right until fifty years after approval of the plan of action. Because an appeals mechanism is not needed at this time, the

Department will delay formulating such a system until a later date. At that time, HUD will consider extending this right to State and local governments.

*Section 248.147 (Housing Standards)*

A commenter suggested that this section, requiring an owner to "maintain the project in accordance with local codes or housing quality standards, whichever is stricter," is too permissive and that the owner must not merely agree to maintain the project, but must also demonstrate that the project is in compliance with the housing standards as a condition of receiving incentives. LIHPRHA assumes that a project will be in compliance with housing standards as part of the rehabilitation plan required for approval of a plan of action involving incentives. It is the intent of the Department to examine projects that are in violation of housing code standards at the time of plan of action review and to require owners to accept incentives such as a section 241 rehabilitation loan or a flexible subsidy capital improvements loan in order to cure these violations and secure approval of the plan of action. Pursuant to § 248.145(b), an owner who retains the project under this subpart may not receive any incentives or distributions, except those designed to correct the project's deficiencies, until the project is in accord with the housing quality standards. This should provide sufficient assurance that an owner will bring the project up to the standards required under this section. If the owner fails to do so, several sanctions are available. The owner's annual distribution can be denied or limited and the disbursements from an equity take-out loan can be withheld and used for repair of the project.

Two commenters wanted to allow tenants and State or local governments the opportunity to trigger sanctions against an owner if it fails to comply with the housing quality standards. The Department will receive complaints from tenants or governmental entities of building deficiencies and violations of building codes and will then impose sanctions where warranted.

The question of whether sanctions will be effective against nonprofit purchasers was raised by one commenter. Sanctions could trigger a default on the section 241(f) acquisition loan and on the original project mortgage. While discretion will be exercised, HUD will use whatever sanctions it considers appropriate to enforce the housing quality standards. HUD recognizes that its sanctions could trigger a loan default and cause a mortgage assignment, yet HUD would carry out such a sanction if it determined that this would be the only method for maintaining the quality of the property.

A suggestion was made by two commenters that tenants should be directly involved in the annual inspection and have input on the project's condition. In response to these comments, HUD has agreed to notify the tenant representative 30 days prior to the annual inspection, and in the absence of a tenant representative, HUD will require the owner to post a 30-day notice of the annual inspection, inviting tenants and their representatives to participate in the inspection with Departmental personnel and to submit comments regarding the physical condition of the project. Two commenters also recommended that local city code enforcement officials should be contacted to obtain the history of enforcement actions against the project and to cooperate in the enforcement of housing standards. State and local officials carry out their own project inspections and the Department believes that it is not necessary to formally obtain their input. HUD encourages local housing code officials, tenants and the tenant representatives to submit any comments concerning the past history and current physical condition of the project.

Two commenters recommended that potential purchasers be given the results of HUD's annual inspection, particularly if deficiencies are found. The annual inspection is performed by the Department after approval of the plan of action and after rehabilitation has been completed. Prospective purchasers are allowed, pursuant to § 248.157(f), to inspect the property after filing an expression of interest. Another commenter proposed that tenants be given up to 30 days to comment on the results of HUD's annual inspection. The Department intends to fully enforce housing quality standards and tenants are encouraged to submit complaints of deficiencies at any time, but a 30-day comment period would serve only to delay the Department's orders to make repairs. The results of an annual physical inspection are available to tenants and other interested parties through the submission of a Freedom of Information Act request.

One commenter asked for clarification as to the sanctions available to HUD if an owner fails to comply with the terms of the use agreement or the Plan of Action. The sanctions listed in § 248.147 pertain only to violations of housing standards. In cases where the requirements of the plan of action are imposed through the execution of a regulatory agreement or amendment of the existing regulatory agreement, the sanctions available to HUD are those stated in the regulatory agreement, i.e., chiefly, requesting the insured mortgagee to declare a default and accelerate the debt, foreclosure (in the case of a HUD-held mortgage), taking possession of the project, or injunctive or other judicial relief or remedies. If the plan of action's requirements are implemented through a use agreement, the primary method of enforcement would be judicial relief.

*Section 248.149 (Timetable for Approval of a Plan of Action)*

Six comments were received regarding the amount of time the Department has in which to approve a plan of action, once submitted. Two commenters suggested that the Department's deadline for approval be shortened to 90 days from 180. The 180-day period is derived from section 225 of the statute and is necessary to provide the Department with adequate processing time. This time frame allows 60 days for HUD to review the plan and notify the owner of any deficiencies, 60 days for the owner to respond, and another 60 days for HUD to review any revisions.

Another commenter requested that the processing clock be interrupted during any period where the owner has been asked to submit additional information or remedy deficiencies. The 180-day time limit applies only to the Department and is applicable in cases where the owner (and purchaser, in the case of a plan of action involving a transfer) have adequately addressed all issues related to the plan of action. If plan of action revisions are not received within that time frame, the statute does not require Departmental approval of the plan within this time frame.

The 180-day deadline does not apply to plans of action that are not approved because of deficiencies. One commenter suggests this should only be the case if there are material deficiencies. Section 225 of LIHPRHA, from which this provision of the rule is derived, does not distinguish between material and nonmaterial deficiencies, and thus the interim rule likewise makes no such distinction.

The rule provides that if the Department does not act within the time constraints of this section, the owner will receive incentives and assistance in an amount that the owner would have received if the Department had complied with the time limitations. One commenter questioned whether the owner will be permitted to accrue interest on the amount it would have received if the plan of action was approved in a timely manner. The Department will pay the owner retroactively for incentives delayed due to HUD's failure to meet processing deadlines, but will not pay interest on any late payment of incentives.

Another commenter recommended that the rule be changed so that State or local governments receive all deficiency letters from the Department regarding plans of action. This change is not necessary because any revisions submitted by the owner to the Department must also be submitted to the State or local agency. As part of the requirement that owners give plans of action to State or local agencies, owners are also responsible for keeping those agencies informed about any changes or revisions to those plans.

*Section 248.153 (Incentives to Extend Low Income Use)*

The Department received eleven comments concerning the provision of incentives to retain the affordability restrictions on eligible low income housing. A commenter recommended that paragraph (b)(1) of this section be amended to authorize release of all residual receipts as of the plan of action approval date. The commenter stated that the release of residual receipts should be automatic and should be in addition to the annual authorized return because residual receipts belong to the owner and the owner paid taxes on this money. The Department declines to make the release of residual receipts automatic since it does not have the authority to do so under LIHPRHA. Section 219(a) of

the statute only authorizes the Department to provide incentives necessary "to enable the owner to receive the annual authorized return for the housing determined under section 214(a), pay debt service on the federally-assisted mortgage covering the housing, pay debt service on any loan for rehabilitation of the housing, and meet project operating expenses and establish adequate reserves." Thus, the owner can access the residual receipts account only when it has unpaid distributions accruing prior to implementation of the plan of action, or to realize the 8% annual authorized return under the plan of action.

A commenter also suggested that the regulations should authorize release of land owned by the owner and currently included as security under the mortgage, if such land is not an integral part of the housing. The Department will consider allowing a partial release of security on a case- by-case basis as part of the plan of action in accordance with the administrative requirements applicable to FHA programs generally. Partial releases of security require mortgagee consent. Owners are advised to request the release at the time of their first notice of intent so that appraisers can be instructed to make separate value determinations. If a partial release of security is requested after this point, the owner would be required to obtain another appraisal and to pay for HUD's new appraisal and any third appraisal, if necessary.

A commenter recommended that sufficient section 8 assistance should be provided to cover all the units occupied by tenants with income at or below 80% of the area median income. The Department reaffirms that it intends to provide section 8 assistance to all current low and very- low income tenants. Additional assistance may also be reserved based on the tenant income profile required in § 248.135(e).

A commenter stated that the Department should accept rehabilitation, equity and acquisition financing from any source, public or private, without necessarily using section 241 mortgage insurance. The Department's position is that the plan of action may include an uninsured rehabilitation loan provided that the terms of the loan, including monitoring of rehabilitation, and default acceleration and foreclosure provisions are acceptable to the Department.

A commenter asked about the impact to the debt service on the section 236 mortgage if the interest reduction payment is redirected to the second mortgage. The Department has determined that redirection of the interest reduction payment ("IRP") will have no effect on the project's total debt service. Instead, the IRP will be redirected to service the debt on the second mortgage and the first loan will be fully serviced from project rental income. Two commenters also pointed out that a redirection of the section 236 interest reduction payment has no effect as an incentive. The Department agrees but will still allow the redirection to be requested as part of the plan of action since it is authorized by statute as an incentive. Mortgagee consent would also be required in this case.

A commenter asked how the owner is guaranteed the income reflected in the section 236 basic rents if the rents of moderate income residents are limited to the lower of 30% of the adjusted gross income or the section 8 existing FMR. The Department has determined that section 8 contract rents may go over 120% of the FMR as long as the gross potential income for the project does not exceed the Federal cost limit. Where necessary, section 8 rents in effect will subsidize market rents in order to ensure that the project remains affordable and that the owner has enough income to operate the project and receive an adequate return on preservation equity. If the rent stream in the future were to fall short of the amount needed to provide the owner with an 8 percent return, access to residual receipts could be provided or the shortfall accrued for distribution in a future year.

*Section 248.157 (Voluntary Sale for Projects Not Exceeding the Federal Cost Limit)*

The Department received 397 comments concerning this section of the proposed rule. The majority of the comments focused on three major issues: The ranking of priority purchasers, the twelve-month priority purchaser marketing period, and the level and timing of the earnest money deposit.

The Department received 86 comments concerning the earnest money deposit which must be submitted by qualified purchasers as part of a bona fide offer to purchase eligible low income housing pursuant to this subpart. The

issues raised by the commenters concerned the amount of the earnest money deposit, specifically whether it would be feasible for priority purchasers to raise the money; the timing of the deposit, along with the concern that the funds could be tied up for a year; and the waiver of the deposit by an owner or the Department. The proposed rule, in paragraph (g) of this section, requires that a bona fide offer include an earnest money deposit equal to one percent of the transfer preservation value of the project. While the statute does not expressly require such a deposit, the Department believes that an earnest money deposit is a reasonable means of ensuring that a purchaser is making a good faith offer. The purpose of the earnest money deposit is not to decrease an owner's risk or to ensure that a purchaser has the financial capacity to complete the transfer, as two commenters suggested, but to prevent sham offers which could result in an owner prepaying the mortgage or terminating the insurance contract in contravention of the purposes of this subpart. One commenter suggested that a more appropriate requirement for preventing sham offers would be to require HUD review of corporate documents, the history of the organization, and previous HUD participation information. The Department intends to review a purchaser's corporate documents when an expression of interest is submitted and will look at its previous participation information when approving a plan of action. However, the Department believes that an earnest money deposit is necessary at the time of submission of a bona fide offer in order to deter sham offers and to fulfill the requirements of LIHPRHA. Therefore, the Department has retained the concept of an earnest money deposit with the following modifications made in response to public comments.

Commenters suggested a range of alternatives to the amount of the earnest money deposit established in the proposed rule. All of the commenters who raised a concern as to the amount of the deposit, except for two, claimed that the proposed amount was excessive. Commenters protested that many priority purchasers would not be able to raise the predevelopment funds for the deposit, and that the deposit would limit the participation of many nonprofit organizations in the preservation program. In order to mitigate these effects, commenters suggested that the earnest money deposit be eliminated, or decreased to anywhere from $100 per unit, to $50,000 per project. Many commenters suggested a range for the deposit, such as the lesser of $400 per unit or $40,000 for the project.

The Department acknowledges that a large earnest money deposit may be prohibitive to many priority purchasers. In response to the reactions of the commenters, the Department has amended paragraph (g)(1)(ii) of this section to require an earnest money deposit equal to the lesser of one percent of the transfer preservation value of the project, $50,000, or $500 per unit. Resident councils intending to purchase a project pursuant to a resident homeownership plan under § 248.173 or § 248.175 must submit an earnest money deposit equal to $200 per unit for 75% of the occupied units. The rational for the lower amount of the deposit under a resident homeownership plan is that the purpose of the earnest money deposit is different. It is not to deter sham offers, but to ensure sufficient tenant support to make the homeownership plan successful. Paragraph (f) of the proposed rule, which lists the information the Department must provide to a purchaser who has submitted an expression of interest, has also been amended to include a worksheet which will indicate the level of the earnest money deposit required of the purchaser.

One commenter questioned what source could be used to raise the earnest money deposit. The statute and the proposed rule are both silent on this matter. The Department is not authorized to provide funds to a purchaser except in connection with an approved plan of action. The Department defers to the purchaser to choose the source of the deposit, whether from the purchaser's own funds, loans or grants. With regard to resident councils who intend to purchase the project under a homeownership plan under § 248.173 or § 248.175, the earnest money could come from a pledge of the tenants' security deposits as long as this pledge would not violate any State or local laws and the owner has given its agreement to the pledge.

The earnest money deposit may not, in any transfer under this subpart, be provided by the owner, or by any entity affiliated with the owner. However, an owner may waive the requirement of an earnest money deposit or decrease the amount of the deposit. Paragraph (g)(2) has been amended to provide for this waiver or decrease. In order to waive or lower the deposit, an owner must state in its second notice of intent, submitted under § 248.133, that it intends to waive or accept a lower earnest money deposit, and that the waiver or decrease will apply to all qualified purchasers. If an owner fails to declare its intent to waive or decrease the deposit in the second notice of intent, the deposit may be waived or decreased during the time the project is held out for sale through written notice to the Secretary. The

Secretary will then notify all purchasers which have submitted an expression of interest of the owner's decision to waive the deposit or accept a lower deposit. A waiver of or decrease in the earnest money deposit applies to all qualified purchasers who submit a bona fide offer for a particular project, except for resident councils who intend to purchase the project under a homeownership plan pursuant to § 248.173 or § 248.175. Resident councils will still be required to provide an earnest money deposit, despite an owner's waiver or decrease, because, in the case of resident homeownership, the purpose of the deposit is to ensure sufficient tenant support to make such an undertaking successful, not to avoid sham offers.

With regard to the timing of the deposit, comments ranged from suggesting that the deposit be tied to site control to requiring that the deposit be due 45 days after HUD approval of the bona fide offer. The Department concedes that there is a concern among purchasers that under the proposed rule the earnest money could be tied up for a year without acceptance of the offer, making it difficult for purchasers to obtain predevelopment funding and preventing purchasers from putting the money to use elsewhere. In response to public comments, the Department, while still requiring the earnest money deposit at the time a bona fide offer is submitted, has amended paragraph (h) of this section to require an owner to accept or reject a bona fide offer, which has been made during the appropriate purchase period, within 30 days from the receipt of the offer. If the owner rejects an offer, the earnest money deposit must be returned to the purchaser; however, the offer will still be deemed a bona fide offer which an owner may later accept. If the owner accepts an offer at a later date, after first rejecting it and returning the earnest money deposit, the purchaser, if still interested in buying the project, must redeposit the earnest money within 30 days from receipt of the owner's acceptance of the offer.

Five commenters stated that while an earnest money deposit is held by an owner, it should be deposited in a HUD-supervised escrow account, earning interest to the benefit of the purchaser. The Department will defer to State and local law on this issue. The earnest money deposit must be held in accordance with the laws of the jurisdiction in which the project is located.

The Department received 89 comments concerning the ranking of priority purchasers under paragraph (h) of this section. Twenty-nine of these comments suggested abolishing any type of ranking among priority purchasers, while 60 comments expressed agreement with the concept, but suggested expanding the first priority beyond resident councils who intend to purchase the project pursuant to a homeownership plan under § 248.173 or § 248.175. Commenters claimed that expanding the ranking system would acknowledge tenant preferences for rental housing and would permit nonprofit organizations with experience in owning and operating low income housing more opportunity for purchasing projects under this subpart. Commenters wishing expansion of the ranking system suggested that first priority be given to any resident council, regardless of the type of ownership it seeks, to community-based nonprofit organizations, or at least those community-based nonprofits with tenant- endorsement, or to any priority purchaser with tenant endorsement.

The Department acknowledges that resident homeownership will account for only a small portion of all preservation plans of action for eligible low income housing. In most cases the projects will remain as low income housing and in this situation tenants may support a tenants association or a community-based nonprofit organization to own and manage the project. In order to accommodate these preferences and to provide community-based nonprofit organizations with the maximum opportunity to purchase eligible low income housing, the Department has decided to expand the groups who are eligible to purchase a project during the first priority purchaser marketing period to include resident councils purchasing a project as rental housing and community-based nonprofit organizations with tenant endorsement.

In order for a community-based nonprofit organization or a resident council intending to purchase a project and maintain it as rental housing to be among the first of priority purchasers, the organization or council must demonstrate that it has the support of a majority of the tenants of the project. This support can be demonstrated by a resolution of the resident council or by a petition signed by tenants representing a majority of the occupied units. A resident council intending to purchase the project under a resident homeownership plan must demonstrate that it has the tenant support required under § 248.173(c). The proposed ranking system in paragraph (h) has been omitted from the regulation, paragraph (c) has been amended to change the priorities during the lock-out period, and paragraph (g) has been

amended to require that evidence of tenant support be submitted as part of the bona fide offer, if the offer is made during the first priority purchaser marketing period.

The Department received 68 comments contesting the 12-month marketing period for resident councils under paragraph (h) of this section of the proposed rule. All of the commenters preferred a shorter marketing period; many advocated two, three or six month periods for priority purchasers, while others suggested permitting an owner to negotiate a sale at any time with any priority purchaser, giving tenants a right of first refusal, or allowing known priority purchasers to certify that they do not want to make an offer. The commenters expressed concern that owners may be reluctant to sell if they have to wait 12 months before accepting an offer and hence, may decide to retain the project instead. Also, there was a concern that purchasers may find it difficult to obtain funding and might be hesitant to invest time and resources in an offer which could be held for a year before acceptance or rejection. In recognition of these concerns, the Department has amended paragraph (c) to shorten the marketing period.

Beginning on the date of receipt of the second notice of intent, resident councils and community-based nonprofits, with the requisite tenant support, will have six months in which to make a bona fide offer without competition from any other priority or qualified purchasers. During this six-month period, an owner may accept a bona fide offer from a resident council or community-based nonprofit organization with tenant endorsement, within 30 days of receiving the offer. Any acceptance by an owner is conditioned on HUD's approval that the offer meets the requirements of a bona fide offer. From the end of this six-month period, until 12 months after receipt of the second notice of intent, any priority purchaser may submit a bona fide offer, and an owner may accept an offer from any priority purchaser it chooses, conditioned on HUD's determination that the offer is bona fide. Once the 12-month period has expired, all qualified purchasers will have the opportunity to submit bona fide offers during the next three months.

Twenty comments were received regarding the language in paragraph (a) of the proposed rule which states that an owner is not obligated to accept a bona fide offer under this section, but may elect to retain the project and request incentives. The commenters expressed concern that permitting an owner to change its mind about selling the project after receipt and acceptance of a bona fide offer would result in the loss of time and resources by priority purchasers who go to the trouble of obtaining tenant endorsement and raising an earnest money deposit. Some commenters suggested that to deter owners from changing their minds, there should be a penalty, such as a five year period from the date of rejection of an offer which was previously accepted, in which an owner may not submit another notice of intent or prepay the mortgage or terminate the mortgage insurance contract.

The Department recognizes the concern raised by potential purchasers with regard to this issue. However, section 220 of LIHPRHA imposes no obligation on an owner to accept a bona fide offer. LIHPRHA creates two separate types of sales transactions; those under section 220 for sales of property within the Federal cost limit, where an owner "may" accept a bona fide offer from a qualified purchaser, and those under section 221, where the property exceeds the Federal cost limit, and an owner must accept the first bona fide offer it receives at a price that is not less than the transfer preservation value. The establishment of this dichotomy illustrates Congress' intent that the provisions of section 220 be voluntary, as opposed to the mandatory provisions of section 221. To impose an obligation on an owner to accept a bona fide offer under this section would be contrary to standard real estate practice, where an owner may change its mind and take a property off the market, and in the absence of any indication to the contrary in the statute, the Department does not have the authority to create such an obligation. A purchaser whose bona fide offer has been accepted by an owner who later withdraws its acceptance may seek remedies under State and local law. Also, there are certain restrictions built into the statute and the regulation which should have the effect of deterring an owner from changing its mind once it has accepted a bona fide offer. For instance, if an owner changes its mind and fails to submit a plan of action within six months after receiving the information from the Department in § 248.131, the waiting period of § 248.135(h) applies, precluding the filing of another initial notice of intent for six months.

One commenter suggested, that in carrying out its responsibilities under paragraph (b) of this section, the Department solicit and maintain a list of priority purchasers who will be notified when purchasing opportunities are available. The Department intends to create such a list, including qualified, non-priority purchasers, in order to

streamline its informational duties under this paragraph, and requests that any potential purchasers who wish to be part of this list contact the local HUD office with their request.

One commenter contested that the three-month qualified purchaser period in paragraph (c) of this section is inadequate since it would not give priority purchasers who are unsuccessful in the priority purchaser period sufficient time to seek a partner and restructure a deal. The three-month period in paragraph (c) is derived from the statutory language of section 220(c), and hence cannot be modified by the Department. Also, the Department sees no reason why a bona fide offer by a priority purchaser would not be accepted, unless an owner accepts another offer or changes its mind about selling the project in which case, extending the three-month period would not benefit the failed purchaser. If an offer is not accepted because it is not bona fide, a purchaser may resubmit an acceptable contract of sale and earnest money deposit.

Three commenters stated that in cases where an owner receives more than one bona fide offer from priority purchasers, the owner should be required to accept the offer from the priority purchaser which has the highest ranking in paragraph (h) of the proposed rule, provided that the offer is at least 80% of the project's transfer preservation value. As previously noted, paragraph (h) has been amended to omit the ranking system contemplated in the proposed rule. If an owner receives more than one offer, it may choose which one it wishes to accept; the only requirement being that the offer is bona fide. Section 220 of the statute states that the purchase price of a project sold under that section may not exceed the preservation value of the project and paragraph (d) of this section repeats that language. The statute does not establish a minimum purchase price for the voluntary sale of a project under this section and, in the absence of any statutory direction, the Department has decided not to impose such a requirement.

The Department received two comments questioning whether community-based nonprofit organizations will be required to establish a separate nonprofit subsidiary to purchase a project under this section, as is required for projects constructed under section 202. Most eligible low income housing is covered by a regulatory agreement which requires an owner to be a single asset mortgagor. The Department, therefore, expects that separate subsidiaries will be established in order to meet this regulatory requirement. It is expected that State and local governments shall also establish separate mortgagor entities for the purpose of purchasing eligible low income housing. If a separate subsidiary is established or being established, the purchaser should notify HUD of this fact when submitting an expression of interest under paragraph (e) of this section.

One commenter requested that the State or local government be informed of all expressions of interest received by the Department, while another asked for notification at the time a bona fide offer is submitted. The State or local government will receive a copy of the second notice of intent submitted by the owner, and will be made aware at that time that the project is up for sale. A copy of the plan of action will also be submitted to the State or local government, which will then have a 60-day comment period. These requirements provide sufficient notice to these entities.

One commenter stated that in order to estimate the expenses involved in acquiring the project, the purchaser must have access to any expense analyses, operating income, and rehabilitation estimates for the project. This information shall be provided to any purchasers under paragraph (f) of this section who have submitted an expression of interest.

Eleven comments were received by the Department concerning the fact that a bona fide offer, as set forth in paragraph (g) of this section, must contain a contract of sale as well as an earnest money deposit. The primary concern was that priority purchasers may not have the sophistication and experience necessary to draft an acceptable contract, and this could lead to rejection of their offer. The commenters suggested that HUD prepare draft contracts of sale to be used by purchasers under this subpart. The Department will provide some guidance at to required or prohibited language for the contract in its administrative guidance, but sees no need to prescribe an entire model contract.

Paragraph (g) of this section of the proposed rule has been amended to explicitly state that a bona fide offer must be for a purchase price which does not exceed the transfer preservation value of the project. This limitation applies to voluntary sales under this section, as well as to mandatory sales under § 248.161. It is equally applicable regardless of

whether the transfer is financed solely through HUD assistance or through other sources.

Five commenters stated that an owner should have the sole responsibility of deciding whether an offer is bona fide, and HUD should not have to review each offer. The Department agrees that reviewing each offer is not necessary. Therefore, paragraph (i) has been amended to require HUD review only of the offer which is accepted by the owner, rather than of all of the offers which are submitted. Departmental review of the accepted offer is necessary to ensure compliance with the statutory requirement that a project can be sold only to a qualified purchaser which has made a bona fide offer. While HUD will not review all offers to ensure that they are bona fide, all offers which are received by an owner must still be submitted to the Department in case a review is required to ensure that an owner has not received any bona fide offers and thus, is entitled to prepay or terminate the insurance contract under § 248.169.

Another commenter stated that the contract of sale and earnest money deposit should be a minimum standard and that an owner should be entitled to conduct further investigation before determining that an offer is bona fide. Paragraph (h) has been amended to require an owner to accept or reject a bona fide offer within 30 days of receipt. During that 30-day period an owner may conduct any investigation it desires prior to accepting or rejecting the offer.

Paragraph (*l*) of this section permits an owner to prepay or voluntarily terminate the insurance contract if a sales transaction, for which a bona fide offer was accepted and approved by HUD, is not consummated within 90 days of approval of the plan of action and if the failure to complete the transaction was for reasons not attributable in whole or in part to the owner. One commenter stated that the proposed rule should be clarified to show that prepayment would not be allowed if a bona fide offer is made and rejected; if the purchaser is unable to complete the sale for reasons within the owner's control; or if HUD fails to act in a timely fashion. Under section 220 of the statute, an owner is not required to accept a bona fide offer. If it rejects all of the offers it receives, an owner may not prepay, but must continue the affordability restrictions in place and may submit a plan of action for incentives, if it can meet the time requirements of § 248.135(a), or file a new notice of intent under § 248.105 to receive incentives. If an owner attempts to sell the project under the mandatory sale provisions of § 248.161, it must accept the first bona fide offer it receives, in accordance with the priority purchaser marketing period established in this section. If an owner rejects any offers under § 248.161, it will not be permitted to prepay or terminate under this paragraph. Paragraph (*l*) clearly encompasses the commenter's second concern; if a purchaser cannot consummate a sales transaction, for which a bona fide offer has been accepted and approved by HUD, and the owner is to blame, the owner will not be permitted to prepay or terminate. If the Department does not meet the time requirements for providing assistance under an approved plan of action, an owner is eligible to prepay or terminate, pursuant to § 248.169. Sanctions are not imposed if the Department misses any other time constraints.

Three commenters contested the additional 60-day lock-in period set forth in paragraph (*l*)(2) of this section, which requires an owner, if a transfer falls through after the conclusion of the 15-month sales period, to contact those qualified purchasers whose bona fide offers were not accepted, to invite them to renew their offers and purchase the project. The commenters claimed that the statute does not provide any authority for this extension of the sales period. The Department acknowledges that there is no express authority in LIHPRHA for this requirement; however, the primary intent of the statute is to preserve eligible low income housing and this one-time window would fulfill the statute's intent without unduly restricting an owner's rights. If an offer is made and accepted during the 60-day period, the owner would be in the same position as if the first transaction had been consummated. If an offer is not made or accepted, an owner will be eligible to prepay only two months after it would have in the absence of this requirement. The Department believes that the benefit of this 60-day period, the purpose of which is in part to ensure that an owner does not accept an offer it knows will fail in order to thwart the purpose of the statute, far outweighs any cost.

One commenter suggested that the proposed rule be amended to provide that an owner would not be required to wait longer than 12 months before receiving incentives or opening the sale period to qualified purchasers and that an owner would not be required to wait more than 15 months before gaining the unencumbered right to prepay. Pursuant to section 220 of the statute, as long as an owner has not accepted a bona fide offer from a priority purchaser, the sales period for qualified purchasers will begin automatically 12 months after submission of the second notice intent.

However, an owner will not be guaranteed the receipt of incentives within this 12-month period or eligibility to prepay within 15 months. Section 224 of LIHPRHA, implemented in § 248.169 of the proposed rule, sets forth the period of time an owner must wait before being eligible to prepay due to the failure of HUD to provide the agreed upon incentives in a timely manner because of the failure of a sales transaction for which the owner was not to blame, or because no bona fide offers were received. These time constraints were established in the statute and the Department has no authority to override them.

Sixty-three comments were received by the Department concerning paragraph (m) of this section, which limits the Federal financial assistance provided to qualified purchasers to that needed to cover certain enumerated project costs. Two commenters stated that the assistance provided under this section should be the same for both priority and qualified purchasers. Three commenters stated that technical assistance funds should be available to all tenant groups, regardless of the form of ownership they choose. In addition to the assistance and incentives given to all qualified purchasers, priority purchasers may be reimbursed, under paragraph (m)(6), for transaction expenses incurred in acquiring the project, and may receive a grant under paragraph (o) of this section. Also, pursuant to paragraph (m)(7), those resident councils who are purchasing a project in accordance with a resident homeownership plan under § 248.173 or § 248.175 may receive financial assistance to cover the costs of training for the tenants, the resident council and for homeownership counseling. The additional assistance for priority purchasers and resident councils under the homeownership program is specifically authorized in section 220(d) of LIHPRHA. HUD cannot exceed its statutory authority by providing funding in excess of that designated in the statute for each type of purchaser.

Another commenter stated that the Federal assistance provided to a purchaser should be sufficient to cover the debt service on all of the federally-assisted mortgages on the project. This section of the rule has been amended accordingly.

Ten commenters were concerned that sufficient assistance be provided under paragraph (m)(4) to ensure that all project operating costs will be supported by the project's rental income. The commenters suggested that the organizational and overhead costs of ongoing ownership and operation, including management oversight, financial monitoring, inspections, budget preparation, and audit oversight should be expenses which will be paid out of project income. The Department will include as project operating expenses those reasonable expenses which are ordinarily covered in the program under which the project is insured.

One commenter stated that an owner should earn interest on reserve for replacement deposits. All reserve for replacement accounts may be invested and earn interest at the request of the owner to the mortgagee. Under Mortgagee Letter 83-24, mortgagees may not refuse such requests, provided the requested investment is eligible and the owner agrees to pay a reasonable fee to compensate the mortgagee for expenses.

The Department received 23 comments stating that priority purchasers should be entitled to a return on equity, pursuant to paragraph (m)(5). The definition of priority purchaser, in § 248.101, requires that the purchaser be a nonprofit organization. A nonprofit organization is not normally entitled to a return on its investment. However, the Department acknowledges that virtually all priority purchasers will be dependent on Federal assistance in order to consummate a transfer under this section and will need an acquisition loan under section 241(f). An acquisition loan may only cover 95% of the transfer preservation equity of the project, plus, in the case of priority purchasers, expenses associated with the acquisition, loan closing and implementation of the plan of action, and the remaining 5% must come from the purchaser's own funds or other financing sources. The Department recognizes that priority purchasers may need to borrow the 5%. Therefore, the Department will build into the rent stream a return on any actual cash investment by the purchaser and debt service on any gap financing. The extra income must be allocated towards debt service payments on the non-federal loan, and if there is no non-federal loan, or if the return exceeds the debt service on the loan, then the surplus cash must be deposited in the residual receipts account for the project. For priority purchasers, HUD may also provide a grant to cover the 5% equity requirement.

Sixteen commenters asked for more clarification as to what transaction costs will be reimbursed to priority purchasers under paragraph (m)(6). The Department will provide a one-time grant to priority purchasers on a

case-by-case basis in an amount not in excess of 5% of the project's transfer preservation equity. The purchaser should list those costs for which it is seeking reimbursement in the plan of action. At the time of plan of action approval, the Department will determine the amount of the grant. As noted in the preamble to the proposed rule, organizational costs incurred in establishing the nonprofit purchasing organization are reimbursable. Tenant training and education costs incurred by a priority purchaser which is not a resident council purchasing the project under a homeownership plan, may be reimbursed depending on the need for the training and the reasonableness of the costs. In response to one commenter's request, brokers fees are not a reimbursable expense. Seller financing will not be permitted to cover transaction costs.

Fifteen commenters stated that resident councils and other priority purchasers should be permitted to receive the assistance set forth in paragraphs (m)(6) and (7) to cover transaction, training, and counseling costs, on an up-front basis, rather than being reimbursed after the fact. These commenters asserted that resident councils and other priority purchasers require seed money for predevelopment costs to assist in the preparation of a bona fide offer and the plan of action and for tenant education. The Department recognizes the need for financial backing early in the prepayment process. However, statutory constraints prohibit the Department from expending funds prior to approval of a plan of action. Section 220(d)(2), from which paragraph (m) of this section is derived, authorizes the Department to provide assistance only for approvable plans of action. The same constraint exists for mandatory sales under section 221(d)(1). Therefore, the Department is not able to provide any of the assistance authorized under paragraph (m) prior to approving a plan of action. The plan of action should include the transaction and training expenses which the resident council or other priority purchaser incurred or will incur with regard to the transfer of the project. HUD will reimburse the purchaser for those expenses covered under this section at the time of the transfer.

Two commenters suggested that HUD have a specific technical assistance pool for resident groups who require such assistance and a standard set of curricula for training which will be covered under paragraph (m)(7). Resident councils purchasing under a resident homeownership plan must include in their plan a description of the scope of any training they intend to undertake. The council must work with a nonprofit organization, approved by HUD, to develop the tenants' capacity for homeownership. These requirements are stringent enough to ensure that any training program is acceptable to the Department, while leaving resident councils with sufficient flexibility to tailor any training program to their particular needs. For these reasons, the Department believes that it is unnecessary for it to establish training criteria or to preapprove trainers.

The Department received 11 comments concerning paragraph (n) of this section, which requires that the amount of any residual receipts transferred to the selling owner be deducted from the sale price of the project. This language is derived from section 220(d)(3) of the statute. As noted in the preamble to the proposed rule, this provision poses a problem since residual receipts are not included in the sale price of the project, which is capped at the project's transfer preservation value. Therefore, deducting the amount of the residual receipts from the sale price will result in owners realizing less than the full amount of the project's transfer preservation value. In the proposed rule, the Department specifically requested comments as to how this inconsistency should be dealt with. Two commenters expressed agreement with the statutory language; one commenter responded by suggesting that the purchaser buy the residual receipts from the owner; and eight commenters asserted that an owner should be permitted to receive the full transfer preservation value of the project and suggested that residual receipts be added to transfer preservation value in the appraisals and then deducted pursuant to this section. The Department has considered this problem and feels that adding residual receipts to preservation value would be inconsistent with customary appraisal standards, which section 213(c) of the statute instructs HUD to implement. Since the statute and its legislative history give no indication that this provision was a drafting error, the Department must assume that Congress intended that HUD deduct residual receipts from transfer preservation value. Therefore, the rule continues to track the language of the statute. Purchasers may buy the residual receipts from the owner as part of the sales transaction; however, the Department will not subsidize this purchase.

Three commenters raised concerns regarding paragraph (o) of this section, which authorizes grant assistance for priority purchasers. The assistance may not be in excess of the present value of the total projected fair market rent for

the next ten years, or such longer period if necessary to cover the costs listed in paragraph (m). One commenter questioned whether the grant would be available concurrently with section 8 assistance. Another commenter asked whether the grant can be provided for more than ten years and if there is a limit on the amount of the grant. As the proposed rule indicates, a grant under this paragraph is a one-time grant. The reference to the ten year or longer period of time is to compare the grant to the present value of the fair market rents over time. The purpose of the grants is to provide HUD with more flexibility to work with priority purchasers to determine the most appropriate mix of subsidies, i.e., grants and incentives. Grant funds could, therefore, be made available in conjunction with section 8 assistance. There is no cap on the grant; however, the amount will depend on the costs listed in paragraph (m) and will be limited to what is necessary to cover those costs for each particular project. Another commenter stated that HUD should develop guidelines for allocating these grants. As noted above, the purpose of providing assistance in the form of grants is to give HUD flexibility in financing specific projects. The Department will review plans of action to assure that the mix of proposed subsidies is appropriate and is the least costly alternative to the Federal government.

Three comments were received concerning paragraph (p) of this section, which states that the Department shall be entitled to seek reimbursement for any assistance provided under this subpart to a priority purchaser who becomes affiliated with, or sells the project to, a non-priority purchaser who would not otherwise be eligible for such assistance. One commenter claimed that the language of this paragraph should be amended to state that HUD "may under some circumstances" be reimbursed in order to permit a nonprofit to affiliate with a for-profit organization and not be penalized. This type of affiliation is exactly what this paragraph is intended to discourage. If a nonprofit and for-profit jointly own the project, the ownership entity would no longer meet the definition of a priority purchaser, and hence should not have access to the additional assistance available only to priority purchasers. Another commenter stated that if a priority purchaser sells the project to a qualified purchaser, HUD should modify the plan of action and only seek reimbursement of the grant on a prorated basis and reimbursement of the transaction expenses which have not already been used. The Department has decided not to prorate the grant. The grant is provided in one lump sum and the Department may seek reimbursement in the full amount. This paragraph requires reimbursement of assistance which is in excess of that to which a nonpriority purchaser is entitled. Since Federal reimbursement of transaction expenses is assistance which is only provided to priority purchasers, the entire amount of the assistance must be returned if the owner is no longer a priority purchaser. Another commenter suggested that this paragraph set a time limit on reimbursements to the Department. The Department believes that a time limit of ten years from the date of approval of the plan of action would be sufficient to serve the purpose of this provision, while providing HUD with adequate reimbursement. The rule has been amended to permit HUD to seek reimbursement for assistance if a priority purchaser affiliates with, or sells the project to, a for-profit organization within ten years of approval of the plan of action.

*Section 248.161 (Mandatory Sale for Housing Exceeding Federal Cost Limit)*

In the proposed rule, the Department requested comments concerning how the Federal grants provided to qualified purchasers under paragraph (d) should be allocated if there are insufficient appropriations to fund all the requests. The Department received nineteen comments in response to this request. Many commenters suggested that in allocating insufficient grant money, priority be given to projects with the greatest amount of tenant involvement, the highest percentage of very low income tenants and those which will remain permanently affordable to low income tenants. Others recommended that preference be given according to when the projects are eligible to prepay, with those being eligible within twelve months given priority over those which are eligible within twenty-four months. Some commenters stated that there should be equal access to the grants and suggested that State and local governments be required to pay the shortfall that cannot be covered by Federal funds. Another commenter recommended that preferences be based on a demonstrated need for low income housing or on a showing that minority housing opportunities and racial integration would be adversely affected if the mortgage is prepaid. One commenter also recommended that first priority for grant assistance should be provided to projects located in areas with low income housing shortages.

Allocating grants according to the need for the housing may be unrealistic since it is expected that there is a need

for each project being sold under the mandatory sale provisions of this section and that its prepayment may affect minorities; otherwise the owner most likely would be eligible to prepay the mortgage or terminate the insurance contract under § 248.141 and would not be selling the project under this section. Additionally, the Department does not have the authority to require a State or local government to provide grants to make up for the shortfall in Federal funds.

The statutory restrictions governing the manner in which plans of action are submitted and the time frames for their approval make the rest of these suggestions infeasible. LIHPRHA establishes a specific time in which the Department must approve a plan of action and provide the agreed-upon funding. If the assistance is not provided within the statutory time frames, as set forth in § 248.169, then an owner may prepay the mortgage or terminate the insurance contract and the project will be lost from the low income housing inventory. In order to implement the allocation processes suggested by the commenters, the Department would be required to withhold its approval of a plan of action until it received other plans and could then compare them to determine which have the most tenant involvement or the most very low income tenants. Since owners and purchasers will be submitting their plans of action at different times, withholding approval of the plans could result in more prepayments and terminations due to the delay caused by this process.

The alternative would be to provide grants to only a certain class of projects, such as those that are only twelve months away from prepayment; however, if there are few projects in this class in a particular year, funds which could have been provided to other projects would be withheld, resulting in needless losses to the low income housing inventory. The Department has decided to continue considering this matter in the event that it receives inadequate funding in the future.

In response to internal discussions, the Department has amended § 248.161 of the proposed rule to permit an owner, at its option, to accept an offer to purchase eligible low income housing at a sale price less than the transfer preservation value of the project. Sections 221 (b)(1) and (c) of LIHPRHA require an owner, under the mandatory sale provisions, to accept a bona fide offer to purchase the housing for a sale price not less than the transfer preservation value. While the Department recognizes that an offer to purchase the housing at a price less than the transfer preservation value does not meet the definition of bona fide offer, there is no language in the legislation prohibiting an owner from accepting an offer other than a bona fide offer. Since LIHPRHA does not prohibit an owner from voluntarily accepting an offer for a lower sale price, the Department has revised the rule to allow an owner to accept such an offer.

Permitting an owner to accept an offer at a lower sale price could avert unnecessary prepayments under section 224 of the statute in the event no bona fide offers are received. Additionally, a lower sale price would most likely require less Federal subsidy, in furtherance of section 221(a)(1) of LIHPRHA, which requires that the Department employ the least costly alternative to the Federal government in achieving the purposes of the legislation.

Under the mandatory sale provisions of this section, if an owner receives an offer at a sale price less than the project's transfer preservation value, the offer may be accepted as long as it is submitted by a qualified purchaser within the appropriate sales periods set forth in § 248.157(c) and as long as the offer meets all of the requirements of a bona fide offer in § 248.157(g), except for the amount of the sale price.

*Section 248.165 (Assistance for Displaced Tenants)*

Fourteen comments were received by the Department regarding this section of the proposed rule. The most frequently made comment concerned relocation expenses. One commenter asserted that owners should not have to pay fifty percent of the relocation costs incurred by displaced tenants plus additional costs imposed by State or local laws. Two commenters expressed the view that owners should be required to pay more than fifty percent of the relocation expenses incurred by displaced tenants. Three commenters stated that if an owner pays fifty percent of the relocation expenses, HUD should pay the rest.

Section 223(b) of the statute states that the Secretary shall require the owner to "pay fifty percent of the moving expenses of each family relocated, except that such percentage shall be increased to the extent that State or local law of general applicability requires a higher payment by the owner." Therefore owners must pay at least fifty percent of the relocation costs of displaced tenants.

However, it would clearly be inconsistent with this statutory limit for the Department to impose a financial burden on owners in excess of fifty percent of the costs, in the absence of a State or local law directing a higher payment. As one commenter pointed out, those expenses which must be paid by the owner must be actual and reasonable relocation expenses, as defined in § 248.101 of this section. The Department will not require an owner to pay unreasonable relocation expenses or expenses which were not actually incurred by the tenants. Additionally, the statute does not impose any burden on HUD to pay relocation expenses. Those relocation expenses which are not paid by the owner must be borne by the tenants.

According to one commenter, tenants who voluntarily move in response to a notice of intent to prepay, and tenants who pay rents beyond the regulated levels after prepayment, should be included in the definition of displaced tenant and should be entitled to the protections of this section. Section 223 of the statute applies only to tenants who are displaced as a result of prepayment of the mortgage or termination of the mortgage insurance under § 248.169 of this subpart. Tenants who voluntarily leave when a notice of intent is submitted are not leaving due to prepayment or termination, for at that point, an owner would not know that it could prepay under § 248.169, which only applies in extenuating circumstances. If an owner prepays or terminates under § 248.169, the Department no longer regulates rents except for special needs tenants who continue to reside in the project and for current tenants if the project is located in a low-vacancy area. If, in these cases, a tenant is paying more than the regulated rents, he or she should notify the Department and HUD will enforce the lower rent, but any such tenant would not be considered displaced for purposes of this section.

One commenter requested clarification as to the assistance to be provided by the Department in paragraph (a) of this section. This paragraph refers to the section 8 certificates and vouchers which will be provided by the Department to any low and very low, income tenants who are displaced as a result of a mortgage prepayment or insurance termination under § 248.169 of this subpart. This section 8 assistance will be provided pursuant to 24 CFR parts 882 and 887.

As one commenter noted, the Conference Report at page 467 indicates that HUD is authorized to set section 8 existing fair market rents at the "exception rent," i.e., 120% of the fair market rent, so that tenants who receive the assistance provided in paragraph (a) may use section 8 certificates or vouchers at the project even if the project's rents exceed the section 8 existing fair market rent. In order to implement this, the Department has amended § 882.106(a) and § 887.351(b) of this title, to permit approval of the exception rent on a case-by-case basis, as the Secretary deems appropriate. Paragraph (a) of this section has also been amended accordingly.

Special needs tenants, and, if the project is located in a low vacancy area, all current tenants, may accept the section 8 assistance provided in paragraph (a) in addition to the protections set forth in paragraphs (e) and (f), which permit special needs tenants and those who reside in a low vacancy area to continue to occupy their unit in the project or receive a replacement unit at the same rent levels, for three years after the date of approval of the plan of action. If these tenants initially refuse the section 8 assistance provided in paragraph (a), they may apply for section 8 certificates or vouchers during or after the three-year protection period; as displaced tenants, they will be given priority for receiving section 8 assistance.

Paragraph (f) of this section provides that in order for the owner to fulfill its obligations with respect to a tenant by providing assistance enabling the tenant to occupy a replacement unit, rather than continued occupancy, the tenant must freely waive its right to continued occupancy in the project. A commenter suggested that for tenants who are 60 years or older, the rights which they would be waiving should be explained to them by an appropriate community services group. The Department concedes that special needs tenants may not be aware that they are entitled to continued

occupancy in the project or a replacement unit. For this reason, the Department will notify special needs tenants, which includes tenants 62 years of age, or older, of their status and of the protections they can receive under this section at the same time they are notified of approval of the plan of action under § 248.169. The Department does not find that there is a justification for mandating that the owner arrange to have a community services group advise the tenants.

Two commenters suggested that the three year continued occupancy period should be applicable to all current tenants who are displaced. However, section 223(c) of the statute expressly states that the continued occupancy and replacement unit provisions "shall only apply" to special needs tenants or tenants residing in a low vacancy area. In the face of this clear statutory limitation, the Department cannot extend these protections to cover all displaced tenants. However, as previously noted, any displaced low income tenant may receive section 8 certificates or vouchers. Also, as one commenter pointed out, under paragraph (d) of section 223 of the statute and paragraph (i) of the proposed regulation, an owner cannot refuse to rent to tenants because they receive section 8 assistance.

The Department received a suggestion from one commenter that upon being notified that tenants will be displaced, HUD should request vacancy information from the local public housing agency in order to locate suitable housing for elderly and disabled tenants. Paragraph (c) of the proposed rule already requires the Department to consult with public housing agencies to ensure that any very low and low income families which are displaced are able to find suitable replacement housing. Therefore, the proposed regulation need not be amended to accommodate this comment.

*Section 248.169 (Permissible Prepayment. Voluntary Termination or Modification of Commitments)*

The Department received one comment stating that an owner should not be permitted to prepay its mortgage or terminate the mortgage insurance contract under any condition if it would mean that low income tenants are displaced and if the prepayment or termination would result in a loss of affordable housing. Section 224 of the statute, however, authorizes prepayments and/or terminations if the Department approves a plan of action and then fails to provide the agreed upon incentives within a specified time period; if an owner offers the project for sale in accordance with the voluntary or mandatory sale provisions and no bona fide offers are received; or if an owner accepts a bona fide offer, but the sales transaction fails through no fault of the owner. Also, an owner may be permitted to prepay under this section at a later date if HUD is unable to renew a section 8 housing assistance payments contract due to the lack of funding and cannot modify the commitments or revise the incentive package to compensate the owner for the lack of section 8 assistance.

Another commenter suggested that in order to minimize prepayments and terminations under this section, if a resident council makes a bona fide offer to purchase the project and the offer is dependent upon Federal funding which is not forthcoming, the residents should have time to seek alternative financing before an owner is permitted to terminate the affordability restrictions. Section 224(a) of the statute states that an owner may prepay or terminate if any of the enumerated circumstances occur. The statute does not provide any extra time period in order to secure other assistance. The Department interprets this to mean that an owner has the option to prepay or terminate as soon as the Department fails to meet the time periods for the provision of assistance set forth in paragraph (a)(1) of the statute, or as soon as the fifteen-month purchase period ends and the owner fails to receive a bona fide offer. The Department acknowledges that an owner is not required to exercise its option to prepay or terminate, and if an owner, or owner and purchaser, decide to extend the time in which HUD can provide assistance, the Department will recognize this extension and make every effort to provide the agreed upon incentives. Likewise, if an owner wishes to hold the project for sale past the purchase period, the Department will recognize a plan of action submitted by the owner and a qualified purchaser, subject to the restriction in § 248.111, which prohibits HUD from approving a plan of action with an appraisal which is more than thirty months old.

A commenter expressed concern that it is likely that many owners with projects in rural areas or small municipalities will be entitled to prepay the mortgage or terminate the insurance contract under this section. The commenter suggested that, in order to minimize this possibility, the preservation program should be flexible and

encourage broad participation of potential purchasers. The Department recognizes the commenter's concern, and intends to minimize this outcome by notifying as many potential purchasers as possible about the project under § 248.157(b) and by providing incentive packages which are attractive to qualified purchasers and will enable them to meet the costs of owning and operating the project.

Paragraph (a)(4)(i) permits an owner to prepay the mortgage or terminate the insurance contract if the owner receives and accepts a bona fide offer, but the sales contract falls through for reasons not attributable in whole or in part to the owner. One commenter stated that title defects or covenants on the property which run with the land and housing violations which can be cured by making repairs should not be considered attributable to the owner. The Department disagrees, with one exception. Covenants that run with the land, such as utility easements, should not affect an owner's title to the property to the extent that it would preclude completing a sales transfer, but if they do, and the owner has acted diligently to have the covenants or easements removed and has failed to do so, the owner would not be penalized and could take action under this section. However, if there are defects in an owner's title to the property, such as mechanics liens or liens resulting from unpaid taxes, it is the owner's responsibility to clear up these defects and if it fails to do so and the sale falls through as a result, the owner will not be entitled to prepay or terminate the mortgage contract. Likewise, if the project has been cited for housing code violations, it is the owner's responsibility to bring the project up to code. A housing code violation is not the same as not meeting the housing standards. If a project does not meet housing standards, the owner may still transfer the project and the Department will make a rehabilitation loan available to a qualified purchaser, but the purchaser must agree to maintain the project in accordance with the housing standards upon completion of the rehabilitation.

One commenter requested clarification as to what happens if the Department is unable to provide the section 8 assistance required under an approved plan of action. If section 8 assistance is not available to a project for which a plan of action has been approved and, as a result, the Department fails to meet the deadline for providing assistance under paragraph (a), the owner has the option of prepaying the mortgage or terminating the mortgage insurance contract. If section 8 assistance is unavailable at the time of renewal of the housing assistance payments contract, the provisions of paragraph (b) of this section are applicable.

Pursuant to paragraph (b), if HUD is unable to extend the term of the section 8 assistance, it may attempt to revise the package of incentives provided to the owner under the plan of action and provide benefits which are comparable to those the owner had been receiving. If HUD is unable to create a comparable incentive package, the owner may request that the commitments it made pursuant to § 248.145(a) (2) through (10) be modified or that the plan of action be terminated, which would result in termination of the affordability restrictions on the project. If the owner intends to request a modification of commitments or termination of the plan of action, it must first send a notice to HUD stating this intention. The Department then has ninety days from the date of receipt of this notice to extend the section 8 assistance or comparable incentives and to continue the binding commitments on the project. If the Department is unable to do either of the foregoing within the ninety-day period, HUD may modify the commitments, and if this fails, permit termination of the plan of action. If an owner does not request a modification of commitments or termination of the plan of action, the Department is not bound to the ninety-day period.

*Section 248.173 (Resident Homeownership Program)*

The Department received comments from 46 individuals and groups on this section. The most significant issue expressed by commenters was their concern that the Department had not given sufficient priority to forms of homeownership that involved continuing restrictions to assure that units remained affordable to low income families. This concern was raised in several different contexts.

Most directly, 12 comments stated that too much emphasis was placed on resident homeownership programs where there was no requirement for permanent affordability restrictions and no additional limitations on resale profits beyond the 20 year phase-out required by statute and described in paragraphs (i)-(k). Thirteen comments advocated the

inclusion of a requirement that all resident homeownership programs be subject to the continuing affordability restrictions for the remaining useful life of the project under § 248.145. Four comments recommended or asked whether a resident council could impose more stringent resale restrictions than those included in paragraphs (i)-(k).

An additional 15 comments specifically recommended that limited equity cooperatives with continuing income affordability restrictions be considered an eligible form of homeownership. These comments were received despite the fact that proposed paragraph (f) explicitly includes such entities as an eligible form of homeownership.

Similarly, 20 comments requested that the Department allow limited equity cooperatives to assume the existing federally-assisted mortgage. By statute, the assumption of such a mortgage would also require the limited equity cooperative to comply with the continuing low-income affordability restrictions under § 248.145.

Lastly, in regard to funding resident homeownership programs, 10 commenters recommended that limited equity cooperatives be eligible to receive continuing project- based section 8 assistance to assure that the housing remains affordable to low-income purchasers. This assistance would be in place of, or as a supplement to, the grants provided for resident homeownership programs. Five of these commenters pointed out that section 220(d)(3)(A) of the statute expressly authorizes the provision of incentives (including section 8) under section 219(b) to all qualified purchasers, which includes resident councils proposing homeownership programs. This set of comments went on to note that the Conference Report at page 465 indicates that HUD should work with priority purchasers to determine the most appropriate mix of subsidies, i.e., grants and incentives.

The Department attributes the number of comments raising these concerns to the structure of § 248.173, which attempted to cover various types of homeownership programs, and which did not highlight the fact that this section includes limited equity cooperatives as an eligible form of homeownership.

The lack of requirements to retain affordability restrictions beyond the initial purchaser and the phaseout of restrictions on resale profits are designed to provide current low-income tenants and other initial low-income purchasers with an opportunity to become homeowners in the fullest sense of the term. This goal includes the ability over time to fully benefit, like any other homeowner, from making a profit at resale. However, the Department has long recognized that homeownership can take a variety of forms. This is implicitly recognized in paragraph (d)(xii) of this section, which requires that resident councils include with their homeownership plan any restrictions on resales beyond those imposed by the statute.

In order to fully respond to this overall concern, the Department has decided to add a new § 248.175, entitled "Resident homeownership program -- limited equity cooperatives." Resident councils seeking to convert the ownership form of their project to a limited equity cooperative would be subject to the requirements of this new section.

These limited equity cooperatives would be operated very much like those currently assisted by the Department under the section 236 and section 221(d)(3) BMIR programs. These entities would be eligible to assume the existing federally-assisted mortgage and, therefore, be subject to the continuing low-income affordability restrictions under § 248.145. With respect to restrictions on resale profits, sellers would be subject to the limitations described in the preamble discussion of § 248.175.

With respect to providing section 8 assistance and, as appropriate, other incentives, the Department agrees that such assistance is authorized and can be used for resident homeownership plans submitted under § 248.175. Limited equity cooperatives receiving incentives will be subject to the continuing low-income affordability restrictions under § 248.145.

Since grants will not be the sole source of HUD funding under § 248.175, the Department anticipates that the amount of grant funding will be less than for a similar project submitted under § 248.173. This expectation is based on the "due diligence" that the Department must provide to assure that the funding will result in a homeownership program that is both financially feasible and is the least costly alternative that is consistent with establishing a viable

homeownership program.

The Department received a number of comments on more specific aspects of resident homeownership programs. Six comments were received on paragraph (a) of this section. Two commenters recommended that tenant-controlled nonprofits, in addition to resident councils, be eligible to develop and implement a resident homeownership plan. By statute, tenants seeking to purchase a project to develop a resident homeownership plan must form a resident council, which is a tenant-controlled nonprofit. A tenant-controlled nonprofit that is not a resident council may, however, be a priority purchaser eligible to acquire a project and receive assistance to maintain it as affordable rental housing under § 248.157 or § 248.161.

Three commenters endorsed the use of public-spirited for-profit organizations to assist resident councils and tenants to consider their options and develop the capacity necessary to own and manage a project. The statute requires resident councils to work exclusively with public or private nonprofit organizations for these purposes. However, such nonprofit organizations may subcontract with for-profit entities.

The last comment on this paragraph stated that a resident council should be required to be incorporated under State law. The statute and the proposed rule require a resident council to be both incorporated and to be a nonprofit, and require a nonprofit to be organized or chartered under State or local law. To make this linkage more directly, the rule will change the definition of "nonprofit organization" in § 248.101 to say that it must be incorporated under State or local law.

Seven comments were submitted in reference to requirements for "bona fide offers" for resident councils under both paragraph (c) of this section and § 248.157(g). Three commenters, two local community service agencies and a national housing trade association, stated that a resident council should be required to demonstrate that a simple majority of the tenants should have expressed an interest in participating in a resident homeownership program. Two other commenters, a law firm and a national tenant's organization, felt that a simple majority was too onerous and recommended that the Department establish procedural standards to ensure legitimate tenant representation rather than using an arbitrary percentage of residents.

The remaining two comments were directed at the amount of the earnest money deposit required to be made as part of a resident council's bona fide offer. These comments are in addition to those discussed under § 248.157(g). Both commenters felt that one percent of the transfer preservation value was too high an amount and one comment went on to suggest that $200 for each interested tenant was an appropriate amount. The latter commenter also urged that security deposits pledged by tenants interested in becoming homeowners be counted as part of the earnest money deposit.

The proposed rule required that the resident council demonstrate that at least 75 percent of all families, representing at least 50 percent of all the units, express an interest in participating in a homeownership program at the time an offer is made. The Department strongly believes that a substantial interest, as described in the proposed rule, has to be shown by the tenants to realize a viable homeownership program. This is particularly important given the time frames involved in having the resident council prepare and submit a detailed homeownership plan to HUD for approval and acquire ownership of the project upon HUD's approval the plan. If the resident council is unable to meet these time frames, the owner may be able to prepay the mortgage and convert the project to a market-rate rental property or to other uses.

The Department, therefore, will maintain the current requirement in terms of the percentage of tenants needed to express an interest in participating in a homeownership program. In light of the comments on earnest money deposits above and the changes made in regard to comments received in response to § 248.157(g), the Department will make the following adjustment with respect to bona fide offers submitted by resident councils pursuing a homeownership plan under this section or § 248.175. Resident councils will be required to submit as an earnest money deposit $200 from each interested tenant (i.e., $200 x the number of units that constitute 75 percent of the occupied units). This requirement cannot be waived or reduced by the current owner under § 248.157(g). However, the tenants will be allowed to pledge their security deposits if the owner agrees and such a pledge is permitted under applicable State and