local law. The Department feels that this change is responsive to legitimate concerns about the amount of the earnest money deposit and that this expression of support from a very substantial portion of the tenants is a good indicator of the likelihood of realizing a viable homeownership program.

Seven comments were received on requirements for submitting a homeownership plan under paragraph (d) of this section in relation to activities and costs eligible for funding under paragraph (e) of this section. One comment recommended that repairs as well as rehabilitation activities be included as an eligible item. Paragraph (d)(iii) already requires a resident council to indicate as part of its description of rehabilitation activities what major types of repairs will be undertaken. A second commenter urged that a reserve for unforeseen replacements for a period of at least five years be included in the homeownership plan submitted to HUD. The proposed rule requires that the project be brought up to the housing standards set forth in § 248.147 and provides funding for an adequate reserve for replacements (both an initial contribution as well as monthly contribution from occupancy charges). The Department, therefore, does not feel that a special reserve for "unforeseen replacements" is needed. However, the Department will carefully review homeownership plans to assure that replacement needs are fully addressed through the proposed rehabilitation activities and reserve for replacements account.

The remaining five comments asked what types of activities and costs are allowable for technical assistance, training, and counseling. One commenter suggested that continuing homeownership training provided by staff or on a contractual basis be included, another stressed the need for legal and organizational assistance, and two other commenters simply asked for more clarification. The fifth commenter stated that funding should be at a sufficient level to enable resident councils to seek services at prevailing rates rather than requiring the use of the lowest cost services in a local area. The need for assistance will vary considerably from project to project and, therefore, the Department feels that the language in the rule should remain unchanged and inclusive. This will permit HUD to fund a wide range of activities if they are justified in the homeownership plan and come within the overall cost limits established in § 248.157(m)(7). With respect to allowable cost rates, there is no requirement that the costs be the lowest in the area. The Department will review the proposed costs to determine if they are reasonable.

In addition to the comments discussed above regarding limited equity cooperatives, the Department received 6 comments on eligible forms of homeownership under paragraph (f) of this section. Four comments urged that mutual housing associations be included as a separate and distinct form of homeownership. One commenter provided the following definition for a mutual housing association:

A private, section 501(c)(3) non-profit organization organized under state law, which owns, manages and continuously develops affordable housing by providing resident involvement in the provision of such housing, long-term housing for low and moderate income families in which residents participate in the ongoing management of such housing, through membership in the association, and have the right to continue residing in such housing as long as they remain members of the association.

This definition indicates that members of a mutual housing association do not have any ownership or equity interest in their units and, therefore, such an ownership form would not be approvable. The proposed rule follows the statutory language in allowing a broad range of ownership forms including cooperatives, limited equity cooperatives, condominiums and fee simple ownership as long as ownership interests or shares are transferred to individual purchasers. Insofar as ownership or equity interests are to be held by the individual purchasers and a mutual housing association meets the other requirements of the rule then such an ownership form could be approved. The Department believes that this determination is best made on an administrative, case-by-case basis rather than through a change in the rule. It should also be noted that a mutual housing association may qualify as a priority purchaser eligible to acquire a project and receive assistance to maintain it as affordable rental housing under § 248.157 or § 248.161.

The two remaining comments on this subsection recommended that condominium arrangements not be allowed as an eligible form of homeownership. Both of these commenters are tenant organizations and they described their own adverse experience in getting condominium associations to enforce use agreements and other restrictions vis-a-vis

individual association homeowners. The Department recognizes that a condominium association may have more difficulty enforcing use agreements than a cooperative corporation. Nevertheless, the statute specifically authorizes condominium ownership and HUD feels that a broad range of ownership forms should be allowed. In approving homeownership plans, the Department will review the resident council's capacity to own and manage a project, including its ability to meet the various ongoing compliance requirements specified in this section.

Three comments took issue with the requirement in paragraph (g) of this section; that the initial owners must occupy their units for at least the initial 15 years of ownership. The comments felt that this requirement was too long and would discourage tenant interest in purchasing, and did not accommodate changes in employment or emergencies. This requirement was included in the proposed rule for two reasons. The first reason was to assure that the units remained owner occupied rather than having the units revert to a primarily rental status, although with no continuing affordability restrictions and potentially with significantly higher rents. The second reason was to keep homeowners from effectively evading the minimum 20 year phase-out on limitations on resale profits by renting out their units at rents considerably higher than their occupancy charges. The Department feels that these reasons continue to be legitimate. With respect to accommodating employment changes or an emergency situation, this subsection explicitly allows resident councils to make such determinations and allow owners to rent out their units.

The Department is removing the owner-occupancy requirement for homeownership plans submitted under the new § 248.175. This occupancy requirement is not needed for a limited equity cooperative with continuing affordability restrictions and limitations on resale profits. Furthermore, most of the limited equity cooperatives will assume the existing federally-assisted mortgage or receive section 8 assistance. As a result, they will be subject to other HUD program regulations restricting the ability of the initial owners to rent out their units.

Three commenters objected to the recapture requirements in paragraphs (h) and (*l*). One commenter stated that returning 50 percent of any net sales proceeds from the sale of the units to HUD is unnecessary and that these proceeds should have been reflected in funding for the resident council's homeownership plan. This requirement is statutory and is directed at the situation where there may be unexpected proceeds from the initial sale of the units. Two commenters stated that the requirement that any net proceeds from resale not retained by the homeowner at resale be paid into a local HOME Investment Trust Fund was wrong in principle and should be restructured. This requirement is also statutory. The Department, therefore, has not made any changes to these recapture provisions.

Two comments were received on paragraph (o) concerning qualified management. The first commenter stated that resident councils should be required to use professional management to operate the project after conversion. This subsection, in fact, already establishes this requirement. Resident councils will either have to demonstrate their management experience and ability or enter into a contract with a qualified management firm approved by HUD.

The second comment urged that HUD establish a process to regain control of a unit if the individual unit owner leaves or if the unit becomes uninhabitable. The Department expects that the resident council will have primary responsibility for dealing with the types of situations described by the commenter. In approving homeownership plans, the Department will pay very close attention to the resident council's capacity to own and manage a project. Limited equity cooperatives approved under § 248.175 are also likely to be subject to other HUD program regulations covering vacated or uninhabitable units. This will occur because most limited equity cooperatives will assume the existing federally-assisted mortgage.

Five comments were submitted on the timely homeownership provisions of paragraph (o) of this section. One commenter stated that since the transfer of ownership has to be approved as part of the homeownership plan, resident councils should be required to acquire ownership of the project immediately rather than within six months after approval, as included in the proposed rule. Three other commenters felt that six months was too short a period and suggested that this period be extended for good cause or be at least one year.

The proposed rule, in fact, contained an inconsistency with respect to this issue. Section 248.135(*l*) of the proposed

rule required qualified purchasers, a term that includes resident councils, to close transactions within 90 days of HUD's approval. Paragraph (o) has been changed to conform to this overall requirement. The Department believes that all qualified purchasers, as well as sellers, are likely to need a reasonable period of time to actually close on a sales transaction after the date of HUD's approval. It is only after HUD's approval of a plan that both the buyer and the seller may be able to complete such closing requirements, among others, as finalizing financing arrangements (e.g. the precise amount of principal) or obtaining the consent of the partners to the terms approved by HUD. The Department believes that 90 days is fair to both the buyer and the seller.

The Department is sensitive to the concerns that resident councils will not have sufficient time to complete a transaction. This concern applies to all purchasers, but may have particular relevance for resident councils and community-based nonprofits. The process of transferring a property set forth in the statute for either continued rental use or for resident homeownership under the best circumstances is a very long procedure and the Department is hesitant to further lengthen the time periods. As noted in the discussion of § 248.135(b), the Department has, in part, addressed this issue by extending the period for submitting plans of action after the owner has accepted an offer from 90 days in the proposed rule to six months. This additional time should enable purchasers to develop better plans of action that most often lead to closing transactions within 90 days of HUD's approval. The rule also does not preclude a buyer and seller from agreeing to extend this period as long as the owner waives its right to prepay during this extension.

Finally, one commenter felt that the resident council should be required to transfer ownership of the units to individual purchasers within one year of its acquisition of the project rather than the four year period provided for in the proposed rule. The Department agrees with the basic thrust of this comment, i.e., ownership interests should be transferred to individual purchasers as quickly as possible. The four year period was intended to account for a variety of contingencies that might reasonably delay this transfer, such as making sales contingent on the completion of rehabilitation activities. The Department believes that this intent remains valid and has not shortened the maximum transfer period to individual purchasers.

*Section 248.175 (Resident Homeownership Program -- Limited Equity Cooperative)*

As discussed above with respect to § 248.173, the Department has included in the interim rule a new provision setting forth the requirements applicable to the purchase and operation of an eligible low income housing project by a limited equity cooperative. The limited equity cooperative model includes the procedures and requirements otherwise applicable to the purchase and operation of projects with continued low income affordability restrictions. Although certain provisions of § 248.173 which ensure the feasibility of the resident homeownership program and do not conflict with such procedures and requirements or with the nature of a limited equity cooperative have been incorporated by reference into § 248.175, the Department does not view § 248.175 as being based solely on the statutory authority of section 226; instead, it is a variation of the "transfer" plan of action authorized under LIHPRHA generally.

Paragraph (b) lists those paragraphs of § 248.173 which are incorporated by reference into § 248.175. Paragraph (d)(i) of § 248.173 states that the homeownership program shall include a statement of the amount of grant funds requested. Under § 248.175 the limited equity cooperative will be eligible for both grants and for any incentives otherwise available to nonprofit purchasers. The "type of homeownership contemplated," for purposes of § 248.173(d)(ix), would be a limited equity cooperative, and the "restrictions on resale" referred to in § 248.173(d)(xii) would be those restrictions on resale required by HUD in FHA multifamily programs for limited equity cooperatives. HUD's Model Form of By-Laws, Form No. 3245, for limited equity cooperatives, imposes restrictions on the amount of equity which a cooperative shareholder may realize; those restrictions provide that memberships may be sold at no more than the "transfer value," which generally equals the sum of the down payment paid by the first occupant, the value of improvements installed by the selling member, the amount of principal amortized by the selling member and previous members, and, with HUD's approval, an amount corresponding to an increase in the cost of living.

Section 248.173(f) is not cross-referenced in paragraph (b), since the Department has determined that a limited

equity cooperative is an acceptable for of homeownership. Of course, the specific features of the resident homeownership program must nevertheless be approved by HUD in accordance with § 248.175. Paragraphs (g)(2) and (g)(4) have also not been incorporated by reference. The former establishes a standard for affordability which is inapplicable to limited equity cooperatives; instead, the affordability requirements under § 248.145 shall be applicable. Likewise, paragraph (g)(4) would not be applicable, since such restrictions are not needed for projects where availability and affordability restrictions will continue for the full term of the plan of action and HUD program regulations restrict the ability of tenants to rent out their units.

Section 248.175 also does not cross-reference paragraphs (i) (1) and (3), (j), (k) and (53151) of § 248.175. These provisions require the execution of a promissory note payable to HUD, establish formulas for the amount of equity which a cooperative shareholder may retain from sales proceeds and provide for the use of recaptured funds. These provisions would overlap with and conflict with the provisions applicable under HUD's program requirements for section 236 and section 221(d)(3) limited equity cooperatives. Paragraphs (p), (q) and (r) have not been cross-referenced, because housing standards, audit and reporting requirements in those paragraphs would likewise overlap HUD's analogous program requirements for limited equity cooperatives and requirements under the plan of action. Paragraph(s) is not cross-referenced because the limited equity cooperative would have continued low income affordability restrictions that are consistent with those applicable under the section 236 or section 221(d)(3) mortgage and its regulatory agreement, as modified pursuant to subpart B.

Paragraph (c) provides that the purchase and operation of eligible low income housing by a limited equity cooperative under this section shall be carried out in accordance with all provisions of subpart B that are otherwise applicable to the transfer and operation of a project with continued low income affordability restrictions, except as otherwise provided in § 248.175. Thus, for example, the total charges for housing costs (i.e., principal and interest, taxes, insurance, occupancy charges and utilities) for current tenants that become cooperative share holders may not exceed 30% of the adjusted income of the tenant, or the fair market rent, whichever is lower, in accordance with § 248.145(a)(5).

*Section 248.177 (Delegated Responsibility to State Agencies)*

The Department received six comments regarding this section, two from State housing agencies, two from trade organizations or lobbyists, and one from a consultant and one from an advocacy organization. Two commenters suggested that HUD expand on the regulation by publishing the implementing instructions normally reserved for administrative guidance. As stated in the preamble to the proposed rule, the Department will publish its application and approval procedures in its administrative guidance. The rule has not been changed to reflect these comments. Two comments stated that the Department should employ State agencies as "processors" without regard to State preservation plans approved under this section. The Department will contract for technical assistance with State agencies as the need arises. Such contracting will be done through established contracting and bidding procedures, such as those used for HUD's multifamily program, Delegated Processing, which do not necessitate a change to the proposed rule.

Two comments were received regarding the ability of State agencies to charge fees for processing notices of intent and plans of action as part of an approved State preservation plan under this subpart; one commenter was in favor of such fees and one opposed. The Department does not believe that State agencies should charge owners of eligible low income housing fees for processing notices of intent or plans of action where the owner, absent an approved State preservation plan, would be able to file such notices of intent or plans of action with Department at no charge. Accordingly, paragraph (d) has been added to the rule, prohibiting a State agency from charging owners fees for processing any notice of intent or plan of action or taking other action under an approved State preservation plan.

Three commenters suggested that the Department entertain proposals for various levels of delegated authority under this section. The proposed rule stated that the Department would "delegate some or all responsibility" to a State agency as part of a delegation plan approved under this section. The administrative instructions will allow State agencies to

specify those activities for which they desire delegated responsibility. The rule has not been changed to reflect these comments.

One commenter suggested that the Department use Standard and Poor's "top tier" bond rating certification as satisfaction of the "independent analysis" requirement. The Department will adopt this standard as well as others in its administrative instructions.

Three comments were received regarding the lack of regulations implementing a portion of section 602(a) of the statute, amending section 241(f)(1) of the National Housing Act, regarding risk sharing arrangements with State agencies for the insurance of section 241(f) equity and acquisition loans. The three commenters all proposed some modified form of State agency coinsurance. The proposals conform with the Department's interpretation of the statutory language. State agency coinsurance, the Department's only coinsurance program that has not been formally terminated, is administratively inactive at this time. If the Department decides to implement section 602(a) as a form of coinsurance for section 241(f) loans, it will do so through separate rulemaking.

*Section 248.179 (Consultation With Other Interested Parties)*

The Department received two comments on this section expressing the importance of communication between HUD and State and local governments and suggesting that HUD identify contact persons from these entities, permit the submission of comments on notices of intent and plans of action, and give State and local governments the opportunity to provide economic data and other information relevant to the preservation process. One commenter suggested that this section of the proposed regulation be expanded to identify specific responsibilities that State and local governments should be expected to undertake.

The Department intends to implement fully this section of the regulation and is currently meeting with State and local governments to formulate criteria for consultation and to identify specific contact persons in State and local governments where eligible low income housing is located. The Department has also expanded the role of State and local governments in the preservation program by providing them with a sixty-day comment period on plans of action submitted for projects within their jurisdiction, as set forth in § 248.135. While the State or local government will also receive copies of notices of intent submitted in their jurisdiction, no comment period has been established for notices of intent since the Department sees no need for comments at that stage in the process. State and local governments are encouraged to submit comments or any relevant data they may possess to the Department at any time during the preservation process. The Department declines, however, to impose any responsibility on State and local governments under this section. The Department assumes that these entities are familiar with the preservation program and will act accordingly.

*Section 248.181 (Notice to Tenants)*

Nineteen comments were received by the Department concerning the notification of tenants affected by owners' actions under this subpart. The comments suggested that tenants be notified at every stage in the preservation process and that they receive copies of all correspondence between owners and the Department.

Under the provisions of this rule, tenants residing in projects subject to this subpart will receive copies of the first and second notices of intent, under §§ 248.105 and 248.133, including a summary of possible outcomes for the project. Tenant representatives will also receive the valuation information provided to the owner under § 248.131. A summary of the plan of action, along with any revisions, will be posted, in accordance with § 248.135, in accessible places in all affected buildings with the name, address and telephone numbers of any tenant representatives, or if none are known, of the local HUD field office, where tenants may obtain a complete copy of the plan of action. The plan of action will also be available at the on-site office for tenant inspection and copying. The tenants are entitled to a 60-day comment period

on the plan of action. After taking into consideration the tenant comments, the Department will notify the tenants as to whether the plan is approved. Tenants will also have the opportunity to submit comments and participate in the annual HUD inspections of the project under § 248.147. Any tenants who are eligible for relocation assistance under § 248.165 will be notified of their status. If the tenants submit an expression of interest to purchase the project under § 248.157, they will be entitled to receive all the information which is made available to other qualified purchasers. The Department believes that these provisions provide sufficient notice and comment to all affected tenants of the various stages of the preservation process. Also, there is no need to supply tenants with all of the correspondence between the Department and the owner, since the Department expects that the outcome of any correspondence pertaining to the preservation program will be reflected in the plan of action.

Four commenters raised the concern of enforceability of the notice provisions and suggested that if an owner fails to notify the tenants in accordance with this subpart, that the notice of intent submitted by the owner should be considered void. These comments are in accord with the Department's position. If an owner fails to notify the tenants, in violation of this subpart or of LIHPRHA, then the notice of intent will be invalidated and the owner will be required to submit a new notice of intent under § 248.105.

Four commenters suggested that HUD designate a contact person for arranging meetings, answering questions, and generally assisting tenants who are affected by this subpart. The Department recognizes the need for tenant support. Field office staff will be available to help tenants in understanding the preservation process and to aid them in identifying nonprofit organizations who can help them to promote greater tenant participation and possibly to work towards homeownership under § 248.173 or § 248.175. Also, informational meetings for the tenants may be held by the Department at the discretion of personnel in the local field office. Tenants are welcome to request such meetings.

Another commenter suggested that the Department provide tenants with a list of all properties in the area, designating which are eligible to prepay. The Department intends to distribute a list of eligible low income housing which has been compiled from a survey conducted earlier this year of the local HUD field offices. The field offices shall make this list available to the public upon request.

Subpart C

*Section 248.213 (Plan of Action)*

One commenter suggested that this section of subpart C be amended to provide the same notice requirements for tenants and State and local governments as is set forth in § 248.135(c) of subpart B. The Department does not have the statutory authority to impose this notification burden on owners proceeding under ELIHPA and has declined to amend this section of the rule.

*Section 248.218 (Tenant Notice and Opportunity to Comment)*

One commenter recommended that tenants should have the same right to receive information and make comments as provided under § 248.181 of subpart B. The Department believes that this section provides sufficient opportunity for tenant notice and comment and has not amended it as suggested.

*Section 248.221 (Approval of a Plan of Action That Involves Termination of Low Income Affordability Restrictions) and Section 248.233 (Approval of a Plan of Action That Includes Incentives).*

Two commenters contested the Department's basis for requiring that there be no outstanding findings of noncompliance with the civil rights legislation enumerated in these sections of the proposed rule prior to approving any plan of action submitted pursuant to this subpart. For the reasons previously stated in the discussion concerning §

248.141(a)(3), the Department has determined that this requirement will remain in the rule.

Subpart D

In response to concerns raised by a State agency and a member of Congress, the Department is implementing section 613(b) of the statute by adding subpart D to the interim rule.

*General.* Section 613(b) directs the Department to offer incentives to owners of low income housing developed under a State (i.e., non-Federal) housing program, upon application of a State agency, where an owner is able to prepay the State assisted or subsidized mortgage on the housing. The statute states that the level of incentives to be provided under this section should conform to the incentives provided to a similarly situated project under subtitle B of title II of the Housing and Community Development Act of 1987. Since LIHPRHA repeals and replaces ELIHPA (except for those owners which elect to proceed under ELIHPA), the reference to title II of the 1987 Act is presumed to mean LIHPRHA. Therefore, in implementing section 613(b), this subpart refers to subpart B rather than subpart C.

Although Congress did not specifically define the term "State assisted or subsidized mortgage," the Department construes section 613(b) as being inapplicable to any project that would constitute eligible low income housing under subpart B, such as a section 236 non-insured mortgage.

The Department interprets the statutory language "State assisted or subsidized mortgage" as meaning that the State program must entail a form of mortgage assistance or subsidy. This interpretation of "assisted or subsidized" precludes other forms of housing assistance, such as rental assistance or tax abatement programs, in which there is no direct mortgage subsidy.

In order to implement this provision, the Department will require a two-phase application process. The first will qualify the State's mortgage subsidy program as conforming to the requirements of the statute. The second will require owners of such housing, in order to avail themselves of the incentives, to submit a notice of intent and plan of action similar to that for eligible low income housing under subpart B. Processing of such projects will, however, be done by the State agency or a designated local housing authority, which will then make application to the Department for the incentives. The costs of appraisals and capital needs assessments will be borne by the State agency. The State agency will review and approve the notice of intent, plan of action and all other submitted documents. The State agency's application for assistance must demonstrate that the amount of incentives, pursuant to subpart B, required to induce the owner to preserve the housing for low and moderate income families, does not exceed that available for housing otherwise designated as "eligible low income housing" under subpart B.

Because prepayment of the State-assisted or subsidized mortgage is a matter of State law and regulation, this subpart does not incorporate the provisions of subpart B regarding the prepayment of such mortgages and the termination of affordability restrictions. Similarly, the rule does not address tenant protections in the event of termination of the affordability restrictions, either in the event of a prepayment or the inability of the Department to provide funding for incentives. With respect to the latter event, section 613(b) requires only that the Department "may" provide incentives upon application of the State agency or a local housing authority. This language contrasts with the Department's obligation to provide incentives pursuant to a plan of action approved for eligible low income housing under subpart B, the lack of funding for which may entitle an owner to prepay and terminate the affordability restrictions. Although the Department, therefore, views its funding obligations under section 613(b) as discretionary, as opposed to its funding of approved Plans of Action for otherwise eligible low income housing which is solely subject to funding availability, it will fund such applications by a State agency or local housing authority so long as such funding will not interfere with the funding of an approved plan of action for eligible low income housing under subparts B or C.

The statutory language presents some interpretive difficulties by generally requiring, as noted above, that incentives made available to owners under State assisted programs conform with those made available to owners of eligible low income housing. However, with two exceptions discussed below, the statute is silent with respect to the terms and

conditions for rendering assistance and incentives. The Department believes that since the amount of incentives is inextricably bound to the determinations of value, it would be incongruous to require a less rigorous determination of value for State assisted mortgages. Further, since the amount and type of incentives in subpart B is dependent on an owner's decision to maintain or transfer ownership in the housing, the Department believes that the same requirements should apply to State assisted mortgages and owners. Thus, the rule requires owners of State assisted projects to follow the process for notices of intent and plans of action required for owners subject to subpart B in order to receive incentives.

*Section 8 assistance.* The statute generally requires that section 8 assistance, awarded as an incentive under an approved plan of action, conform to the requirements for such assistance made available under subpart B; that is, it is available for all very low and lower income families; rent levels reflect those necessary to implement an approved plan of action; and no tenant shall pay in excess of the lesser of 30% of adjusted gross income or the fair market rent for rent. The rule, by incorporating the corresponding provisions of subpart B, reflects these statutory requirements.

The statute further specifies in section 613(b)(2) that if the owner receives section 8 assistance, the project will be subject to the standards for maintenance and sanctions in "Section 224(e) of the Housing and Community Development Act of 1987." Since LIHPRHA has replaced the 1987 Act in its entirety with the instant statute and since neither statute contains a provision at section 224(e), the Department believes that this language is a vestigial reference to a former version of LIHPRHA. It is intended to refer to section 222(d) ("Housing Standards") of the LIHPRHA. The rule reflects this interpretation.

*Restrictions.* Section 613(b)(3) requires an owner of housing awarded incentives under this subpart to maintain the housing as affordable to low and moderate income tenants for the period for which the assistance is received. This section departs from § 248.145(d) of subpart B which requires maintenance of the affordability restrictions for the remaining useful life of the project, such determination of which may not be appealed by the owner for 50 years following the agreement to maintain the affordability restrictions. Section 248.169(b) further prescribes remedies available to the owner if the Department fails to renew the contract for the assistance for the term of the plan of action. While subpart D generally conforms with the applicable requirements of subpart B, the rule requires maintenance of the affordability restrictions for State assisted mortgages only if the contract for assistance is renewed timely. The statute is silent with respect to a State's option to provide its own substitute assistance, in the absence of Federal assistance, in order to insure extension of the preservation agreement. While States may include such a provision in their preservation agreements, the rule tracks the statutory language.

*Preemption.* The Department has not incorporated § 248.7 into subpart D. The references in section 232(a)(3) and 232(b) to loans which are inconsistent with the provisions of "this subtitle" (i.e., subtitle A of title VI) indicate that section 232 is not intended to apply to subtitle B, of which section 613(b) is a part.

PART 241 -- SUPPLEMENTARY FINANCING FOR INSURED PROJECT MORTGAGES

Subpart A

Two commenters suggested that HUD waive the equity requirements for rehabilitation loans insured under this subpart. There is no statutory basis for the Department to consider such a proposal. Further, prudent underwriting practices demand an equity requirement. The rule has not been changed to reflect this comment. The commenter further suggests that owners receive an 8 percent return on the equity requirement for a rehabilitation loan. There is no statutory language in support of this suggestion, and it has not been adopted. Another suggestion by the same commenter would permit seller financing of the equity requirement for rehabilitation loans with the seller receiving "market return" on the loan. The Department has no objection to a seller providing take back financing for the equity requirements on rehabilitation loans. However, the seller may not charge interest at a rate in excess of that of the rehabilitation loan. The related party rule has been amended to reflect this change.

One commenter suggested that the Department use its housing standards when underwriting a rehabilitation loan insured under this subpart. The Department intends that rehabilitation activities under this program bring the project back to its original physical standard for occupancy.

Another comment stated that improvements financed through rehabilitation loans should include health and safety features for the elderly and disabled, including alarm systems, grab bars, sprinkler systems, etc. For projects constructed originally for the benefit of the elderly and disabled where these features were not included, the Department will permit them in the rehabilitation loan. In some jurisdictions retrofitted sprinkler systems are being required for high-rise structures regardless of the target tenant population. The Department will recognize these costs as well. These items will be handled administratively and do not require a change in the rule.

Another commenter suggested that the Department underwrite rehabilitation loans at 100 percent of required repairs and administer loan draws using the Flexible Subsidy program methodology. The Department intends to maintain the distinction between section 241(a) rehabilitation loans and Flexible Subsidy Capital Improvement Loans. Section 241(a) loans will be administered by the mortgagee on a draw basis like any insured rehabilitation or new construction loan program. Flexible Subsidy Capital Improvement Loans will be administered by the Department utilizing the program's disbursement procedures. The rule has not been changed to reflect this comment.

Subpart E

*Section 241.1000 Purpose and Scope*

The Department received eighteen comments suggesting that section 241(f) equity and acquisition loans be combined with section 241(a) rehabilitation loans. Most of the commenters were concerned with the financing costs associated with two loans versus one loan. With the exception of any ancillary fees charged by commercial mortgagees, financing fees for insured mortgages are based on the mortgage amount. It is doubtful, therefore, that two loans would be any more costly to the transaction than one. One commenter stated that separate rehabilitation loans and equity or acquisition loans would be difficult to sell on the secondary mortgage market. However, all forms of HUD-insured mortgages have been accepted in the secondary mortgage market and HUD does not foresee any reason to believe that these loans would not also be acceptable. Another commenter suggested that in combining the two loan programs, the Department waive its review and inspection requirements for section 241(a) rehabilitation loans.

The Department believes that the statute (see sections 214(b) and 219(b)) specifically contemplates and authorizes separate loans for rehabilitation and equity or acquisition, as stated in § 241.1067 of the proposed rule; however, HUD will consider combining the two programs to facilitate processing of loans pursuant to approved plans of action. (See also the comments on § 241.1067 below.) However, the Department will not waive its review and inspection requirements, pursuant to section 241(a) for the rehabilitation component of the loan.

*Section 241.1010 Feasibility Letters*

One comment requested that the Department make a feasibility letter for a section 241(f) acquisition loan available to priority purchasers who have submitted an expression of interest pursuant to § 248.157(f). This comment confuses the different processes designed in the part 248 rule for accepting expressions of interest and processing plans of action pursuant to an owner's acceptance of a bona fide offer. An owner's decision to offer the project for sale does not contain an application for a section 241(f) acquisition loan. That application is made when the purchaser and the seller jointly file the plan of action to transfer the project. However, purchasers will be advised pursuant to § 248.157(f) of the amount of the preservation equity and the maximum amount of a section 241(f) acquisition loan.

Another commenter suggested that the need for feasibility and conditional commitment letters are obviated by the identification of project income, expenses and required repairs in the appraisal. The income, expenses and repairs

identified in the appraisal are for the purpose of determining a project's values in accordance with section 213 of the statute. The actual project income, expenses and required repairs will be identified in the plan of action. The Department will accept applications for rehabilitation and acquisition loans with the filing of a plan of action to transfer the project to a qualified purchaser. Similarly, the Department will accept applications for rehabilitation loans and equity loans with a plan of action to extend the affordability restrictions.

*Section 241.1015 Application and Commitment Fees*

One comment suggested that the Department authorize the use of proceeds of an acquisition loan insured under this part to pay financing and application fees. The statute, in section 241(f)(3)(B), specifically limits the maximum insurable acquisition loan under this subpart to 95 percent of the preservation equity except, in the case of priority purchasers, any expenses associated with the acquisition, loan closing and implementation of plans of action may also be included. The Department is authorized, however, under sections 220(d)(2)(F) and 221(d)(2) to provide capital grants to priority purchasers in order to reimburse them for expenses incurred in the transfer of the project which are not included in an acquisition loan. Therefore, the Department will include the reasonable costs of applications and financing in a capital grant as part of its approval of a plan of action to transfer the project to a priority purchaser under a voluntary sale and any qualified purchaser under a mandatory sale. (See further discussions at § 241.1067 below.)

*Section 241.1020 Commitments*

One commenter requested that the Department combine conditional and firm commitment applications and lower the fees charged for making the application. The Department is considering bypassing the conditional commitment stage; however, it does not contemplate lowering its application fees.

*Section 241.1035 Charges by Lender*

One commenter asserted that the limitation on the initial service charge in § 241.1035(b) conflicted with the debt service coverage requirements of § 241.1067. The Department does not see any conflict between the two provisions, and the rule has not been changed to reflect the comment. Another comment requested that provisions regarding mortgagee consent to section 241(f) loans be clearly stated in the rule. The proposed rule did so at § 241.1120.

*Section 241.1046 Rental Assistance*

Three comments stated that the term of section 8 housing assistance payments contracts offered as an incentive to an owner or purchaser to support section 241(f) equity or acquisition loans should be coincidental with the term of the mortgage. Section 8 contract terms are limited to those provided for in appropriations acts. However, section 241(f)(7) requires the Department, when underwriting the mortgage insurance, to assume that the assistance will be available for the full period of time during which the plan of action is in effect. The proposed rule at § 241.1046(a) reflects this statutory intent. Further, § 248.169(b) of the interim rule prescribes the actions the Department must take to protect the owner and tenants should an assistance contract not be renewed.

Two commenters objected to the acceleration provision of § 241.1046(b), stating that it would make loans unmarketable, presumably on the secondary market. This provision reflects the language of the statute at section 241(f)(7), and will protect the mortgagee in case there are insufficient appropriations to fund a renewal of an assistance contract to support an equity or acquisition loan insured under this subpart. The provision does not affect the mortgage insurance or compromise a mortgagee's ability to file a claim in the event of a default. Indeed, its probable intention is to allow the Department the option of immediately causing a default, and subsequent assignment of the mortgage in exchange for insurance benefits, instead of having the mortgagee wait for a monetary default and then proceeding to an

assignment. The last comment suggested that the Department clarify that it will accept an insurance claim in the event that an assistance contract is not renewed. While section 241(f)(8) directs the Department to "take actions * * * to avoid default," the Department acknowledges its obligation under the mortgage insurance contract to pay insurance claims upon proper notification and assignment by the mortgagee.

*Section 241.1060 Maturity*

The Department received 86 comments objecting to the 20-year term for loans insured under this subpart for a variety of reasons: (1) The 20-year term would increase the likelihood of preservation rents exceeding the Federal cost limit, enabling more owners to prepay their mortgages and terminate the affordability restrictions; (2) the 20-year term is more costly to the Federal government than a 40-year term because of the assistance which must be provided to support increased debt service costs; (3) a 20-year term would make purchase of the loan for the Government National Mortgage Association's mortgage backed securities (MBS) program infeasible; and (4) a 20-year term would limit an owner's opportunity to realize the full 70 percent of preservation equity under an equity loan.

While it is true that the increased debt service associated with a shorter term loan might in some instances cause a project's aggregate preservation rents to exceed the Federal cost limit, the Department does not view this as impacting on the likelihood that an owner will prepay the mortgage and terminate the affordability restrictions. If the transfer preservation rents exceed the Federal cost limits, an owner may elect to prepay subject to the mandatory sales provisions of § 248.161 of this title. An owner may prepay only if it does not receive a bona fide offer at the preservation value. This is in effect identical to a voluntarily sales offer under § 248.157, where the owner may also prepay only if it does not receive a bona fide offer to purchase. Since the opportunity to prepay is a direct result of the lack of a purchaser available or willing to make a bona fide offer, the Department is not persuaded that an increase in the term of an acquisition loan would have any effect on prepayment.

While it is true that a shorter term loan would carry higher amortization costs, it is not true that a longer term loan would, therefore, be less costly to the government. The extra subsidy assistance necessary to support a longer term loan is greater than the reduction in annual debt service costs attendant to a longer term loan. The Department is, therefore, reluctant to support a loan program with inherently higher costs, the benefits of which have not been demonstrated.

The Department does not ordinarily structure program regulations around the potential for third parties to create investment opportunities. The Department's multifamily insured loan programs have traditionally carried 40-year terms, which have most likely been a contributing factor to the terms of various MBS programs. The Department is confident that the market can adjust to an insured mortgage of a lesser term.

*Section 241.1067 Maximum Loan Amount*

Fifteen commenters offered various suggestions for nonprofit purchasers to include soft costs and transaction costs in acquisition loans in addition to the maximum loan amount. As previously discussed in the comments to § 241.1015, the Department will include such costs which are not covered in the acquisition loan in a capital grant for priority purchasers in all sales and qualified purchasers in mandatory sales.

One comment stated that the Department should accept rehabilitation, equity and acquisition financing from any source, public or private, without necessarily using section 241 mortgage insurance. The Department's position is that the plan of action may include an uninsured rehabilitation, equity or acquisition loan provided that the terms of the loan, including monitoring of rehabilitation, and default acceleration and foreclosure provisions are acceptable to the Department.

The Department recognizes that purchasers may have difficulty obtaining the additional 5% of transfer preservation equity which may not be financed through an acquisition loan under this section. In order to make financing more

accessible, seller financing will be permitted as long as it meets the requirements of the related party rule in § 248.101. Any seller financing must be in the form of a loan, not a grant, and the total amount of the financing, including the acquisition loan provided under this subpart, may not exceed the project's transfer preservation equity, plus in the case of a priority purchaser, any expenses associated with the acquisition, loan closing, and implementation of the plan of action. Also, the interest rate charged by a seller on any financing may not be in excess of the interest rate imposed on the acquisition loan under this subpart. A new § 248.157(q) has been added to part 248 to provide for seller financing.

A commenter suggested that the 30 percent equity requirement for equity loans be construed as not requiring the owner to post any further equity to obtain the loan.

The Department concurs with the commenter. However, owners may have to pay loan fees and other transaction costs incidental to receiving such loans. The Department will not provide additional incentives for this purpose. A commenter suggested that priority purchasers be subject only to a 5 percent holdback. The 5 percent holdback pertains to equity loans. Only owners who extend low income affordability restrictions, and not purchasers, are eligible for equity loans, and the holdback requirement does not apply to purchasers. Another comment suggested that standard debt service coverage and vacancy allowance practices be used in setting the actual rents for servicing acquisition loans. The Department intends to assume a 3% vacancy cost in approving acquisition loans.

One comment asked why mortgagees, and in particular servicing mortgagees, were prohibited from charging transaction fees for consenting to secondary financing insured under this subpart. The mortgagee is prohibited from withholding consent to an equity or acquisition loan or an insured rehabilitation loan. HUD considers the imposition of a substantial transaction fee to be tantamount to the withholding of consent to the second mortgage. Moreover, since the mortgagee is prohibited from withholding consent, the servicer would undertake only a very limited review of the secondary financing. Therefore, the Department sees no basis for the mortgagee to charge a transaction fee.

One commenter inquired whether a mortgagee could withhold consent to a section 241(a) rehabilitation loan. Section 241.1661(c) of the proposed rule prohibited the holder of an insured mortgage from withholding its consent to a rehabilitation loan insured under section 241(a) with respect to "eligible multifamily housing," as defined in that section. This provision implements section 204(b) of the Department of Housing and Urban Development Reform Act. The interim rule retains the language of the proposed rule.

*Section 241.1069 Escrow Requirements*

One comment objected to HUD or a State housing finance agency controlling the disbursement of the 10 percent holdback from equity loans. The rule tracks the statutory language at section 241(f)(2)(B)(ii) and has not been changed.

One commenter noted that the language of this section suggested the possible use of insured advances with respect to equity and acquisition loans and further suggested a methodology similar to that used in the section 223(f) program. The Department interprets the statute as requiring disbursement of section 241(f) loan proceeds in full at loan closing, except to account for any phase-in of rents, and except for the 10 percent holdback on equity loans.

Therefore, the rule has not been changed to reflect this comment. Another commenter suggested that insured advances be deleted entirely, the Department also waiving its review and inspection requirements under section 241(a). As stated above (see § 241.1000), the Department will continue to review and inspect rehabilitation work performed under section 241(a).

Another commenter suggested that insured equity loans be fully disbursed at closing with the 10 percent holdback considered "subject to escrow." The statute at section 241(f)(2)(B)(ii) conditions the issuing of insurance on the holdback, held by the mortgagee for a period of not less than five years, to ensure compliance with the maintenance standards at section 222(d) of LIHPRHA. The rule reflects the statutory provisions.

With respect to the phase-in provisions in § 241.1069(b), another commenter stated that is was unlikely that any operating deficit would be required, and that a letter of credit posted by the borrower would offer the mortgagee sufficient protection in case a deficit actually occurred. While the Department generally agrees that operating deficits during the rent phase-in period will be exceptional, it sees no reason to amend this protection. Moreover, the phase-in provision is specifically contemplated by section 241(f)(5)(B).

*Section 241.1100 Prepayment Privileges and Charges*

One comment suggested that the Department include the provisions of Mortgagee Letter 87-9 to loans insured under this subpart. Mortgagee Letter 87-9 addresses prepayment lock-outs and prepayment charges imposed by lenders in bond-financed and other investor-financed transactions. Section 241.1100 provides the regulatory basis for HUD's approval of such lock-outs and charges. There is no need to include the provisions of the Mortgagee Letter in the regulation itself.

*Section 241.1120 Mortgagee's Consent*

One commenter suggested that the Department expand the coverage of this section by prohibiting a mortgagee from withholding its consent on any noninsured secondary financing pursuant to an approved plan of action. The Department has revised the language of this section to clarify that the prohibition on withholding consent to an equity loan is applicable with respect to both insured and noninsured equity loans. In addition, the prohibition has been expanded to include a prohibition on withholding consent to insured or noninsured acquisition loans. Sections 241(f) (2)(A) and (3)(A) define the terms "equity loan" and "acquisition loan" respectively without regard to whether the loan is insured by HUD. Section 241(f)(9) prohibits a HUD-approved mortgagee from withholding consent to an "equity loan" or "acquisition loan" on a property on which that mortgagee holds a mortgage. Thus, on the basis of the literal statutory language, HUD believes that the prohibition on withholding consent is applicable to both insured and noninsured equity and acquisition loans. (By contrast, the prohibition on withholding consent to a rehabilitation loan is restricted to loans insured under section 241; see section 241(g)(2) of the National Housing Act, as added by section 204(b) of the Department of HUD Reform Act of 1989.)

Subpart F -- Insurance for Equity Loans -- Contract Rights and Obligations

*Section 241.1210 Condition for Payment of Insurance Benefits*

One comment stated that this section should be clarified to ensure that all regulatory requirements regarding timely notice and other actions would also apply to an application for insurance benefits under this section. The proposed rule incorporated such regulatory requirements by cross-referencing the provisions of § 207.258 of this title. Further clarification is not deemed necessary.

*Section 241.1235 Cross Default*

One comment requested that the phrase "and the holder thereof initiates a foreclosure proceeding" be deleted from this section. The Department has retained the quoted language. In cases where the holder elects to assign the loan to HUD rather than foreclosing, there is no need to protect HUD's interests by creating a cross-default.

Another commenter stated that a mortgagee should only be obligated to inform the Department of defaults of which the mortgagee is aware. There is no expectation that a mortgagee be obligated to inform the Department of mortgage violations of which it does not have knowledge.

*Section 241.1245 Insurance Endorsement*

One commenter suggested that secondary market lenders be consulted when loans under this subpart are endorsed to avoid any secondary market problems. HUD presumes that primary lenders intending to sell their loans on the secondary market will consult with secondary lenders to ensure the marketability of their loans. The Department sees no need to amend the rule to address what is essentially a market transaction.

Part 219 -- Flexible Subsidy Program for Troubled Projects

Subpart C

The Department received one comment concerning part 219 of this title. The commenter suggested waiving any equity requirements for capital improvement loans provided to priority purchasers. Pursuant to § 219.305(c), an owner must contribute 25 percent of the total estimated cost of the needed capital improvements; however, if the owner is a nonprofit organization other than a cooperative association, it is exempt from this requirement. Therefore, cooperative associations, are subject to an equity requirement when applying for a capital improvement loan.

Part 236 -- Mortgage Insurance and Interest Reduction Payment for Rental Projects

Section 236.60 and paragraph (b) of § 236.55 have been restated in this interim rule to correct an error in the publication of the April 1, 1991 revised version of title 24 of the CFR in which language from both sections was inadvertently omitted.

Miscellaneous Comments

Thirty-four miscellaneous comments were received regarding a variety of issues that were not covered within any specific section of the rule.

A concern was raised by three commenters that an owner may attempt to interfere with the tenants right to organize or participate in the prepayment process. The commenter requested that a penalty be imposed or a warning clearly stated in the regulations in order to preclude any owner interference. The Department does not have express authority to impose a penalty on owners. If tenants feel that their right to organize has been violated, they may seek redress through any State or local tenant/landlord institutions or State or local law.

Three commenters want the Department to designate a contact person that will provide tenants with access to information and general planning assistance throughout the preservation process. The Department has already designated personnel in the regional and field offices whose primary responsibilities are providing information and guidance to the tenants and acting as facilitators between tenant groups, mortgage companies and non-profit organizations.

Another commenter requested that it be notified of all elderly projects that have submitted their second notice of intent. The Department has compiled a list of eligible low income housing and this information may be obtained from local field offices upon request.

Two commenters stated that the regulation should be neutral concerning an owner's choice of retaining or selling its property and should not undermine an owner's right to choose, as the commenters claim the sales provisions in the proposed rule do. The regulation reflects the statutory requirements relative to retaining or selling a project.

A commenter requested that a distinction be made between large and small projects (under 100 units) so that profit motivated developers could more easily purchase small projects. The same commenter stated that the regulations should

specifically enable individual owners, who are disabled, over 65 or financially stressed to be able to sell their property outright and receive cash. The implication is that such owners should not have to follow the regulatory process. The statute does not distinguish between small and large projects. A profit-motivated purchaser may buy projects so long as it meets the requirements of a qualified purchaser.

There was a concern by a commenter that the provision of financial incentives under a plan of action may be hampered by subsidy layering reviews. Pursuant to section 102(d) of the Housing and Urban Development Reform Act of 1989, the Department must perform a subsidy layering analysis to ensure that HUD funds are expended in the least costly manner, while assuring project feasibility. However, the overall preservation process, including approval of the plan of action, should not be materially affected by this requirement in terms of time delay.

Four commenters asked about advances to the owners to finance capital improvements, annual increases to section 8 and moderate income rents, and assistance to state-assisted or subsidized projects to prevent prepayment. The questions concerning advances pertain to section 611(b) of the statute and are not germane to this regulation; a rule implementing section 611(b) will be published separately for comment. While this rule does not implement section 612, which governs rent increases for moderate income and market-rate tenants, its impact on tenant rents has been explained in the discussion concerning § 248.145 of this subpart. Section 613(b), relating to the state mortgage programs, is implemented as subpart D herein.

Findings and Other Matters

This rule constitutes a major rule, as determined by the Office of Information and Regulatory Affairs, Office of Management and Budget, under the authority of Executive Order 12291 on Federal Regulations issued on February 17, 1981. A copy of the Regulatory Impact Analysis has been transmitted to the Office of Management and Budget, and is available for public inspection during regular business hours in the Office of General Counsel, Rules Docket Clerk, room 10276, 451 Seventh Street SW., Washington, DC 20410.

This rule was listed as item 1349 in the Department's Semiannual Agenda of Regulations published on October 21, 1991 *(56 FR 53380, 53396),* under Executive Order 12291 and the Regulatory Flexibility Act.

A Finding of No Significant Impact with respect to the environment has been made in accordance with HUD regulations in 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969, *42 U.S.C. 4332.* The Finding of No Significant Impact is available for public inspection during regular business hours in the Office of General Counsel, Rules Docket Clerk, room 10276, 451 Seventh Street, SW., Washington, DC 20410.

Under section 605 of the Regulatory Flexibility Act *(5 U.S.C. 601),* HUD certifies that this rule does not have a significant economic impact on a substantial number of small entities, because it carries out statutorily-mandated limitations on prepayment of the affected mortgages. Any economic impact is a direct consequence of the statute and is not separately imposed by this rule.

The Information collection requirements contained in the rule have been submitted to the Office of Management and Budget, Office of Information and Regulatory Affairs, HUD Desk Officer, room 3001, New Executive Office Building, Washington, DC 20503, for review under the provisions of the Paperwork Reduction Act of 1980 *(44 U.S.C. 3501*-3502). No person may be subject to a penalty for failure to comply with these information collection requirements until they have been approved and assigned an OMB control number. The OMB control number, when assigned, will be announced by separate notice in the Federal Register.

57 FR 11992

Tabulation of Annual Reporting Burden

| Description of information collection and applicable program reference | Number of respon dents 17.1 X | Number of respon ses per respo 17.2= | Total annual responses 17.3 X |
|---|---|---|---|
| A. First notice of intent 1990 statute: Section 248.105 | 509.00 | 1.00 | 509.00 |
| B. Election to proceed under 1987 statute: 248.5 | 120.00 | 1.00 | 120.00 |
| C. Appraisal: 248.111 | | | |
| D. Second notice of intent: 248.133 | 283.00 | 1.00 | 283.00 |
| E. Plans of action: | | | |
| 1. Termination of Affordability: 248.141 | 4.00 | 1.00 | 4.00 |
| 2. Extension of Affordability/Transfer of Project: 248.145 | 465.00 | 1.00 | 465.00 |
| (Resident councils plans included in L) | | | |
| F. Expression of interest from potential purchasers: 248.157(e) | 283.00 | 1.00 | 283.00 |
| Additional information from resident councils: 248.173(b) | 39.00 | 1.00 | 39.00 |
| G. Owner provides potential purchaser information on housing: 248.157(b) | 283.00 | 1.00 | 283.00 |
| H. Bona fide offers | 283.00 | 1.00 | 283.00 |
| Additional information from resident councils | 39.00 | 1.00 | 39.00 |
| I. Owner provides information on displaced tenants: 248.165(b) | 4.00 | 1.00 | 4.00 |
| J. Notices of vacancies from public housing agencies: 248.165(c) | 4.00 | 1.00 | 4.00 |
| K. Owner notifies HUD of expiring section 8 contracts: 248.169 1 | 0.00 | 1.00 | 0.00 |
| L. Resident homeownership plan: 248.173(d) | 39.00 | 1.00 | 39.00 |
| M. State preservation plan: 248.177(d) 2 | 6.00 | 1.00 | 6.00 |
| N. State insurance program application, 2 1990 statute: Section 248.301 | 1.00 | 1.00 | 1.00 |
| O. Application for project assistance statute: 248.319 | 3.00 | 1.00 | 3.00 |
| Totals | 2,365.00 | | |

1 See item 13 of supporting statement.

2 These items will be reported only in first year of program.

The Department specifically requests comments on how the paperwork burden on the public resulting from the interim rule may be reduced.

The General Counsel, as the Designated Official under section 6(a) of Executive Order 12612, Federalism, has determined that the policies contained in this rule will not have substantial direct effects on States or their political subdivisions, or the relationship between the Federal government and the States, or on the distribution of power and responsibilities among the various levels of government. As a result, the rule is not subject to review under the Order.

The General Counsel, as the Designated Official under Executive Order 12606, The Family, has determined that some of the policies in this rule will have a significant impact on the formation, maintenance and general well-being of the family. Achievement of homeownership by low income families under the regulation can be expected to support family values, by helping families to achieve security and independence, by enabling them to live in decent, safe and sanitary housing, and by giving them the skills and means to live independently in mainstream American society. Since the impact on the family is beneficial, no further review is necessary.

The General Counsel, as Designated Official under Executive Order 12630, Government Actions and Interference with Constitutionally Protected Property Rights, has determined that this interim rule does not have "takings implications," as defined in HUD's "Supplemental Guidelines for the Evaluation of Risk and Avoidance of Unanticipated Takings." The interim rule does not deny the owner an economically viable use for the project. Instead, the owner will, at a minimum, maintain ownership of the project with the below market rate mortgage or rental subsidies in place and with greatly enhanced access to the full equity in the project as residential rental housing; alternatively, the owner may transfer the project under a plan of action in which the Secretary will provide incentives that will enable the owner to realize the full value of the project at its highest and best use, or may be entitled to prepay the mortgage.

The Catalog of Federal Domestic Assistance program number for this rule is 14.137 (Mortgage Insurance -- Rental and Cooperative Housing for Low and Moderate Income Families).

List of Subjects

*24 CFR Part 50*

Environmental assessments, Environmental impact statements, Environmental policies and review procedures.

*24 CFR Part 219*

Loan programs -- housing and community development, Low and moderate income housing.

*24 CFR Part 221*

Low and moderate income housing, Mortgage insurance, Reporting and recordkeeping requirements.

*24 CFR Part 236*

Grant programs -- housing and community development, Low and moderate income housing, Mortgage insurance, Rent subsidies, Reporting and recordkeeping requirements.

*24 CFR Part 241*

Energy conservation, Home improvement, Loan programs -- housing and community development, Mortgage

insurance, Reporting and recordkeeping requirements, Solar energy.

*24 CFR Part 248*

Intergovernmental relations, Loan programs -- housing and community development, Low and moderate income housing, Mortgage insurance, Reporting and recordkeeping requirements.

Accordingly, the Department amends title 24 of the Code of Federal Regulations as follows:

PART 50 -- PROTECTION AND ENHANCEMENT OF ENVIRONMENTAL QUALITY

1. The authority citation for part 50 is revised to read as follows:

Authority: *42 U.S.C. 4332, 42 U.S.C. 3535*(d).

2. In § 50.20, paragraph (n) is revised to read as follows:

§ 50.20 Categorical exclusions.

* * * * *

(n) Approval of mortgage prepayments or plans of action (including incentives) under the Emergency Low Income Housing Preservation Act of 1987 or the Low Income Housing Preservation and Resident Homeownership Act of 1990, and approval of mortgage prepayments under other statutes or authorities, when the proposal does not involve demolition of any buildings, or parts of any building, containing the primary use served by the project.

* * * * *

PART 219 -- FLEXIBLE SUBSIDY PROGRAM FOR TROUBLED PROJECTS

3. The authority citation for part 219 is revised to read as follows:

Authority: *12 U.S.C. 1715z-1a; 42 U.S.C. 3535*(d).

4. In § 219.325, the introductory text of paragraph (b) and paragraph (b)(3) are revised and a new paragraph (b)(5) is added to read as follows:

§ 219.325 Effect on rental rates.

* * * * *

(b) If rent increases that would result from the debt service and other expenses of a capital improvement loan under subpart C of this part for a project would cause the rents of lower income residents of the project to be higher than the amount that would be allowed for eligible families under 24 CFR 813.107, or where appropriate to implement a plan of action under part 248 of this chapter, the Secretary may consider taking any or all of the following actions:

* * * * *

(3) Notwithstanding § 219.320(b), reduce the rate of interest on the capital improvement loan to a rate not lower

than one percent.

* * * * *

(5) Permit repayment of the debt service to be deferred as long as the low and moderate income character of the project is maintained in accordance with § 219.110(b).

PART 221 -- LOW COST AND MODERATE INCOME MORTGAGE INSURANCE

5. The authority citation for part 221 is revised to read as follows:

Authority: *12 U.S.C. 1707*(a), 1715(b), 1715*l*, *42 U.S.C. 3535*(d).

6. In § 221.524, paragraph (e) is revised to read as follows:

§ 221.524 Prepayment privileges.

* * * * *

(e) *Prepayment of mortgages subject to part 248.* Where the mortgage described in paragraph (a)(1) of this section is, or prior to assignment to the Commissioner was, insured under section 221(d)(3) of the Act and the mortgagor receives project-based assistance under parts 880, 881 or 886 of this title, or where the mortgage is, or prior to assignment to the Commissioner was, insured under section 221(d)(5) of the Act, the mortgage may be prepaid in full only in accordance with a plan of action approved by the Commissioner under part 248 of this chapter.

PART 236 -- MORTGAGE INSURANCE AND INTEREST REDUCTION PAYMENT FOR RENTAL PROJECTS

7. The authority for part 236 is revised to read as follows:

Authority: *12 U.S.C. 1715b* and 1715z-1; *42 U.S.C. 3535*(d).

8. In § 236.55, paragraph (b) is revised to read as follows:

§ 236.55 Rental charges.

* * * * *

(b) *Monthly rental charge.* Except as agreed to by the Commissioner pursuant to a plan of action approved under part 248 of this chapter, monthly rental charges shall be calculated as follows:

(1) *Tenant Rent for qualified tenants whose initial lease is effective on or after May 1, 1983.* The Tenant Rent payable by a Qualified Tenant shall be the greater of the Basic Rent or 30 percent of the tenant's Adjusted Monthly Income, but not more than the Market Rent. In the case of tenant paid utilities, the Utility Allowance may not reduce the Tenant Rent below 25 percent of Adjusted Monthly Income.

(2) *Tenant Rent for qualified tenants whose initial lease was effective before May 1, 1983.* The Tenant Rent shall be calculated in accordance with paragraph (b)(1) of this section, except that instead of 30 percent, the percentage applied to Adjusted Monthly Income shall be as follows:

| Effective date of recertification | Percentage |
|---|---|
| May 1, 1983 to Sept. 30, 1983 | 27 |
| Oct. 1, 1983 to Sept. 30, 1984 | 28 |
| Oct. 1, 1984 to Sept. 30, 1985 | 29 |
| Oct. 1, 1985 and after | 30 |

(3) *Limitation on tenant's monthly rental payment.* In no event shall the monthly rental exceed the HUD-approved market rental.

* * * * *

9. Section 236.60 is revised to read as follows:

§ 236.60 Excess rental charges.

Except as agreed to by the Commissioner pursuant to a plan of action approved under part 248 of this chapter or in connection with an adjustment of contract rents under section 8(c)(10) of the United States Housing Act of 1937, the mortgagor shall agree to pay monthly to the Secretary the total of all rental charges collected in excess of the Basic Rent in accordance with the instructions prescribed by the Secretary.

PART 241 -- SUPPLEMENTARY FINANCING FOR INSURED PROJECT MORTGAGES

10. The authority for part 241 is revised to read as follows:

Authority: *12 U.S.C. 1715b,* 1715z-6, *42 U.S.C. 3535*(d).

11. Section 241.166 is added to subpart A to read as follows:

§ 241.166 Special underwriting standards for eligible multifamily housing.

(a) For purposes of this section, the term "eligible multifamily housing" means any housing financed by a loan or mortgage that is --

(1) Insured or held by the Commissioner under section 221(d)(3) of the National Housing Act and assisted under section 101 of the Housing and Urban Development Act of 1965 or section 8 of the United States Housing Act of 1937;

(2) Insured or held by the Secretary and bears interest at a rate determined under the proviso of section 221(d)(5) of the National Housing Act; or

(3) Insured, assisted or held by the Secretary under section 236 of the National Housing Act.

(b) When underwriting a loan under subpart A of this part in connection with eligible multifamily housing, the Commissioner may assume that any rental assistance provided for purposes of servicing the additional debt will be extended for the term of the rehabilitation loan. The Commissioner shall exercise prudent underwriting practices in insuring rehabilitation loans under subpart A of this part.

(c) The holder of an insured mortgage which is recorded prior to the rehabilitation loan covering eligible multifamily housing may not withhold its consent to the rehabilitation loan or the security instrument executed in connection with the rehabilitation loan, and may not charge a fee as a condition to its consent to such loan or security instrument.

12. Section 241.251 is amended by adding a paragraph heading to paragraph (a) and by adding a new paragraph (c) to read as follows:

§ 241.251 Cross-reference.

(a) *Projects with a HUD-insured or HUD-held mortgage.* * * *

* * * * *

(c) *Projects without a HUD-insured or HUD-held mortgage.* The provisions of subpart D of this part shall be applicable to a project without a HUD-insured or HUD-held mortgage that is receiving a loan insured under subpart A of this part in connection with a plan of action approved by the Commissioner under part 248 of this chapter.

13. Subpart E (consisting of §§ 241.1000 through 241.1120) and subpart F (consisting of §§ 241.1200 through 241.1250), are revised to read as follows:

Subpart E -- Insurance for Equity Loans and Acquisition Loans -- Eligibility Requirements

Sec.

241.1000 Purpose and scope.

241.1005 Definitions.

241.1010 Feasibility letter.

241.1015 Application and commitment fees.

241.1020 Commitments.

241.1025 Refund of fees.

241.1030 Mortgage insurance premiums.

241.1035 Charges by lender.

241.1040 Eligible lenders.

241.1045 Note and security form.

241.1046 Rental assistance.

241.1050 Method of loan payment.

241.1055 Date of first payment to principal.

241.1060 Maturity.

241.1065 Maximum loan amount -- loans insured in connection with a plan of action under subpart C of part 248 of this chapter.

241.1067 Maximum loan amount -- loans insured in connection with a plan of action under subpart B of part 248 of this chapter.

241.1069 Escrow requirements.

241.1070 Agreed interest rate.

241.1080 Eligibility of title.

241.1085 Title evidence.

241.1090 Accumulation of next premium.

241.1095 Application of payments.

241.1100 Prepayment privilege and charges.

241.1105 Late charges.

241.1120 Mortgagee's consent.

Subpart F -- Insurance for Equity Loans and Acquisition Loans -- Contract Rights and Obligations

Sec.

241.1200 Cross-references.

241.1205 Payment of insurance benefits.

241.1210 Condition for payment of insurance benefits.

241.1215 Calculation of insurance benefits.

241.1220 Termination of insurance benefits.

241.1230 No vested right in fund.

241.1235 Cross default.

241.1245 Insurance endorsement.

241.1250 Effect of endorsement.

Subpart E -- Insurance for Equity Loans and Acquisition Loans -- Eligibility Requirements

§ 241.1000 Purpose and scope.

(a) Section 231 of the Emergency Low Income Housing Preservation Act of 1989 ("ELIHPA") amended the National Housing Act by adding a new subsection (f) to section 241. This section authorizes the Secretary to provide insurance for an equity loan as a vehicle for the owner of an eligible multifamily project to capture a portion of the project's equity, in connection with a plan of action approved by the Commissioner under ELIHPA.

(b) Section 602 of the Low-Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA") amended section 241 by expanding its scope to include both equity loans for owners, and acquisition loans for purchasers, under a plan of action approved under the provisions of the 1990 Act, and by making other changes. The provisions of section 241(f) as amended by LIHPRHA are applicable to owners with plans of action being processed under part 248, subpart B of this chapter, which implements LIHPRHA.

(c) The provisions of section 241(f) of the Act as they were in effect prior to LIHPRHA remain in effect for owners with plans of action being processed under part 248, subpart C of this chapter, which implements ELIHPA.

(d) The insurance of an equity loan or acquisition loan under subpart E of this part may be provided only as a specific element of a plan of action approved by the Commissioner under part 248 of this chapter and is not available under any other departmental program.

(e) Unless otherwise indicated, the provisions of subparts E and F of this part are applicable to loans insured in connection with plans of action being processed under either subpart B or C of part 248 of this chapter.

(f) An owner or purchaser may obtain both a rehabilitation loan under subpart A of this part and an equity loan or

acquisition loan under subpart E of this part.

§ 241.1005 Definitions.

(a) All of the definitions of § 241.1 apply to equity and acquisition loans insured under subpart E of this part except the following definitions:

§ 241.1(i) -- Borrower;

§ 241.1(k) -- Energy conserving improvements;

§ 241.1(1) -- Solar energy system.

(b) As used in subpart E of this part, the following terms have the meaning indicated:

*Acquisition loan* means a loan or advance of credit made to a purchaser of eligible low income housing which is made for the purpose of implementing a plan of action approved in accordance with part 248 of this chapter.

*Borrower* means the owner or qualified purchaser of an eligible low income housing project, which owner receives and becomes primarily obligated for the repayment of an equity loan. With respect to loans insured in connection with a plan of action under part 248, subpart C of this chapter, the term includes a public entity, a nonprofit organization or a limited equity cooperative, which entity is purchasing an eligible low income housing project by means of an equity loan and is obligated for the payment of the equity loan.

*Eligible low income housing* has the same meaning as provided at § 248.101 or § 248.201 of this chapter, with respect to loans insured in connection with plans of action under subparts B or C of part 248 of this chapter.

*Equity* means, for purpose of subparts E and F of this part only, the difference between the fair market value of the project as determined by the Commissioner and the outstanding indebtedness relating to the property.

*Equity Loan* means a loan or advance of credit to the owner of an eligible low income housing project which is made for the purpose of implementing a plan of action approved in accordance with part 248 of this chapter.

*Extension preservation equity* has the same meaning as provided at § 248.101 of this chapter.

*Limited equity cooperative* means a tenant cooperative corporation which, in a manner acceptable to the Commissioner, restricts the initial and resale price of the shares of stock in the cooperative corporation so that the shares remain affordable to lower income families and moderate income families.

*Low income families* has the same meaning as provided at § 248.101 of this chapter.

*Moderate income families* has the same meaning as provided at § 248.101 of this chapter.

*Plan of action* has the same meaning as provided at § 248.101 or § 248.201 of this chapter.

*Preservation equity* has the same meaning as provided at § 248.101 of this chapter.

*Priority purchaser* has the same meaning as provided at § 248.101 of this chapter.

*Qualified Purchaser* has the same meaning as provided at § 248.101 of this chapter.

§ 241.1010 Feasibility letter.

(a) *Request for study.* The owner may request the Commissioner to undertake a feasibility analysis of an equity or acquisition loan, and issue a feasibility letter. At the discretion of the Commissioner the feasibility analysis may be undertaken or denied.

(b) *Findings.* The issuance of a feasibility letter indicates completion of the Commissioner's preliminary analysis for the insurance of an equity or acquisition loan. The feasibility letter shall contain the Commissioner's estimate of the supportable loan amount, based upon the project's equity in the case of an equity loan and based on the project's purchase price in the case of an acquisition loan, but such feasibility letter shall neither constitute a commitment to insure nor bind the Commissioner in any other manner.

(c) *Fee.* The Commissioner shall not charge a fee for undertaking a feasibility analysis or for the issuance of a feasibility letter.

§ 241.1015 Application and commitment fees.

(a) *Application.* An application for the issuance of either a conditional or firm commitment for insurance of an equity or acquisition loan on a project shall be submitted by an approved lender and by the owner or purchaser of the project to the Commissioner on a form prescribed by the Commissioner. No application shall be considered unless the exhibits called for by such forms are furnished.

(b) *Application and commitment fees* -- (1) *Application for conditional commitment.* An application commitment fee of $2.00 per thousand dollars of the amount of the loan applied for shall accompany the application for a conditional commitment.

(2) *Application for firm commitment.* An application for a firm commitment shall be accompanied by the payment of an application-commitment fee in an amount which, when added to any prior fee received in connection with a conditional commitment application, will aggregate $3.00 per thousand dollars of the loan applied for.

§ 241.1020 Commitments.

(a) *Conditional commitment.* The issuance of a conditional commitment constitutes an agreement by the Commissioner, subject to specified terms and conditions, to accept an application for a firm commitment.

(b) *Firm Commitment.* The issuance of a firm commitment indicates the Commissioner's approval of the application for insurance and sets forth the terms and conditions upon which the equity or acquisition loan will be insured. The firm commitment may provide for the insurance of advances of equity or acquisition loan immediately upon endorsement of the note.

(c) *Term of commitment.* (1) A conditional commitment is effective for whatever term is specified in the text of the commitment.

(2) A firm commitment is effective for whatever term is specified in the text of the commitment.

(3) The term of either a conditional or firm commitment may be extended in such manner as the Commissioner may prescribe.

(d) *Reopening of expired commitments.* An expired conditional or firm commitment may be reopened if a request for reopening is received by the Commissioner within 90 days of the expiration of the commitment. The reopening request shall be accompanied by a fee of 50 cents per thousand dollars of the amount of the expired commitment. If the reopening request is not received by the Commissioner within the required 90-day period, a new application, accompanied by the required application and commitment fee, must be submitted.

§ 241.1025 Refund of fees.

If the amount of the commitment issued is less than the amount applied for, the Commissioner shall refund the excess amount of the application and commitment fees submitted by the applicant. If an application is rejected before it is assigned for processing, or in such other instances as the Commissioner may determine, the entire application and commitment fees or any portion thereof may be returned to the applicant. Commitment and reopening fees may also be refunded to the applicant, in whole or in part, in such other instances as the Commissioner may determine.

§ 241.1030 Mortgage insurance premiums.

The lender, upon endorsement of the note, shall pay the Commissioner a first mortgage insurance premium equal to 0.5 percent of the original face amount of the equity or acquisition loan.

(a) If the date of the first principal payment is more than one year following the date of endorsement, the lender upon each anniversary of such endorsement date, shall pay a premium equal to 0.5 percent of the original face amount of the loan. On the date of the first principal payment, the lender shall pay another premium equal to 0.5 percent of the average outstanding principal obligation of the loan for the following year which shall be adjusted so as to accord with such date and so that the aggregate of said premiums shall equal the sum of:

(1) 0.5 percent of the average outstanding principal obligation of the loan for the year following the date of endorsement; and

(2) 0.5 percent per annum of the average outstanding principal obligation of the loan for the period from the first anniversary of the date of endorsement to one year following the date of the first principal payment.

(b) If the date of the first principal payment is one year or less than one year following the date of endorsement, the lender, upon such first principal payment date, shall pay a second premium equal to 0.5 percent of the average outstanding principal obligation of the loan for the following year which shall be adjusted so as to accord with such date and so that the aggregate of the said two premiums shall equal the sum of:

(1) 0.5 percent per annum of the average outstanding principal obligation of the loan for the period from the date of endorsement to the date of the first principal payment; and

(2) 0.5 percent of the average outstanding principal obligation of the loan for the year following the date of the first payment following the date of the first principal payment.

(c) Until the equity or acquisition loan is paid in full or until receipt by the Commissioner of an application for insurance benefits, or until the contract of insurance is otherwise terminated with the consent of the Commissioner, the lender on each anniversary date of the first principal payment, shall pay an annual insurance premium equal to 0.5 percent of the average outstanding principal obligation of the loan for the year following the date on which such premium becomes payable.

(d) The premiums payable on or after the date of the first principal payment shall be calculated in accordance with the amortizing provisions without taking into account delinquent payments or prepayments.

(e) Premiums shall be payable in cash or in debentures at par plus accrued interest. All premiums are payable in advance and no refund can be made of any portion thereof except as hereinafter provided in subpart E of this part.

§ 241.1035 Charges by lender.

(a) The lender may collect from the borrower the amount of the fees provided for by subpart E of this part.

(b) The lender may also collect from the borrower an initial service charge, as reimbursement for the cost of closing

the transaction, in an amount not to exceed 2 percent of the original principal amount of the loan.

(c) Any charges to be collected by the lender in addition to those prescribed in paragraphs (a) and (b) of this section, shall be subject to the prior approval of the Commissioner.

§ 241.1040 Eligible lenders.

Lenders meeting the applicable eligibility qualifications and requirements contained in § 203.4 or § 203.6 of this chapter are eligible for insurance of equity or acquisition loans under subpart E of this part.

§ 241.1045 Note and security form.

The lender shall present for insurance a note and security instrument on forms approved by the Commissioner for use in the jurisdiction in which the property is located, which shall not be changed without the prior approval of the Commissioner. The security instrument shall provide for accelerated repayment at the request of the Commissioner pursuant to § 241.1046(b).

§ 241.1046 Rental assistance.

(a) When underwriting an equity or acquisition loan under subpart E of this part, the Commissioner may assume that the rental assistance provided in accordance with a plan of action approved under subparts B or C of part 248 of this chapter will be extended for the full term of the contract entered into under the plan of action.

(b) In the event that rental assistance is not extended under part 248 of this chapter, or the Commissioner is unable to develop a revised package of incentives to the owner comparable to those received under the original approved plan of action, the Commissioner may require the mortgagee to accelerate the debt of the equity or acquisition loan.

(c) If the Commissioner is unable to extend the term of rental assistance for the full term of the contract entered into under part 248 of this chapter, the Commissioner is authorized to take such actions as the Commissioner deems appropriate to avoid default, avoid disruption of the sound ownership and management of the property or otherwise minimize the cost to the Federal Government.

§ 241.1050 Method of loan payment.

The loan shall provide for monthly payments on the first day of each month on account of interest and principal and shall provide for payments in accordance with the amortization plan as agreed upon by the borrower, the lender, and the Commissioner.

§ 241.1055 Date of first payment to principal.

The date for first payment to principal shall be established by the Commissioner.

§ 241.1060 Maturity.

Acquisition loans and equity loans insured under subpart E of this part shall have a maturity equal to the remaining term of the first insured mortgage, or 20 years, whichever is longer.

§ 241.1065 Maximum loan amount -- loans insured in connection with a plan of action under subpart C of part 248 of this chapter.

The amount of the equity loan shall not exceed ninety percent of the owner's equity in the project, as determined by the Commissioner. Notwithstanding the above, the equity loan shall not exceed an amount which, when added to the existing indebtedness on the property, can be supported by 90 percent of the projected net operating income of the

project, as determined by the Commissioner. The Commissioner, in making a determination regarding the amount of an equity loan and sums available to service said loan, shall take into account the fact that the project's income may increase within the limits established by § 248.233(d) of this chapter.

§ 241.1067 Maximum loan amount -- loans insured in connection with a plan of action under subpart B of part 248 of this chapter.

(a) The amount of the equity loan shall not exceed the lesser of 70 percent of the extension preservation equity of the project or the amount the Commissioner determines can be supported by the project on the basis of an 8 percent return on extension preservation equity, assuming normal debt service coverage.

(b) The amount of the acquisition loan shall not exceed 95 percent of the transfer preservation equity of the project, except that, if the purchaser is a priority purchaser, the loan may include any expenses associated with the acquisition, loan closing, and implementation of the plan of action, subject to the approval of the Commissioner.

(c) The owner or purchaser may receive an equity or acquisition loan pursuant to subpart E of this part in combination with a rehabilitation loan insured under subpart A of this part, subject to the approval of the Commissioner.

§ 241.1069 Escrow requirements.

(a) An equity loan provided in connection with a plan of action under subpart B of part 248 of this chapter shall provide for the lender to deposit, on behalf of the borrower, 10 percent of the loan amount in an escrow account, controlled by the Commissioner or a State housing finance agency approved by the Commissioner, which shall be made available to the borrower upon the expiration of the 5-year period beginning on the date the loan is made, subject to compliance with § 248.147 of this chapter.

(b) An equity loan provided in connection with a plan of action under either subpart B or subpart C of part 248 of this chapter shall provide for the lender to phase in advances to reflect project rent levels.

§ 241.1070 Agreed interest rate.

The equity or acquisition loan shall bear interest at the rate agreed upon by the borrower and the lender.

§ 241.1080 Eligibility of title.

In order for the project to be eligible for insurance, the Commissioner shall determine that the title to the property is vested in the borrower as of the date the security instrument is filed for record. The title evidence will be examined by the Commissioner and the endorsement of the credit instrument for insurance shall be evidence of its acceptability.

§ 241.1085 Title evidence.

(a) Upon insurance of the loan, the lender shall furnish to the Commissioner a policy of title insurance as provided in paragraph (a)(1) of this section. If the lender is unable to furnish such policy for reasons satisfactory to the Commissioner, the lender shall furnish such evidence of title as provided in paragraphs (a)(2), (3) or (4) of this section as the Commissioner may require. Any policy of title insurance, or evidence of title required under this section shall be furnished without expense to the Commissioner. The acceptable types of title evidence are:

(1) A policy of title insurance issued by a company satisfactory to the Commissioner. Such policy shall comply with the "L.I.C. Standard Mortgage Form," or such other form as may be approved by the Commissioner; shall name the lender and the Secretary of Housing and Urban Development, as their respective interests may appear, as the insured; and shall become an owner's policy, running to the lender as owner upon its acquisition of the property in extinguishment of the debt, and to the Secretary as owner upon his acquisition of the property pursuant to the loan insurance contract;

(2) An abstract of title satisfactory to the Commissioner, prepared by an abstract company or individual engaged in the business of preparing abstracts of title, accompanied by a legal opinion satisfactory to the Commissioner, as to the quality of such title, signed by an attorney at law experienced in the examination of titles;

(3) A Torrens or similar title certification; or

(4) Evidence of title conforming to the standards of a supervising branch of the Government of the United States of America, or of any State or territory thereof.

§ 241.1090 Accumulation of next premium.

The security instrument shall provide for payments by the borrower to the lender on each interest payment date of an amount sufficient to accumulate in the hands of the lender one payment period prior to its due date the next annual insurance premium payable by the lender to the Commissioner. These payments shall continue only as long as the contract of insurance remains in effect.

§ 241.1095 Application of payments.

(a) The security instrument shall provide that all monthly payments to be made by the borrower shall be added together and the aggregate amount shall be paid by the borrower upon each monthly payment date in a single payment. The lender shall apply the payment in the following order:

(1) Premium charges under the contact of insurance;

(2) Interest on the loan; and

(3) Amortization of the principal of the loan.

(b) Any deficiency in the amount of any monthly payments required under paragraph (a) of this section shall constitute a default. The security instrument shall provide for a grace period of 30 days within which time the default must be cured.

§ 241.1100 Prepayment privilege and charges.

(a) *Prepayment privilege.* (1) Except as otherwise provided in paragraph (b) of this section, the security instrument shall contain a provision permitting the borrower to prepay the loan, in whole or in part, upon any interest payment date after giving to the lender 30 days advance notice of its intention to prepay.

(2) If the loan exceeds $200,000, the security instrument may contain a provision for an additional charge in the event of prepayment of principal as may be agreed upon between the borrower and lender. These charges shall not be imposed if the loan is accelerated at the request of the Commissioner, pursuant to § 241.1046(b). The borrower shall be permitted to prepay up to 15 percent of the original principal amount of the loan in any one calendar year without any additional charge. A provision for an additional charge in the event of prepayment may not be included in a loan of $200,000 or less.

(b) *Prepayment of bond-financed loan.* Where the lender has obtained the funds for the loan by the issuance and sale of bonds or bond anticipation notes, or both, the loan may contain a prepayment restriction and prepayment penalty charges acceptable to the Commissioner as to term, amount, and conditions.

§ 241.1105 Late charges.

The note and security instrument may provide for the lender's collection of a late charge, not to exceed 2 cents for each dollar of each payment to interest or principal more than 15 days in arrears, to cover the expense involved in

handling delinquent payments. Late charges shall be separately charged to and collected from the borrower and shall not be deducted from any aggregate monthly payment.

§ 241.1120 Mortgagee's consent.

The holder of an insured mortgage which is recorded prior to the equity or acquisition loan shall not withhold its consent to the equity or acquisition loan (whether or not such equity or acquisition loan is insured by the Commissioner) or the security instrument executed in connection therewith, and may not charge a fee as a condition to its consent to such loan or security instrument.

Subpart F -- Insurance for Equity Loans and Acquisition Loans -- Contract Rights and Obligations

§ 241.1200 Cross-references.

(a) *Projects with a HUD-insured or HUD-held mortgage.* (1) All the provisions of part 207, subpart B of this chapter, covering mortgages insured under section 207 of the Act, apply to equity loans or acquisition loans on a project insured under section 241(f) of the Act, except the following provisions:

Sec.

207.251 Definitions.

207.252 First, second and third premium.

207.252a Premiums -- operating loss loans.

207.252b Premiums -- mortgages insured pursuant to section 223(f) of the Act.

207.252c Premiums -- mortgages insured pursuant to section 238(c) of the Act.

207.254 Insurance endorsement.

(2) For the purposes of subpart F of this part, all references in part 207 of this chapter to section 207 of the Act and to the term "mortgage" shall be construed to refer to section 241(f) of the Act and "equity or acquisition loan," respectively.

(b) *Projects without a HUD-insured or HUD-held mortgage.* The provisions of subpart D of this part shall be applicable to a project without a HUD-insured or HUD-held mortgage that is receiving an equity loan or acquisition loan under subpart E of this part in connection with a plan of action approved by the Commissioner under part 248 of this chapter.

(c) All of the definitions in § 241.1005 apply to subpart F of this part. In addition, as used in subpart F of this part, the term "contract of insurance" means the agreement evidenced by the Commissioner's insurance endorsement and includes the provisions of subpart F of this part and of the Act.

§ 241.1205 Payment of insurance benefits.

All the provisions of § 207.259 of this chapter relating to insurance benefits shall apply to an equity or acquisition loan insured under subpart F of this part, except that insurance benefits shall be payable in cash if the insurance benefits under the senior insured mortgage are payable in cash, unless the lender files a written request for payment in debentures. If such a request is made, payment shall be made in debentures with a cash payment to adjust for any difference between the total amount of the insurance payment and the amount of the debentures issued.

§ 241.1210 Condition for payment of insurance benefits.

(a) All of the provisions of § 207.258 of this chapter apply to subpart F of this part, except that, if the holder of the senior insured mortgage institutes a foreclosure action, the lender shall notify the Commissioner in a timely manner of such action. The Commissioner, at its option, may then direct the lender to assign the equity or acquisition loan to the Commissioner, or bid an amount necessary to acquire the project and convey the project to the Commissioner.

(b) If the equity loan or acquisition loan is assigned in accordance with this section, the Commissioner at a foreclosure sale may bid, in addition to amounts otherwise authorized, any sum not in excess of the aggregate unpaid indebtedness secured by the senior insured mortgage and equity or acquisition loan, plus taxes, insurance, foreclosure costs, fees and other expenses.

§ 241.1215 Calculation of insurance benefits.

All of the provisions of § 207.259 of this chapter apply to subpart F of this part, except that if the lender, at the direction of the Commissioner, acquires title to the project at a foreclosure sale instituted by the holder of the senior insured mortgage, the amount of the claim determined under § 207.259(c) of this chapter shall also include an amount bid by the lender to satisfy the senior insured mortgage at the foreclosure sale.

§ 241.1220 Termination of insurance benefits.

All of the provisions of § 207.253a of this chapter apply to subpart F of this part, except that the following shall also constitute grounds for terminating the contract of insurance:

(a) The failure of the lender to notify the Commissioner in a timely manner of a foreclosure action initiated by the holder of the senior insured mortgage; and

(b) The failure of the lender when directed by the Commissioner to assign the equity or acquisition loan or bid an amount necessary to acquire title to the project and convey the project to the Commissioner, in accordance with § 241.1210.

§ 241.1230 No vested right in fund.

Neither the lender nor the borrower shall have any vested or other right in the insurance fund under which the loan is insured.

§ 241.1235 Cross default.

In the event the borrower commits a default under a prior recorded insured mortgage and the holder thereof initiates a foreclosure proceeding, said default under the prior recorded insured mortgage shall constitute a default under the equity or acquisition loan.

§ 241.1245 Insurance endorsement.

(a) *Endorsement.* The Commissioner shall indicate his insurance of the equity loan or acquisition loan by endorsing the original credit instrument and identifying the section of the Act and the regulations under which the loan is insured and the date of insurance.

(b) *Endorsement of phased loan.* In the event the loan is phased, the Commissioner shall indicate his insurance of each amount by endorsing the original credit instrument and identifying the section of the Act and the regulations under which such amount is insured and the date of the insurance.

(c) *Final advance of phased loan.* When all advances of a phased loan have been made and the terms and conditions of the commitment have been complied with to the satisfaction of the Commissioner, the Commissioner shall indicate on the original credit instrument the total of all advances the Commissioner has approved for insurance and again endorse such instrument.

§ 241.1250 Effect of endorsement.

From the date that the equity or acquisition loan is endorsed, the Commissioner and the lender shall be bound by the provisions of subpart F of this part to the same extent as if they had executed a contract including the provisions of subpart F of this part and the applicable sections of the Act.

PART 248 -- PREPAYMENT OF LOW INCOME HOUSING MORTGAGES

14. The authority citation for part 248 is revised to read as follows:

Authority: *12 U.S.C. 1715 et seq., 42 U.S.C. 3535*(d).

15. In chapter II, part 248, subpart A is revised, subpart B is redesignated as subpart C, and a new subpart B (consisting of §§ 248.101 through 248.183) is added to read as follows:

Subpart A -- General

Sec.

248.1 Purpose.

248.3 Applicability.

248.5 Election to proceed under subpart B or subpart C of this part.

248.7 Waivers.

Subpart B -- Prepayments and Plans of Action Under the Low Income Housing Preservation and Resident Homeownership Act of 1990

Sec.

248.101 Definitions.

248.103 General prepayment limitation.

248.105 Notice of intent.

248.111 Appraisal and preservation value of eligible low income housing.

248.121 Annual authorized return and aggregate preservation rents.

248.123 Determination of Federal cost limit.

248.127 Limitations on action pursuant to Federal cost limit.

248.131 Information from the Commissioner.

248.133 Second notice of intent.

248.135 Plans of action.

248.141 Criteria for approval of a plan of action involving prepayment and voluntary termination.

248.145 Criteria for approval of a plan of action involving incentives.

248.147 Housing standards.

248.149 Timetable for approval of a plan of action.

248.153 Incentives to extend low income use.

248.157 Voluntary sale of housing not in excess of Federal cost limit.

248.161 Mandatory sale of housing in excess of the Federal cost limit.

248.165 Assistance for displaced tenants.

248.169 Permissible prepayment or voluntary termination and modification of commitments.

248.173 Resident homeownership program.

248.175 Resident homeownership program -- limited equity cooperative.

248.177 Delegated responsibility to state agencies.

248.179 Consultation with other interested parties.

248.181 Notice to tenants.

248.183 Preemption of State and local laws.

Subpart A -- General

§ 248.1 Purpose.

The purpose of this part is to --

(a) Preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately owned dwelling units that were produced for such purpose with Federal assistance, without unduly restricting the owners' prepayment rights;

(b) Minimize the involuntary displacement of tenants currently residing in such housing;

(c) Work in partnership with State and local government and the private sector in the provision and operation of housing that is affordable to very low, low and moderate income families; and

(d) Facilitate the sale of housing to residents under a resident homeownership program.

§ 248.3 Applicability.

The requirements of subparts B and C of this part apply to any project that is eligible low income housing, as defined in subparts B and C of this part respectively, on or after November 1, 1987, except that such requirements shall not apply to a project which receives assistance under title IV, subtitle B of the Cranston-Gonzalez National Affordable Housing Act in connection with a homeownership program approved by the Commissioner thereunder.

§ 248.5 Election to proceed under subpart B or subpart C of this part.

(a) Any owner who has not submitted a notice of intent prior to January 1, 1991, pursuant to either § 248.211 or § 248.105, shall proceed under subpart B of this part.

(b) Any owner who has filed a plan of action with the Commissioner on or before October 11, 1990 pursuant to subpart C of this part, regardless of whether or not the Commissioner has approved such plan of action or whether the owner has received incentives thereunder, may proceed under subpart B of this part by submitting a notice of intent to the Commissioner in accordance with § 248.105 within 30 days after publication of revised Appraisal Guidelines or within thirty days after the Commissioner notifies the owner of HUD's final approval of the plan of action, whichever is later. The notice of intent shall state that the owner is exercising its conversion right pursuant to this section. If the owner fails to file a notice of intent within that period, the owner forfeits its right of conversion. In awarding incentives to an owner who elects to proceed under subpart B of this part in accordance with this section, the Commissioner shall take into consideration any incentives which the owner has already received under subpart C of this part.

(c) Any owner of housing that becomes eligible low income housing, as defined in subpart B of this part, before January 1, 1991, and who before such date, filed a notice of intent under § 248.211 of subpart C of this part, may, unless

a plan of action was submitted after October 11, 1990, elect to proceed under subpart B or under subpart C of this part. An owner must indicate its election by submitting to the Commissioner, within 30 days of the effective date of this part, a notice of election to proceed indicating whether it wishes to proceed under subpart B or subpart C of this part, or proceed under subpart B of this part until completion of the appraisals and then elect either subpart B or subpart C of this part. An owner who chooses to retain its option until after the completion of the appraisals under § 248.111 must submit a new notice of intent to the Commissioner within 30 days after receipt of the information provided by the Commissioner under § 248.131. The notice of intent shall be submitted in accordance with either § 248.105 (for owners electing to proceed under subpart B of this part) or § 248.211 (for owners electing to proceed under subpart C of this part). Any owner who fails to file a notice of intent within the 30-day period may not proceed under subpart C of this part, but may proceed under subpart B of this part by filing a new notice of intent thereafter. If an owner who has filed a notice of intent before January 1, 1991 elects under this paragraph to proceed under subpart C of this part, it may change its election within 30 days after receipt of the information provided by the Commissioner under § 248.131 by filing a new notice of intent under § 248.211. For purposes of calculating any time periods or deadlines under this part for actions following the filing of the notice of intent, the date on which the owner submits the new notice of intent under this paragraph shall be deemed the date of the filing of the notice of intent. Any owner who, exercising its option under paragraph (c) of this section, submits a notice of intent under § 248.211 after the Commissioner has incurred the cost of having an appraisal, or appraisals, performed pursuant to § 248.111 of subpart A of this part, shall reimburse the Commissioner for these expenses within 30 days of receipt of a bill covering these expenses.

(d) An owner who has filed a plan of action after October 11, 1990, pursuant to § 248.213, may not elect to proceed under subpart B of this part.

§ 248.7 Waivers.

Upon making a determination and finding of good cause, the Commissioner may waive any provision of this part, subject to statutory limitations. Each waiver shall be in writing and shall be supported by documentation of the facts and reasons which form the basis for the waiver.

Subpart B -- Prepayments and Plans of Action under the Low Income Housing Preservation and Resident Homeownership Act of 1990

§ 248.101 Definitions.

*Acquisition Loan.* A loan or advance of credit made to a qualified purchaser of eligible low income housing and insured by the Commissioner under part 241, subpart E of this chapter.

*Adjusted Income.* Annual income, as specified in § 813.106 of this title, less allowances specified in the definition of "Adjusted Income" in § 813.102 of this title.

*Aggregate Preservation Rent.* The extension preservation rent or transfer preservation rent, as defined under this section.

*Annual Authorized Return.* That amount an owner of an eligible low income housing project may receive in distributions from the project each year, plus debt service payments payable each year attributable to the equity take-out portion of any loan approved under the plan of action, expressed as a percentage of the project's extension preservation equity.

*Bona Fide Offer.* A certain and unambiguous offer to purchase an eligible low income housing project pursuant to subpart B of this part made in good faith by a qualified purchaser with the intent that such offer result in the execution of an enforceable, valid and binding contract. A bona fide offer shall include, for purposes of subpart B of this part, a contract of sale and an earnest money deposit, as set forth in § 248.157(g). For mandatory sales under § 248.161, the offer must include a contract of sale, an earnest money deposit and also be for a purchase price which equals the transfer

preservation value.

*Capital Improvement Loan.* A direct loan originated by the Commissioner under part 219, subpart C of this chapter.

*Community-Based Nonprofit Organization.* A private nonprofit organization that --

(1) Is organized under State or local laws;

(2) Has no part of its net earnings inuring to the benefit of any member, founder, contributor, or individual;

(3) Is neither controlled by, nor under the direction of, individuals or entities seeking to derive profit or gain from the organization.

(4) Has applied for, or has a tax exemption ruling from the Internal Revenue Service under *section 501(c) of the Internal Revenue Code of 1986*;

(5) Does not include a public body (including the participating jurisdiction) or an instrumentality of a public body. An organization that is State or locally chartered may qualify as a community-based nonprofit organization; however, the State or local government may not have the right to appoint more than one-third of the membership of the organization's governing body and no more than one-third of the board members can be public officials;

(6) Has standards of financial accountability that conform to Attachment F of OMB Circular No. A-110 (Rev.) "Standards for Financial Management Systems";

(7) Has among its purposes the provision of decent housing that is affordable to low-income and moderate-income persons, as evidenced in its charter, articles of incorporation, resolutions or by-laws;

(8) Maintains accountability to low income community residents by --

(i) Maintaining at least one-third of its governing board's membership for low income neighborhood residents, other low-income community residents, or elected representatives of low-income neighborhood organizations. For urban areas, "community" may be a neighborhood or neighborhoods, city, county, or metropolitan area; for rural areas, it may be neighborhood or neighborhoods, town, village, county, or multi-county area (but not the entire State), provided the governing board contains low-income residents from each county of the multi-county area; and

(ii) Providing a formal process for low-income, program beneficiaries to advise the organization on its decisions regarding the acquisition, rehabilitation and management of affordable housing.

*Default.* For purposes of § 248.105(a), the failure of the owner to make any payment due under the mortgage (including the full amount of the debt if the mortgagee has accelerated the debt on the basis of a non-monetary default) within 30 days after such payment becomes due.

*Eligible Low Income Housing.* Any project that is not subject to a use restriction imposed by the Commissioner that restricts the project to low and moderate income use for a period at least equal to the remaining term of the mortgage, and that is financed by a loan or mortgage --

(1) That is --

(i) Insured or held by the Commissioner under section 221(d)(3) of the National Housing Act and assisted under part 215 of this chapter or project-based assistance under parts 880, 881 or 886 of this title;

(ii) Insured or held by the Commissioner under part 221 of this chapter and bearing a below market interest rate as provided under § 221.518(b) of this chapter;

(iii) Insured, assisted, or held by the Commissioner or a State or State agency under part 236 of this chapter; or

(iv) A purchase money mortgage held by the Commissioner with respect to a project which, immediately prior to HUD's acquisition, would have been classified under paragraphs (1)(i), (ii), or (iii) of this definition; and

(2) That, under regulation or contract in effect before February 5, 1988, is or will within 24 months become eligible for prepayment without prior approval of the Commissioner.

*Equity Loan.* A loan or advance of credit to the owner of eligible low income housing and insured by the Commissioner under part 241, subpart E of this chapter.

*Extension Preservation Equity.* The extension preservation equity of a project is:

(1) The extension preservation value of the project determined under § 248.111; less

(2) The outstanding balance of any debt secured by the property.

*Extension Preservation Rent.* The extension preservation rent is the gross potential income for the project that would be required to support:

(1) The annual authorized return;

(2) Debt service on any rehabilitation loan for the project;

(3) Debt service on the federally-assisted mortgage(s) for the project;

(4) Project operating expenses; and

(5) Adequate reserves.

*Extension Preservation Value.* The fair market value of the project based on the highest and best use of the project as multifamily market-rate rental housing.

*Fair market rent.* The section 8 existing fair market rent published for effect and as defined under § 882.102 of this title, applicable to the jurisdiction in which the project is located, with adjustments, where appropriate, for projects in which tenants pay their own utilities. (No utility adjustments will be made to the fair market rent for purposes of determining the Federal cost limit.)

*Federal Cost Limit.* The greater of 120 percent of the section 8 existing fair market rent for the market area in which the project is located or 120 percent of the prevailing rents in the relevant local market area in which the project is located.

*Federally-assisted Mortgage.* Any mortgage as defined in this section, any insured operating loss loan secured by the project and any loan insured by the Commissioner under part 241 of this chapter.

*Good Cause.* With respect to displacement, the temporary or permanent uninhabitability of the project justifying relocation of all or some of the project's tenants (except where such uninhabitability is caused by the actions or inaction of the owner), or actions of the tenant that, under the terms of the tenant's lease and applicable regulations, constitute a basis for eviction.

*HOME Investment Trust Fund.* A public fund established in the general local or State government in which a project is located pursuant to title II of the Cranston-Gonzalez National Affordable Housing Act.

*Homeownership Program.* A program developed by a resident council for the sale of an eligible low income

housing project to the tenants in accordance with the standards in § 248.173 or § 248.175.

*Interest Reduction Payments.* Payments made by the Commissioner pursuant to a contract to reduce the interest costs on a mortgage insured under part 236 of this chapter, as provided under subpart C of part 236 of this chapter.

*Limited Equity Cooperative.* A tenant cooperative corporation which, in a manner acceptable to the Secretary, restricts the initial and resale price of the shares of stock in the cooperative corporation so that the shares remain affordable to low income families and moderate income families.

*Low Income Affordability Restrictions.* Limits imposed by regulation or regulatory agreement on tenant rents, rent contributions, or income eligibility with respect to eligible low income housing.

*Low Income Families.* Families or persons whose incomes do not exceed the levels established for low income families under part 813 of this title.

*Low Vacancy Area.* A market area in which the current supply of decent, safe and sanitary, vacant, available rental units, as a proportion of the total overall rental inventory in the area is not sufficient to allow for normal growth and mobility, taking into account the need for vacancies resulting from turnover and to meet growth in renter households. The determination of a low vacancy area, as set forth in § 248.165(h), will be made by the Commissioner, utilizing the most recent available data for the market area on the rental inventory, renter households, rental vacancy rates and other factors as appropriate.

*Moderate Income Families.* Families or persons whose incomes are between 80 percent and 95 percent of median area income, as determined by the Commissioner, with adjustments for smaller and larger families.

*Mortgage.* The mortgage or deed of trust insured or held by the Commissioner or a State or State agency under parts 221 or 236 of this title or the purchase money mortgage taken back by the Commissioner in connection with the sale of a HUD-owned project and held by the Commissioner, where such mortgage, deed or trust or purchase money mortgage is secured by eligible low income housing.

*Nonprofit Organization.* Any private, nonprofit organization or association that --

(1) Is incorporated under State or local law;

(2) Has no part of its net earnings inuring to the benefit of any member, founder, contributor, or individual;

(3) Complies with standards of financial accountability acceptable to the Commissioner; and

(4) Has among its principal purposes significant activities related to the provision of decent housing that is affordable to very low, low, and moderate income families.

*Notice of Intent.* An owner's notification to the Commissioner of its intention to terminate the low income affordability restrictions on the project through prepayment of the mortgage or voluntary termination of the insurance contract, to extend the low income affordability restrictions on the project, or to transfer the project to a qualified purchaser.

*Owner.* The mortgagor or trustor under the mortgage secured by eligible low income housing.

*Participating Jurisdiction.* For purposes of the resident homeownership program established in § 248.173, any State or unit of general local government that has been so designated in accordance with section 216 of the Cranston-Gonzalez National Affordable Housing Act of 1990 *(42 U.S.C. 12746).*

*Plan of Action.* A plan providing for the termination of the low income affordability restrictions on the project

through prepayment of the mortgage or voluntary termination of the insurance contract, for extension of the low income affordability restrictions on the project, or for the transfer of the project to a qualified purchaser. A homeownership program constitutes a plan of action for purposes of subpart B of this part.

*Prepayment.* Prepayment in full of a mortgage, or a partial prepayment or series of partial prepayments that reduces the mortgage term by a least six months, except where the prepayment in full or partial prepayment results from the application of condemnation proceeds.

*Preservation Equity.* The extension preservation equity or transfer preservation equity, as defined under this section.

*Preservation Value.* The extension preservation value or transfer preservation value, as defined under this section.

*Priority Purchaser.* Any entity that is not a related party to the owner and that is either --

(1) A resident council organized to acquire the project in accordance with a resident homeownership program that meets the requirements of subpart B of this part; or

(2) Any nonprofit organization or State or local agency that agrees to maintain low income affordability restrictions for the remaining useful life of the project. A nonprofit organization or State or local agency that is affiliated with a for-profit entity for purposes of purchasing a project under subpart B of this part shall not be considered a priority purchaser.

*Public Housing Agency.* A public housing agency, as defined in section 3(b) of the United States Housing Act of 1937 *(42 U.S.C. 1437a*(b)).

*Qualified Purchaser.* Any entity that is not a related party to the owner and that agrees to maintain low income affordability restrictions for the remaining useful life of the project, and includes for-profit entities and priority purchasers.

*Regulatory Agreement.* The agreement executed by the owner and the Commissioner or a State agency providing for the regulation of the operation of the project.

*Related Party.* An entity that, either directly or indirectly, is wholly or partially owned or controlled by the owner of the project being transferred under subpart B of this part, is under whole or partial common control with such owner, or has any financial interest in such owner or in which such owner has any financial interest. However, this shall not prohibit a nonprofit organization from buying out the interest of its limited dividend or for-profit partners in connection with the sale of eligible low income housing under subpart B of this part, as long as the sale is made on an arm's length basis and the partners who sell their interest completely divest themselves of any input in the continued operation of the project. The purchaser and the owner shall not be deemed related parties on the basis that financing is provided to the purchaser by the seller, or a management company affiliated with the seller, as long as:

(1) Only a loan, and not a grant, is provided;

(2) The financing is provided for the acquisition of the project, the rehabilitation of the project, or both;

(3) In the case of financing for the acquisition of the project, the sum of the principal amount of the loan, plus the amount of the acquisition loan under section 241(f) of the National Housing Act *(12 U.S.C. 1715z-6*(f)), and any Federal grant to cover acquisition of the project, does not exceed the sum of the sales price and the expenses associated with the acquisition, loan closing and implementation of the plan of action; and in the case of financing for the rehabilitation of the project, the principal amount of the loan does not exceed the equity requirements applicable to the rehabilitation loan or capital improvement loan obtained by the purchaser under part 241 or part 219 of this chapter;

(4) The loan is not a condition of accepting a bona fide offer or entering into a sales contract;

(5) The seller has no input in the continued operation of the project as a result of the loan; and

(6) In the case of a loan provided by a management company that is affiliated with the seller, the execution of a management contract between the purchaser and the management company is not a condition of the loan. This rule does not bar an owner, or former owner, from membership on a nonprofit organization's board of directors, as long as the owner, or former owner, participates only in his or her personal capacity, without compensation, and holds a nonvoting membership. The purchaser and the owner shall not be deemed related parties solely by reason of the purchaser's retention of a property management entity of a company that is owned or controlled by the owner or a principal thereof, if retention of the management company is neither a condition of sale nor part of consideration paid for the project and the property management contract is negotiated by the qualified purchaser on an arm's length basis.

*Relevant Local Market.* An area geographically smaller than the market area established by the Commissioner for purposes of determining the section 8 existing fair market rent, that is identifiable as a distinct rental market area in which similar projects and units would effectively compete with the subject project, for potential tenants.

*Relocation Expenses.* Relocation expenses shall consist of payment for --

(1) Advisory services, including timely information, counseling (including the provision of information on a resident's rights under the Fair Housing Act *(42 U.S.C. 3601*-3619)), and referrals to suitable, affordable, decent, safe and sanitary alternative housing; and

(2) Payment for actual, reasonable moving expenses.

*Remaining Useful Life.* With respect to eligible low income housing, the period during which the physical characteristics of the project remain in a condition suitable for occupancy, assuming normal maintenance and repairs are made and major systems and capital components are replaced as becomes necessary.

*Reserve for Replacements.* The escrow fund established under the regulatory agreement for the purpose of ensuring the availability of funds for needed repair and replacement costs.

*Resident Council.* Any incorporated nonprofit organization or association in which membership is available to all the tenants, and only the tenants, of a particular project and --

(1) Is representative of the residents of the project;

(2) Adopts written procedures providing for the election of officers on a regular basis; and

(3) Has a democratically elected governing board, elected by the residents of the project.

*Residual Receipt Fund.* The fund established under the regulatory agreement for holding cash remaining after deducting from the surplus cash, as defined by the regulatory agreement, the amount of all allowable distributions.

*Return on Investment.* The amount of allowable distributions that a purchaser of a project may receive under a plan of action under § 248.157 or § 248.161.

*Section 8 Assistance.* Assistance provided under parts 880 through 887 of this title.

*Special Needs Tenants.* Those "elderly persons," 62 years of age or older, "elderly families," or families that include "disabled persons," as such terms are defined in § 812.2 of this title, or large families of five or more persons and requiring units with three or more bedrooms.

*State assisted or subsidized mortgage.* A mortgage which is assisted or subsidized by an agency of a State government without any Federal mortgage subsidy.

*Tenant Representative.* A designated officer of an organization of the project's tenants, a tenant who has been elected to represent the tenants of the project with respect to subpart B of this part, or a person or organization that has been formally designated or retained by an organization of the project's tenants to represent the tenants with respect to subpart B of this part.

*Termination of Low Income Affordability Restrictions.* The elimination of low income affordability restrictions under the regulatory agreement through termination of mortgage insurance or prepayment of the mortgage.

*Transfer Preservation Equity.* The transfer preservation equity of a project is:

(1) The transfer preservation value of the project determined under § 248.111; less

(2) The outstanding balance of the federally-assisted mortgage(s) for the project.

*Transfer Preservation Rent.* For purposes of receiving incentives pursuant to a sale of the project, transfer preservation rent shall be the gross income for the project that would be required to support:

(1) Debt service on the loan for acquisition of the project;

(2) Debt service on any rehabilitation loan for the project;

(3) Debt service on the federally-assisted mortgage(s) for the housing;

(4) Project operating expenses; and

(5) Adequate reserves.

*Transfer Preservation Value.* The fair market value of the project based on its highest and best use.

*Very Low Income Families.* Families or persons whose incomes do not exceed the level established for very low income families under § 813.102 of this title.

*Voluntary Termination of Mortgage Insurance.* The termination of all rights under the mortgage insurance contract and of all obligations to pay future insurance premiums.

§ 248.103 General prepayment limitation.

(a) *Prepayment.* An owner of eligible low income housing may prepay, and a mortgagee may accept prepayment of, a mortgage on such project only in accordance with a plan of action approved by the Commissioner.

(b) *Termination.* A mortgage insurance contract with respect to eligible low income housing may be terminated pursuant to § 207.253 of this chapter only in accordance with a plan of action approved by the Commissioner.

(c) *Foreclosure.* A mortgagee of a mortgage insured by the Commissioner may foreclose the mortgage on, or acquire by deed in lieu of foreclosure, any eligible low income housing only if the mortgagee also conveys title to the project to the Commissioner in connection with a claim for insurance benefits.

(d) *Effect of unauthorized prepayment.* A mortgagee's acceptance of a prepayment in violation of paragraph (a) of this section, or the voluntary termination of a mortgage insurance contract in violation of paragraph (b) of this section, shall be null and void and any low income affordability restrictions on the project shall continue to apply to the project.

(e) *Remedies for unauthorized prepayment.* A mortgagee's acceptance of a prepayment in violation of paragraph (a) of this section, or attempt to obtain voluntary termination of a mortgage insurance contract in violation of paragraph (b) of this section, is grounds for administrative action under parts 24 and 25 of this title, in addition to any other remedies available by law, including rescission of the prepayment or reinstatement of the insurance contract.

§ 248.105 Notice of intent.

(a) *Eligibility for filing.* An owner of eligible low income housing intending to prepay the mortgage or voluntarily terminate the mortgage insurance contract pursuant to § 248.141, extend the low income affordability restrictions of the housing in accordance with § 248.153, or transfer the housing to a qualified purchaser under § 248.157, may file a notice of intent unless the mortgage covering the project --

(1) Continued in default or fell into default on or after the November 28, 1990, and the mortgage has been assigned to the Commissioner as a result of such default;

(2) Continued in default or fell into default on or after November 28, 1990, while the mortgage was held by the Commissioner;

(3) Fell into default prior to November 28, 1990, if the owner entered into a workout agreement prior to that date, and on or after that date, the owner has defaulted under the workout agreement (and, if the agreement was with an insured mortgagee, the mortgage has been assigned to the Commissioner as a result of the default under the workout agreement); or

(4) Fell into default prior to November 28, 1990, but has been current since that date and the owner has not agreed to recompense the appropriate insurance fund for losses sustained by the fund as a result of any work-out or other arrangement agreed to by the Commissioner and the owner with respect to the defaulted mortgage.

(b) *Filing with the Commissioner.* The notice of intent shall be filed with the HUD Field Office in whose jurisdiction the project is located. The notice of intent shall identify the project by name, project number and location. It shall contain a statement indicating whether the owner intends to extend the affordability restrictions on the project by retaining ownership of the project or transferring it to a qualified purchaser, or whether the owner intends to terminate the affordability restrictions on the project through prepayment of the mortgage or termination of the mortgage insurance contract. The notice of intent shall also request the tenants to notify the owner, the Commissioner, and the State or local officer identified in the notice of intent of any individual or organization that has been designated or retained by the tenants to represent the tenants with respect to the actions to be taken under subpart B of this part.

(c) *Filing with the State or local government and tenants.* The owner simultaneously shall file the notice of intent with the chief executive officer of the appropriate State or local government in which the project is located, or any officer designated by executive order or State or local law to receive such information, and with the mortgagee. In addition, the owner shall deliver a copy of the notice of intent to each occupied unit in the project and to any tenant representative, if any, known to the owner, and shall post a copy of the notice of intent in readily accessible locations within each affected building of the project. The copies of the notice of intent delivered to the tenants and the tenant representative shall include a summary of possible outcomes of the filing which shall be furnished by the Commissioner. Upon the request of any non-English speaking tenants residing in the affected project, the owner shall tabulate the number and type of translations needed by the tenants and request the local HUD field office to provide the appropriate translations. The owner shall deliver a copy of the translated notice of intent to all of the tenants who requested such translation. The failure of an owner to comply with any non-federal notice requirements shall not invalidate the notice of intent.

§ 248.111 Appraisal and preservation value of eligible low income housing.

(a) *Appraisal.* Upon receiving a notice of intent indicating an intent to extend the low income affordability

restrictions under § 248.153 or transfer the project under § 248.157, the Commissioner shall provide for determination of the preservation values of the project pursuant to this section.

(b) *Notice.* Within 30 days after the filing of a notice of intent to extend the income restrictions or to transfer the project, the Commissioner shall provide the owner with written notice of --

(1) The need for, and the rules and guidelines governing, an appraisal of the project;

(2) The filing deadline for submission of the appraisal;

(3) The need for an appraiser retained by the Commissioner to inspect the project and the project's financial records; and

(4) Any delegation to an appropriate State agency, if any, by the Commissioner of responsibilities regarding the performance of an appraisal pursuant to this section.

(c) *Appraisers.* The Commissioner and the owner shall each select and compensate an appraiser who shall:

(1) Neither be an employee of the Federal Government nor an employee or officer of any entity that is affiliated with the owner or the mortgagee of record;

(2) Be certified by the appropriate State agency under the standards established by the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989 *(12 U.S.C. 1451*-1459); and

(3) Have six years of experience in the appraisal profession and at least three years experience in the practice of appraising multifamily residential properties;

(4) Is not the subject of a charge issued following a reasonable cause determination under the Fair Housing Act *(42 U.S.C. 3601*-3619).

(d) *Guidelines.* The Commissioner shall provide to the owner and the appraiser retained by the Commissioner guidelines for the conduct of the appraisal. The guidelines established by the Commissioner shall be consistent with customary appraisal standards. The guidelines shall assume repayment of the existing federally-assisted mortgage(s), termination of the existing Federal low income affordability restrictions, and costs of compliance with any State or local laws of general applicability. The guidelines may permit reliance upon assessments of rehabilitation needs and other conversion costs determined by an appropriate State agency, as determined by the Commissioner.

(e) *Operating expenses.* For the purpose of determining preservation values, the guidelines shall instruct the appraiser to use the greater of actual project operating expenses at the time of the appraisal, based on the average of the actual project operating expenses during the preceding three years, or projected operating expenses after conversion, as determined by the Commissioner. However, if the current year operating expenses are higher than those of the preceding three years and the Commissioner has made a determination that these costs are unlikely to decrease in the future, the appraiser shall use current year operating expenses rather than operating expenses for the preceding three years for purposes of comparison with projected operating expenses after conversion. Likewise, if the current year operating expenses are lower than those of the preceding years and the Commissioner has made a determination that these costs are unlikely to increase in the future, the appraiser shall use current year operating expenses rather than operating expenses for the preceding three years for purposes of comparison with projected expenses after conversion. Where the highest and best use of a project is not as rental housing, the appraiser shall use projected operating expenses assuming conversion of the project to its highest and best use.

(f) *Preservation values.* The preservation values will be determined on the basis of the appraisals conducted by the owner's and the Commissioner's independent appraisers. Each appraiser will determine both the extension preservation

value and the transfer preservation value, regardless of the owner's intentions as indicated in the notice of intent.

(g) *Highest and best use as residential property.* In determining the extension preservation value of the project, the appraiser shall assume conversion of the project to market-rate rental housing. The appraiser shall, in accordance with the guidelines established by the Commissioner, determine the amount of rehabilitation expenditures, if any, that would be necessary to bring the project up to quality standards required to attract and sustain a market-rate tenancy upon conversion and assess other costs that the owner could reasonably be expected to incur if the owner converted the property to market-rate multifamily rental housing.

(h) *Highest and best use.* In determining the transfer preservation value for the project, the appraiser shall assume conversion of the project to highest and best use for the property, and shall, in accordance with the guidelines established by the Commissioner, determine the amount of any rehabilitation expenditures, including demolition, that would be necessary to convert the project to such use and assess other costs that the owner could reasonably be expected to incur if the owner converted the property to its highest and best use.

(i) *Submission of appraisal.* Within four months after the filing of the notice of intent:

(1) The owner shall submit to the HUD Field Office in whose jurisdiction the project is located, the appraisal made by the owner's selected appraiser; and

(2) The Commissioner's selected appraiser shall conduct and submit an appraisal to the Commissioner.

(j) *Joint determination of preservation values.* No later than one month after the owner and the Commissioner exchange appraisals, the owner and the Commissioner shall, on the basis of the appraisals delivered to them, agree on the preservation values of the project. If no agreement as to preservation values can be reached, the owner and the Commissioner shall jointly select a third appraiser meeting the qualifications set forth in paragraph (c) of this section by the end of six months from the date that the notice of intent was filed. The cost of this third appraisal shall be borne equally by both parties. The third appraiser must comply with the guidelines set forth in paragraph (d) of this section and must conduct the appraisal and submit an appraisal within two months after accepting the assignment. The determination by the third appraiser of the project's preservation values shall be binding on both the owner and the Commissioner.

(k) *Timeliness of appraisals.* The Commissioner may approve a plan of action to receive incentives under §§ 248.153, 248.157 or 248.161 only based upon an appraisal conducted in accordance with this section that is not more than 30 months old, unless the failure of the Commissioner to approve the plan of action within the 30-month period was due to circumstances beyond the control of the owner.

§ 248.121 Annual authorized return and aggregate preservation rents.

(a) *Annual authorized return.* For each eligible low income housing project appraised under § 248.111, the Commissioner shall set an annual authorized return on the project equal to 8 percent of the extension preservation equity.

(b) *Aggregate preservation rents.* For each eligible low income housing project appraised under § 248.111, the Commissioner shall also determine the aggregate preservation rents. The aggregate preservation rents shall be used solely for the purposes of comparison with the Federal cost limit under § 248.123. Actual rents received by the owner (or a qualified purchaser) shall be determined pursuant to §§ 248.153, 248.157, and 248.161.

(c) *Extension preservation rent.* The extension preservation rent shall be the gross potential income for the project, as determined by the Commissioner, that would be required to support --

(1) The annual authorized return determined under paragraph (a) of this section;

(2) Debt service on any rehabilitation loan for the project, assuming a market rate of interest and customary terms;

(3) Debt service on the federally-assisted mortgage(s) for the project;

(4) Project operating expenses as determined by the Commissioner; and

(5) Adequate reserves.

(d) *Transfer preservation rent.* The transfer preservation rent shall be the gross potential income for the project, as determined by the Commissioner, that would be required to support --

(1) Debt service on the loan for acquisition of the project;

(2) Debt service on any rehabilitation loan for the project, assuming a market rate of interest and customary terms;

(3) Debt service on the federally-assisted mortgage(s) for the project;

(4) Project operating expenses as determined by the Commissioner; and

(5) Adequate reserves.

(e) *Adequate reserves and operating expenses.* For purposes of this section --

(1) Adequate reserves are the amount of funds which, when added to existing reserves, are sufficient to maintain the project, including needed deferred maintenance, at a level that meets the standards set forth in § 248.147; and

(2) Project operating expenses shall be based on operating expenses for the preceding 3 years, adjusted for reasonable reductions in operating costs due to rehabilitation and energy improvements. For purposes of comparison to the gross rents used in determining the Federal cost limit, project operating expenses shall include the cost of utilities paid by the residents.

(f) *Debt service.* For purposes of this section, the amount of debt service for an acquisition loan will be estimated based on the maximum loan to which the purchaser is entitled under § 241.1067 of this chapter. The debt service on any rehabilitation loan will be estimated using costs derived from the appraisals conducted under § 248.111, taking into account any funds provided for rehabilitation by State or local governments and assuming market rate interest rates.

§ 248.123 Determination of Federal cost limit.

(a) *Initial determination.* For each eligible low income housing project appraised under § 248.111, the Commissioner shall determine whether the aggregate preservation rents for the project exceed the amount determined by multiplying the number of dwelling units in the project, according to appropriate unit sizes, by 120 percent of the section 8 existing fair market rent for the appropriate unit sizes.

(b) *Relevant local markets.* If either the extension or transfer preservation rent for a project exceeds the amount determined under paragraph (a) of this section, the Commissioner shall determine whether such extension or transfer preservation rent exceeds the amount determined by multiplying the number of units in the project, according to the appropriate unit sizes, by 120 percent of the prevailing rents in the local market area. The relevant local market, and the prevailing rents in such relevant local market, shall be determined on the basis of the appraisal conducted by the appraiser selected by the Commissioner pursuant to § 248.111 and any other information that the Commissioner determines is appropriate. If there are no comparables in the relevant local market and it is not otherwise possible to determine prevailing rents in that area, the section 8 existing fair market rent shall be the sole measure for determining the Federal cost limit.

(c) *Effect.* The extension or transfer preservation rent for an eligible low income housing project appraised under § 248.111 shall be considered to exceed the Federal cost limit only if the extension or transfer preservation rent exceeds the amount determined under paragraphs (a) and (b) of this section.

§ 248.127 Limitations on action pursuant to Federal cost limit.

(a) *Retention of the project.* With respect to owners who seek to retain the project, the owner may file a plan of action to receive incentives under § 248.153, except that if the extension preservation rent exceeds the Federal cost limit, the amount of the incentives may not exceed an amount that can be supported by a projected income stream equal to the Federal cost limit.

(b) *Transfer of the project.* With respect to owners who seek to transfer the project --

(1) If the transfer preservation rent does not exceed the Federal cost limit, or if the transfer preservation rent exceeds the Federal cost limit and the owner is willing to transfer the project at a price which will result in project rents that, on an aggregate level, do not exceed the Federal cost limit, the owner may file a second notice of intent indicating an intention to transfer the project under § 248.157; or

(2) If the transfer preservation rent exceeds the Federal cost limit, the owner may file a second notice of intent to transfer the project under § 248.161 or, if no bona fide offers are received, to prepay the mortgage or terminate the mortgage insurance.

§ 248.131 Information from the Commissioner.

(a) *Information to owners terminating affordability restrictions.* Within six months after receipt of a notice of intent to terminate the low income affordability restrictions under § 248.141, the Commissioner shall provide the owner with a description of the criteria for such termination and with information that the owner needs to prepare a plan of action. This shall include information concerning the standards under § 248.141 regarding the approval of a plan of action and a list of the Federal incentives authorized under § 248.153 and available to those projects for which a plan of action involving termination of low income affordability restrictions, through prepayment of the mortgage or termination of the mortgage insurance contract, would not be approvable. The Commissioner shall also provide the owner with any other relevant information which the Commissioner may possess.

(b) *Information to owners extending affordability restrictions.* Within nine months of receipt of a notice of intent to extend the low income affordability restrictions under § 248.153 or to transfer the project under § 248.157, the Commissioner shall provide the owner who submitted the notice with --

(1) A statement of the preservation values of the project as determined under § 248.111;

(2) A statement of the aggregate preservation rents for the project as calculated under § 248.121;

(3) A statement of the applicable Federal cost limit for the market area (or relevant local market, if applicable) in which the project is located, and an explanation of the limitations under § 248.127 on the amount of assistance the Commissioner may provide based on such cost limits;

(4) A statement of whether either of the aggregate preservation rents exceeds the Federal cost limit; and

(5) A direction to file a plan of action and the information necessary to file a plan of action; or

(6) A direction to submit a second notice of intent under § 248.133.

(c) *Information to tenants and State or local governments.* The Commissioner shall provide any information provided to the owner under paragraphs (a) and (b) of this section to the tenant representative, if any, known to the

Commissioner, and shall post a notice in each affected building informing tenants of the name(s), address(es), and telephone number(s) of the tenant representative(s) and appropriate personnel in the local HUD field office, from whom they may obtain this information. The Commissioner shall also provide this information to that officer of State or local government to whom the owner submitted a notice of intent pursuant to § 248.105(c). The Commissioner shall include in the information packet made available to the tenants any other information relating to their rights and opportunities, including --

(1) The potential opportunity of the tenants to become priority purchasers under §§ 248.157 and 248.161; and

(2) The potential opportunity of resident homeownership under §§ 248.173 or 248.175.

§ 248.133 Second notice of intent.

(a) *Filing.* A second notice of intent must be filed by all owners who, after receiving the information provided by the Commissioner in § 248.131, elect to transfer the project under §§ 248.157 or 248.161.

(b) *Timeliness.* A second notice of intent must be submitted not later than 30 days after receipt of the information provided by the Commissioner under § 248.131. If an owner who is required to submit a second notice of intent fails to do so within this time period, the original notice of intent submitted under § 248.105 shall be void and ineffective for purposes of subpart B of this part.

(c) *Filing with the State or local government and tenants.* The owner simultaneously shall file the second notice of intent with that officer of State and local government to whom the owner submitted a notice of intent under § 248.105(c) and with the mortgagee. In addition, the owner shall deliver a copy of the second notice of intent to each tenant representative known to the owner, and if none is known, then to each occupied unit in the project.

§ 248.135 Plans of action.

(a) *Submission.* An owner seeking to terminate the low income affordability restrictions through prepayment of the mortgage or voluntary termination under § 248.141, or to extend the low income affordability restrictions on the project under § 248.153, shall submit a plan of action to the Commissioner in the form and manner prescribed in paragraph (d) or (e) of this section respectively, within 6 months after receipt of the information from the Commissioner under § 248.131.

(b) *Joint Submission.* An owner and purchaser seeking a transfer of the project under §§ 248.157 or 248.161 shall jointly submit a plan of action to the Commissioner in the form and manner prescribed in paragraph (e) of this section within six months after the owner's acceptance of a bona fide offer under § 248.157 or the purchaser's making of a bona fide offer under § 248.161.

(c) *Filing with the State or local government and tenants.* The owner shall notify the tenants of the plan of action by posting in each occupied building a summary of the plan of action and by delivery of a copy of the plan of action to the tenant representative, if any. In addition, the summary must indicate that a copy of the plan of action shall be available from the tenant representatives, whose names, addresses and telephone numbers are indicated on the summary, the local HUD field office, and the on-site office for the project, or if one is not available, in the location where rents are collected, for inspection and copying, at a reasonable cost, during normal business hours. Simultaneously with the submission to the Commissioner, the owner shall submit the plan of action to that officer of State or local government to whom the owner submitted a notice of intent under § 248.105(c). The Commissioner shall submit a copy of the plan of action to the appropriate agency of such State or local government which shall review the plan of action and advise the tenants of the project of any programs that are available to assist the tenants in carrying out the purposes of subpart B of this part.

(d) *Termination of affordability restrictions.* If the plan of action proposes to terminate the low income affordability

restrictions through prepayment or voluntary termination in accordance with § 248.141, it shall include:

(1) A description of any proposed changes in the status or terms of the mortgage or regulatory agreement;

(2) A description of any proposed changes in the low income affordability restrictions;

(3) A description of any change in ownership that is related to prepayment or voluntary termination;

(4) An assessment of the effect of the proposed changes on existing tenants;

(5) An analysis of the effect of the proposed changes on the supply of housing affordable to low and very low income families or persons in the community within which the project is located and in the area that the housing could reasonably be expected to serve;

(6) A list of any waivers requested by the owner pursuant to § 248.7; and

(7) Any other information that the Commissioner determines is necessary to achieve the purposes of subpart B of this part.

(e) *Extension of affordability restrictions.* If the plan of action proposes to extend the low income affordability restrictions of the project in accordance with § 248.153 or transfer the project to a qualified purchaser in accordance with §§ 248.157 or 248.161, the plan of action shall include:

(1) A description of any proposed changes in the status or terms of the mortgage or regulatory agreement;

(2) A description of the Federal incentives requested, including cash flow projections and analyses of how the owner will address any physical or financial deficiencies and maintain the low income affordability restrictions of the project;

(3) A description of any assistance from State or local government agencies, including low income housing tax credits that have been offered to the owner or purchaser or for which the owner or purchaser has applied or intends to apply;

(4) A description of any transfer of the property, including the identity of the transferee and a copy of any documents of sale;

(5) An income profile of the tenants as of the date of submission of the plan of action and as of January 1, 1987 (based on the area median income limits established by the Commissioner in February 1987), or if the January 1, 1987 profile is unavailable, a certification from the owner stating its unavailability and a profile as of January 1, 1988, or, if that is also unavailable, a profile as of January 1, 1989;

(6) A transfer of physical assets package, if a transfer is proposed;

(7) A list of any waivers requested by the owner pursuant to § 248.7; and

(8) Any other information that the Commissioner determines is necessary to achieve the purposes of subpart B of this part.

(f) *Revisions.* The owner or owner and purchaser may from time to time revise and amend the plan of action as may be necessary to obtain approval under subpart B of this part and must amend the plan of action no later than 30 days after a change in any of the information required in paragraphs (d) or (e) of this section. The owner or owner and purchaser shall submit any revision to the Commissioner, and provide a copy of the revision to the parties and in the manner specified in paragraph (c) of this section.

(g) *Failure to Submit.* If the owner fails to submit a plan of action to the Commissioner, when prepayment or termination is sought, within the 6 month period set forth in paragraph (a) of this section or, when a transfer is sought, if the owner and purchaser fail to submit a plan of action within the 6 month time period set forth in paragraph (b) of this section, the notice of intent filed by the owner under § 248.105 shall be ineffective for the purposes of subpart B of this part and the owner shall be barred from submitting another notice of intent under § 248.105 until 6 months after expiration of such period.

(h) *Comment Period for tenants and State or local governments.* Upon submission of the plan of action by the owner, the tenants of the affected project and the State or local government shall have 60 days in which to provide comments on the plan of action to the Commissioner or to the owner, who will then submit the comments to the Commissioner. The Commissioner shall not approve a plan of action under subpart B of this part before the end of this 60-day period and all comments received during this period will be considered by the Commissioner in making its determination to approve or disapprove a plan of action.

(i) *Notification to tenants and the State or local government of plan of action approval.* Upon the Commissioner's approval of the plan of action, the owner shall notify tenants of the terms thereof by posting in each occupied building a summary of the plan of action and by delivery of a copy of the plan of action to the tenant representative, if any. In addition, the summary must indicate that a copy of the plan of action shall be available for inspection and copying during reasonable hours in a location convenient to the tenants.

§ 248.141 Criteria for approval of a plan of action involving prepayment and voluntary termination.

(a) *Approval.* The Commissioner may approve a plan of action that provides for the termination of the low income affordability restrictions through prepayment of the mortgage or voluntary termination of the mortgage insurance contract only upon a written finding that --

(1) Implementation of the plan of action will not --

(i) Materially increase economic hardship for current tenants, and will not in any event result in a monthly rental payment by any current tenant that exceeds 30 percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment in any year that exceeds 10 percent (whichever is lower); or in the case of a current tenant who already pays more than such percentage, an increase in the monthly rental payment in any year that exceeds the increase in the Consumer Price Index or 10 percent (whichever is lower); or

(ii) Involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and

(2) The supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect --

(i) The availability of decent, safe, and sanitary housing affordable to low income and very low income families or persons in the area that the housing could reasonably be expected to serve;

(ii) The ability of low income and very low income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

(iii) The housing opportunities of minorities in the community within which the housing is located.

(3) There are no open audit findings, open findings of noncompliance with title VI of the Civil Rights Act of 1964 *(42 U.S.C. 2000d);* the Fair Housing Act *(42 U.S.C. 3601*-3619); Executive Order 11063 (3 CFR 1959-1963 comp., p. 652); the Age Discrimination Act of 1975 *(42 U.S.C. 6101*-6107); section 504 of the Rehabilitation Act of 1973 *(29*

*U.S.C. 794);* and all regulations promulgated under such statutes and authorities (including, but not limited to 24 CFR part 100), or outstanding violations of the regulatory agreement.

(b) *Disapproval.* If the Commissioner determines a plan of action to prepay a mortgage or terminate an insurance contract fails to meet the requirements of paragraph (a) of this section, the Commissioner shall disapprove the plan and within a reasonable time, shall inform the owner of the reasons for disapproval and suggest alternatives. In the case of disapproval of the plan of action, except for the failure to meet the requirement of paragraph (a)(3) of this section, the notice of intent filed under § 248.105 shall be rendered ineffective for the purposes of this subtitle, and the owner, in order to receive incentives, must file a new notice of intent under such section. If the plan of action is disapproved because of an outstanding civil rights or audit finding, the finding must be closed before the Commissioner will approve a plan of action under this section.

§ 248.145 Criteria for approval of a plan of action involving incentives.

(a) *Approval.* The Commissioner may approve a plan of action for extension of the low income affordability restrictions on an eligible low income housing project or for transfer of the housing to a qualified purchaser, other than a resident council, only upon a finding that --

(1) Due diligence has been given to ensuring that the package of incentives set forth in the plan of action is, for the Federal Government, the least costly alternative that is consistent with the full achievement of the purposes of subpart B of this part. The Commissioner will conduct a "windfall profits" test to determine whether the project is located in a rental market where there is an adequate supply of decent, affordable housing. If the project is located in such a rental market, and if the provision of incentives would not serve other public policy objectives under subpart B of this part, then no incentives will be provided to the owner;

(2) The project will be retained as housing affordable for very low, low and moderate income families and persons, as determined under paragraph (a)(8) of this section, for the remaining useful life of the project;

(3) Throughout the remaining useful life of the project, adequate expenditures will be made for maintenance and operation of the project and the project meets the housing standards established in § 248.147 as determined by inspections conducted by the Commissioner;

(4) Current tenants will not be involuntarily displaced, except for good cause;

(5) Any increase in rent contributions for current tenants will be to a level that does not exceed 30 percent of the adjusted income of the tenant or the fair market rent, whichever is lower. However, the rent contributions of any tenants occupying the project at the time of any increase may not be reduced by reason of this paragraph, except with respect to tenants receiving section 8 assistance in accordance with paragraph (a)(7) of this section;

(6) Any resulting increase in rents for current tenants (except for increases made necessary by increased operating costs) shall be phased in as follows:

(i) If such increase is 30 percent or more, the increase shall be phased in equally over a period of not less than three years, with the first increase occurring upon the effective date of the plan of action, and the subsequent two increases occurring annually thereafter;

(ii) If such increase is more than 10 percent but less than 30 percent, it shall be limited to not more than 10 percent per year;

(7) Section 8 assistance shall be provided, to the extent appropriations are available, if necessary to mitigate any adverse effect on current very low and low income tenants;