(8) Rents for units becoming available to new tenants shall be at levels approved by the Commissioner, taking into account any incentives provided under subpart B of this part, that will ensure, to the extent practicable, that the units will be available and affordable to the same proportions of very low, low and moderate income families and persons, including families and persons whose incomes are 95 percent or more of area median income, as based on the area median income limits established by the Commissioner in February 1987, as resided in the project as of the date of the tenant income profile submitted under § 248.135(e)(5), or the date the plan of action is approved, whichever date results in the highest proportion of very low income families. This limitation shall not prohibit a higher proportion of very low income families and persons from occupying the project;

(9) Future rent adjustments shall be --

(i) Made by applying an annual factor, to be determined by the Commissioner, to the portion of rent attributable to operating expenses for the project; and

(ii) Subject to a procedure, established by the Commissioner, for owners to apply for rent increases not adequately compensated by annual adjustment under paragraph (a)(9)(i) of this section, under which the Commissioner may increase rents in excess of the amount determined under paragraph (a)(9)(i) of this section only if the Commissioner determines such increases are necessary to reflect extraordinary necessary expenses of owning and maintaining the project;

(10) Any savings from reductions in operating expenses due to management efficiencies shall be deposited in project reserves for replacement and the owner shall have periodic access to such reserves, to the extent the Commissioner determines that the level of the reserves is adequate and that the project is maintained in accordance with the standards established in § 248.147;

(11) The mortgage on the project is current; and

(12) There are no open audit findings, open findings of noncompliance with title VI of the Civil Rights Act of 1964 *(42 U.S.C. 2000d);* the Fair Housing Act *(42 U.S.C. 3601*-3619); Executive Order 11063 (3 CFR 1959-1963 comp., p. 652); the Age Discrimination Act of 1975 *(42 U.S.C. 6101*-6107); section 504 of the Rehabilitation Act of 1973 *(29 U.S.C. 794);* and all regulations promulgated under such statutes and authorities (including, but not limited to, 24 CFR part 100), or outstanding violations of the regulatory agreement.

(b) *Compliance with housing standards.* No incentives under § 248.153 may be provided, other than to qualified purchasers under §§ 248.157 and 245.161, and no distributions may be taken by the owner or purchaser, until the Commissioner determines that the project meets the housing standards set forth in § 248.147, except that incentives designed to correct deficiencies in the project may be provided.

(c) *Implementation.* Any agreement to maintain the low income affordability restrictions for the remaining useful life of the project may be made through execution of a new regulatory agreement, modifications to the existing regulatory agreement or mortgage, or in the case of prepayment of a mortgage or voluntary termination of mortgage insurance, a recorded instrument.

(d) *Determination of remaining useful life.* The Commissioner shall make determinations, on the record and after opportunity for a hearing, as to when the useful life of an eligible low income housing project has expired. Under procedures and standards to be established by the Commissioner, owners of eligible low income housing may petition the Commissioner for a determination that the useful life of such project has expired. Such petition may not be filed before the expiration of the 50-year period beginning upon the approval of a plan of action under subpart B of this part with respect to such project. In making a determination pursuant to a petition under paragraph (d) of this section, the Commissioner shall presume that the useful life of the project has not expired, and the owner shall have the burden of proof in establishing such expiration. The Commissioner may not determine that the useful life of any project has expired if such determination results primarily from failure to make regular and reasonable repairs and replacement, as

became necessary. In making a determination regarding the useful life of any project pursuant to a petition submitted under paragraph (d) of this section, the Commissioner shall provide for comment by tenants of the project and interested persons and organizations with respect to the petition. The Commissioner shall also provide the tenants and interested persons and organizations with an opportunity to appeal a determination under paragraph (d) of this section.

(e) In the case of any plans of action involving incentives the owner must agree to comply with title VI of the Civil Rights Act of 1964 *(42 U.S.C. 2000d);* the Fair Housing Act *(42 U.S.C. 3601*-3619); Executive Order 11063 (3 CFR 1959-1963 comp., p. 652); the Age Discrimination Act of 1975 *(42 U.S.C. 6101*-6107); section 504 of the Rehabilitiation Act of 1973 *(29 U.S.C. 794)* (including the Department's Accessibility Guidelines (24 CFR chapter I, subchapter A, appendix II) and all regulations issued pursuant to these authorities.

§ 248.147 Housing standards.

(a) *Standards.* As a condition to receiving incentives under subpart B of this part, the owner shall agree to maintain the project in accordance with local housing codes and the housing quality standards set forth in § 886.307 of this title. Where a housing quality standard conflicts with local housing codes, the owner shall maintain the project in compliance with the standard that is stricter.

(b) *Annual inspections.* The Commissioner shall inspect each project at least annually in order to determine compliance with the housing quality standards. At least 30 days prior to the inspection, the Commissioner shall notify any tenant representatives, or if none exist, the Commissioner shall provide the owner with a notice to be posted in each affected building, stating the time and date of the inspection and advising any interested tenants that they may accompany HUD personnel on the inspection and/or submit any comments they may have on the physical condition of the project. The Commissioner shall notify the owner of any deficiencies within 30 days following the inspection. The owner shall have 90 days from the date of such notification to correct any deficiencies cited by the Commissioner and shall promptly notify the Commissioner when such deficiencies have been corrected. The Commissioner shall reinspect the project upon such notification or, if the owner does not notify the Commissioner, upon the expiration of the 90-day period.

(c) *Sanctions for noncompliance.* If the Commissioner determines, upon reinspection of the project, that the project is still not in compliance with the standards set forth in paragraph (a) of this section, the Commissioner shall take any action appropriate to bring the project into compliance, including --

(1) Directing the mortgagee, with respect to an equity take-out loan provided under part 241 of this chapter, to withhold the disbursement to the owner of any escrowed loan proceeds and requiring that such proceeds be used for repair of the project; and

(2) Reduce the amount of the allowable distributions to 4 percent of extension preservation equity or (in the case of a purchaser 4 percent of cash invested, as appropriate, for the period ending upon a determination by the Commissioner that the project is in compliance with the standards and requiring that such amounts be used for repair.

(d) *Continued compliance.* To ensure continued compliance with the standards set forth in paragraph (a) of this section for a project subject to any action under paragraph (c) of this section, the Commissioner may limit access of and use by the owner of such amounts set forth in paragraph (c) of this section, for not more than the 2-year period beginning upon the determination that the project is in compliance with the housing standards.

(e) *Sanctions for continuous noncompliance.* If, upon inspection, the Commissioner determines that any eligible low income housing project has failed to comply with the standards established under this section for two consecutive years, the Commissioner may, upon notification to the owner of the noncompliance, take one or more of the following actions;

(1) Subject to the availability of appropriations, provide assistance, other than project-based assistance attached to

the project, under parts 882 and 887 of this title for any tenant eligible for such assistance who desires to terminate occupancy in the project. For each unit in the project vacated pursuant to the provision of assistance under this paragraph, the Commissioner may, notwithstanding any other law or contract for assistance, cancel the provision of project-based assistance attached to the project for one dwelling unit, if the project is receiving such assistance, or convert the project-based assistance allocation for that unit to assistance under part 882 or 887 of this title;

(2) In the case of projects for which an equity take-out loan has been made under part 241 of this chapter, direct the mortgagee to declare such a loan to be in default and accelerate the maturity date of the loan;

(3) Declare, or direct the insured mortgagee to declare, any rehabilitation loan insured or provided by the Commissioner with respect to the project, including loans provided under part 219 of this chapter, to be in default and accelerate the maturity date of the loan; and

(4) Suspend payments under or terminate any contract for project-based rental assistance under section 8 of the United States Housing Act of 1937 *(42 U.S.C. 1437f)*.

(f) *Sanctions not exclusive.* The Commissioner may take any other action authorized by law or the project regulatory agreement to ensure that the project will be brought into compliance with the standards established under this section or with other requirements pertaining to the condition of the project.

§ 248.149 Timetable for approval of a plan of action.

(a) *Notification of deficiencies.* Not later than 60 days after receipt of a plan of action, the Commissioner shall notify the owner in writing of any deficiencies that prevent the plan of action from being approved. Such notice shall describe alternative ways in which the plan may be revised to meet the criteria for approval set forth in § 248.145.

(b) *Notification of approval.* Not later than 180 days after receipt of a plan of action, or such longer period as the owner requests, but not more than 365 days, the Commissioner shall notify the owner in writing whether the plan of action, including any revisions, is approved. If approval is withheld, the notice shall describe --

(1) The reasons for withholding approval; and

(2) Suggestions to the owner for meeting the criteria for approval.

(c) *Opportunity to revise.* The Commissioner shall give the owner a reasonable opportunity of not more than 60 days to revise the plan of action when approval is denied. If the owner fails to comply with this time period, it shall not be eligible for relief under paragraph (d) of this section.

(d) *Delayed approval.* If the Commissioner fails to approve a plan of action within the time set forth in paragraph (b) of this section, the Commissioner shall provide incentives and assistance under subpart B of this part, to an owner who is entitled to receive such incentives and assistance, in the amount that the owner would have received if the Commissioner had complied with such time limitations. Paragraph (d) of this section does not apply to plans of action that are not approved because of deficiencies.

§ 248.153 Incentives to extend low income use.

(a) *Agreements by the Commissioner.* After approving a plan of action filed pursuant to § 248.145, from an owner of eligible low income housing that includes the owner's plan to extend the low income affordability restrictions of the project, the Commissioner shall, subject to the availability of appropriations for such purpose, enter into such agreements as are necessary to enable the owner to --

(1) Receive the annual authorized return for the project as determined under § 248.121;

(2) Pay debt service on the federally-assisted mortgage(s) covering the project;

(3) Pay debt service on any loan for rehabilitation of the project;

(4) Meet project operating expenses; and

(5) Establish adequate reserves.

(b) *Permissible incentives.* Such agreements may include one or more of the following incentives, as determined necessary by the Commissioner:

(1) Increased access to residual receipts accounts as necessary to enable the owner to realize the annual authorized return;

(2) An increase in the rents permitted under an existing project-based section 8 contract;

(3) Additional project-based section 8 assistance or an extension of any project-based assistance attached to the housing;

(4) An increase in the rents on non-section 8 units occupied by current tenants up to the maximum allowable rents;

(5) Financing of capital improvements under part 219 of this chapter;

(6) Financing of rehabilitation through provision of insurance for a second mortgage under part 241 of this chapter;

(7) Redirection of the Interest Reduction Payment subsidies to a second mortgage for projects which are insured, assisted, or held by the Commissioner or a State or State agency under part 236 of this chapter;

(8) Access by the owner to a portion of the preservation equity in the project through provision of insurance for an acquisition or equity loan insured under part 241, subpart E of this chapter or through a non-insured mortgage loan approved by the Commissioner and the mortgagee;

(9) An increase in the amount of allowable distributions up to the annual authorized return; and

(10) Other incentives authorized in law.

(c) *Limitation on the provision of permissible incentives.* (1) The total amount of incentives provided to a project under paragraphs (b)(2), (3), and (4) of this section shall not result in a projected rental income stream which exceeds the Federal cost limit.

(2) The debt service on the loan obtained by the owner under paragraph (b)(8) of this section, when added to the allowable distributions under paragraph (b)(9) of this section, shall not exceed the annual authorized return.

(d) *Interest reduction subsidies.* Where Interest Reduction Payment subsidies are sought to be redirected, pursuant to paragraph (b)(7) of this section, the lender may not unreasonably withhold its consent to such redirection.

(e) *Recalculation of section 236 basic rent and market rent.* With respect to any project with a mortgage insured or otherwise assisted pursuant to part 236 of this chapter, the basic rent and market rent, as defined in § 236.2 of this chapter, for each unit in such project may be increased to take into account the allowable distributions permitted under this section and the debt service on any equity loan, rehabilitation loan or acquisition loan approved under a plan of action under subpart B of this part.

§ 248.157 Voluntary sale of housing not in excess of Federal cost limit.

(a) *Offer to sell.* Where an owner has submitted a second notice of intent under § 248.133 for the purpose of transferring the project to a qualified purchaser, and the transfer preservation rent does not exceed the Federal cost limit, the owner shall offer the housing for transfer as provided in this section. The owner shall not be obligated to accept any offer made under this section, but may instead elect to retain the project and receive incentives under § 248.145.

(b) *Notification of qualified purchasers.* Upon receipt of a second notice of intent to transfer the project to a qualified purchaser, the Commissioner shall notify potential qualified purchasers of the availability of the project for sale, and of the names and addresses of the owner, or of a person representing the owner in the sale of the project, by --

(1) Mailing notices to non-profit organizations;

(2) Placing notices in the major local newspaper(s) in the jurisdiction in which the project is located;

(3) Mailing notices to clearinghouse networks; and

(4) Using any other means of notification which the Commissioner determines would be effective to notify potential qualified purchasers of the sale of the project.

(c) *Right of first offer to priority purchasers.* (1) For the 6-month period beginning on the date of receipt by the Commissioner of a second notice of intent under § 248.133, the owner may accept a bona fide offer only from:

(i) A resident council intending to purchase the project under §§ 248.173 or 248.175, which has met the requirements for tenant support, pursuant to those sections;

(ii) A resident council intending to purchase the project and retain it as rental housing, which has the support of a majority of the tenants; or

(iii) A community-based nonprofit organization which has the support of a majority of the tenants.

(2) If no bona fide offer to purchase the project is made and accepted during or at the end of the 6-month period specified in paragraph (c)(1) of this section, the owner may offer to sell the project during the next 6 months to any priority purchasers.

(3) If no bona fide offer to purchase the project is made and accepted during or at the end of the 6-month period specified in paragraph (c)(2) of this section, the owner may offer to sell the project during the 3 months immediately following that period only to qualified purchasers.

(d) *Purchase price.* The sale price, including assumption of the debt on the federally-assisted mortgage(s), or the amount of the debt on the federally-assisted mortgage(s) that the project is taken subject to, may not exceed the transfer preservation value of the project.

(e) *Expression of interest.* Any priority purchaser seeking to make an offer during the 6-month periods specified in paragraph (c) of this section shall, and other qualified purchasers may, submit written notice thereof to the Commissioner. Such notice, if made by a priority purchaser seeking to make an offer during either 6-month priority purchaser marketing period, shall contain the following:

(1) A statement identifying the priority purchaser as a State or local government agency, a nonprofit organization, or a resident council;

(2) A copy of its articles of incorporation, charter and list of officers and directors, if the purchaser is a nonprofit organization or a resident council and in the case of a nonprofit organization, proof that the organization is, or has applied to be, a tax exempt organization in accordance with *26 U.S.C. 501*(c); and

(3) A statement as to whether the purchaser is affiliated with any other entity for purposes of purchasing the project and whether any Low Income Housing Tax Credits may be awarded in connection with the purchase of the project.

(f) *Information from the Commissioner.* Within 30 days of receipt of an expression of interest by a priority purchaser, the Commissioner shall determine the status of the priority purchaser with respect to the categories listed in paragraph (h) of this section, and provide such purchaser with:

(1) A list of all possible assistance available from the Federal Government to facilitate a transfer of the project;

(2) The appraisal reports for the project as submitted under § 248.111;

(3) The Commissioner's determination as to the priority status of the purchaser and as to whether the purchaser qualifies as a resident council, community-based nonprofit organization or State or local government entity;

(4) A worksheet indicating the level of the earnest money deposit required upon the submission of a bona fide offer;

(5) An acknowledgment of the purchaser's right to inspect the project; and

(6) Any other relevant financial information that the Commissioner possesses concerning the project, including the information determined under § 248.121.

Within the same 30-day period, the Commissioner shall also notify the owner of the purchaser's expression of interest and instruct the owner to provide to the purchaser any information concerning the project that the Commissioner deems relevant to the transfer of the project.

(g) *Bona fide offer.* A bona fide offer is an offer to purchase eligible low-income housing at a sales price which does not exceed the transfer preservation value of the project.

(1) A bona fide offer must include the following:

(i) A contract of sale signed by the purchaser, which states that acceptance of the contract is contingent upon approval by the Commissioner;

(ii) An earnest money deposit from every qualified purchaser equal to the lesser of one percent of the transfer preservation value, $50,000 or $500 per unit, unless the purchaser is a resident council purchasing the project under a resident homeownership plan under § 248.173 or § 248.175, in which case the earnest money deposit shall be equal to $200 per unit from 75% of the occupied units; and

(iii) If the purchaser is a resident council intending to purchase the project pursuant to a resident homeownership plan, the information required under § 248.173(b); or

(iv) If the purchaser is a resident council intending to retain the project as rental housing, or a community-based nonprofit and the offer is submitted within the marketing period established in paragraph (c)(1) of this section, a resolution of the resident council, or a petition signed by tenants representing a majority of the units indicating their support of the offer.

(2) An owner may waive the requirement of an earnest money deposit or agree to accept a smaller deposit for all qualified purchasers, except resident councils who intend to purchase the project pursuant to a resident homeownership plan under § 248.173 or § 248.175. In order to be effective:

(i) The waiver must be indicated in the second notice of intent submitted under § 248.133 and the waiver must

apply equally to all qualified purchasers, except resident councils who intend to purchase the project pursuant to a resident homeownership plan under § 248.173 or § 248.175; or

(ii) If the second notice of intent has already been submitted, the owner must submit to the Commissioner, in writing, its decision to waive the earnest money deposit. The Commissioner shall notify all qualified purchasers who have submitted an expression of interest under paragraph (e) of this section that the owner has waived the earnest money deposit requirement.

(h) *Retention and acceptance of offers.* The owner shall accept or reject any bona fide offer within 30 days of receipt of such offer. For an offer to be bona fide, it must meet the requirements of paragraph (g) of this section, as well as be submitted to the owner within the appropriate marketing period under paragraph (c) of this section. If an owner rejects any offer, it must return the earnest money deposit to the offeror at the time of rejection. A bona fide offer which is rejected by the owner will still be considered a bona fide offer for purposes of this section, even after the earnest money deposit has been returned. If an owner decides to accept the offer at a later date, the purchaser may renew the offer by resubmitting the earnest money deposit, if a deposit had originally been required, within 30 days of notification of the owner's acceptance of the offer.

(i) *Submission of offer to HUD.* The purchaser shall submit the offer to the Commissioner. The Commissioner shall review the offer which is preliminarily accepted by the owner to determine whether it meets the requirements of a bona fide offer. The Commissioner shall notify the owner and purchaser, within 30 days after acceptance, whether the offer meets such requirements. The owner's preliminary acceptance of any offer pursuant to this section shall be conditional upon the Commissioner's certification that the offer is bona fide. If the Commissioner determines that the offer is not a bona fide offer, the offer will be considered invalid for the purposes of subpart B of this part.

(j) *Submission of plan of action.* Upon a determination by the Commissioner that the offer is bona fide and final acceptance of such an offer, the owner and purchaser shall jointly submit a plan of action to the Commissioner pursuant to § 248.135. The plan of action shall include any request for assistance from the Commissioner for purposes of transferring the project.

(k) *Requirements for plan of action approval.* If the qualified purchaser of the project is a resident council seeking to purchase the project under a resident homeownership program, the Commissioner may approve a plan of action only if the resident council's proposed resident homeownership program meets the requirements under § 248.173 or § 248.175. For all other qualified purchasers, the Commissioner may approve a plan of action submitted pursuant to this section only if the plan of action meets the criteria listed in § 248.145.

(l) *Failure to consummate sales transaction.* (1) If the owner accepts an offer from a priority purchaser during either of the two 6-month periods specified in paragraph (c) of this section, and before the expiration of the period specified in paragraph (c) of this section, the sales transaction either falls through or does not close within 90 days after the Commissioner's approval of the plan of action, the owner shall:

(i) Immediately notify the Commissioner that the sale has fallen through;

(ii) Notify any other purchaser that had submitted an offer to purchase the project; and

(iii) Resume holding the project open for sale for the remainder of the time periods specified in paragraph (c) of this section.

(2) If the owner accepts an offer from a purchaser, and during the 3-month period specified in paragraph (c) of this section, or thereafter, the sales transaction either falls through or does not close within 90 days after the Commissioner's approval of the plan of action, the owner shall take the following steps:

(i) Immediately notify the Commissioner that the sale has fallen through;

(ii) Contact any other purchaser that had submitted an offer to purchase the project and give such purchaser and any other qualified purchaser 60 days from the date of notification to the Commissioner in which to resubmit an offer to purchase the project.

(3) At any time during the 60-day period the owner may accept an offer submitted under paragraph (l)(2) of this section.

(4) If an offer submitted during the 60-day period specified in paragraph (l)(2) of this section is made and accepted, but the sale is not consummated within 90 days of the Commissioner's approval of the plan of action for reasons not attributable in whole or in part to the owner, the owner may terminate the low-income affordability restrictions through prepayment or voluntary termination, subject to compliance with the provisions of § 248.165.

(m) *Assistance.* Subject to the availability of amounts approved in appropriation acts, the Commissioner shall, for approvable plans of action, provide assistance sufficient to enable qualified purchasers to:

(1) Acquire the eligible low income housing project from the current owner for a purchase price not greater than the transfer preservation value of the project;

(2) Pay the debt service on the federally-assisted mortgage(s) covering the project;

(3) Pay the debt service on any loan for the rehabilitation of the project;

(4) Meet project operating expenses and establish adequate reserves for the housing;

(5) Receive a return on investment in an amount equal to 8 percent on any actual cash investment made to acquire the project;

(6) In the case of a priority purchaser, receive an adequate reimbursement for transaction expenses relating to acquisition of the project, not in excess of 5% of the project's transfer preservation equity, subject to approval by the Commissioner in accordance with standards applicable to insured loan transactions under this chapter; and

(7) In the case of an approved resident homeownership program, cover the costs of training for the resident council, homeownership counseling and training, the fees for the nonprofit entity or public agency working with the resident council, if such entity or agency is approved by the Commissioner, and costs related to relocation of tenants who elect to move. Assistance for such costs, exclusive of relocation expenses, shall not exceed $500 per unit or $200,000 for the project, whichever is less.

(n) *Incentives; residual receipts.* The Commissioner may provide assistance for all qualified purchasers under subpart B of this part in the form of one or more of the incentives authorized under § 248.153, except that any residual receipts for the project transferred to the owner shall be deducted from the sale price of the project. The incentives provided by the Commissioner to any qualified purchaser may include an acquisition loan provided under subpart E of part 241 of this chapter.

(o) *Grants to priority purchasers.* The Commissioner may provide assistance for priority purchasers under subpart B of this part in the form of a grant for each unit in the project in an amount, as determined by the Commissioner, that does not exceed the present value of the total of the projected fair market rent for the next ten years, or such longer period if additional assistance is necessary to cover the costs set forth in paragraph (m) of this section.

(p) *Reimbursement of assistance.* The Commissioner reserves the right to seek reimbursement from a priority purchaser who, within ten years of approval of a plan of action, becomes affiliated with or transfers the project to any non-priority purchaser. The Commissioner shall be entitled to receive reimbursement for the difference between the assistance provided to the priority purchaser and the assistance that would have been provided in the same

circumstances to a non-priority purchaser.

(q) *Seller financing.* In order to finance the acquisition or rehabilitation of a project under this section, a qualified purchaser may receive take-back financing from the owner of the project. If the purpose of the seller financing is to aid acquisition of the project, the principal amount of such financing, together with an acquisition loan provided under part 241 of this chapter, may not exceed the transfer preservation equity of the project, plus, in the case of priority purchasers, any expenses associated with the acquisition, loan closing, and implementation of the plan of action. If the purpose of the seller financing is to fund rehabilitation of the project, the principal amount of such financing may not exceed the equity requirements for a rehabilitation loan under § 241.70 or § 219.305 of this chapter. The seller may not charge interest on any seller financing at a rate in excess of that of the Federal acquisition or rehabilitation loan.

§ 248.161 Mandatory sale of housing in excess of the Federal cost limit.

(a) *In general.* With respect to any eligible low income housing for which the transfer preservation rent determined under § 248.121 exceeds the Federal cost limit, the owner shall offer the housing for transfer to qualified purchasers as provided in this section.

(b) *Applicability of voluntary sale provisions.* The provisions of § 248.157, other than paragraphs (a) and (p) of this section thereof, shall be applicable to any sale conducted under this section. If the owner receives an offer to purchase the project for a sale price equal to the transfer preservation value of the project, as determined under § 248.111, the owner shall be obligated to accept the offer upon its receipt and sell the project to the purchaser. If the owner receives an offer to purchase the project for a sale price less than the transfer preservation value of the project, the owner may accept the offer, but is not obligated to do so. Any offer to purchase a project under this section for less than the transfer preservation value must comply with the requirements of a bona fide offer in § 248.101, except for the requirement that the sale price equal the transfer preservation value. At the time of submission of the offer, the potential purchaser must also submit the documentation required in § 248.157(g).

(c) *Section 8 assistance.* Subject to the availability of amounts approved in appropriation acts, the Commissioner shall, for approvable plans of action, provide assistance to qualified purchasers under part 886, subpart A of this title sufficient to produce a gross potential income equal to the amount determined by multiplying 120 percent of the prevailing rents in the relevant local market in which the project is located by the number of units in the project, according to appropriate unit size, and any other incentives authorized under § 248.153 that would have been provided to a qualified purchaser under § 248.157.

(d) *Grants to qualified purchasers.* From amounts made available by Congress, the Commissioner may make grants to assist in the completion of transfers under this section to any qualified purchasers. Any grant made pursuant to paragraph (d) of this section shall be in an amount not exceeding the difference between the amount of assistance provided under paragraph (c) of this section and the amount of assistance specified in § 248.157(m).

(e) *Securing State and local funding.* The Commissioner shall assist any qualified purchaser of a project pursuant to this section in securing funding and other assistance, including tax and assessment reductions from State and local governments to facilitate a transfer under this section.

§ 248.165 Assistance for displaced tenants.

(a) *Section 8 assistance.* Each low income family that is displaced as a result of the prepayment of the mortgage or voluntary termination of an insurance contract on eligible low income housing shall, subject to the availability of funds, receive assistance under parts 882 or 887 of this title in the form of section 8 certificates or vouchers. At its discretion, the Commissioner may set the section 8 existing fair market rent levels at the exception rent in order to allow tenants to use the certificates or vouchers to remain at the project.

(b) *Notification of Commissioner.* The owner of any eligible low income housing project who prepays the mortgage

or voluntarily terminates the mortgage insurance contract pursuant to subpart B of this part, shall notify the Commissioner of:

(1) The names and addresses of all of the tenants in the project who will be displaced;

(2) The size of the unit in which each of the displaced tenants is currently dwelling; and

(3) The names of all of the displaced tenants who are special needs tenants, as that term is defined in § 248.101, as well as a statement as to the nature of their special need.

The owner shall provide the Commissioner with this information within 30 days of identifying such tenants for displacement, but in no event less than 30 days prior to the date when the tenants must vacate the premises.

(c) *Relocation of displaced tenants.* The Commissioner shall coordinate with public housing agencies to ensure that any very low or low income family displaced from eligible low income housing as the result of prepayment of the mortgage or termination of the mortgage insurance contract on such project is able to acquire a suitable, affordable dwelling unit in the area where the project from which the displaced family is located. The Commissioner, upon receiving information from the owner under paragraph (b) of this section stating that certain tenants will be displaced, shall request from the public housing agencies located in the same area as the affected project, notices of vacancies in other affordable projects which would be suitable for the displaced tenants. The Commissioner shall convey the notices of vacancies to the tenants who will be displaced along with the addresses of the local public housing agencies.

(d) *Relocation expenses.* The Commissioner shall require the owner of eligible low income housing who prepays or terminates the insurance contract resulting in the displacement of tenants to pay 50 percent of the relocation expenses of each family which is relocated, except that the Commissioner shall increase such percentage to the extent that State or local law of general applicability requires a higher payment by the owner.

(e) *Continued occupancy.* Each owner who prepays the mortgage or terminates the mortgage insurance contract on eligible low income housing shall, as provided in paragraph (g) of this section, allow the tenants occupying units in such project on the date of submission of a notice of intent under § 248.105 to remain in the project for a period of three years, commencing on the date of prepayment or contract termination, at rent levels existing at the time of prepayment or termination, except for rent increases made necessary due to increased operating costs.

(f) *Replacement unit.* In any case in which the Commissioner requires an owner to allow tenants to occupy units under paragraph (e) of this section, an owner may fulfill the requirements of such paragraph by providing such assistance necessary for the tenant to rent a decent, safe, and sanitary unit in another project for the same 3-year period and at a rental cost to the tenant not in excess of the rental amount the tenant would have been required to pay to the owner in the owner's project, except that the tenant must freely agree to waive the right to occupy the unit in the owner's project. The provisions of paragraph (d) of this section requiring an owner who prepays or terminates an insurance contract to pay a portion of the relocation expenses incurred by displaced tenants shall also be applicable to tenants who relocate pursuant to this paragraph.

(g) *Applicability.* The provisions of paragraphs (e) and (f) of this section shall apply only to:

(1) All tenants in eligible low income housing projects located in a low-vacancy area; and

(2) Special needs tenants.

(h) *Low Vacancy Areas.* The Commissioner shall notify the owner, within 30 days of the owner's request to prepay under § 248.169, whether the project is located in a low vacancy area for purposes of paragraph (g) of this section.

(i) *Required acceptance of section 8 assistance.* Any owner who prepays the mortgage or terminates the mortgage

insurance contract on eligible low income housing and maintains the project for residential rental occupancy may not refuse to rent, refuse to negotiate for the rental of, or otherwise make unavailable or deny the rental of a dwelling unit in such project to any person, or discriminate against any person in the terms, conditions, or privileges or rental of a unit, or in the provision of services or facilities in connection therewith, because the person receives assistance under parts 882 or 887 of this title.

(j) *Regional pools.* In providing assistance under this section, the Commissioner shall allocate the assistance on a regional basis through the regional offices of the Department of Housing and Urban Development. The Commissioner shall allocate assistance under this section in a manner so that the total number of assisted units in each such region available for occupancy by, and affordable to, low income families and persons does not decrease because of the prepayment of a mortgage on eligible low income housing or the termination of an insurance contract on such project.

(k) This section shall only apply to prepayments and terminations occurring pursuant to §§ 248.157(l) and 248.169.

§ 248.169 Permissible prepayment or voluntary termination and modification of commitments.

(a) *In general.* Notwithstanding any limitations on prepayment or voluntary termination under subpart B of this part, an owner may terminate the low income affordability restrictions through prepayment or voluntary termination, subject to compliance with the provisions of § 248.165, under one of the following circumstances:

(1) The Commissioner approves a plan of action under § 248.153(a), but does not provide the assistance approved in such plan and contained in an executed use agreement between the Commissioner and the owner, including section 8 assistance or a loan provided under part 219 of this chapter, but not including insurance of a rehabilitation or equity take-out loan under part 241 of this chapter, during the 15-month period beginning on the date of final approval of the plan of action;

(2) After the date that the project would have been eligible for prepayment pursuant to the terms of the mortgage, notwithstanding this part, the Commissioner approves a plan of action under § 248.157 or § 248.161, but does not provide the assistance approved in such plan, including section 8 assistance, a loan provided under part 219 of this chapter, a grant provided under § 248.157(o), or a grant under § 248.161(d), before the earlier of:

(i) The expiration of the 2-month period beginning on the commencement of the first fiscal year beginning after such final approval; or

(ii) The expiration of the 6-month period beginning on the date of final approval.

(3) The Commissioner approves a plan of action under §§ 248.157 or 248.161 for any eligible low income housing not covered by paragraph (a)(2) of this section, but does not provide the assistance approved in such plan before the earlier of:

(i) The expiration of the 2-month period beginning on the commencement of the first fiscal year beginning after such final approval; or

(ii) The expiration of the 9-month period beginning on the date of final approval.

(4) An owner who intended to transfer the project to a qualified purchaser under § 248.157 or § 248.161, and fully complied with the provisions of such section,

(i) Did not receive any bona fide offers from any qualified purchasers within the applicable time periods; or

(ii) Received and accepted a bona fide offer from a qualified purchaser, but the sales transaction fell through for reasons not attributable in whole or in part to the owner, and the owner then complied with the requirements of § 248.157(l) and did not receive another bona fide offer from any qualified purchasers.

(b) *Section 8 assistance.* When providing section 8 assistance, the Commissioner may enter into a contract with an owner, contingent upon the future availability of appropriations, for the purpose of renewing expiring contracts for rental assistance as provided in appropriations acts, to extend the term of such rental assistance for such additional period or periods necessary to carry out an approved plan of action. The contract and approved plan of action shall provide that, if the Commissioner is unable to extend the term of such rental assistance or is unable to develop a revised package of incentives providing benefits to the owner comparable to those received under the original approved plan of action, the Commissioner, upon the request of the owner, shall take the following actions, subject to the limitations under the following paragraphs:

(1) Modify the binding commitments made pursuant to § 248.145(a)(2)-(10) that are dependent upon such rental assistance; or

(2) If the Commissioner determines that such modification is infeasible, permit the owner to prepay the mortgage and terminate the plan of action and any implementing use agreements or restrictions, but only if the owner agrees in writing to comply with the provisions of § 248.165.

(c) *Failure to provide section 8 assistance.* With regard to paragraph (b) of this section, the Commissioner shall notify the owner of an inability to either extend the term of section 8 rental assistance or to develop a revised package of incentives providing benefits comparable to those received under the original plan of action as soon as practicable upon discovering that fact. The owner shall inform the Commissioner in writing, within 30 days of receipt of the notice that, since the Commissioner is unable to fulfill the terms of the original plan of action, the owner intends to request that the Commissioner take action under paragraphs (b)(1) or (2) of this section. The Commissioner shall, no later than 90 days from receiving the owner's notice, take action to extend the rental assistance contract and to continue the binding commitments under § 248.145(a)(2)-(10).

§ 248.173 Resident homeownership program.

(a) *Formation of resident council.* Tenants seeking to purchase eligible low income housing in accordance with §§ 248.157 and 248.161 shall organize a resident council for the purpose of developing a resident homeownership program in accordance with standards established by the Commissioner. In order to fulfill the purposes of this section, the resident council shall work with a public or private nonprofit organization or a public body, including an agency or instrumentality thereof. Such organization shall have sufficient experience to enable it to help the tenants to consider their options and to develop the capacity necessary to own and manage the project, where appropriate, and shall be approved by the Commissioner.

(b) *Submission of expression of interest.* A resident council shall identify itself as such in an expression of interest submittted pursuant to § 248.157 or § 248.161 and shall state that, it is interested in purchasing the project pursuant to a homeownership program.

(c) *Bona fide offer.* When submitting an offer to purchase the project pursuant to this section, the resident council must simultaneously submit a certified list of project tenants representing at least 75 percent of the occupied units in the project, and representing at least 50 percent of all of the units in the project, who have expressed an interest in participating in the homeownership program developed by the resident council. An offer made without this certified list will not be considered a bona fide offer for the purposes of subpart B of this part.

(d) *Submission of a homeownership program.* (1) The resident council shall prepare a homeownership program acceptable to the Commissioner for giving all residents of the project an opportunity to become homeowners. The plan shall describe the major elements of, and schedules for, the homeownership program and demonstrate how the program complies with all applicable requirements of this section. The plan shall also describe the resident council's current abilities and proposed capacity-building activities to successfully carry out the homeownership program in compliance with this section. The homeownership program shall include, at a minimum, the following information:

(i) The amount of grant funds requested from the Commissioner, and the expected amounts and sources of other funding;

(ii) The proposed use of the grant funds to be received from HUD and of all other funds, including proceeds from the sale of units to initial purchasers, consistent with paragraph (h) of this section;

(iii) A summary of major rehabilitation activities to be carried out, including repairs, replacements and improvements;

(iv) The price at which the resident council intends to transfer ownership interests in, or shares representing, units in the project, broken down by unit size and/or type; the factors that will influence the establishment of such price, including, but not limited to, the resident council's acquisition cost, estimated rehabilitation costs, capitalization of reserves and organizational costs; how the price arrived at by the resident council compares to the estimated appraised value of the ownership interests or shares; and the underwriting standard that the resident council plans to use, or reasonably expects a public or private lender to use, for potential tenant purchasers, consistent with paragraph (g)(2) of this section;

(v) The expected number of very low, low and moderate income tenants that will be initial owners under the program, consistent with paragraph (g)(1) of this section;

(vi) A pro forma analysis which demonstrates the financial feasibility and viability of the homeownership program, based on the required conditions specified in paragraph (g) of this section;

(vii) The financing arrangements that the tenants are expected to pursue or to be provided, including financing available through the resident council or a State or local governmental entity, and criteria for acceptability of conventional financing;

(viii) A description of the estimated costs expected to be paid by the homeowner at closing;

(ix) The type of homeownership contemplated, consistent with paragraph (f) of this section;

(x) How the marketing of currently vacant units and units occupied by nonpurchasing tenants that become vacant will affect the sales price and occupancy charges to purchasers;

(xi) A workable schedule of sale, subject to the limitations of paragraph (o) of this section, based on estimated tenant incomes;

(xii) Any restrictions on resale by homeowners over and above those specified in paragraph (i) of this section, and any restrictions on homeowners' equity, over and above those specified in paragraph (k) of this section;

(xiii) The qualifications of the resident council or the proposed management entity to manage the project, in compliance with paragraph (n) of this section;

(xiv) The expected number of non-purchasing tenants and their eligibility for section 8 rental assistance under paragraph (m)(2) of this section;

(xv) Expected scope and expenses of relocation activities, both for any temporary relocation due to rehabilitation as well as relocation assistance for nonpurchasing tenants, consistent with paragraph (m)(4) of this section;

(xvi) Expected scope and costs of technical assistance, training and counseling for the resident council, purchasers and non-purchasing tenants; and

(xvii) A certification that the resident council shall comply with the provisions of the Fair Housing Act *(42 U.S.C.*

*3601*-3619); title VI of the Civil Rights Act of 1964 *(42 U.S.C. 2000d);* Executive Order 11063 (3 CFR 1959-1963 comp., p. 652); section 504 of the Rehabilitation Act of 1973 *(29 U.S.C. 794);* the Age Discrimination Act of 1975 *(42 U.S.C. 6101*-6107); and all regulations issued pursuant to these statutes and authorities.

(2) The Commissioner shall give the resident council a reasonable opportunity to revise the homeownership program if approval is denied.

(e) *Approval of a homeownership program; assistance provided.* (1) When the Commissioner determines that the homeownership program submitted by the resident council meets the requirements of this section, is financially feasible, and is the least costly alternative that is consistent with establishing a viable homeownership program, the Commissioner shall approve the program.

(2) In connection with an approved homeownership program the Commissioner shall provide assistance sufficient to pay the following costs:

(i) The purchase price, which shall not exceed the transfer preservation value;

(ii) Transaction costs, as provided in § 248.157(m)(6);

(iii) Other costs, as provided in § 248.157(m)(7);

(iv) The costs of rehabilitation;

(v) The establishment of an adequate reserve for replacements; and

(vi) If necessary, the establishment of operating reserve escrows including contingencies against unexpected increases in expenses or shortfalls in homeowners' payments.

(3) Upon approval of the homeownership program, the Commissioner and the resident council shall enter into a agreement, which shall include, among other matters, procedures governing the drawdown of funds and remedies for noncompliance with the requirements of this section.

(f) *Method of conversion.* The Commissioner shall approve the method for converting the project to homeownership, which may involve acquisition of ownership interests in, or shares representing, the units in a project under any arrangement determined by the Commissioner to be appropriate, such as cooperative ownership, and fee simple ownership, including condominium ownership.

(g) *Required conditions.* The Commissioner shall require that the form of homeownership impose appropriate conditions, including conditions to assure that:

(1) To the extent practicable, the number of initial owners that are very low, low, and moderate income persons at initial occupancy are of the same proportion of very low, low, and moderate income tenants (including families and persons whose incomes are 95 percent or more of area median income) as resided in the project on January 1, 1987 (or if the January 1, 1987 profile is unavailable, a certification from the owner stating its unavailability and a profile as of January 1, 1988, or, if that is also unavailable, a profile as of January 1, 1989) or as of the date of approval of the plan of action, whichever date results in the higher proportion of very low income families, except that the resident council may, at its option, increase the proportions of very low income and low income initial owners, however, no current tenant may be denied homeownership as a result of this paragraph;

(2) Projected debt service payments, occupancy charges and utilities payable by the owners shall not exceed 35 percent of the monthly adjusted gross income of the owners;

(3) The aggregate incomes of initial owners and other sources of funds for the project are sufficient to permit

occupancy charges to cover the full operating costs of the project and any debt service; and

(4) Each initial owner occupies the unit it acquires for at least the initial 15 years of ownership, unless the resident council determines that the initial owner is required to move outside the market area due to a change in employment or an emergency situation.

(h) *Use of proceeds from sales to eligible families.* The entity that transfers ownership interests in, or shares representing, units to eligible families, or another entity specified in the approved application, may use 50 percent of the proceeds, if any, from the initial sale for costs of the homeownership program, including improvements to the project, operating and replacement reserves for the project, additional homeownership opportunities in the project, and other project-related activities approved by the Commissioner. The remaining 50 percent of such proceeds shall be returned to the Commissioner for use under §§ 248.157 and 248.161, subject to the availability of appropriations. Such entity shall keep, and make available to the Commissioner, all records necessary to calculate accurately payments due the Commissioner under paragraph (h) of this section.

(i) *Restrictions on resale by homeowners.* Resale of a homeowner's interest in a project with an approved homeownership program may occur subject to any reasonable restrictions placed on such a transfer by the resident council and approved by the Commissioner.

(1) *Transfer permitted.* A homeowner may transfer the homeowner's ownership interest in the unit, subject to the right to purchase under paragraph (i)(2) of this section, the requirement for the purchaser to execute a promissory note, if required under paragraph (i)(3) of this section and the restrictions on retention of sales proceeds in paragraph (k) of this section. An applicant may propose in its application, and HUD may approve, reasonable restrictions on the resale of units under the program.

(2) *Right to purchase.* Where a resident management corporation, resident council, or cooperative has jurisdiction over the unit, it shall have the right to purchase the ownership interest in the unit from the initial homeowner for the amount specified in a firm contract between the homeowner and a prospective buyer. Where a resident management corporation, resident council, or a cooperative exercises a right to purchase, it shall resell the unit to an eligible family within a reasonable period of time.

(3) *Promissory note required.* At closing, the initial homeowner shall execute a nonrecourse promissory note for a term of twenty years, in a form acceptable to HUD, equal to the difference between the fair market value of the unit and the purchase price, payable to the Commissioner, together with a mortgage securing the obligation of the note.

(i) With respect to a sale by an initial homeowner, the note shall require payment upon sale by the initial homeowner, to the extent proceeds of the sale remain after paying off other outstanding debt incurred in connection with the purchase of the property, paying any other amounts due in connection with the sale, including closing costs and transfer taxes, and paying the family the amount of its equity in the property, computed in accordance with paragraph (k) of this section.

(ii) With respect to a sale by an initial homeowner during the first six years after acquisition, the family may retain only the amount computed under paragraph (k) of this section. Any excess is distributed as provided in paragraph (1) of this section.

(iii) With respect to a sale by an initial homeowner six to twenty years after acquisition, the amount payable under the note shall be reduced by 1/168th of the original principal amount of the note for each full month of ownership by the family after the end of the sixth year. The homeowner may retain all other proceeds of the sale.

(j) *Execution of promissory note by subsequent purchaser.* Where a subsequent purchaser during the 20-year period, measured by the term of the initial promissory note, purchases the property for less than the then current fair market value, the purchaser shall also execute at closing such a promissory note and mortgage, for the amount of the

discount. The term of the promissory note shall be the period remaining of the original 20-year period. The note shall require payment upon sale by the subsequent homeowner, to the extent proceeds of the sale remain after paying off other outstanding debt incurred in connection with the purchase of the property, and paying any other amounts due in connection with the sale (such as closing costs and transfer taxes). The amount payable on the note shall be reduced by a percentage of the original principal amount of the note for each full month of ownership by the subsequent homeowner. The percentage shall be computed by determining the percentage of the term of the promissory note that the homeowner has owned the property. The remainder may be retained by the subsequent homeowner selling the property.

(k) *Homeowners' equity.* The amount of equity an initial homeowner has in the property is determined by computing the sum of the following:

(1) The contribution to equity paid by the family, if any, including any down payment and any amount paid towards principal on a mortgage loan during the period of ownership;

(2) The value of any improvements installed at the expense of the family during the family's tenure as owner, as determined by the resident council based on evidence of amounts spent on the improvements, including the cost of material and labor; and

(3) The appreciated value, determined by applying the Consumer Price Index (urban consumers) against the contribution to equity under paragraphs (k) (1) and (2) of this section, excluding the value of any sweat equity or volunteer labor used to make improvements to the unit. The resident council may, at the time of initial sale, enter into an agreement with the family to set a maximum amount which this appreciation may not exceed.

(l) *Use of recaptured funds.* Any net sales proceeds that may not be retained by the homeowner under the homeownership program approved under this section shall be paid to the HOME Investment Trust Fund for the unit of general local government in which the project is located. If the project is located in a unit of general local government that is not a participating jurisdiction, as such term is defined in § 248.101, any such net sales proceeds shall be paid to the HOME Investment Trust Fund for the State in which the project is located. With respect to any proceeds transferred to a HOME Investment Trust Fund under paragraph (1) of this section, the Commissioner shall take such actions as are necessary to ensure that the proceeds shall be immediately available for eligible activities to expand the supply of affordable housing under section 212 of the Cranston-Gonzalez National Affordable Housing Act of 1990 *(42 U.S.C. 12742).* The Commissioner shall monitor the HOME Investment Trust Fund for each State and unit of local government and shall require maintenance of any records necessary to calculate accurately payments due under this paragraph (1) of this section.

(m) *Protection of nonpurchasing families.* Nonpurchasing families who continue to reside in a project subject to a homeownership program approved under this section shall be protected as follows:

(1) *Eviction.* No tenant residing in an eligible property on the date the Commissioner approves a plan of action may be evicted by reason of a homeownership program approved under this section. This does not preclude evictions for material violation of the terms of occupancy of the unit.

(2) *Section 8 assistance.* If a tenant decides not to purchase a unit, or is not qualified to do so, the Commissioner shall ensure that assistance under parts 882 or 887 of this title is available for use in that or another property by each tenant that meets the eligibility requirements thereunder.

(3) *Rent increases for ineligible tenants.* Rents for tenants who do not purchase a unit but are ineligible for assistance under paragraph (m)(2) of this section may be increased to a level that does not exceed 30 percent of the tenant's adjusted income or the section 8 existing fair market rent, whichever is lower. Rent increases shall be phased in in accordance with § 248.145(a)(6).

(4) *Relocation assistance.* The resident council shall also inform each tenant that if the tenant chooses to move, the resident council, as owner of the project, will pay relocation expenses in accordance with the approved homeownership program. The provisions of § 248.165 shall not apply to resident councils who are project owners pursuant to an approved homeownership program under this section.

(n) *Qualified management.* As a condition of approval of a homeownership program under subpart B of this section, the resident council shall have demonstrated its abilities to manage eligible properties by having done so effectively and efficiently for a period of not less than three years or by entering into a contract with a qualified management entity that meets such standards as the Commissioner may prescribe to ensure that the project will be maintained in a decent, safe and sanitary condition.

(o) *Timely homeownership.* The resident council shall acquire ownership of the project no later than 90 days after final approval of a plan of action pursuant to this section. The resident council shall transfer ownership of units in the project (other than units occupied by nonpurchasing tenants) to the tenants within a reasonable time thereafter, but in no event more than 4 years from the date of transfer of the project to the resident council. The Commissioner may seek contractual remedies against any resident council which fails to transfer ownership of all units within the 4-year period. During the interim period when the project continues to be operated and managed as rental housing, the resident council shall utilize written tenant selection policies and criteria that are approved by the Commissioner as consistent with the purpose of providing housing for very low income families. The resident council shall promptly notify in writing any rejected applicant of the grounds for any rejection.

(p) *Housing standards; inspections.* (1) Until the resident council has transferred all units in the project (other than those occupied by nonpurchasing tenants) to the initial purchasers, the project shall be maintained in accordance with the housing standards set forth in § 248.147.

(2) The Commissioner shall inspect the project at least annually in order to determine compliance with paragraph (p)(1) of this section.

(q) *Audits.* Each resident council shall be subject to the audit requirements in part 45 of this title and shall submit an annual audit to the Commissioner in such form as the Commissioner may prescribe. The resident council shall keep such records as may be reasonably necessary to fully disclose the amount and the disposition by such resident council of the proceeds of assistance received under subpart B of this part, including any proceeds from sales under paragraphs (h) and (l) of this section, the total cost of the homeownership program in connection with which such assistance is given or used, and the amount and nature of that portion of the program supplied by other sources, and such other sources as will facilitate an effective audit.

The Commissioner or his or her duly authorized representative shall have access for the purpose of audit and examination to any books, documents, papers, and records of the resident council that are pertinent to assistance received under subpart B of this part. The Comptroller General of the United States, or any of the duly authorized representatives of the Comptroller General, shall also have access, for the purpose of audit and examination, to any books, documents, papers, and records of the resident council that are pertinent to assistance received under subpart B of this part.

(r) *Reports.* The resident council shall submit reports, as required by the Commissioner, in order to demonstrate continued compliance with the requirements of this section.

(s) *Assumption of the Federally-assisted mortgage.* The resident council may not assume a mortgage insured, held or assisted by the Commissioner under part 236 of this chapter or under part 221 of this chapter and bearing a below market interest rate as provided under § 221.518(b) of this chapter.

§ 248.175 Resident homeownership program -- limited equity cooperative.

(a) Tenants may carry out a resident homeownership program through the purchase of eligible low income housing by a limited equity cooperative and the operation of the project as a limited equity cooperative.

(b) The purchase of a project by a limited equity cooperative and the operation of the project by the limited equity cooperative shall be carried out in accordance with the provisions of § 248.173 (a), (b), (c), (d), (except that paragraph (d)(i) of paragraph (d) shall include a statement of the amount of grant funds and the amount and type of incentives requested, rather than only the amount of grant funds requested), (e), (g)(3), (h), (i) (except paragraphs (i) (1) and (3)), (m), (n) and (o).

(c) The purchase and operation of eligible low income housing by a limited equity cooperative under this section shall be carried out in accordance with all provisions of subpart B of this part otherwise, applicable to the transfer and operation of a project with continued low income affordability restrictions, except as provided in this section.

§ 248.177 Delegated responsibility to State agencies.

(a) *In general.* The Commissioner shall delegate some or all responsibility for implementing subpart B of this part to a State housing agency if such agency submits a preservation plan acceptable to the Commissioner.

(b) *Approval.* State preservation plans shall be submitted in such a form and in accordance with such procedures as the Commissioner shall establish. The Commissioner may approve plans that contain:

(1) An inventory of low income housing located within the State that is or will be eligible low income housing under subpart B of this part within five years;

(2) A description of the agency's experience in the area of multifamily financing and restructuring;

(3) A description of the administrative resources that the agency will commit to the processing of plans of action in accordance with subpart B of this part;

(4) A description of the administrative resources that the agency will commit to the monitoring of approved plans of action in accordance with subpart B of this part;

(5) An independent analysis of the performance of the multifamily housing inventory financed or otherwise monitored by the agency;

(6) A certification by the public official responsible for submitting the comprehensive housing affordability strategy under section 105 of the Cranston-Gonzalez National Affordable Housing Act *(42 U.S.C. 12705)* that the proposed activities are consistent with the approved housing strategy of the State within which the eligible low income housing is located; and

(7) Such other certifications or information that the Commissioner determines to be necessary to implement an approved State preservation plan, which may include incentives that are authorized under other provisions of subpart B of this part.

(c) *Implementation agreements.* The Commissioner may enter into any agreements necessary to implement an approved State preservation plan, which may include incentives that are authorized under other provisions of subpart B of this part.

(d) *Fees.* Any State agency with responsibility so delegated under subpart B of this part may not charge any owner of eligible low income housing any fee for accepting notices of intent, processing plans of action or any other process pursuant to approval of a plan of action under subpart B of this part. This prohibition shall not preclude:

(1) An owner paying for its appraisal or share of a joint appraisal under the provisions of § 248.111; or

(2) A State agency from collecting fees normally associated with providing and processing financing insured under part 241 of this chapter.

§ 248.179 Consultation with other interested parties.

The Commissioner shall confer with any appropriate State or local government agency to confirm any State or local assistance that is available to achieve the purposes of subpart B of this part and shall give consideration to the views of any such agency when making determinations under subpart B of this part. The Commissioner shall also confer with appropriate interested parties that the Commissioner believes could assist in the development of a plan of action that best achieves the purposes of subpart B of this part.

§ 248.181 Notice to tenants.

Except as provided in §§ 248.105 and 248.133, with respect to the first and second notices of intent, with regard to all provisions of subpart B of this part which mandate that information or material be given to the tenants, by the Commissioner, the owner, or a qualified purchaser, or other party, this requirement shall be satisfied where the notifying entity:

(a) Posts a copy of the information or material in readily accessible locations within each affected building, or posts notices in each location describing the information or material and specifying a location, as convenient to the tenants as is reasonably practical, where a copy may be examined and copied during reasonable hours; and

(b) Supplies a copy of the information or material to a tenant representative, if any.

§ 248.183 Preemption of State and local laws.

(a) *In general.* No State or political subdivision of a State may establish, continue in effect, or enforce any law or regulation that:

(1) Restricts or inhibits the prepayment of any mortgage described in § 248.101 or the voluntary termination of any insurance contract pursuant to § 207.253 of this chapter on eligible low income housing projects;

(2) Restricts or inhibits an owner of such projects from receiving the authorized annual return provided under § 248.121;

(3) Is inconsistent with any provision of subpart B of this part, including any law, regulation, or other restriction that limits or impairs the ability of any owner of eligible low income housing to receive incentives authorized under subpart B of this part, including authorization to increase rental rates, transfer the project, obtain secondary financing, or use the proceeds of any such incentives; or

(4) In its applicability to low income housing is limited only to eligible low income housing for which the owner has prepaid the mortgage or terminated the insurance contract.

(b) *Effect.* Any law, regulation or restriction described in paragraph (a) of this section shall be ineffective and any eligible low income housing exempt from the law, regulation, or restriction, only to the extent that it violates the provisions of this section.

(c) *Law of general applicability; contractual restrictions.* This section shall not prevent the establishment, continuing in effect, or enforcement of any law or regulation of any State or political subdivision of a State not inconsistent with the provisions of subpart B of this part and relating to building standards, zoning limitations, health, safety, or habitability standards for housing, rent control, or conversion of rental housing to condominium or cooperative ownership, to the extent such law or regulation is of general applicability to both projects receiving Federal assistance and nonassisted projects. This section shall not preempt, annul, or alter any contractual restrictions or

obligations existing before November 28, 1990 or voluntarily entered into by an owner of eligible low income housing on or after that date, and that limit or prevent that owner from prepaying the mortgage on the project or terminating the mortgage insurance contract.

15a. The subpart heading for newly designated subpart C is revised to read as follows:

Subpart C -- Prepayment and Plans of Action Under the Emergency Low Income Preservation Act of 1987

16. In § 248.213, paragraph (b)(9) is redesignated as paragraph (b)(10) and a new paragraph (b)(9) is added to read as follows:

§ 248.213 Plan of action.

* * * * *

(b) * * *

(9) A list of any waivers requested by the owner pursuant to § 248.7 of this part; and

* * * * *

17. Section 248.221 is amended by adding new paragraphs (c) and (d) to read as follows:

§ 248.221 Approval of a plan of action that involves termination of low income affordability restrictions.

* * * * *

(c) There are no open audit findings, open findings of noncompliance with title VI of the Civil Rights Act of 1964 *(42 U.S.C. 2000d);* the Fair Housing Act *(42 U.S.C. 3601*-3619); Executive Order 11063 (3 CFR 1959-1963 comp., p. 652); the Age Discrimination Act of 1975 *(42 U.S.C. 6101*-6107); section 504 of the Rehabilitation Act of 1973 *(29 U.S.C. 794);* and all regulations promulgated under such statutes and authorities (including, but not limited to, 24 CFR part 100), or outstanding violations of the regulatory agreement.

(d) Any plan of action approved under this section shall specify actions that the Commissioner and the owner shall take to ensure that tenants displaced as a result of the termination of low income affordability restrictions are relocated to affordable housing.

18. Section 248.233 is amended by adding a new paragraph (f) to read as follows:

§ 248.233 Approval of a plan of action that includes incentives.

* * * * *

(f) The Commissioner shall not approve a plan of action under this section if there are open findings of noncompliance with title VI of the Civil Rights Act of 1964 *(42 U.S.C. 2000d);* the Fair Housing Act *(42 U.S.C. 3601*-3619); Executive Order 11063 (3 CFR 1959-1963 comp., p. 652); the Age Discrimination Act of 1975 *(42 U.S.C. 6101*-6107); section 504 of the Rehabilitation Act of 1973 *(29 U.S.C. 794);* and all regulations promulgated under such statutes and authorities, or if there are open audit findings with respect to violations of the regulatory agreement.

19. In § 248.234, paragraph (c) is redesignated as paragraph (d), and a new paragraph (c) is added to read as follows:

§ 248.234 Section 8 rental assistance.

* * * * *

(c) The approved plan of action shall specify actions that the Commissioner and the owner shall take to ensure that any tenants displaced as a result of actions taken under paragraph (b) of this section are relocated to affordable housing.

* * * * *

§ 248.235 [Removed]

20. Section 248.235 is removed.

20a. A new subpart D (consisting of §§ 248.300 through 248.319) is added to read as follows:

Subpart D -- State Preservation Project Assistance

248.300 General.

248.301 Initial application.

248.303 Approval of a State agency's initial application.

248.305 Applicability of subpart B of this part.

248.307 Authority to process and approve notices of intent and plans of action.

248.311 Notice of intent.

248.315 Preservation agreements.

248.319 Application for assistance.

Subpart D -- State Preservation Project Assistance

§ 248.300 General.

Upon application by a State agency or a local public housing agency, the Commissioner may make available assistance for use in preventing the loss of housing affordable for low and moderate income families that is assisted under a State program under the terms of which the owner may prepay a State assisted or subsidized mortgage on such housing.

§ 248.301 Initial application.

A State agency shall make an initial application to the Commissioner which:

(a) Describes the manner by which the State housing program provides mortgage assistance or subsidy to private mortgagors to provide housing opportunities for low and moderate income families;

(b) Includes copies of the authorizing legislation, any implementing regulations and any administrative guidance provided to owners;

(c) Includes a comprehensive description of the terms and conditions under which a private owner may prepay the assisted or subsidized mortgage without the prior consent of the State agency;

(d) Includes a complete set of pro forma mortgage and/or regulatory documents which evidence an owner's ability to prepay the assisted or subsidized mortgage without the consent of the State agency;

(e) Includes a list of all properties assisted under the State or local housing program whose owners are eligible to prepay the assisted or subsidized mortgages without the consent of the State agency.

§ 248.303 Approval of a State agency's initial application.

(a) The Commissioner will evaluate the State agency's application and will notify the State agency within 90 days of receipt that the program and properties qualify under subpart D of this part or that the program and properties do not qualify under subpart D of this part.

(b) If the Commissioner determines that the program and projects do not qualify under subpart D of this part, it will state the reasons why the program and properties do not qualify and will give the State agency an opportunity to provide additional information, as the Commissioner determines, which would assist the Commissioner in qualifying the program and properties.

§ 248.305 Applicability of subpart B of this part.

The provisions of subpart B of this part shall be applicable to any application of a State agency or local housing authority for assistance under subpart D of this part, except the following provisions:

Sec.

248.103 General prepayment limitation.

248.105 Notice of intent.

248.131 Information from the Commissioner: Only paragraph (a).

248.141 Criteria for approval of a plan of action involving prepayment and voluntary termination.

248.153 Incentives to extend low income use: Only paragraphs (a)(7), (d) and (e).

248.165 Assistance for displaced tenants.

248.169 Permissible prepayment or voluntary termination and modification of commitments.

248.173 Resident homeownership program: Only paragraph (s).

248.177 Delegated responsibility to State agencies.

§ 248.307 Authority to process and approve notices of intent and plans of action.

(a) *Delegation of authority.* State agencies which regulate or otherwise supervise owners of projects with State assisted or subsidized mortgages shall have the authority, reserved to the Commissioner under subpart B of this part, to process and approve all notices of intent and plans of action submitted to the State agency or local housing authority under subpart D of this part. State agencies may redelegate such authority to local housing authorities at their discretion.

(b) *Designation of processing agency.* The Executive Director of the State agency whose State assisted or subsidized mortgage program has been approved under § 248.303 shall inform all owners of projects with State assisted or subsidized mortgages that the State agency or a designated local housing authority shall accept and process notices of intent and plans of action.

§ 248.311 Notice of intent.

(a) *Eligibility for filing.* An owner of a project with a State assisted or subsidized mortgage intending to extend the low income affordability restrictions of the housing in accordance with § 248.153 or transfer the housing to a qualified purchaser under § 248.157 may file a notice of intent.

(b) *Filing with the State agency.* The notice of intent shall be filed with the agency specified in § 248.307(b) or the agency which regulates or otherwise supervises the State assisted or subsidized mortgage. The notice of intent shall also request the tenants to notify the owner and the State agency of any individual or organization that has been designated or retained by the tenants to represent the tenants with respect to the actions to be taken under subpart B and subpart D of this part.

(c) *Filing with HUD, mortgagee and tenants.* The owner simultaneously shall file the notice of intent with the local HUD field office having jurisdiction over the area in which the project is located and with the mortgagee, if any. In addition, the owner shall deliver a copy of the notice of intent to each tenant in the project and to any tenant representative, if any, known to the owner, and shall post a copy of the notice of intent in readily accessible locations within each affected building of the project. The copies of the notice of intent delivered to the tenants and the tenant representative shall include a summary of possible outcomes of the filing which shall be furnished by the State agency. Upon the request of any non-English speaking tenants residing in the affected project, the owner shall tabulate the number and type of translations needed by the tenants and request the State agency to provide the appropriate translations. The owner shall deliver a copy of the translated notice of intent to all of the tenants who requested such a translation. The failure of an owner to comply with any non-federal notice requirements shall not invalidate the notice of intent.

§ 248.315 Preservation agreements.

(a) *Agreements required.* Owners of projects with State assisted or subsidized mortgages whose plans of action have been approved under § 248.307 shall enter into agreements, contracts and/or mortgage modifications with the State agency or local housing authority to maintain the housing as affordable to tenants in accordance with § 248.145. Such

agreements may provide for the renewal of any assistance made available under § 248.319(c).

(b) *Term of agreement.* Preservation agreements shall be coterminous with the expiration of any assistance provided under § 248.153 and made available in accordance with § 248.319(c).

§ 248.319 Application for assistance.

(a) *Application for assistance.* State agencies or local housing authorities shall submit an application for assistance in a form prescribed by the Commissioner with the local HUD field office having jurisdiction over the project. The application shall include:

(1) A copy of the approved plan of action, including all applicable notices of intent;

(2) A copy of any worksheet or other document which demonstrates the extension and transfer preservation values of the project, the Federal cost limits (including the determination of relevant local market rents if applicable), and the preservation rents;

(3) A request for each incentive required as part of the approved plan of action and the amount thereof;

(4) A demonstration and certification by the Executive Director of the State agency or local housing authority that the assistance and incentives requested as part of the approved plan of action do not exceed the level of incentives required for a similarly situated project which is eligible low income housing as defined in subpart B of this part;

(5) Copies of proposed agreements, contracts and mortgage modifications proposed pursuant to § 248.315.

(b) *Notification of approval.* Not later than 90 days after receipt of the application for assistance, the local HUD field office shall notify the Executive Director of the State agency or local housing authority of the approval or disapproval of the application. If the application is disapproved, the notification shall state the reasons therefor and afford the State agency or local housing authority the opportunity to revise the application to make it approvable.

(c) *Funding.* After approving the State agency's or local housing authority's application for assistance, the HUD field office shall make the assistance in the approved application available to the State agency or local housing authority within the time frames specified in § 248.169.

(d) *Agreements.* The State agency or local housing authority shall provide the local HUD field office with a copy of all agreements entered into with the owner pursuant to § 248.315.

(e) *Section 8 contract administration.* Any contract for Section 8 assistance made pursuant to the approved plan of action, the State agency's or local housing authority's application for assistance and the regulations at 24 CFR 886, subpart A shall be administered by the State agency or local housing authority pursuant to § 886.120 of this title.

Dated: March 6, 1992.

Jack Kemp,

Secretary.
[FR Doc. 92-7512 Filed 4-7-92; 8:45 am]

BILLING CODE 4210-32-M

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
ADDITIONAL ASSISTANCE PROGRAM FOR PROJECTS WITH HUD-INSURED AND HUD-HELD MORTGAGES
24 CFR PART 886, SUBPART A

HOUSING ASSISTANCE PAYMENTS (HAP) CONTRACT RENEWAL

This Contract is between the United States of America, acting through the Department of Housing and Urban Development (called "HUD"), and Suehar Realty Inc. (called "Owner"). This Contract is executed pursuant to the United States Housing Act of 1937 (called the "Act"), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq. The housing project covered by this Contract is identified as follows:

Project Name: Suehar Realty Inc. City: New York
Street Address: 62-64-66 West 107th Street
Section 8 No.: NY36-M000-246 County: New York

I. Sections 1 through 28 and Exhibits A and B of the Initial/Renewal Contract beginning August 1, 19 83 and continuing through July 31, 19 88, are incorporated herein by reference as if fully set forth hereafter.

II. Sections 5 and 6a are modified as follows:

Section 5. Term of Contract. This Contract shall run for a period of five years, beginning August 1, 19 88, and continuing through July 31, 19 93. This Contract may be renewed for one additional five-year periods at the option of the Owner ~~and HUD.~~

Section 6. Maximum Amount of Housing Assistance Payments

Maximum Annual Contract Commitment. Notwithstanding any other provision of this Contract (other than Paragraph b) or any other contract between HUD and the Owner, HUD shall not be obligated to make assistance payments and pay FHA fees, if any, in excess of $ 242,224 under this Contract during any contract year. In addition, HUD shall not be obligated to pay assistance for more than the total number of contract units shown in Exhibit B.

III. All other sections of the contract shall remain the same.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Section 29. Signatures.

| | |
|---|---|
| Owner ______________________ | HUD ______________________ |
| By ______________________ | By ______________________ |
| Name | Name |
| Official Title | Official Title |
| Date ______________, 19__ | Date ______________, 19__ |

Kelly Decl. Ex. C



IRH 0082931

13

FHA FORM NO. 4187-D
(CORPORATE)
Revised October 1966

# DEED OF TRUST NOTE

Baltimore, Maryland
~~Virginia~~,

$ 2,597,200.00 May 15, 19 70

FOR VALUE RECEIVED, the undersigned, TOWN AND COUNTRY APARTMENTS AND TOWNHOUSES promise(s) to pay to the order of THE EQUITABLE TRUST COMPANY a corporation organized and existing under the laws of Maryland, the principal sum of TWO MILLION, FIVE HUNDRED NINETY SEVEN THOUSAND, TWO HUNDRED Dollars ($ 2,597,200.00), with interest from date at the rate of eight & one-half centum ( 8-1/2 %) per annum on the unpaid balance until paid. The said principal and interest shall be payable in monthly installments as follows: (see attached rider):

Interest alone payable monthly on the first day of June, 1970, and on the first day of each month thereafter to and including November 1, 1971. Thereafter commencing on the first day of December, 1971, installments of interest and principal shall be paid in the sum of NINETEEN THOUSAND, THIRTY NINE AND 92/100 Dollars ($19,039.92), each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid. In any event the balance of principal (if any) remaining unpaid, plus accrued interest shall be due and payable on November 1, 2011. The installments of interest and principal shall be applied first to interest at the rate of eight and one-half per centum (8-1/2%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid, and the balance thereof shall be applied on account of principal.

In the event that any payment due under the deed of trust securing this note shall become overdue for a period in excess of fifteen (15) days, a "late charge" of two cents (2¢) for each "dollar" ($1.00) of principal and interest so overdue may be charged by the holder hereof for the purpose of defraying the expenses incident to handling such delinquent payments.

In the event of prepayment of principal during any one calendar year in an amount in excess of 15 percent of the original principal amount of the note, all parties liable for payment thereof hereby agree to be jointly and severally bound to pay to the holder hereof for its own account a premium or charge equal to 3 percent of the amount of such excess less 1/8th of 1 percent for each 12-month period which has elapsed since the date of the note.

The debt evidenced by this note may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner except where: (1) the prepayment is in connection with the release of an individual unit for sale to a lower income, elderly, or handicapped person; or (2) the maker is a limited distribution mortgagor which is not receiving payments from the Commissioner under a Rent Supplement Contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of twenty years from the date of final endorsement or as a result of a sale of the project to a cooperative, or non-profit corporation or association and the purchase is financed with a mortgage insured pursuant to Section 236 (j) (3) of the National Housing Act, as amended.

If default be made in the payment of any installment under this Note, and if such default is not made good prior to the due date of the next such installment, the entire principal sum and accrued interest shall at once become due and payable without notice, at the option of the holder of this Note. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, and if the same is collected by an attorney at law, the undersigned hereby agree(s) to pay all costs of collection, including a reasonable attorney's fee.

No default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal already made pursuant to the privilege of prepayment set forth in the deed of trust securing this Note equals or exceeds the amount of such required installment of principal.

All parties to this Note, whether principal, surety, guarantor, or endorser, hereby waive presentment for payment, demand, protest, notice of protest, and notice of dishonor.

Kelly Decl. Ex. D

The makers hereof (i.e., Ben Cohen, Zelda G. Cohen, Rosalee C. Davison and Richard Davison, d/b/a/ Town and Country Apartments and Townhouses) assume no liability (individually or jointly and severally) for the payment hereof except as set out in the Deed of Trust of even date herewith given to secure this indebtedness.

This Note and the interest are secured by first Deed of Trust of even date herewith on property located in Richmond County, Commonwealth of Virginia.

TOWN AND COUNTRY APARTMENTS AND TOWNHOUSES

WITNESS AS TO ALL:

ROGER PEED
Roger Peed

By BEN COHEN (SEAL)
Ben Cohen, Partner

By ZELDA G. COHEN (SEAL)
Zelda G. Cohen

By ROSALEE C. DAVISON (SEAL)
Rosalee C. Davison

By RICHARD DAVISON (SEAL)
Richard Davison

Trustee

COMMONWEALTH OF VIRGINIA

LOAN NO.

**Deed Of Trust Note**

TO

No. 051-44037-LD

Insured under 236 of the National Housing Act and Regulations published thereunder

In effect on February 19, 1970

To the extent of advances approved by the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner

By /s/ W Edwin Lipscombe
(Authorized Agent)

Date May 18, 1970

A total sum of $ 2,570,700 has been approved for insurance hereunder by the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner

By /s/ W Edwin Lipscombe
(Authorized Agent)

Date December 17, 1971

Reference is made to the Act and to the Regulations thereunder covering assignments of the insurance protection on this Note.

43564-P Rev. 10/68 FHA-Wash., D. C.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ALGONQUIN HEIGHTS, et al.,** <br> **Plaintiffs,** <br> **v.** <br> **THE UNITED STATES,** <br> **Defendant.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **No. 97-582C** <br> **(Judge Margaret M. Sweeney)** |

**DECLARATION OF RICHARD DAVISON**

Richard Davison., being duly sworn, deposes and states as follows:

1. My name is Richard Davison. I am over the age of eighteen and competent to testify in this case. I make this declaration based on my personal knowledge.

2. I am the Managing General Partners of Town and Country Apartments and Townhouses, a Virginia partnership ("Town & Country"), which is one of the plaintiffs in the above-captioned litigation. Town and Country is the owner of Town and Country Apartments and Townhouses in Richmond, Virginia (the "Property").

3. The Property was constructed in two phases. Both phases participated in the Section 236 program. Town & Country was a limited dividend mortgagor under the Section 236 program with respect to both phases. Town & Country did not participate in the rent supplement program with respect to either phase.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 8, 2008.

Richard Davison

Richard Davison

(2)

BOOK 359 PAGE 259

U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION

FHA FORM NO. 3136
Rev. 9/69
(Previous edition obsolete)

# REGULATORY AGREEMENT FOR LIMITED DISTRIBUTION MORTGAGORS UNDER SECTION 236 OF THE NATIONAL HOUSING ACT, AS AMENDED

Project No. 051-44037-LD

Mortgagee THE EQUITABLE TRUST COMPANY

Amount of Mortgage Note $2,597,200.00 Date May 15, 1970

Mortgage: Recorded: Virginia State City of Richmond ~~County~~ Date 5/ /70.

Book Page

This Agreement entered into this 15th day of May, 19 70,

between TOWN AND COUNTRY APARTMENTS AND TOWNHOUSES

whose address is 1229 Mt. Royal Avenue, Baltimore, Maryland

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors, acting by and through the Federal Housing Commissioner (hereinafter called Commissioner).

In consideration of the endorsement for insurance by the Commissioner of the above described note or in consideration of the consent of the Commissioner to the transfer of the mortgaged property, and in order to comply with the requirements of Section 236 of the National Housing Act, as amended, and the Regulations adopted by the Commissioner pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Commissioner shall be the owner, holder or reinsurer of the mortgage, or during any time the Commissioner is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 17 hereof, shall promptly make all payments due under the note and mortgage; provided, however, that the Commissioner shall make payments to the mortgagee on behalf of the Owners in accordance with the interest reduction contract between the mortgagee and the Commissioner.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Commissioner of an amount equal to $ 806.42 per month unless a different date or amount is approved in writing by the Commissioner. Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America, shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Commissioner. In the event of a default in the terms of the Mortgage, pursuant to which the loan has been accelerated, the Commissioner may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved or required in writing by the Commissioner.

(c) Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, within 60 days after the end of the semiannual or annual fiscal period within which such receipts are realized. Residual receipts shall be under the control of the Commissioner, and shall be disbursed only on the direction of the Commissioner, who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. The Owners covenant and agree that:

(a) with the prior approval of the Commissioner, they will establish for each dwelling unit (1) a basic rental charge determined on the basis of operating the project with payments of principal and interest under a mortgage bearing interest at one percent and (2) a fair market rental charge determined on the basis of operating the project with payments of principal, interest and mortgage insurance premiums due under the insured mortgage on the project;

Kelly Decl. Ex. E

(b) the rental charged for each unit, which will include all utilities except telephone, will be equal to 25% of the tenant's income or the basic rental, whichever is greater, but in no event shall the rental charged exceed the fair market rental;

(c) they shall limit admission to the project to those families whose incomes do not exceed the limits prescribed by the Commissioner, with the exception of those tenants who agree to pay fair market rental;

(d) preference for occupancy shall be given to those families displaced from an urban renewal area, or as a result of governmental action, or as a result of a disaster determined by the President to be a major disaster, and to those families whose incomes are within the lowest practicable limits for obtaining rental units in the project;

(e) on forms approved by the Commissioner they will obtain from each prospective tenant, prior to admission to the project, a certification of income, and a recertification of income from all tenants who are not paying fair market rental at intervals as required by the Commissioner;

(f) if any recertification reveals a change in income whereby the tenant becomes eligible for a lower or higher rental, such adjustment in rental charged shall be made, provided that rental shall never be less than basic rental and shall never exceed fair market rental;

(g) in a manner prescribed by the Commissioner, they will obtain written evidence substantiating the information given on the tenants' certifications and recertifications of income and shall retain the evidence in their files for three years;

(h) they shall require all tenants who do not pay the fair market rental to execute a lease in the form prescribed by the Commissioner, and shall not rent any unit in the project for less than 30 days nor more than one year;

(i) they shall remit to the Commissioner on or before the tenth day of each month the amount by which the total rentals collected on the dwelling units exceeds the sum of the approved basic rentals for all occupied units, which remittance shall be accompanied by a monthly report on a form approved by the Commissioner, provided that a monthly report must be filed even if no remittance is required;

(j) they shall not restrict occupancy by reason of the fact that there are children in the family, except in those projects that are designed primarily for elderly persons;

(k) they will rent commercial facilities, if any, at not less than the rental approved by the Commissioner;

(l) no change will be made in the basic rental or fair market rental unless approved by the Commissioner;

(m) no tenant shall be permitted to rent more than one unit at any given time without the prior written approval of the Commissioner;

(n) if there are rent supplement units in the project, the determination as to the eligibility of tenants for admission to such units and the conditions of continued occupancy shall be in accordance with the Rent Supplement Contract executed by the Owners and the Commissioner which is incorporated in and made a part of this Agreement.

5. Upon prior written approval of the Commissioner, the Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owner or others to such tenant upon his request, in addition to the facilities and services included in the approved Rental Schedule.

6. Owners shall not without the prior written approval of the Commissioner:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property;

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds, other than from surplus cash, except for reasonable operating expenses and necessary repairs;

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the mortgaged property, or the interest of any general partner in a partnership owning the mortgaged property, or any right to manage or receive the rents and profits from the mortgaged property;

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project;

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project, except from surplus cash and except on the following conditions:

(1) All distributions shall be made only as of or after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Commissioner; and the right to such distribution shall be cumulative;

(2) No distribution shall be made from borrowed funds or prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds;

(4) There shall have been compliance with all outstanding notices of requirements for proper maintainance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project;

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any fund collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account;

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Commissioner;

(i) Incur any liability, direct or contingent, other than for current operating expenses, exclusive of the indebtedness secured by the mortgage and necessarily incident to the execution and delivery thereof;

(j) Pay any compensation, including wages or salaries, or incur any obligations, to themselves, or any officers, directors, stockholders, trustees, partners, beneficiaries under a trust, or to any of their nominees;

(k) Enter into any contract or contracts for supervisory or managerial services.

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

8. Owners shall not file any petition in bankruptcy, or for a receiver, or in insolvency, or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors or permit an adjudication in bankruptcy, the taking possession of the mortgaged property or any part thereof by a receiver, or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale and fail to have such adverse actions set aside within forty-five days.

9. (a) Owners shall provide for the management of the project in a manner satisfactory to the Commissioner. Any management contract entered into by Owners, or any of them, involving the project shall contain a provision that it shall be subject to termination, without penalty and with or without cause, upon written request by the Commissioner addressed to the Owners. Upon receipt of such request Owners shall immediately terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Commissioner for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and shall be subject to examination and inspection at any reasonable time by the Commissioner or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Commissioner or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Commissioner.

(e) Within sixty days following the end of each fiscal year the Commissioner shall be furnished with a complete annual financial report based upon an examination of the books and records of the mortgagor prepared in accordance with the requirements of the Commissioner certified to by an officer or responsible Owner and, when required by the Commissioner, prepared and certified by a Certified Public Accountant, or other person acceptable to the Commissioner.

(f) At the request of the Commissioner, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project, remittances to the Commissioner as required under Paragraph 4(i) above, or for distributions of surplus cash as limited by Paragraph 6(e) above. Any owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust.

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, creed, or national origin, including Title VI of the Civil Rights Act of 1964 (Public Law 88-352, 78 Stat. 241), all requirements imposed by or pursuant to the Regulations of the Department of Housing and Urban Development (24 CFR, Subtitle A, Part 1) issued pursuant to that title, and regulations issued pursuant to Executive Order 11063.

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Commissioner may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Commissioner, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Commissioner within thirty days after the date such notice is mailed or within such further time as the Commissioner reasonably determines is necessary to correct the violation, without further notice the Commissioner may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Commissioner may:

(a)(1) If the Commissioner holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(2) If said note is not held by the Commissioner - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and the holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Commissioner as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the mortgagor's obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Commissioner in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Commissioner arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain;

(e) Terminate the interest reduction payments to the mortgagee made pursuant to Paragraph 1 hereinabove.

12. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Commissioner because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Commissioner their rights to the rents, profits, income and charges of whatever sort which they may receive or be entitled to receive from the operation of the mortgaged property,, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", and any other security for the note identified herein, and endorsed for insurance or held by the Commissioner;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Mortgagor" means the original borrower under the mortgage and its successors and assigns;

(d) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors and assigns;

(e) "Mortgaged Property" includes all property, real, personal, or mixed covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Commissioner;

(f) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is to provide housing and other such activities as are incidental thereto;

(g) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the mortgage insured or held by the Commissioner unless funds for payment are set aside or deferment of payment has been approved by the Commissioner;

(iv) Remittances due to the Commissioner as required by Paragraph 4(i); and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held;

(iii) That portion of rentals which must be remitted to the Commissioner in accordance with Paragraph 4(i), but not yet due.

(h) "Residual Receipts" means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of all distributions as that term is defined below and as limited by Paragraph 6(e) hereof;

(i) "Family" means (1) two or more persons related by blood, marriage, or operation of law, who occupy the same unit; (2) a handicapped person who has a physical impairment which is expected to be of long continued and indefinite duration, substantially impedes his ability to live independently, and is of such a nature that his ability to live independently could be improved by more suitable housing conditions; (3) a single person, 62 years of age or older; or (4) a single person less than 62 years of age provided that occupancy by such persons is limited to 10% of the dwelling units in the project;

(j) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project;

(k) "Income" means the gross annual income of the family from all sources before taxes and withholding, after giving effect to exclusions allowed by the Commissioner;

(l) "Default" means a default declared by the Commissioner when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Commissioner after written notice.

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Commissioner and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Commissioner shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provision of this Agreement shall not effect the validity of the remaining portions thereof.

17. The following Owners: Ben Cohen, Zelda G. Cohen, Rosalee C. Davison and Richard Davison do not assume personal liability for payments due under the note and mortgage, to the reserve for replacements, or for matters not under their control, except:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first hereinabove written.

TOWN AND COUNTRY APARTMENTS AND TOWNHOUSES
*Owners*

~~SEAL~~X

By _______________ (SEAL)
Ben Cohen, Partner

WITNESS AT TO ALL:

By _______________ (SEAL)
Zelda G. Cohen, Partner

_______________
Roger Reed

By _______________ (SEAL)
Rosalee C. Davison, Partner

_______________ (SEAL)
Richard Davison, Partner

SECRETARY OF HOUSING AND URBAN DEVELOPMENT acting by and through the FEDERAL HOUSING COMMISSIONER

_______________

By _______________
*Authorized Agent*

STATE OF MARYLAND )
COUNTY OF BALTIMORE ) SS:
~~(Add proper acknowledgments)~~

I, the undersigned Notary Public in and for the County and State aforesaid, do hereby certify that Ben Cohen, Zelda G. Cohen, Rosalee C. Davison and Richard Davison, whose names as Partners of TOWN AND COUNTY APARTMENTS AND TOWNHOUSES are signed to the foregoing instrument bearing date as of May 15, 1970, have acknowledged the same before me in the County of Baltimore, State of Maryland.

Given under my hand this 15th day of May, 1970.

_______________
Dorothy G. Cully, Notary Public

My commission expires: July 1, 1970.

STATE OF VIRGINIA )
) ss:
CITY OF RICHMOND )

On this 18th day of May, 1970, before me personally appeared W. Edwin Lipscombe, to me personally known and known to me to be the duly appointed Authorized Agent and the person who executed the aforesaid instrument bearing date of May 15, 1970, by virtue of the authority vested in him by 24 C.F.R. 200.96, and acknowledged that he executed the aforesaid instrument for and on behalf of the Federal Housing Commissioner, for the purpose therein expressed.

Witness my hand and seal of office.

Gerald Press
Notary Public

My commission expires: January 16, 1972

BOOK 359 PAGE 266

All that property situate and being in the City of Richmond, Commonwealth of Virginia, and more particularly described as follows:

Beginning at an iron rod marking the southwest corner of the H. G. Cordle, Jr. property, said rod being N73° 03' 20" W, 275.00' from an iron rod on the west line of Whitehead Road 1330.57' north of the north line of Elkhardt Road; thence S16° 56' 40" W, 33.00'" thence N73° 03' 20" W, 102.69'; thence S16° 56' 40" W, 50.00'; thence N73° 03' 20" W, 30.00'; thence along a curve to the left having a radius of 286.68; 422.69'; thence S 22° 28' W, 82.50; thence along a curve to the left having a radius of 144.40; 135.00'; thence S40° 44' 02" W, 73.80'; thence along a curve to the left having a radius of 439.28', 75.00', the chord bearing being N73° 22' 32" W; thence N76° 16' 00" W, 40.83'; thence along a curve to the left having a radius of 527.45'; 56.91'; thence along a curve to the left having a radius of 20.00', 11.40', the chord bearing being S20° 10' 25"W; thence S3° 50' 58" W, 369.70'; thence N86° 09' 02 W, 155.22'; thence S14° 28' 26" W, 79.99'; thence along a curve to the left having a radius of 210.56', 57.07', having a chord bearing of S67° 45' 40" E; thence S75° 31' 34" E, 45.50'; thence S14° 28' 26" W, 45.00': thence N75 31' 34" W, 45.50', thence along a curve to the right having a radius of 255.56', 178.03'; thence along a line radial to the aforementioned curve, S54° 23' 16" W, 20.00'; thence S70° 45' 24" W, 135.22' to a point on the east line of Route No. 150; thence along the east line of Route No. 150 on a curve to the right having a radius of 374.26', 18.17' to a Virginia Department of Highways Monument; then continuing along the east line of Route No. 150, N19° 14' 46" W, 895.06' to a Virginia Department of Highways Monument; thence along a curve to the right having a radius of 374.26', 224.26' to a Virginia Department of Highways Monument on the east line of Flynn Road; thence along the east line of Flynn Road N15° 10' 30" E, 14.33'; thence S80° 39' 00" E, 112.90', thence N89° 32' 28" E, 31.38' along a line radial to the curve next to be described, thence along a curve to the left having a radius of 405.27', 27.99'; thence N 85° 35' 00" E, 65.00'; thence S4° 25' 00" E, 53.76'; thence N85° 35' 00" E, 120.36'; thence S14° 05' 08" E, 187.18'; thence N80° 30' 40" E, 110.69'; thence S09° 29' 20" E, 8.77'; thence N80° 30' 40" E, 65.00'; thence S09° 29' 20" E, 20.50'; thence N80° 30' 40" E, 87.00'; thence S09° 29' 20" E, 76.83'; thence S49° 06' 14" E, 293.18', thence along a curve to the left having a radius of 186.21'; 71.40', the chord bearing being N33° 27' 08" E; thence N22° 28' 00" E, 82.50'; thence along a curve to the right having a radius of 336.68, 130.00'; thence along a line radial to the aforementioned curve, N45° 24' 36" W, 290.34'; thence N82° 51' 18" E, 501.96'; thence S68° 59' 10" E, 227.85'; thence S15° 35' 10" W, 110.00' along the western rear line of the H. G. Cordle, Jr. property to the point and place of beginning and containing 16.23 acres, all as shown on a plat by J. K. Timmons & Associates, Civil Engineers, dated April 14, 1970 entitled "Property Lying on East Line of Chippenham Pkwy. at Flynn Road".

R.D.
~~[illegible]~~ CP CR
3 J. G.
[illegible]

Virginia:
In the Clerk's Office of the Hustings Court of the City of Richmond, Part II, this instrument was presented MAY 18 1970 11:30 a.m. and with Certificate annexed, admitted to record.
Ava R. Purdy Clerk

No. 1240
State Tax .15
Trf. fee
City Tax .05
C 's Fee 7.00
Cl rk's
Total 7.20 pd
D.B. PG.

Exhibit A



DOJ0040349

**Initial Notice of Intent To Terminate or Extend Low–Income Affordability Restrictions**

U. S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

(Pursuant to Section 212 of the Low–Income Housing Preservation and Resident Homeownership Act of 1990)

Public reporting burden for the collection of information is estimated to average 2.0 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of the collection of information, including suggestions for reducing the burden, to the Reports Management Officer, Office of Information Policies and Systems, U. S. Department of Housing and Urban Development, Washington, DC 20410–3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502–0459), Washington DC 20502. Do not send the completed form to either of these addresses.

This Notice must be filed simultaneously with (1) the local HUD Field Office, (2) the chief executive officer of the appropriate State or local government, (3) the mortgagee, (4) tenants of the property, and (5) all known representatives of the tenants.

1. Date of this Notice 9/14/93

2. Purpose of This Notice (Check one):

[X] **Extend** the low–income affordability restrictions by requesting incentives; or
[ ] Offer to Sell the housing to a qualified purchaser,
[ ] Terminate the low–income affordability restrictions through prepayment of the mortgage or voluntary termination of the mortgage insurance.

3. Borrower and Project Information:

a. Borrower/Entity: Town and Country Apartments and Townhouses
b. FHA Project Number: 051–44037–LD
c. State Agency Project Number (if project is Section 236 non–insured): N/A
d. Project Name: Town and Country Apartments and Townhouses, Section I
e. Project Address (include City, State and Zip Code): 6551 Elmbridge Road, Richmond, VA 23225
f. Date of Final Endorsement: December 16, 1971

4. Name of Mortgagee: Federal National Mortgage Association

5. Name of State or local Agency Receiving this Notice of Intent: The Mayor, City of Richmond

6. Owner's Certification:

I, the undersigned, certify that this Notice of Intent has been submitted and distributed in accordance with the requirements of the statute as specified above.

[X] I certify that I know of no tenant representative.

Under the penalties and provisions of Title 18, United States Code, Section 1001, the statements contained in the request and its attachments have been examined by me and, to the best of my knowledge and belief, are true, correct, and complete.

Signature (Owner) Richard Davison    Date 9/14/93

Name (Owner) Richard Davison, Managing General Partner

Address (include City, State and Zip Code):
Town and Country Apartments and Townhouses
c/o Mount Royal Management
1233 Mount Royal Avenue
Baltimore, MD 21217

**Residents**

Important Information about this Notice of Intent is on the back of this form.

ref. Handbook 4350.6    Form HUD–9608 (4/3/92)

Kelly Decl. Ex. F

Notice to: All Residents of (Project Name) **Town and Country Apartments and Townhouses, Section I Richmond, VA**

From: U. S. Department of Housing and Urban Development
Subject: Future Plans for Your Apartment Building

The other side of this form is a copy of a Notice sent by the owner of your apartment building to the U. S. Department of Housing and Urban Development (HUD). The Notice tells HUD about the owner's future plans for the project. The owner has checked one of three boxes which say "Extend," "Offer to Sell," or "Terminate." Because of a law passed by Congress in November of 1990, the owner will be able to act upon these plans only if HUD approves.

The owner has checked the box labeled **Extend**

If the box next to "Extend" or "Offer to Sell" has been checked, this means that the owner wants to work with HUD to keep the building affordable to you and other tenants, or sell it to someone who will keep it affordable. However, it is still possible that the owner may be allowed to pay off the mortgage. If the owner does, you may get assistance under certain circumstances which will be explained to you in another letter.

In addition, if the owner is planning to "Extend" or "Offer to Sell" the project, you may let HUD or a tenant representative shown below know if you think repairs need to be done, and what they are. Another Notice will be posted in the next few weeks asking you again to let us know what repairs are needed. Once that Notice is posted, you will have only a few days to get your answers to us.

There is also the possibiltiy that an organization of tenants may be able to buy this project. This kind of organization can either continue to rent to you or sell to tenants who want to own their own apartments. If this is the case, we will let you know, or you can have a tenant representative call the HUD office for more information.

If the box next to "Terminate" has been checked, this means that the owner wants to pay off the mortgage. The rents in your building might then increase. Before HUD would allow the owner to do this, the owner must prove that this action will not hurt tenants. The owner would have to show that, in your area, rents at other buildings are about the same as yours, and/or there are other available, affordable apartments in your area to which you could move.

HUD will send you a letter explaining any decisions that are made or actions that are taken. The owner will be providing any tenant representative(s) with much more information than we are able to post. These representative(s) can then explain to you what is happening. The owner knows of the following tenant representative(s):

| | | | |
|---|---|---|---|
| Name | None | Name | |
| Address | | Address | |
| | | | |
| Telephone No. | | Telephone No. | |

If there is any other organization or individual who will be representing the tenants of this project, please let both the owner and HUD know.

All questions and other comments for HUD should be made to the following address and telephone number:

Office **Richmond Office**
Address **3600 West Broad; PO Box 90331**
City, State, Zip code: **Richmond, VA 23230-0331**
Attention: Chief, Loan Management Branch
Telephone: **(804) 278-4510**

Form HUD-9608

U. S. Department of Housing and Urban Development

Richmond Field Office, Region III
P.O. BOX 90331
3600 W. Broad Street
Richmond, VA 23230-0331

SEP 29 1993

Mr. Richard Davison
Mount Royal Management Company
1233 Mount Royal Avenue
Baltimore, MD 21217

Dear Mr. Davison:

SUBJECT: Town & Country Apartment
Project No.'s 051-44037/44125-LD
Appraisal Guidelines

We have received your Notices of Intent (NOI) to extend low-income affordability restrictions for the remaining useful life of the project or to transfer the project to an owner who will extend low-income affordability restrictions. We have determined your projects, Town & Country 1 & 2, located in Richmond, VA, to be eligible projects. In order to determine fair compensation for you for not prepaying your mortgage, Section 213 of Subtitle A of Title VI of the National Affordable Housing Act of 1990 requires the owner and HUD to separately contract for independent appraisers. These appraisers will each perform an appraisal based on certain assumptions as outlined in the enclosed Appraisal Guidelines.

An independent appraiser is defined as one who is not an employee of the Federal Government or an employee or officer of any entity that is affiliated with the owner of the property. The appraiser must not be the subject of a charge issued following a reasonable cause determination under the Fair Housing Act.

The appraiser must meet the following qualifications:

1. Six years of appraisal experience with three years in appraising multifamily projects; and

2. Certified or licensed by the State in accordance with Title 11 of the Federal Financial Institution Reform, Recovery Act of 1989. The States are scheduled to have licensing procedures and standards in place by December 31, 1992.

Appraisers have four months from the date HUD received your NOI (September 17, 1993) to complete their assignments. HUD Loan Management will forward to its appraiser, and we are requesting that you provide your appraiser, the following:

1. A set of original plans and specifications, if available.

2. Last three years of audited financial statements.

In addition, please provide both appraisers access to the project to the extent needed to complete the appraisals.

There will be a physical inspection of your property to determine the Capital Needs for your project (required repairs and replacement reserve analysis) followed by an exit conference to discuss the findings with all interested parties. The required repairs will bring the property up to good condition and meet local codes and the Housing Quality Standards as outlined in 24 CFR 886.113. Those present at this inspection should be HUD's Architectural and Engineering staff or contractor, you or your representative, both appraisers or their representatives, any local code enforcement officials and tenant representatives who wish to attend, and HUD Loan Management staff. All these people in addition to any tenants and representatives of State and local government who wish to attend are invited to the exit conference. We will be in contact with you and the concerned parties as to the time and exact meeting place for both the physical inspection and exit conference. You are encouraged to submit at this inspection any studies, reports on the physical condition of your property, etc. to the HUD inspector / contractor. Comments from tenants and State and Local officials may also be provided to the inspector / contractor up to the time of the exit conference. The exit conference will be used to discuss the results of the inspection. You must post the date and time when advised of it.

In about 60 days of HUD's receipt of the NOI, HUD will provide you and your appraiser a preliminary list of the repairs and their cost (See Appraisal Guidelines for further explanation). Only those repairs required to bring the property up to good condition, exclusive of HUD regulatory requirements that are not a requirement of the local governing body or local appraisal custom, will be furnished the appraisers for their consideration in their value estimates. Within 120 days of receipt of the NOI, HUD will provide you with the total results of the Capital Needs Assessment.

When the appraisals are completed they will be exchanged for review by HUD and yourself. Once the appraisals have been found acceptable (adheres to the appraisal guidelines, proper support for conclusions, and etc.), we will attempt to come to a agreement with you on the preservation values. If agreement cannot be reached on the values, a third appraiser will be hired by you from HUD's pool of independent appraisers. You <u>may not</u> give the appraiser any of the data from either of the two previous appraisals. HUD will reimburse you for half the cost of the third appraisal. The appraiser will have two months to complete the assignment. Once reviewed by HUD and yourself and found to be acceptable with respect to the appraisal guidelines and adequate documentation, the values as set by this appraisal will be binding.

Once the values have been set, we will provide you with further information.

Enclosed is a Tenant Notice which must be posted in all occupied buildings of the project. Copies of the Tenant Notice, along with this letter, should be given to any known tenant representative.

Very sincerely yours,

James Kisicki
Supervisory Loan Specialist
Housing Management Division

Enclosures:
Appraisal Guidelines and Notice to Tenants

cc:
Mr. Barry Merchant
VHDA
601 S. Belvidere Street
Richmond, VA 23220

Mr. Robert Bobb
City Manager
900 E. Broad Street
Richmond, VA 23219

LEXSTAT 12 USC 4119

UNITED STATES CODE SERVICE
Copyright © 2008 Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved

*** CURRENT THROUGH PL 110-316, APPROVED 8/14/2008 ***
*** WITH A GAP OF 110-315 ***

TITLE 12. BANKS AND BANKING
CHAPTER 42. LOW INCOME HOUSING PRESERVATION AND RESIDENT HOMEOWNERSHIP
PREPAYMENT OF MORTGAGES INSURED UNDER NATIONAL HOUSING ACT

**Go to the United States Code Service Archive Directory**

*12 USCS § 4119*

§ 4119. Definitions

For purposes of this subtitle:
(1) The term "eligible low-income housing" means any housing financed by a loan or mortgage--
(A) that is
(i) insured or held by the Secretary under section 221(d)(3) of the National Housing Act [*12 USCS § 1715l(d)(3)*] and receiving loan management assistance under section 8 of the United States Housing Act of 1937 [*42 USCS § 1437f*] due to a conversion from section 101 of the Housing and Urban Development Act of 1965;
(ii) insured or held by the Secretary and bears interest at a rate determined under the proviso of section 221(d)(5) of the National Housing Act [*12 USCS § 1715l(d)(5)*];
(iii) insured, assisted, or held by the Secretary or a State or State agency under section 236 of the National Housing Act [*12 USCS § 1715z-1*]; or
(iv) held by the Secretary and formerly insured under a program referred to in clause (i), (ii), or (iii); and
(B) that, under regulation or contract in effect before February 5, 1988, is or will within 24 months become eligible for prepayment without prior approval of the Secretary.
(2) The term "Federal cost limit" means, for any eligible low-income housing, the amount determined under section 215(a) [*12 USCS § 4105(a)*].
(3) The term "low-income affordability restrictions" means limits imposed by regulation or regulatory agreement on tenant rents, rent contributions, or income eligibility in eligible low-income housing.
(4) The terms "low-income families or persons" and "very low-income families or persons" mean families or persons whose incomes do not exceed the respective levels established for low-income families and very low-income families, respectively, under section 3(b)(2) of the United States Housing Act of 1937 [*14 USCS § 1437a*(b)(2)].
(5) The term "moderate-income families or persons" means families or persons whose incomes are between 80 percent and 95 percent of the median income for the area, as determined by the Secretary with adjustments for smaller and larger families.
(6) The term "nonprofit organization" means any private, nonprofit organization that--
(A) is organized or chartered under State or local laws;
(B) has no part of its net earnings inuring to the benefit of any member, founder, contributor, or individual;
(C) complies with standards of financial accountability acceptable to the Secretary; and
(D) has among its principal purposes significant activities related to the provision of decent housing that is affordable to very low-, low-, and moderate-income families.

(7) The term "owner" means the current or subsequent owner or owners of eligible low-income housing.
(8) The term "preservation equity" means, for any eligible low-income housing--
(A) for purposes of determining the authorized return under section 214(a) and providing incentives to extend the low-income affordability restrictions on the housing under section 219 [*12 USCS § 4109*]--
(i) the preservation value of the housing determined under section 213(b)(1) [*12 USCS § 4103(b)(1)*]; less
(ii) any debt secured by the property; and
(B) for purposes of determining incentives under section [sections] 220 and 221 [*12 USCS §§ 4110, 4111*] and determining the amount of an acquisition loan under the provisions of section 241(f)(3) of the National Housing Act [*12 USCS § 1715z-6(f)(3)*]--
(i) the preservation value of the housing determined under section 213(b)(2) [*12 USCS § 4103(b)(2)*]; less
(ii) the outstanding balance of the federally-assisted mortgage or mortgages for the housing.
(9) The term "preservation value" means, for any eligible low-income housing, the applicable value determined under paragraph (1) or (2) of section 213(b) [*12 USCS § 4103(b)*].
(10) The term "Secretary" means the Secretary of Housing and Urban Development.
(11) The term "resident council" means any incorporated nonprofit organization or association that--
(A) is representative of the residents of the housing;
(B) adopts written procedures providing for the election of officers on a regular basis; and
(C) has a democratically elected governing board, elected by the residents of the housing.

**HISTORY:**

(Feb. 5, 1988, P.L. 100-242, Title II, Subtitle B, § 229, as added Nov. 28, 1990, P.L. 101-625, Title VI, Subtitle A, § 601(a), 104 Stat. 4271; Oct. 28, 1992, P.L. 102-550, Title III, Subtitle A, §§ 310, 317(a)(5), 106 Stat. 3765, 3772; Sept. 28, 1994, P.L. 103-327, Title II, 108 Stat. 2316.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

References in text:

"This subtitle", referred to in this section, is Subtitle B of Act Feb. 5, 1988, P.L. 100-242, Title II, as added by Act Nov. 28, 1990, P.L. 101-625, Title VI, Subtitle A, § 601(a), 104 Stat. 4249, and appears as *12 USCS §§ 4101* et seq.

"Section 101 of the Housing and Urban Development Act of 1965", referred to in this section, is § 101 of Act Aug. 10, 1965, P.L. 89-117, Title I, 79 Stat. 451, which is classified to *12 USCS § 1701s* and *42 USCS §§ 1451* and *1465*. Section 1465 of 42 USCS was repealed by Act Jan. 2, 1971, P.L. 91-646, Title II, § 220(a)(5), 84 Stat. 1903.

Explanatory notes:

The bracketed word "sections" was inserted in para. (8)(B) as the word probably intended by Congress.

Effective date of section:

Act Nov. 28, P.L. 101-625, Title VI, Subtitle A, § 605, 104 Stat. 4278, which appears as *12 USCS § 4101* note, provides that this section is effective on enactment.

Amendments:

1992. Act. Oct. 28, 1992 (effective and applicable on enactment, as provided by § 2 of such Act, which appears as *42*

*USCS § 5301* note), in para. (1)(A)(i), substituted "receiving loan management assistance under section 8 of the United States Housing Act of 1937 due to a conversion from section 101 of the Housing and Urban Development Act of 1965" for "assisted under section 101 of the Housing and Urban Development Act of 1965 or section 8 of the United States Housing Act of 1937" and, in para. (11)(A), substituted "residents" for "resident".

1994. Act Sept. 28, 1994 (effective only during fiscal year 1995, as provided by Title II of such Act, incorporating § 601 of S. 2281 of the 103d Cong., 2d Sess.) substituted the following for para. (4):

"(4)

(A) The term 'low-income tenants' means families or persons with incomes that exceed 50 percent of the median income for the area (as determined by the Secretary with adjustments for family size).

"(B) The term 'very low-income tenants' means families or persons with incomes that are less than or equal to 50 percent of the median income for the area (as determined by the Secretary with adjustments for family size).".

Other provisions:

**Retrospective application of section.** Act Feb. 5, 1988, P.L. 100-242, Title II, Subtitle B, § 235, as added Nov. 28, 1990, P.L. 101-625, Title VI, Subtitle A, § 601(a), 104 Stat. 4274, which appears as *12 USCS § 4101* note, provides that this section is applicable to any project that is eligible low-income housing on or after Nov. 1, 1987.

**Termination of § 601 of S. 2281 (103d Cong., 2d Sess.).** Act Sept. 28, 1994, P.L. 103-327, Title II, 108 Stat. 2316, provides that the provisions of § 601 of S. 2281 of the 103d Cong., 2d Sess., which were incorporated into Act Sept. 28, 1994, P.L. 103-327, and which amended para. (4) of this section and *12 USCS § 4112(a)*, shall be effective only during fiscal year 1995.

**NOTES:**

Related Statutes & Rules:

This section is referred to in *12 USCS §§ 1715z-6, 1715z-15, 4104, 4109, 4122, 4146.*

APR 27 1998

Mr. Richard Davison
Mount Royal Management
1223 Mount Royal Avenue
Baltimore MD 21217

Dear Mr. Davison:

SUBJECT: Town & Country Apartments & Townhouses I
Project No. 051-44037

This letter is formal notification of approval of your Plan of Action (POA) submitted under Title VI of the Low-Income Housing Preservation and Resident Homeownership Act of 1990 and the following conditions:

1. The owners may take an annual distribution equal to eight percent of preservation equity determined on the date of closing.

2. The property is to continue as affordable housing for its remaining useful life.

3. HUD will set the rents in accordance with existing guidelines in HUD Handbook 4350.6. The initial rents will be as established under the 241(f) loan. After the initial year of the plan, these rents will be calculated by applying an Operational Cost Adjustment Factor (OCAF). Owners may request a rent increase annually. Please refer to Chapter 11-7 (C) of HUD Handbook 4350.6 for guidance in requesting future increases. A copy of the Rent Schedule, HUD Form 92458, to reflect the approved rents must be provided prior to the loan closing.

4. 193 units of Loan Management Set-Aside (LMSA) rental assistance will be added for those residents qualified under Department Regulations, contingent on reservation of funds.

5. Upon the submission of supporting documentation, release of residual receipts will be approved by the Department of Housing and Urban Development to pay expenses incurred pursuant to filing and negotiating the POA.

A copy of this letter must be posted at the property to advise residents of the approval of the POA. You must also write to each affected resident explaining how the POA will personally affect the resident. Since the approval of the POA contains provisions for a rent increase, your letter must explain the rent phase-in provisions. Please ensure the requirements contained in Chapter 7 of HUD Handbook 4350.1, Insured Project Servicing Handbook, are followed and notification of the rent increase must be posted. Please refer to Chapter 8-28 (2) of HUD Handbook 4350.6 for guidance.

If we may be of any further assistance, please contact Ann Scott or Bill Wallace at (804) 278-4521.

Very sincerely yours,

Charles C. Famuliner
Director
Multifamily Housing Division

ID: G:\lmbcorr\POA.APP WT#___

cc:
c3FHMA Chron/Reading File
M3FHMArry MeScottt
Virginia Housing Development Authority
601 South Belvidere Street
R3FHMAaScott:bms220/27/95 (Thu):3:00pm Ext. 4521

Mr R3FHMA Bobb 3FHMA 3FHMA
City Manager
900 Scottoad St.Wallace Taylor
Richmond, VA 23219