IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - -

ALGONQUIN HEIGHTS, et al., :
Plaintiffs, : NO. 97-582C
: JUDGE ROBERT H.
v. : HODGES, JR.
:
THE UNITED STATES, : ORIGINAL
Defendant. :

\- - - - - - - - - - - - - - - - -

30(b)(6) DEPOSITION OF
LEADER HOUSE ASSOCIATES, LP &
NEW AMSTERDAM ASSOCIATES, LP
BY AND THROUGH ITS DESIGNEE
(STEPHEN SALUP)
New York, NY
Tuesday, August 28, 2007
9:32 a.m.

Reporter: MARGE TEILHABER, Certified Shorthand Reporter, and notary public of the state of New York.

A. I don't recall when I was elected as an officer. My capacity was, I think I was real estate counsel and then general counsel to the parent corporation to provide services to subsidiaries of the parent corporations.

The general partners of both of these partnerships were subsidiaries of the parent corporation.

At some point in time I received an official title as vice-president, and I do not remember if it was after 1984 and it was certainly during this period in question of the Article VI application, prior to it, maybe late 1980s.

Q. Okay. So sometime between 1984 and 1990 you were --

A. That's also a matter of record if you need that information if that's important.

Q. When you became involved in 1984, did you have an occasion to look at anything relating to why the apartment complexes or the partnership for the low-income housing was formed, the reasons why? Did you have an occasion to do that?

A. Why these were formed?
Q. Correct.
A. I know in general why these were formed. I do business in affordable housing. And I believe they were formed to provide affordable housing for low- and moderate-income tenants for a period of twenty years.
Q. Why do you say for a period of twenty years?
A. Because that's the regulatory period under state law and under the applicable HUD program which these projects were eventually, not eventually but were initially processed and approved under.
Q. When you say this 20-year window -- and I know you prefaced your remark to say in general -- do you have any reason to believe that New Amsterdam and Leader House had the same 20-year window, if you will?
A. I know that they did.
Q. When you say that you know that they did, how can we be sure that they had this 20-year

horizon?

A. Because both projects were initially formed as New York State Article II private housing finance law, Mitchell-Lama projects.

The Mitchell-Lama Program by statute has a 20-year affordability period. After the expiration of twenty years, the projects may opt out and become market rate projects. I won't go into the reasons for that. If you want me to, I will, but not at this juncture.

The project also was, had a federal, was called a state agency Mitchell-Lama Section 236. That was the federal subsidy, insurance reduction payment.

And it was my understanding of the Section 236 program that it also had, ran in tandem with the state program, had a 20-year period that you had to remain affordable and then you could get out of it.

Q. When you say that it was initially started as a state entity or state finance, what do you mean by that?

A. Between the time you create a policy and it gets implemented, it could be two or three years. I do remember as a policy matter with the organizations that I was involved with, housing organizations, we started to work on it as a solution to the problems in New York in the late '70s.

Q. And that problem being default?

A. There wasn't a default per se, but the projects were having a very difficult time meeting their expenses, and to avoid default and to save the project and to save the affordable housing stock, HUD came up with this 223(f) program, which succeeded.

You're talking about a very, I don't know; it happened in the late '70s. I think that was maybe the first oil crisis, inflation, double-digit inflation. It was a very difficult time as I recall, and expenses far outpaced income then.

Q. Now, when this new relationship occurred sometime between 1978 and 1982, what happened to

the original 20-year ability to pay?

A. Mitchell-Lama is a New York State affordable housing program. It stays in place. Many federal projects in New York that start out as FHA-insured projects are formed in the Mitchell-Lama law, the reason being in most states in order to get an FHA mortgage, you have to have a determination of financial feasibility, the analysis that they do, and one of the elements that HUD looks for in financial feasibility is a local real estate tax abatement, which is called a shelter and tax abatement. HUD looks for that.

The vehicle in New York to provide the shelter rent tax abatement is what we call Mitchell-Lama, Article II of the private housing finance law.

So the entity is formed. The entity is formed as a Mitchell-Lama entity and then it owns the property, and with that comes the ability through a resolution or act of the local governing body to provide a shelter rent tax abatement. And so you will always have this Mitchell-Lama

overview.

And when I said when we went 223(f), there was a HUD regulatory agreement and HUD became the supervising agency which it did, you still had local agency involvement, HPD involvement. You had to comply with both regulations. But HUD became the rent setting agency and the principal regulatory agreement and physical inspection agency, but you still had to comply with local rules on tenant selection, Mitchell Lama rules. That was the law that applied.

Many states have, like say New Jersey we do a lot of business, it has laws, local laws under which HUD programs are funneled so it's quite common. And the 20-year period is the Mitchell-Lama period. And sometimes in HUD mortgages you may find that. Not in this case. There was no limitation in the HUD mortgage that we had. We could have prepaid it any time but we couldn't opt out so why would you prepay it because you had to stay within the program, Mitchell-Lama, for twenty years. And I think 236 also has a

20-year from the inception of the 236 contract that runs in tandem with the original mortgage.

Q. You said a couple of things. You said that we could opt out but why would you if you could prepay but we couldn't opt out. My question is what do you mean by opt out?

**A. Going market rate.**

Q. Okay. So why couldn't you go market rate?

**A. Because the Mitchell-Lama law prevented you from opting out unless you were in service for twenty years. It's a 20-year sentence some people call it, twenty years from the TCO.**

Q. TCO?

**A. Temporary certificate of occupancy. That is the local authorization that puts the project in service and so you can occupy it and that's when the 20-year period begins. It's my understanding of when it begins.**

Q. Okay. That's under state law?

**A. Yes.**

Q. And Mitchell-Lama is a state law?

**A. Correct.**
Q. Are you familiar with the phrase final endorsement date?
**A. Yes.**
Q. What's your understanding of final endorsement?
MR. KELLY: Are you speaking with respect to these particular properties or just as a general party?
MR. AUSTIN: I want to get his background and then we can talk about --
Q. I'm not asking for a particular date at this point.
MR. KELLY: Okay. You may answer.
**A. It's a HUD concept. Either an FHA mortgage and when you complete construction and the construction loan converts to a permanent loan, that's called final endorsement.**
**We had no final endorsement here because there was no HUD construction loan. This was done under the auspices of the city of New York in the Mitchell-Lama Program, the Mitchell-Lama mortgage,**

**which I believe ran in tandem with the TCO. That's when the Mitchell-Lama 20-year period started.**

THE WITNESS: I'd like to take a break.

(Break taken from 10:09 a.m. to 10:13 a.m.)

Q. Mr. Salup, before we left I was going to ask you is it fair to say that the TCO, the temporary certificate of occupancy, is different than the final endorsement or could they be the same or are they different?

**A. They could be the same and they could be different.**

Q. Okay.

But in any event, for both Leader House and New Amsterdam, there was no final endorsement because it was a state project?

**A. Yes.**

Q. Is this the first time you have been deposed in this case?

**A. Yes.**

Q. How many properties like New Amsterdam and Leader House are you involved in?

MR. KELLY: Object to the form of the question. When you say --

MR. AUSTIN: Yes. Thank you.

Q. Definitionally how many properties are you involved with that are part of this lawsuit like Leader House and New Amsterdam?

**A. In this litigation, Algonquin Heights, just these two -- I'm sorry. No. There's one other, Tower West.**

Q. And Tower West is in New York City?

**A. Yes.**

Q. And is that also a Mitchell-Lama project?

**A. Yes.**

Q. Have you been noticed for a deposition in Tower West?

**A. No.**

Q. When the new documents, if you will, were formulated sometime between 1978 and 1982 for the federal portion, the 223(f), was there the ability to prepay in twenty years in the agreement? Do you know?

**A. There's two questions.**

Q. Yes, there are two questions.

**A. At the time of the 223(f) closing, there was no document that imposed a time period that I can recall or that I have seen and that the time period that I was dealing with was the same original 20-year Mitchell-Lama time period and that the federal mortgage was prepayable without consent at any time.**

Q. Mr. Salup, you mentioned that you worked with the general partner of both New Amsterdam and Leader House. What type of entity do you work for? Is it like an investment company, real estate?

MR. KELLY: Are you speaking now or --

**A. Let me try and do this briefly if possible. In this business, my business, you have a parent company, a holding company, which is my employer. They produce affordable housing developments primarily and they do it through single-purpose subsidiaries, which is how the affordable housing program was created.**

**We create a subsidiary, which is a general partner of a partnership we form to own and**

**old at the time, yes, it is a 236/223(f). I believe it has 28 stories and 229 apartments and I believe it's in Manhattan's fashionable upper west side.**

Q. The next paragraph says, "In 1978 the property's existing Section 236 mortgage was refinanced in an innovative way."

Is that what we were talking about earlier when you were talking about the hard mortgage and the soft mortgage and, to use your analogy, the 7 million versus 10?

**A. Yes.**

Q. Is that what you were talking about?

**A. That is what I was referring to, the bifurcation of the mortgage, and he has the real numbers in here I would venture to guess.**

Q. Earlier we had talked about final endorsement and the TCO, temporary certificate of occupancy. Do you know if in 1978 either -- well, we know there was no final endorsement -- but do you know if the TCO date was affected at all?

**A. No. It remains the same. It's like your birthday.**

Q. Correct.

**A. I believe so. I don't think we needed their services. Not because I was dissatisfied. I don't think we had a need for what they did in the future.**

Q. In paragraph A, workout diseases, and I'm going to jump down to the middle and it says, "Legal Question: We need legal research here on several questions whose answers are far from obvious. When can the mortgage be prepaid and is there any lock-in contained in the 1978 workout documents?"

Now, I know earlier you had mentioned that you as a lawyer did some research. You hired outside counsel. My question is directed to you as the business person. Do you know when the mortgage could be prepaid in either Leader House or New Amsterdam?

**A. After 1978 at any time.**

Q. So it's your testimony at any time after 1978?

**A. Well, we're talking about the HUD**

mortgage, so that was the mortgage that was in place in 1978, the one that we were prevented from prepaying. There was no prohibition on prepaying.

Q. Go ahead.

A. What he says here is the basic legal eligibility for LIHPRHA that HUD makes a finding on and answers these two questions based on documents submitted. And I believe that HUD found that there was no bar to prepayment at the time and there was no lock-in.

Q. No bar to prepayment at what time?

A. In 1991. Well, I take that back. There was no bar in 1991 if that was indeed twenty years after the mortgage, twenty years after TCO except for, but for the LIHPRHA act barred prepayment.

Nothing in the 1978 mortgage documents, HUD documents, the contract itself barred prepayment. So other than the LIHPRHA bar, there was no bar.

Q. So as far as you know, both Leader House and New Amsterdam in 1991 was not constrained by the Mitchell-Lama Act?

A. I would have to double-check the TCO. One of them I think was TCO'd in 1972, which would bring it to 1992, and one was TCO'd in '71, which would bring it to 1991.

Q. The second, is there any lock-in contained in the 1978 workout documents? And I believe your testimony is no.

Is that correct?

A. That's correct.

Q. Now, if you could turn to the next page, 550, the first sentence says, "New Amsterdam was in default, so this provision applies."

Was New Amsterdam in default?

A. I don't know. I wasn't there at the time. I have no record of any foreclosure litigation. Clearly it was troubled, which is why you had the, all of the Mitchell-Lama projects in that era in the city were troubled. Whether you had the 223(f) HUD refundings, Leader House and New Amsterdam were one of many that were benefitted by this HUD program during that period.

Q. In the second paragraph it talks about

questions.

EXAMINATION BY MR. KELLY:

Q. Mr. Salup, I want to thank you for your time today. I appreciate it very much.

Just because it has been a long deposition and we talked about a number of properties, I want to make sure that there are a couple matters on the record that are clear.

The first is just to confirm if you will for me that for both New Amsterdam and Leader House, your testimony is that you were unable to prepay or opt out of those mortgages until 20 years after the temporary certificate of occupancy was issued.

Is that correct?

**A. Yes.**

Q. It's also your testimony, as I understand it, that the Rent Stabilization Law for the city of New York would not have been an impediment to your ability to prepay or opt out because of the availability of provisions such as the unique and peculiar provision.

MR. KELLY: No further questions.

MR. AUSTIN: Once again, Mr. Salup, thank you. And I believe you were -- and this is more directed to your counsel -- are you going to read and sign?

MR. KELLY: We will read and sign.

(Deposition proceedings concluded at 2:07 p.m.)

STEPHEN SALUP
(LEADER HOUSE ASSOCIATES, LP)
(NEW AMSTERDAM ASSOCIATES, LP)

Subscribed and sworn to and before me this 27th day of September, 2007.

Laura F. Carlton
Notary Public

LAURA F CARLTON
NOTARY PUBLIC, State of New York
No. 01CA5038557
Qualified in New York County
Commission Expires ~~January 30, 19~~ april 30, 2011

C E R T I F I C A T E

I, MARGE TEILHABER, a Certified Shorthand Reporter and Notary Public of the States of New Jersey and New York, do hereby certify that prior to the commencement of the examination, the witness was sworn by me to testify to the truth, the whole truth and nothing but the truth. I do further certify that the foregoing is a true and accurate 98-page transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth. I do further certify that I am neither of counsel nor attorney for any party in this action and that I am not interested in the event nor outcome of this litigation.

Pursuant to Federal Rule of Civil Procedure 30(e), the witness/attorney has requested review of the transcript, and if any changes are made, they will be appended to the transcript.

Marge Teilhaber
_______________________________

Notary Public of the States of NJ, NY, and CT
New York registration No. 01TE4741157
New York commission expires February 28, 2010

FHA FORM NO. 4159-A
(CORPORATE)
Rev. March 1972

# MORTGAGE NOTE

$ 6,269,400.00 New York, New York

January 23, 1978

FOR VALUE RECEIVED, the undersigned, LEADER HOUSING CO., INC., promises to pay to New York City Housing Development Corporation, a corporate governmental agency organized and existing under the laws of New York or order, hereinafter designated as the Mortgagee, the principal sum of Six Million Two Hundred Sixty-Nine Thousand Four Hundred and 00/100 Dollars ($ 6,269,400.00 ) with interest from date at the rate of Eight & One-Half per centum ( 8.5 %) per annum on the unpaid balance until paid. The said principal and interest shall be payable in monthly installments as follows:

See "Attachment A", Paragraph 1,
incorporated herein by reference
and made a part hereof.

Both principal and interest under this Note, as well as the additional payments set forth in the Mortgage of even date herewith securing this Note, shall be payable at the office of New York City Housing Development Corporation in 42 Broadway, New York, New York 10038 or such other place as the holder may designate in writing.

Privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days' prior written notice to the holder. If this debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment of this debt hereby agree to be jointly and severally bound to pay to the holder hereof any adjusted premium charge required by the applicable Regulations.

Notwithstanding any provision herein for a prepayment charge, such charge shall be applicable only to the amount of prepayment in any one calendar year which is in excess of fifteen per centum (15%) of the original principal sum of this Note. See "Attachment A", Paragraph 2, incorporated herein by reference and made a part hereof.

The whole of the principal sum or any part thereof, and of any other sums of money secured by the Mortgagee given to secure this Note, shall, forthwith, or thereafter, at the option of the Mortgagee, become due and payable if default be made in the payment of any installment under this Note and if such default is not made good prior to the due date of the next such installment or upon the happening of any default which, by the terms of the Mortgage given to secure this Note, shall entitle the Mortgagee to declare the same, or any part thereof, to be due and payable; all the covenants, agreements, terms, and conditions of said Mortgage ~~[illegible]~~ are hereby incorporated herein by reference to the same extent and effect as if fully set forth and made a part of this Note; and the undersigned hereby covenants to perform all such covenants and agreements. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, and if the same is collected by an attorney at law, the undersigned hereby agree(s) to pay all costs of collection, *including a reasonable attorney's fee.*

No default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal already made pursuant to the privilege of prepayment set forth in this Note equals or exceeds the amount of such required installment of principal.

All parties to this Note, whether principal, surety, guarantor, or endorser, hereby waive presentment for payment, demand, protest, notice of protest, and notice of dishonor. See "Attachment A", paragraph 3, incorporated herein and made a part hereof.

Signed and sealed the day and year first above written.

LEADER HOUSING CO., INC.

WITNESS *[signature]* BY *[signature]*
Sidney Berger, Vice President

THIS IS TO CERTIFY that this is the Note described in, and secured by, Mortgage of even date herewith, and in the same principal amount as herein stated, on property located at 100 West 93rd Street, in the City of New York, County of New York, State of New York.

*[signature]*
Notary Public

JAMES R. BENNETT
NOTARY PUBLIC, State of New York
No. 52-4636535
Qualified in Suffolk County
Commission Expires March 30, 1976

STATE OF NEW YORK

LOAN No. 012-11074 HDC-REF/CON

Mortgage Note

LEADER HOUSING CO., INC.

TO

NEW YORK CITY HOUSING DEVELOPMENT CORPORATION

No. 012-11074 HDC-REF/CON

Insured under Sec.207 pursuant to $223(f) of the National Housing Act and Regulations published thereunder

In effect on October 27, 1977

To the extent of advances approved by the Secretary of Housing and Urban Development acting by and through the Federal Housing Commissioner

By ____________________
(Authorized Agent)

Date ____________________

A total sum of $6,269,400.00 has been approved for insurance hereunder by the Secretary of Housing and Urban Development acting by and through the Federal Housing Commissioner

By *[signature]*
(Authorized Agent)

Date January 25 1978

Reference is made to the Act and to the Regulations thereunder covering assignments of the insurance protection on this Bond.

ATTACHMENT A

Attached to and being a part of the Mortgage Note executed by LEADER HOUSING CO., INC. (Mortgagor) dated January 23, 1978. , to New York City Housing Development Corporation in the principal sum of $6,269,400.00.

Paragraph 1

Interest only payable from the date hereof on the first day of February , 1978. Commencing on the first day of March , 1978, installments of interest and principal shall be paid in the sum of Forty-Five Thousand Nine Hundred Sixty and Sixty-One/100---------------------------------- Dollars ($ 45,960.61 ), such payments to continue thereafter monthly on the first day of each succeeding month until the entire indebtedness has been paid. In any event the balance of the principal, if any, remaining unpaid, plus accrued interest, if any, shall be due and payable on February 1, 2018 . The installments of interest and principal shall be applied first to the interest at the rate of eight and one-half per centum (8 1/2%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid, and the balance thereof shall be applied on account of principal. In the event the maker hereof shall fail to make any monthly payment due to the holder hereof within fifteen (15) days after the due date thereof the holder hereof may, at its option, impose a late charge, in addition to any other sums due and payable upon the maker hereof of Two Cents ($.02) for each One Dollar ($1.00) of interest and/or principal which is more than fifteen days in arrears.

The maker hereof assumes no personal liability for the payment of the principal of or the interest on this Note except as set out in the Mortgage securing this Note.

Paragraph 2

Provided, that additional prepayment (beyond such 15% of such original sum in any one calendar year) may be made on any interest payment date upon 30 days' prior written notice to the holder hereof; And Provided Further, That, in the event of prepayment of principal during any one calendar year in any amount in excess of fifteen percent (15%) of the original principal amount of the Note, all parties liable for payment thereof hereby agree to be jointly and severally bound to pay to the holder hereof for its own account a penalty or charge equal to three percent (3%) of the amount of such excess less 1/8 of 1 percent for each 12 month period which has elapsed since the date of this Note; Provided, however, no additional charge shall be collected by the holder hereof for any partial prepayment of principal which is made by the maker or on its behalf pursuant to a requirement of the Federal Housing Commissioner.

Paragraph 3

This Mortgage Note is evidence of a portion of an indebtedness in an original and prior note in the amount of $ 8,995,000.00 dated August 13, 1970 , which prior note was modified, recast and divided into this senior note, in the amount of $ 6,269,400.00 (insured by the Secretary), and a junior note (of even date herewith), in the amount of $ 2,615,388.13 with accrued and unpaid interest and fees ("Deferred Interest") of $ -NONE- . The recasting and division into the senior and junior indebtedness was accomplished pursuant to a certain Modification and Severance Agreement of even date herewith.

WITNESS:

[signature]

LEADER HOUSING CO., INC.

By: [signature]
Sidney Berger, Vice President

THE CITY OF NEW YORK
HOUSING AND DEVELOPMENT ADMINISTRATION

MORTGAGE NOTE
FROM LIMITED-PROFIT HOUSING COMPANIES

$8,995,000.00 New York, AUGUST 13, 1970

FOR VALUE RECEIVED, LEADER HOUSING CO., INC. a limited-profit housing company organized and existing pursuant to the laws of the State of New York and especially the provisions of the Limited-Profit Housing Companies Law (Article II of the Private Housing Finance Law), having its principal place of business at 301 East 57th Street, New York, New York hereinafter referred to as the "Maker", promises to pay to THE CITY OF NEW YORK, hereinafter referred to as the "Payee", or order at the Office of the City Collector, Room 100 Municipal Building, Borough of Manhattan, City and State of New York, or at such other place as may be designated in writing by the Housing and Development Administration of said Payee, the principal sum of EIGHT MILLION NINE HUNDRED NINETY-FIVE THOUSAND ($8,995,000.00) Dollars, lawful money of the United States or so much thereof as may be advanced under and pursuant to a certain Loan Contract dated AUGUST 13, 1970, entered into by and between the Maker and the Payee and intended to be filed in the Office of the Clerk of the County of New York, and to the Mortgage securing this Note, as hereinafter referred to, with interest on each sum advanced, computed at the rate of five per-centum (5%) per annum, or at a rate equal to the interest rate paid or to be paid by the Payee for the funds which are used to finance this loan which ever is greater, commencing from the date of such advance and payable on the 1st day of OCTOBER 1970 and monthly thereafter up to and including the date upon which the Certificate of Final Acceptance referred to in said Loan Contract shall have been approved by the Housing and Development Administration of The City of New York, hereinafter referred to as the "Administration" upon which date the balance of said interest shall be due and payable, and thereafter with interest on said principal sum, computed at a rate equal to the interest rate paid or to be paid



ML.N
6/70

43

This Note may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

LEADER HOUSING CO., INC.

S/By Robert S. Orrick
President

ATTEST:

Elsa B. Metzler
Secretary

Approved as to legal sufficiency

General Counsel for Development
Housing and Development Administration

Approved as to form:

J. Lee Rankin
Corporation Counsel

Approved as to terms:

Bureau Chief, Housing and
Facilities Production

Approved:
Housing and Development Administration
of The City of New York

Deputy Commissioner

4.

ML-N
12/67

THE CITY OF NEW YORK
HOUSING AND DEVELOPMENT ADMINISTRATION

1223
324 P025

LIMITED-PROFIT HOUSING MORTGAGE

REEL 181 PAGE 1191

THIS MORTGAGE, made the 13 day of AUGUST nineteen hundred and seventy, BETWEEN LEADER HOUSING CO., INC., a limited-profit housing company, organized and existing pursuant to the laws of the State of New York and especially the provisions of the Limited-Profit Housing Companies Law (Article II of the Private Housing Finance Law), having its principal place of business at 301 East 57th Street, New York, New York, and Leader House Associates, a limited partnership formed pursuant to the Partnership Law of the State of New York, having its principal place of business at 301 East 57th Street, New York, New York, said Leader Housing Co., Inc. and Leader House Associates, being hereinafter jointly referred to as the Mortgagor, and THE CITY OF NEW YORK, a municipal corporation, having its principal office at the City Hall, Borough of Manhattan, City and State of New York, the Mortgagee, Witnesseth, that to secure the payment of an indebtedness in the principal sum of EIGHT MILLION NINE HUNDRED NINETY-FIVE THOUSAND ($8,995,000.00) DOLLARS lawful money of the United States, or so much thereof as may be advanced under and pursuant to the terms and provisions of the Loan Contract hereinafter referred to, and to the terms and provisions of this Mortgage, with interest on each sum advanced, computed at the rate of five per centum (5%) per annum, or at a rate equal to the interest paid or to be paid by the Mortgagee for the funds which are used to finance this loan whichever is greater, commencing from the date of such advance and payable on the 1st day of OCTOBER, 1979 and monthly thereafter up to and including the date upon which the Certificate of Final Acceptance referred to in said Loan Contract shall have been approved by the Housing and Development Administration of The City of New York, hereinafter referred to as the "Administration" upon which date the balance of said interest shall be due and payable; and thereafter with interest on said principal sum, computed at a rate equal to the interest rate paid or to be paid by the Mortgagee for the funds which are used to finance this loan, but in any event the amount of interest to be paid hereunder shall not be less than the sums required to be paid by the Mortgagee as interest on the funds used to finance this loan, plus one-quarter of one per centum (0-1/4%) per annum of the original principal amount (which, in



LPM 6/70

C

PA 210

FRC0480319

against whom enforcement of any waiver, change, modification or discharge is sought.

The word "mortgagor" when used herein shall be construed as if it read "mortgagors" whenever the sense of this mortgage so requires.

IN WITNESS WHEREOF, this Mortgage has been duly executed by the Mortgagor.

ATTEST:

BY [signature]
Secretary

LEADER HOUSING CO., INC.

BY [signature]
President

LEADER HOUSE ASSOCIATES

BY: Starrett Brothers and Eken Development Corporation

BY [signature] Pres
General Partner

~~BY General Partner~~

APPROVED AS TO FORM:

[signature]
Corporation Counsel

APPROVED AS TO LEGAL SUFFICIENCY:

[signature]
General Counsel for Development -
Housing & Development Administration

~~APPROVED AS TO TERMS:~~



LPM 6/70

REEL 181 PAGE 1221

LEADER HOUSING CO., INC.

9171

To

The City of New York

D37

(10)

MORTGAGE

STATEMENT FILED
AUG 1 4 1970

N.Y.S. Private Housing Finance Law, Sec. 33

RECORDING TAX
NO MTGE.
$ TAX PAID

LOC. VER.

The land affected by the within instrument lies in Section 4
in Block 1223 Lot 32 & pt. 25
on the Tax Map of the County of New York

RECORD AND RETURN BY MAIL TO:

Robert J. Rubinstein, Esq.
General Counsel for Development
Housing & Development Administration
100 Gold Street
New York, 10038 N.Y.

RECORDED AT REQUEST OF
THE TITLE GUARANTEE COMPANY

OFFICE OF CITY REGISTER
New York County
RECORDED
Witness my hand
and official seal

Victor M. Rivera
CITY REGISTER

RECORDING TAX OF $ NO MTGE. TAX PAID

AUG 14 1970
SERIAL NO. BN 1165
Victor M. Rivera
City Register, New York County

| | | | |
|---|---|---|---|
| AUG-14-70 | 52524 | Tax | 0.00 |
| AUG-14-70 | 52523 | D | 37.00 |

# Initial Notice of Intent
## To Terminate or Extend Low-Income Affordability Restrictions

(Pursuant to Section 212 of the Low-Income Housing Preservation and Resident Homeownership Act of 1990)

U. S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0459

Public reporting burden for this collection of information is estimated to average 2.0 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Officer, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C. 20410-3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502-0459), Washington, D.C. 20503. Do not send this completed form to either of these addresses.

This Notice must be filed simultaneously with (1) the local HUD Field Office, (2) the chief executive officer of the appropriate State or local government, (3) the mortgagee, (4) tenants of the property, and (5) all known representatives of the tenants.

1. Date of this Notice May 3, 1993
2. Purpose of this Notice (Check one):
   - [X] Extend the low income affordability restrictions by requesting incentives; or
   - [ ] Offer to Sell the housing to a qualified purchaser.
   - [ ] Terminate the low income affordability restrictions through prepayment of the mortgage or voluntary termination of the mortgage insurance;
3. Borrower and Project Information:
   a. Borrower Entity Leader House Associates - Leader Housing Co., Inc.
   b. FHA Project Number 012-11074
   c. State Agency Project Number (If project is Section 236 non-insured.) NYC HDA-HPD No MBH20-WS NYC HDC No.33
   d. Project Name Leader House Apartments
   e. Project Address(Include City, State, and Zip Code) 100 West 93rd Street New York, NY 10025
   f. Date of Final Endorsement N/A *
4. Name of Mortgagee New York City Housing Development Corporation
5. Name of State or local Agency Receiving this Notice Of Intent See attached list.
6. Owner's Certification

I, the undersigned, certify that this Notice of Intent has been submitted and distributed in accordance with the requirements of the statute as specified above.

- [ ] I certify that I know of no tenant representative.

Under the penalties and provision of Title 18, United States Code, Section 1001, the statements contained in the request and its attachments have been examined by me and to the best of my knowledge and belief are true, correct, and complete.

Signature (Owner) [signature] Date April 9, 1993

Name (Owner) Stephen Salup, VP, Leader Housing Co., Inc.-Leader House Associates

Address (Include City, State, and Zip Code) 909 Third Avenue-16th floor New York, NY 10022

## Residents

Important Information about this Notice of Intent is on the back of this form.

ref. Handbook 4350.6 form HUD-9606 (04/03/92)

* 3.f Date of Final Endorsement - N/A. The property was developed as an uninsured City-aided Section 236, and had no Final Endorsement. It was first occupied in 1972 (which commenced the twenty-year affordability period) and began paying principal on its mortgage shortly thereafter.

4/92

Kelly Decl. Ex. J



IRH 0055947

Notice To: All Residents of (Project Name): Leader House Apartments
100 West 93rd Street,New York,NY 10025

From: U.S. Department of Housing and Urban Development

Subject: Future Plans for Your Apartment Building

The other side of this form is a copy of a Notice sent by the owner of your apartment building to the U.S. Department of Housing and Urban Development (HUD). The Notice tells HUD about the owner's future plans for the project. The owner has checked one of three boxes which say "Extend," "Offer to Sell," or "Terminate." Because of a law passed by Congress in November of 1990, the owner will be able to act upon these plans only if HUD approves.

If the box next to "Extend" or "Offer to Sell" has been checked, this means that the owner wants to work with HUD to keep the building affordable to you and other tenants or sell it to someone who will keep it affordable. However, it is still possible that the owner may be allowed to pay off the mortgage. If the owner does, you may get assistance under certain circumstances which will be explained to you in another letter.

In addition, if the owner is planning to "Extend" or "Offer to Sell" the project, you may let HUD or a tenant representative shown below know if you think repairs need to be done and what they are. Another Notice will be posted in the next few weeks asking you again to let us know what repairs are needed. Once that Notice is posted, you will only have a few days to get your answers to us.

There is also the possibility that an organization of tenants may be able to buy this project. This kind of organization can either continue to rent to you or sell to tenants who want to own their own apartments. If this is the case, we will let you know, or you can have a tenant representative call the HUD Office for more information.

If the box next to "Terminate" has been checked, this means that the owner wants to pay off the mortgage. The rents in your building might then increase. Before HUD would allow the owner to do this, the owner must prove that this action will not hurt tenants. The owner would have to show that, in your area, rents at other buildings are about the same as yours, and/or there are other available, affordable apartments in your area to which you could move.

HUD will send you a letter explaining any decisions that are made or actions that are taken. The owner will be providing any tenant representative(s) with much more information than we are able to post. These representative(s) can then explain to you what is happening. The owner knows of the following tenant representative(s):

| | |
|---|---|
| Name: Dottie Morgan | Name: |
| Address: President-Leader House Tenants Association 100 West 93rd Street New York, NY 10025 | Address: |
| Telephone No.: | Telephone No.: |

If there is any other organization or individual who will be representing the tenants of this project, please let both the owner and HUD know.

All questions and other comments for HUD should be made to the following address and telephone number:

Office: New York

Address: 26 Federal Plaza

City, State, Zip code: New York, NY 10278-0068

Attention: Chief Loan Management Branch

Telephone: 212 264-4967

form HUD-9608

4/92

State or Local Agencies Receiving Notice of Intent:

1. Office of the Governor of the State of New York;
2. New York State Division of Housing and Community Renewal;
3. New York State Housing Finance Agency;
4. Office of the Mayor of the City of New York;
5. New York City Department of Housing Preservation and Development;
6. New York City Housing Development Corporation.

6/18/93

U.S. Department of Housing and Urban Development
New York Regional Office, Region II
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068

Mr. Stephen Salup
Vice-President
Leader Housing Company, Inc.
909 Third Avenue 16th Floor
New York, New York 10022

Dear Mr. Salup:

SUBJECT: Project No. 012-11087
Leader House Associates
Appraisal Guidelines

We have received your Notice of Intent (NOI) to extend low-income affordability restrictions for the remaining useful life of the project or to transfer the project to an owner who will extend low-income affordability restrictions. We have determined your project, Leader House Associates, located in New York, New York to be an eligible project, subject to the results of the Windfall Profits Test. In order to determine fair compensation for you for not prepaying your mortgage, Section 213 of Subtitle A of Title VI of the National Affordable Housing Act of 1990 requires the owner and HUD to separately contract for independent appraisers. These appraisers will each perform an appraisal based on certain assumptions as outlined in the enclosed Appraisal Guidelines.

An independent appraiser is defined as one who is not an employee of the Federal Government or an employee or officer of any entity that is affiliated with the owner of the property. The appraiser must not be the subject of a charge issued following a reasonable cause determination under the Fair Housing Act.

The appraiser must meet the following qualifications:

1. Six years of appraisal experience with three years in appraising multifamily projects; and

2. Certified or licensed by the State in accordance with Title 11 of the Federal Financial Institution Reform, Recovery Act of 1989. The States are scheduled to have licensing procedures and standards in place by December 31, 1992.

Appraisers have four months from the date HUD received your NOI to complete their assignments. HUD Loan Management will forward to its appraiser, and we are requesting that you provide your appraiser, the following:

1. A set of original plans and specifications, if available.

2. Last three years of audited financial statements.

In addition, please provide both appraisers access to the project to the extent needed to complete the appraisals.

There will be a physical inspection of your property to determine the Capital Needs for your project (required repairs and replacement reserve analysis) followed by an exit conference to discuss the findings with all interested parties. The required repairs will bring the property up to good condition and meet local codes and the Housing Quality Standards as outlined in 24 CFR 886.113. Those present at this inspection should be HUD's Architectural and Engineering staff or contractor, you or your representative, both appraisers or their representatives, any local code enforcement officials and tenant representatives who wish to attend, and HUD Loan Management staff. All these people in addition to any tenants and representatives of State and local government who wish to attend are invited to the exit conference. We will be in contact with you and the concerned parties as to the time and exact meeting place for both the physical inspection and exit conference. You are encouraged to submit at this inspection any studies, reports on the physical condition of your property, etc. to the HUD inspector/contractor. Comments from tenants and State and local officials may also be provided to the inspector/ contractor up to the time of the exit conference. The exit conference will be used to discuss the results of the inspection. You must post the date and time when advised of it.

Within 60 days of HUD's receipt of the NOI, HUD will provide you and your appraiser a preliminary list of the repairs and their cost (see Appraisal Guidelines for further explanation). Only those repairs required to bring the property up to good condition, exclusive of HUD regulatory requirements that are not a requirement of the local governing body or local appraisal custom, will be furnished the appraisers for their consideration in their value estimates. Within 120 days of receipt of the NOI, HUD will provide you with the total results of the Capital Needs Assessment.

When the appraisals are completed they will be exchanged for review by HUD and yourself. Once the appraisals have been found acceptable (adheres to the appraisal guidelines, proper support for conclusions, and etc.), we will attempt to come to an agreement with you on the preservation values. If agreement cannot be reached on the values, a third appraiser will be hired by you from HUD's pool of independent appraisers. You <u>may not</u> give the appraiser any of the data from either of the two previous appraisals. HUD will reimburse you for half the cost of the third appraisal. The appraiser will have two months to complete the assignment. Once reviewed by HUD and yourself and found to be acceptable with respect to the appraisal guidelines and adequate documentation, the values as set by this appraisal will be binding.

Once the values have been set, we will provide you with further information.

Attached is a Tenant Notice which must be posted in all occupied buildings of the project. Copies of the Tenant Notice, along with this letter, should be given to any known tenant representative.

Sincerely,

David Buchwalter
Chief
Loan Management Branch

Attachments: Appraisal Guidelines and Notice to Tenants

cc: New York City Housing Development Corporation
75 Maiden Lane
New York, New York 10038

Mr. Marvin Specht
Assistant Director
State of New York
Division of Housing and Community Renewal
One Fordham Plaza
Bronx, New York 10458

New York City Department of Housing Preservation and Development
100 Gold Street
New York, New York 10038

Honorable Mario Cuomo
Governor of the State of New York
Executive Chamber, Capitol
Albany, New York 12224

New York State Housing Finance Agency
3 Park Avenue
New York, New York 10016

Honorable David Dinkins
Mayor of the City of New York
New York, New York 10007

cc: M/S File, Chrono, Taboas, Hartwell, Emerson, cl 5/27/93

| | | |
|---|---|---|
| 2HML | 2HML | 2HML |
| Taboas | Hartwell | Emerson |

U.S. Department of Housing and Urban Development
New York Regional Office, Region II
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068

NOTICE TO TENANTS

As you were previously told, there will be an inspection of Leader House to determine what repairs need to be made by the owner or purchaser. If there are repairs you would like to have considered, please submit your list to the Housing and Urban Development (HUD) Office whose address is shown below. You will only be given a few days' notice of the date on which the inspection is to be held and you will have to submit your list by that date, so you may want to be sure to complete it now. You may also submit your list to any tenant representative whose name and address is shown on this letter and ask that representative to help to see that your request is taken into account.

At the time you are told the date of the inspection, you will also be told the date and time for a meeting following the inspection. The purpose of this meeting will be to discuss the repairs which need to be done. The tenant representatives listed on the next page, as well as any other tenant representatives, are all invited to attend the inspection and the meeting. While you are also invited to attend the meeting, it is not necessary for you to do so if you have submitted your list to either HUD or a tenant representative.

HUD intends to give incentives to the owners or purchasers of Leader House Associates, in order to keep the housing affordable for you. You will be advised of the steps taken and decisions made during the lengthy process and will be given further opportunity to comment.

The address for the HUD Office Is:

Name of Field Office: U.S. Department of HUD

Address: 26 Federal Plaza

City, State, and Zip Code: New York, New York 10278

Telephone Number: (212) 264-0940
(Loan Management Branch)

The tenant representatives that we have contacted are:

(1)

Name: Dottie Morgan

Address: 100 West 93rd Street

City and State: New York, New York

Telephone Numbers: ____________

(2)

Name: ____________

Address: ____________

City and State: ____________

Telephone Numbers: ____________

# U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## AMENDATORY CONTRACT

Project Number 051-35118

PROJECT NAME DOLLY ANN APARTMENTS

WHEREAS, pursuant to Section 236(f)(2) of the National Housing Act ("ACT"), a certain Rent Supplement Contract ("Contract") was entered into on the day of MAY 25, 1972, by and between the Secretary of Housing and Urban Development ("Government") and DOLLY ANN APARTMENTS, a Virginia Limited Partnership ("Owner").

WHEREAS, in order to assure the accomplishment of the purposes of the Act, it is the desire of all parties to cancel and nullify all aspects of said Contract.

NOW, THEREFORE, in consideration of the promises of the mutual covenants in said Contract and this Amendatory Contract, all parties do hereby agree that the Contract shall be and the same hereby is CANCELLED, NULLIFIED AND VOID.

No further rental assistance payments shall be made under said Contract after 30th day of JUNE, 19 85. ("Effective Date")

This Amendatory Contract shall not be deemed to affect any proceedings taken or any act or thing done by the Owner pursuant to the Contract prior to the effective date of this Amendatory Contract, and all such proceedings properly taken, and all such acts or things properly done pursuant to and in compliance with the provisions of said Contract shall be deemed to have been properly taken, done and performed under the Contract.

IN WITNESS WHEREOF, all parties have caused this Amendatory Contract to be executed in their respective names.

DOLLY ANN APARTMENTS LIMITED PARTNERSHIP

(Housing Owner)

By: [signature]
Eugene F. Ford, Sr.
President-MId-City Financial Corp
General Partner

Date: April 18, 1985

SECRETARY OF HOUSING & URBAN DEVELOPMENT

By: [signature]
G. William Thomas, Jr
Manager, 3.4S

Date: MAY 10 1985

[initials] 4/30/85 [initials] 4/30/85 [initials] 4/30/85 [initials] HLH 5-6-85 [initials] 5/10

Kelly Decl. Ex. L



RIC0020491

APR - 5 1985

Mr. Eugene F. Ford
General Partner
Dolly Ann Apartments
4340 East-West Highway, Suite 900
Bethesda, MD 20814

Dear Mr. Ford:

SUBJECT: FHA Project No. 051-35118-LD
Dolly Ann Apartments
Covington, Virginia

This is to acknowledge receipt of your acceptance of our offer to convert the existing Rent Supplement Contract for the subject project to a Section 8 Loan Management Set-Aside HAP Contract. We are processing the required documents to implement this conversion of contracts.

The proposed Section 8 HAP Contract has been assigned Section 8 Project Number VA 36-M000-091. Once the Section 8 HAP Contract has been executed, it will become effective on June 1, 1985. The Contract will cover all units under the following schedule of units and rents:

| UNIT SIZE | NO. SEC. 8 CONTRACT UNITS | CONTRACT RENT | GROSS RENTS |
|---|---|---|---|
| 2 Bedroom | 54 | $267.00 | $267.00 |
| 2 " | 18 | 280.00 | 280.00 |
| 3 " | 17 | 289.00 | 289.00 |
| 3 " | 16 | 308.00 | 308.00 |

Equipment, utilities and services included in the above rents will be specified in the Section 8 HAP Contract. The above rental rates reflect an increase over the current HUD-approved rental rates and they may not be imposed on any tenants until they are covered under Section 8 assistance.

ESTABLISHING ELIGIBILITY FOR TENANTS IN RESIDENCE/LEASING IN PLACE

A. Families already in residence at the time a HAP contract takes effect are to be converted from Rent Supplement or RAP assistance to Section 8 assistance. The owner must complete Form HUD-50059, Certification and Recertification of Tenant Eligibility, for each family.

B. Residents 62 years of age and older receiving Rent Supplement for whom the owner has not been completing annual recertifications, need only to have Form HUD-50059 completed on their behalf. These residents are to be recertified not later than the first anniversary date of the HAP Contract. Item 45 of Mr. Abrams' April 21, 1983 memorandum (copy sent to all owners and managers) entitled "Changes in Formulas for Calculating Rents for BMIR, Rent Supplement, RAP, Section 236 and Section 8 tenants" should be used in determining the percentage of adjusted income to be paid by Rent Supplement tenants. RAP elderly tenants and all non-elderly tenants who have been certified or recertified in accordance with established procedures should be recertified at the next regularly scheduled recertification.

C. Under no circumstances are tenants receiving Rent Supplement or RAP assistance to be evicted because of a deficit in the subsidy contract.

In order to prepare for converting tenants to Section 8, you should immediately take steps to complete Forms HUD-50059 and 50059A and amend the leases to be effective concurrent with the proposed effective date of the Section 8 HAP contract.

If you have any questions on the above, please contact Mr. James J. Daly at (804) 771-2001.

Sincerely,

S/ C. WILLIAM THOMAS

C. William Thomas, Jr.
Manager, 3.4S

cc:
3.4HML Chron/Read 1206
3.4S Thomas 1218
3AF Abromavage 917 (w/orig. PAD)

3.4HML:CINNAMON:fh-3-26-85-Ext. 2001

| CORRESPONDENCE CODE | ORIGINATOR | CONCURRENCE | CONCURRENCE | CONCURRENCE | CONCURRENCE | CONCURRENCE |
|---|---|---|---|---|---|---|
| | Cinnamon, 3.4HML | Wash. 3.4HML | Warren, 3.4HML | McInnis, 3.4HM | Haney, 3.4G | Epps, 3.4S |
| Name | JAC | JW | | for | MLK | G |
| Date | 3-26-85 | 3-26-85 | 3/26/85 | 3/26/85 | 3-27-85 | 4/2 |

Previous edition is obsolete

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICIAL RECORD COPY

HUD-713 (4-80)
HB 2221.1

*U.S. GOVERNMENT PRINTING OFFICE: 1983-414-053

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
ADDITIONAL ASSISTANCE PROGRAM FOR PROJECTS WITH HUD-INSURED AND HUD-HELD MORTGAGES
24 CFR PART 886, SUBPART A

HOUSING ASSISTANCE PAYMENTS (HAP) CONTRACT RENEWAL

This Contract is between the United States of America, acting through the Department of Housing and Urban Development (called "HUD"), and Dolly Ann Apartments, A Virginia Limited Ptnrshp. (called "Owner"). This Contract is executed pursuant to the United States Housing Act of 1937 (called the "Act"), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq. The housing project covered by this Contract is identified as follows:

Project Name: Dolly Ann Apartments City: Covington
Street Address: Building D, Apartment #8
Section 8 No.: VA36-M000-091 County: ____________

I. Sections 1 through 28 and Exhibits A and B of the Initial/Renewal Contract beginning June 1, 1985 and continuing through May 31, 1990, are incorporated herein by reference as if fully set forth hereafter.

II. Sections 5 and 6a are modified as follows:

Section 5. Term of Contract. This Contract shall run for a period of five years, beginning June 1, 1990, and continuing through May 31, 1995. This Contract may be renewed for 1 additional five-year periods at the option of the Owner and HUD.

Section 6. Maximum Amount of Housing Assistance Payments

Maximum Annual Contract Commitment. Notwithstanding any other provision of this Contract (other than Paragraph b) or any other contract between HUD and the Owner, HUD shall not be obligated to make assistance payments and pay PHA fees, if any, in excess of $ 335,268. under this Contract during any contract year. In addition, HUD shall not be obligated to pay assistance for more than the total number of contract units shown in Exhibit B.

III. All other sections of the contract shall remain the same.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Section 29. Signatures.

| | |
|---|---|
| Owner Dolly Ann Apartments, A Virginia Limited Partnership | HUD Secretary of Housing and Urban Development |
| By ____________ | By ____________ |
| Eugene F. Ford, Sr. <br> Name | ____________ <br> Name |
| General Partner <br> Official Title | ____________ <br> Official Title |
| Date ____________, 19__ | Date FEB 20 ____________, 19__ |

Kelly Decl. Ex. N



RIC0020478

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
ADDITIONAL ASSISTANCE PROGRAM FOR PROJECTS WITH HUD-INSURED AND HUD-HELD MORTGAGES
24 CFR PART 886, SUBPART A

HOUSING ASSISTANCE PAYMENTS (HAP) CONTRACT RENEWAL

This Contract is between the United States of America, acting through the Department of Housing and Urban Development (called "HUD"), and Dolly Ann Apartments, A Virginia Limited Ptnrshp. (called "Owner"). This Contract is executed pursuant to the United States Housing Act of 1937 (called the "Act"), 42 U.S.C. 1437, *et seq.*, and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, *et seq.* The housing project covered by this Contract is identified as follows:

Project Name: Dolly Ann Apartments City: Covington
Street Address: Building D, Apartment #8
Section 8 No.: VA36-M000-091 County: ______

I. Sections 1 through 28 and Exhibits A and B of the Initial/Renewal Contract beginning June 1, 1985 and continuing through May 31, 1990, are incorporated herein by reference as if fully set forth hereafter.

II. Sections 5 and 6a are modified as follows:

Section 5. Term of Contract. This Contract shall run for a period of five years, beginning June 1, 1990, and continuing through May 31, 1995. This Contract may be renewed for 1 additional five-year periods at the option of the Owner and HUD.

Section 6. Maximum Amount of Housing Assistance Payments

Maximum Annual Contract Commitment. Notwithstanding any other provision of this Contract (other than Paragraph b) or any other contract between HUD and the Owner, HUD shall not be obligated to make assistance payments and pay PHA fees, if any, in excess of $ 335,268. under this Contract during any contract year. In addition, HUD shall not be obligated to pay assistance for more than the total number of contract units shown in Exhibit B.

III. All other sections of the contract shall remain the same.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Section 29. Signatures.

Owner Dolly Ann Apartments, A Virginia Limited Partnership
By ______
Eugene F. Ford, Sr.
Name
General Partner
Official Title
Date ______, 19__

HUD Secretary of Housing and Urban Development
By [signature]
______
Name
______
Official Title
Date FEB 20 [illegible], 19 __

LEXSEE 56 FR 20262

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Office of the Secretary

AGENCY: Office of the Secretary, HUD.

24 CFR Parts 50, 219, 221, 241, and 248

Prepayment of a HUD-Insured Mortgage by an Owner of Low Income Housing

[Docket No. R-91-1513; FR-2978-P-01]

RIN 2501-AB14

*56 FR 20262*

May 2, 1991

ACTION: Proposed rule.

SUMMARY: This proposed rule sets forth HUD's procedures and standards for implementing subtitle A of title VI of the Cranston-Gonzalez National Affordable Housing Act of 1990, entitled the "Low Income Housing Preservation and Resident Homeownership Act," which repeals and replaces the Emergency Low Income Housing Preservation Act of 1987. This rule is intended to create a permanent and comprehensive program which preserves privately-owned, low income housing projects while not unduly restricting the owners' mortgage prepayment rights. In localities where there is an adequate supply of low income housing, prepayment of the mortgage would not otherwise undermine public policy objectives set forth in the statute, and prepayment would not result in a material increase in the economic hardship of the current tenants, owners of projects subject to low income affordability restrictions may terminate these restrictions and prepay their HUD-insured mortgages or terminate their mortgage insurance contracts. In areas where the supply of low income housing is inadequate, the low income affordability restrictions must be maintained on the projects for their remaining useful life, but owners may receive a fair market return on their investment through the receipt of incentives provided by HUD or through the transfer of the property to other entities which agree to continue the low income affordability restrictions. This rule provides an opportunity for homeownership of eligible low income housing projects by the tenants through resident homeownership programs. It also encourages the transfer of low income housing projects to nonprofit organizations and State and local government entities, by giving these entities the first opportunity to purchase available projects.

DATES: *Comment due date:* All written comments must be received on or before July 1, 1991. The Department urges commenters to submit comments as soon as possible after the publication of this proposed rule in order to receive full consideration.

ADDRESSES: Submit written comments to the Office of the General Counsel, Rules Docket Clerk, room 10276, Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410. Communications should refer to the above docket number and title. A copy of each communication submitted will be available for public

inspection and copying during regular business hours (7:30 a.m.-5:30 p.m. Eastern Standard Time) at the above address. As a convenience to commenters, the Rules Docket Clerk will accept brief public comments transmitted by facsimile ("FAX") machine. The telephone number of the FAX receiver is (202) 708-4337. (This is not a toll-free number.) Only public comments of six or fewer total pages will be accepted via FAX transmittal. This limitation is necessary to assure reasonable access to the equipment. Comments sent by FAX in excess of six pages will not be accepted. Receipt of FAX transmittals will not be acknowledged, except that the sender may request confirmation of receipt by calling the Rules Docket Clerk at voice (202) 708-2084; TDD (202) 708-4594. (These are not toll-free numbers).
FOR FURTHER INFORMATION CONTACT: Kevin J. East, Office of Multifamily Housing Preservation and Property Disposition, Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410. Telephone, voice (202) 708-2300; TDD (202) 708-4594. (These are not toll-free numbers.)

**TEXT:** SUPPLEMENTARY INFORMATION:

The information collection requirements contained in the rule have been submitted to the Office of Management and Budget for review under the provisions of the Paperwork Reduction Act of 1980 *(44 U.S.C. 3501*-3502). No person may be subject to a penalty for failure to comply with these information collection requirements until they have been approved and assigned an OMB control number. The OMB control number, when assigned, will be announced by separate notice in the Federal Register.

Background

During the late 1960's and early 1970's several thousand multifamily projects were built with mortgages insured or assisted by HUD under sections 221(d)(3) and 236 of the National Housing Act. HUD's regulations at 24 CFR 221.524 and 236.30 provide that in the case of a project owned by a limited distribution mortgagor that is not receiving payments under a rent supplement contract executed pursuant to 24 CFR part 215, the owner is permitted to prepay the mortgage debt at the expiration of 20 years after final endorsement of the mortgage for insurance. (The mortgage term of such mortgages is 40 years.) Prepayment of the mortgage has the effect of terminating the HUD-imposed low income affordability restrictions which ensure that the project is maintained for very low, low and moderate income tenants. Over the next 15 years, the owners of 360,000 units of multifamily projects insured or assisted under parts 236 and 221 of this title will become eligible to prepay their mortgage loans and convert their properties to market rate rental housing or other purposes. Considerable concern has been raised about the risk of losing viable low income projects due to owners exercising their option to prepay and convert their projects to more profitable use.

In response to these concerns, Congress initially enacted an emergency measure, title II of the Housing and Community Development Act of 1987, the Emergency Low Income Housing Preservation Act of 1987 (the "1987 Act"). The final rule implementing the 1987 Act, part 248 of title 24 of the CFR, was published on September 21, 1990 at *55 FR 38943* (the "existing rule"). The 1987 Act placed constraints on an owner's right of prepayment and created incentives to either encourage owners to retain the low income affordability restrictions in exchange for receiving a greater return on their investment or to transfer the property to purchasers who would agree to retain the low income affordability restrictions. The fundamental principles of the 1987 Act were that the housing should be preserved for its intended beneficiaries and that owners should be guaranteed a fair and reasonable return on their investment through new incentives.

The 1987 Act was intended to be temporary in nature and was designed to give Congress time to fashion a permanent program for the preservation of existing low income housing projects. Congress' permanent solution to this problem is embodied in title VI of the Cranston-Gonzalez National Affordable Housing Act, Public Law 101-625, enacted November 28, 1990. Subtitle A of title VI, the Low Income Housing Preservation and Resident Homeownership Act of 1990 (the "1990 Act"), repeals and replaces the 1987 Act.

The 1990 Act provides permanent authority to deal with HUD-assisted projects where owners have the option of

prepaying their mortgage loans. Its basic objectives are to assure that most of the "prepayment" inventory of assisted housing remains affordable to low income households and to provide opportunities for tenants to become homeowners, while at the same time fairly compensating owners for the value of their properties. This proposed rule implements subtitle A of title VI of the 1990 Act.

The prepayment process begins under the 1990 Act when the owner of eligible low income housing files a notice of intent. If the project is located in an area where there is an adequate supply of low income housing, the owner may seek to prepay the mortgage and terminate low income affordability restrictions pursuant to the standards set forth in section 218 of the statute and § 248.141 of the proposed rule. In all other cases, HUD and the owner would each hire an appraiser to estimate the value of the project as market rate rental housing (the "extension preservation value") and the value of the project at its highest and best use (the "transfer preservation value"). If HUD and the owner cannot agree on the appraised values based on the first two appraisals, a third appraiser would be hired jointly by HUD and the owner.

If the owner wants to retain the project, it would be entitled to receive incentives that would generate sufficient project income to enable the owner to receive an annual authorized return of 8 percent of its equity in the project, measured on the basis of the extension preservation value less outstanding debt. The total project income would not exceed the Federal cost limit, i.e., the greater of 120 percent of the section 8 fair market rent or 120% of the prevailing rents in the relevant local market area. The annual authorized return could be received in the form of allowable distributions, an equity loan, or both. As a condition to receiving such incentives, the owner would be obligated to maintain the project as low income housing for the project's remaining useful life.

If the owner seeks to sell the project, and the transfer preservation rent (i.e., the aggregate rent stream projected to be necessary to support the costs of sale, rehabilitation, debt service of the federally-assisted mortgage, operating expenses and adequate reserves) does not exceed the "Federal cost limit," the owner would offer the project for sale under § 248.157 for a price (including assumption of the federally-assisted mortgage) that may not exceed the transfer preservation value. The first 12 months of the sale period would be restricted to "priority purchasers," i.e., resident councils organized to purchase the project under a homeownership program, or any nonprofit organization or State or local agency that agrees to maintain low income affordability restrictions for the remaining useful life of the project. If, at the end of the 12-month period, the owner does not accept any bona fide offer from a priority purchaser, the owner must offer the project for sale to any qualified purchaser, including priority purchasers, for 3 months. If an offer to purchase is accepted, HUD would provide incentives, grant assistance, or both, sufficient to enable the purchaser to acquire the project, pay debt service on the federally-assisted mortgage and on any rehabilitation loan, meet operating expenses and establish adequate reserves, receive a return of 8 percent on any cash investment made by the purchaser and, in the case of a priority purchaser, receive reimbursement for transaction expenses. As in the case of an owner that retains the project and receives incentives, the purchaser would be obligated to maintain the project as low income housing for the project's remaining useful life. If the transfer preservation rent exceeds the Federal cost limit, the owner would offer the project for sale under § 248.161. The sale procedure under § 248.161 is similar to that under § 248.157, except that the owner is required to accept any bona fide offer to purchase the project for the transfer preservation value, whereas an owner under § 248.157 may elect not to accept a bona fide offer. Any amount necessary to fund the transfer, over and above incentives that can be supported by project rental income at the Federal cost limit, would be funded by a capital grant under § 248.161(d). Under either § 248.157 or § 248.161, if the owner does not receive a bona fide offer, the owner may prepay the mortgage and terminate the low income affordability restrictions, subject only to certain protections for current tenants.

Under § 248.173, if a project is being offered for sale under either § 248.157 or § 248.161, a "resident council" may seek to purchase the project under a resident homeownership program. HUD would provide grant assistance sufficient to pay the purchase price, transaction expenses, organizational costs, relocation expenses, training costs and establishment of adequate reserves for replacements and, if necessary, operating reserve escrows.

Part 241